

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAYWOOD COUNTY, TENNESSEE, On behalf
of itself and all others similarly situated,

             Plaintiff,

      v.

BANK OF AMERICA, N.A., CDR FINANCIAL
PRODUCTS, FELD WINTERS FINANCIAL LLC,
JP MORGAN CHASE & CO., MORGAN
KEEGAN & CO., INC., PIPER JAFFRAY & CO.,
UBS AG, WINTERS & CO. ADVISORS LLC and
WACHOVIA BANK N.A.,

             Defendants.

**Civil Action No.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



Plaintiff Haywood County, Tennessee, individually and on behalf of itself and all others similarly situated, brings this action against the Defendants named in this Complaint for treble damages and injunctive relief under the antitrust laws of the United States. Plaintiff alleges the following upon information and belief based upon the investigation of counsel, except as to those paragraphs applicable to the named Plaintiff which are alleged upon knowledge, as follows:

## NATURE OF THE CASE

1.    This antitrust class action is brought to recover treble damages and injunctive relief for violations of Section 1 of the Sherman Act. 15 U.S.C. §1. This action is brought on behalf of Plaintiff and a class of all state, local and municipal government entities, independent government agencies and private entities that purchased by competitive bidding or auction Municipal Derivatives directly from a Defendant. or through a broker, at any time from January 1, 1992 through the present in the United States and its territories or for delivery in the United States and

its territories.

2.      The United States Department of Justice's ("DOJ") Antitrust Division, the Internal Revenue Service ("IRS"), and the Securities and Exchange Commission ("SEC") have been investigating collusive practices in the municipal bond industry and a grand jury investigation currently is being conducted by the DOJ, Antitrust Division in the United States District Court for the Southern District of New York. Defendant Bank of America has received conditional amnesty and has agreed to provide the Government with information regarding the conspiracy alleged herein. As part of its agreement with the Government, Bank of America will provide full and complete cooperation in accordance with the terms of the DOJ amnesty program.

3.      Plaintiff alleges that Defendants entered into a contract, combination or conspiracy to not compete and to rig bids for Municipal Derivatives sold to issuers of Municipal Bonds. Defendants have engaged in communications to restrain competition by rigging bids, secretly compensating losing bidders, making courtesy bids, deliberately losing bids, and entering into agreements not to make competitive bids.

4.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have sustained injury to their business and property by: (i) receiving lower interest rates on contracts than they would have in a competitive market; and (ii) paying ancillary fees and other costs and expenses.

## JURISDICTION AND VENUE

5.      This action is instituted under Sections 4 and 16 of the Clayton Act. 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of

2

the violations alleged herein.

6.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.     Venue is proper in this District pursuant to Sections §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 (b), (c) and (d), because during the Class Period the Defendants resided, transacted business, were found, or had agents in this District. Moreover, a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District, and overt acts in furtherance of the alleged conspiracy were undertaken in this District.

## PLAINTIFF

8.     Plaintiff Haywood County, Tennessee purchased one or more Municipal Derivatives from at least one Defendant during the Class Period.

## DEFENDANTS

9.     Defendant Bank of America, N.A., is a Delaware corporation with its principal place of business located at 100 N. Tryon Street, Charlotte, NC 28255. During the Class Period, Bank of America issued and sold Municipal Derivatives to members of the Class.

10.     Defendant JP Morgan Chase & Co. ("JP Morgan") is a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, NY, 10017. During the Class Period, JP Morgan issued and sold Municipal Derivatives to members of the Class.

11.     Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of Regions Financial Corp., is a Tennessee corporation with its principal place of business located at 50 N. Front Street, Memphis, TN 38103. During the Class Period, Morgan Keegan acted as a broker for

members of the Class in purchasing Municipal Derivatives.

12.    Defendant CDR Financial Products ("CDR") is a California corporation with its principal place of business located at 9777 Wilshire Boulevard, Suite 800, Beverly Hills, CA 90212. During the Class Period, CDR acted as a broker for members of the Class in purchasing Municipal Derivatives.

13.    Defendant UBS AG ("UBS") is a Swiss corporation with its principal place of business located at Bahnhofstrasse 45, CH-8090 Zurich, Switzerland. During the Class Period, UBS issued and sold Municipal Derivatives to members of the Class.

14.    Defendant Piper Jaffray & Co, ("Piper Jaffray") is a Delaware corporation with its principal place of business located at 800 Nicollet Mall, Suite 800, Minneapolis, Minnesota 55402-7020. During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to members of the Class.

15.    Defendant Feld Winters Financial LLC ("Feld Winters") is a California limited liability company with its principal place of business located at 15260 Ventura Boulevard, Suite 2220, Sherman Oaks, CA 91403. During the Class Period, Feld Winters acted as a broker for members of the Class in purchasing Municipal Derivatives.

16.    Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business located at 11845 W. Olympic Boulevard, Suite 540, Los Angeles, CA 90064. During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives.

4

17.    Defendant Wachovia ("Wachovia") is a North Carolina corporation with its principal place of business located at 301 S. College Street, Suite 4000, One Wachovia Center, Charlotte, NC. 28288-0013. During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the Class.

## UNNAMED CO-CONSPIRATORS

18.    Various other persons, firms, corporations and John Does 1-100, not named herein as a Defendant or named conspirator, have participated as co-conspirators with the Defendants and have performed acts and made statements in furtherance of the conspiracy.

19.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## FACTS

### A.    Municipal Bonds

20.    Municipal bonds are issued by states, cities, and counties, or their agencies, as well as by private entities, also known as issuers, to raise funds for various types of large public projects, including, for example, the construction and repair of roads, buildings, mass transit, water treatment plants, and power plants. Municipal bonds bear interest at either a fixed or variable rate of interest. The issuer of a municipal bond receives a cash payment at the time of issuance in exchange for a promise to repay the investors who provide the cash payment (the bond holder) over time. Repayment periods typically span several years.

21.    In light of the tax-exempt status of municipal bonds', investors typically accept lower

interest payments. Bonds are an attractive source of financing to many government and private entities because the borrowing rate available in the tax free municipal bond market is frequently lower than what is available through other channels. In order for municipal bonds to maintain their tax-exempt status, IRS regulations governing the bonds generally require all money raised by a bond sale to be spent on one-time capital projects within three to five years of issuance.

22.    Municipal bond proceeds are typically placed into three types of funds: (i) a project fund or construction fund which is used to pay for the construction or public works project at hand; (ii) a "sinking fund" which contains the money used to make principal and interest payments on the bond; or (iii) a debt service reserve fund which ensures that if unforeseen contingencies occur, debt obligations can still be paid.

23.    The municipal bond industry is extremely large. In 2006, approximately $385 billion worth of municipal bonds were issued. The total United States municipal bond market itself presently is valued at approximately $2.6 trillion.

## B.    Municipal Derivatives

24.    A "Municipal Derivative" is one of a variety of tax-exempt vehicles that government entities use to invest the proceeds of bond offerings in their possession.

25.    Municipal Derivatives, typically sold to government entities, are provided by highly rated insurance companies and large commercial and investment banks. Municipal derivatives are a particularly favored form of investment in the municipal bond industry because they are considered safe and reliable investment vehicles.

26.    When purchasing a municipal derivative government entities typically engage a broker to obtain the best possible price for such derivatives by arranging an auction among multiple providers of Municipal Derivatives.

6

27.     Municipal Derivatives are grouped generally into two categories, pertaining either to: (i) the investment of bond proceeds, or (ii) the bond's underlying interest rate obligations. The former category of Municipal Derivatives includes instruments such as Guaranteed Investment Contracts ("GICs") (forward purchase, supply, or delivery agreements and repurchase agreements) and escrow agreements. The latter category of Municipal Derivatives includes instruments such as Swaps, Options, "Swaptions," Collars, and Floors, which are risk-shifting vehicles.

28.     A GIC is an agreement secured by a contract with a financial institution which guarantees a fixed rate of return and a fixed date of maturity. GICs also can mean any unallocated group contract, investment contract, funding agreement, guaranteed interest contract or other similar instrument in which a provider agrees to guarantee a fixed or variable rate of interest or a future payment that is based on an index or similar criteria. It is payable at a predetermined date on monies that are deposited with the company. The types of investment agreements that the IRS generally references as GICs are: (i) Forward Purchase or Forward Delivery Agreements; (ii) Repurchase Agreements or Collateralized GICs; and (iii) Unsecured or Uncollateralized GICs.

29.     A Forward Purchase or Forward Delivery Agreement is often used in connection with debt service funds. Issuers request bids based on rate of return or on upfront payments. In other words, the buyer and seller agree to settle their respective obligations at some specified future date based upon the current market price at the time the contract is executed. These contracts are generally entered into in the over-the-counter markets.

30.     A Repurchase Agreement or "Collateralized GIC" is an agreement consisting of two simultaneous transactions. The issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces an agreed-upon rate of return.

31.    An Unsecured or Uncollateralized GIC does not involve associated securities. Instead, they function like a savings account. They are frequently for construction or project funds. In the bidding process, the issuer sets forth a proposed draw-down schedule in situations where it wants to spend all of the bond proceeds, for example, within a three-year period.

32.    An Advance Refunding Escrow pertains to an arrangement by which the proceeds of the refunding issue are deposited into an escrow account for investment in an amount sufficient to pay the principal of and interest on the issue being refunded on the original interest payment and maturity dates.

33.    A Swap is a type of agreement frequently used with respect to interest rate obligations. It is the sale of an instrument and the simultaneous purchase of another instrument for purposes of enhancing the investor's holdings. There are at least three types of swaps: (i) floating-for-fixed interest swap; (ii) fixed-for-floating interest swap; and (iii) floating-for-floating (basis-rate) swap, where the two are based on different indices such as LIBOR or BMA.

34.    An Option is much like an option on a securities transaction as it involves one of two types: (i) a Put Option; or (ii) a Call Option. A Put Option is a provision in a bond contract where the investor has the right, on specified dates after required notification, to surrender the securities to the issuer or the issuer's agent at the predetermined price. A Call Option is a transaction where the issuer repays to the holder of an outstanding security the principal amount thereof as a result of the issuer exercising a right under the bond contract to repay the security prior to its scheduled maturity date.

35.    A "Swaption" is the combination of a Swap and an Option.

36.    A Floor is an agreement by the issuer to pay a stated rate of interest even if the actual rate on the variable rate debt is lower. The interest rate floor agreement is entered into with a third-party who typically pays the issuer an upfront fee in exchange for the right to collect the difference

8

between the interest rate floor and the actual lower rate on the debt. In other words, a Floor agreement establishes, for an issuer of variable rate bonds, a minimum or "floor" rate of interest that the issuer will effectively pay, though the bonds themselves may state a different minimum rate.

37.     A Collar is an agreement by the issuer or obligor of variable rate debt combining an interest rate cap and an interest rate floor. The Collar establishes the effective minimum rate of interest that the issuer will pay. The cap component "caps" or establishes a maximum rate of interest the issuer will effectively pay, which again may vary from the maximum stated rate of interest on the variable rate debt.

38.     The Municipal Derivatives industry is very large and a substantial portion of the approximately $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives. The Municipal Derivatives industry is comprised of approximately 20 major providers of Municipal Derivatives in the United States. With respect to GICs, there are 10 to 12 major dealers in the United States. Issuers, on the other hand, number in the tens of thousands.

## C.     IRS Rules And Regulations

39.     IRS rules and their corresponding regulations subject issuers to potential taxation from arbitrage off of their tax-exempt bond proceeds, subject to certain exceptions. *See* Internal Revenue Code § 148(a); Internal Revenue Code §§ 148(c), (d) an (e) (enumerating exceptions to this principle). If the yield from the municipal derivative exceeds the bond's yield by a certain amount, it will be deemed arbitrage and be subject to taxation.

40.     The purpose of the rules and regulations governing arbitrage is to limit issuers' ability to take advantage of tax exempt rates on municipal bonds by investing the bond proceeds at higher, non-tax exempt rates. The rules and regulations, therefore, require all interest that exceeds the bond rate made on tax exempt bond investments to be rebated to the IRS, absent an exception.

9

41.    IRS regulations also ensure a competitive marketplace for GICs by creating a fair

bidding process. *See* Treasury Reg. § 1.148-5(d)(6). The central regulations include the following:

      a.    The bid specifications must be in writing;

      b.    The bid specifications must be timely forwarded to potential providers;

      c.    The bid specifications must contain all material terms (i.e., the term directly or indirectly affects yield);

      d.    The bid specifications must state that by submitting a bid, the potential provider is representing that it has not consulted with other potential providers, that its bid was not submitted solely as a courtesy bid, and that the bid was determined without regard to an agreement with another issuer or other person;

      e.    The bid specifications must be commercially reasonable;

      f.    There must be a legitimate business purpose for all terms in the bid specifications other than solely to increase the price or reduce the yield;

      g.    The bid specifications must contain a reasonably expected draw down schedule;

      h.    All potential providers must have an equal opportunity to bid, and no potential provider can have a last look to review other bids before bidding; and

      i.    The issuer must receive at least three bids from solicited providers.

42.    These rules were designed to provide a fair, competitive, and transparent process for

issuers to obtain the best possible price for tax-exempt municipal derivatives.

## D.    Defendants' Anticompetitive Conduct

43.    During the Class Period, Defendants entered into a continuing contract, combination

or conspiracy to unreasonably restrain trade and commerce in the United States in violation of

Section 1 of the Sherman Act. 15 U.S.C. §1.

44.    Defendants have combined and conspired to allocate customers and fix or stabilize the

10

prices of Municipal Derivatives, including the interest rates paid to issuers on such derivatives, sold in the United States through agreements not to compete and acts of bid rigging.

45.    Defendants knowingly and intentionally engaged in these rigged auctions.    In furtherance of their contract, combination or conspiracy, Defendants directly discussed with each other the terms prior to submitting their bids.

46.    Defendants also communicated indirectly through one or more means by suggesting the terms of their respective bids.

47.    Defendants engaged in complementary trades to compensate other Defendants who either did not submit bids or who engaged in sham bids. On occasion, a winning bidder would compensate one or more bidders for agreeing not to submit a competitive bid.

48.    Defendants have knowingly participated in an unlawful contract, combination or conspiracy not to compete and to rig bids in order to win the favor of other Defendants and share in the profits of the conspiracy. This conduct was in breach of their fiduciary and other duties as agents for Plaintiff and members of the class during the bidding process.

49.    The interconnected nature of the Municipal Derivatives industry facilitated and reinforced the conspiratorial conduct alleged herein, leading to the massive, multi-agency government investigation. As *The Bond Buyer* reported on November 21, 2006:

> "The industry tends to be quite intertwined and interconnected," said Willis Ritter, a partner at Ungaretti & Harris here. "Virtually all the major houses are involved in selling [GICs], so if you think you've found something about one, you suspect you're going to find it about all of them."

50.    The existence of the unlawful contract, combination or conspiracy occurred through

communications among marketing personnel employed in the municipal bond/derivative market. These individuals have participated in direct communications with competitors with respect to the following, *inter alia:*

      a.    the rigging of bids, including the collusive suppression of interest rates paid to issuers on Municipal Derivatives;

      b.    conduct that would be used to limit competition;

      c.    sharing of profits from a winning bid with a losing bidder and other secret compensation of losing bidders;

      d.    bids that would be won by specific Defendants; and

      e.    an exchange of a deliberately losing bid for a future winning bid.

51.    The existence of the unlawful contract, combination or conspiracy occurred through communications among marketing personnel employed in the municipal bond/derivative certain individuals. These individuals have participated in direct communications with competitors with respect to limit competition, rig bids and create the false impression of a competitive environment by:

      a.    submitting courtesy bids to create the appearance of competition where there was none;

      b.    submitting bids known to be unrealistically low and deliberately losing bids;

      c.    submitting bids where only one bid was sufficiently high to make the deal work;

      d.    agreeing to share profits from a winning bid with a losing bidder t o u g h transactions between one another;

      e.    engaging conduct in violation of IRS regulations relating to the bidding process; secret last look agreements; and

      f.    entering into agreements not to bid.

52.    Defendants shared their wrongful profits from the illegal agreement, understanding and conspiracy, by paying kickbacks to broker. For example, CDR had a secret agreement with the provider of a GIC for bonds issued in 1999 by an authority in Gulf Breeze, Florida. The deal allowed CDR to increase its fees if none of $220 million in bond proceeds was used for its intended purpose -

affordable housing.

53.     Brokers knowingly participated in the unlawful contract, combination or conspiracy by agreeing: (i) not to compete; (ii) to rig bids in order to limit competition; and (iii) to create the appearance of competition where there was none. Brokers participated in and facilitated the unlawful contract, combination or conspiracy by arranging the allocation of winning bids among the Defendants. Brokers engaged in conspiratorial communications concerning:

    a.     winning bids that would be allocated to Defendants;

    b.     confirming understandings that bids would be won by Defendants;

    c.     confirming understandings that bids would be lost by Defendants;

    d.     the fact that bids were being rigged; and

    e.     bid levels that would be necessary by Defendants to win or lose a bid.

54.     Individuals who have engaged in the unlawful contract, combination or conspiracy include, *inter alia*:

    a.     Douglas Campbell, a former co-conspirator Bank of America sales team manager who also formerly worked at Piper Jaffray;

    b.     Dean Pinard, former manager of co-conspirator Bank of America's derivatives department;

    c.     James Hertz, former vice-president in JP Morgan's tax-exempt capital markets group;

    d.     Stephen Salvadore, Managing Director of municipal capital markets and derivatives at Bear Stearns;

    e.     Jay Saunders, who worked in the derivatives marketing department at Wachovia;

    f.     Martin McConnell, who worked in the derivatives marketing department at Wachovia;

    g.     Peter Ghavai, former Managing Director and co-manager in UBS's municipal derivatives group;

    h.     Patrick Marsh, Managing Director of Deutsche Bank's municipal restructuring unit, who had worked at Bear Stearns;

    i.     Shlomi Raz, a banker who formerly worked at JP Morgan; and

    j.     Samuel Gruer, former vice-president in JP Morgan's tax-exempt capital markets group.

       k.     James Towne, former Managing Director of Defendant Piper Jaffray's municipal derivatives group;

       l.      David Lail, who worked in Baum's derivatives department; and

      m.    Mary Packer, president of PackerKiss.

55.     The conspiracy has been facilitated through intercompetitor contacts at trade associations such as the International Swaps & Derivatives Association ("ISDA") whose members include Bank of America, JP Morgan, Bear Stearns, Societe Generale, UBS, and Wachovia. Another such organization is the American Bankers Association, which includes Bank of America, Morgan Keegan, JP Morgan, UBS, and Wachovia.

56.     One of the numerous instances of bid-rigging and kickbacks is the $453 million GIC that Bank of America provided to the City of Atlanta in 2002, in which CDR acted as the broker and handled the bidding. In a June 28, 2002 e-mail, Douglas Campbell told Phil Murphy that $182,393 was paid to CDR, Piper Jaffray, PaineWebber, and Winters. The payments were described as a bid to build Bank of America's relationship with these companies.

57.     Other examples of bid-rigging and kickbacks exist. The IRS is examining over 20 lease-to-own deals between CDR and Societe Generale, as well as CDR's involvement in California school advance refunding escrows and put option cases from several issuers around the nation. There is evidence of quarterly payments Societe Generale made to CDR for "unspecified services" relating to these lease-to-own deals. The IRS's audits of 21 deals done between 1996 and 2005 now center on bid-rigging and price-fixing issues.

58.     The IRS has scrutinized a $27 million bond sold by Pima County, Arizona's Industry Development Authority to help individuals buy homes. The IRS said it was concerned about quarterly payments made by Societe Generale to CDR, which structured the transaction and evaluated bids for the investment agreement. Records suggest that Defendant FSA was one of the four that bid for that contract.

14

59.     In November of 2006, as part of a settlement with the IRS, it was disclosed that Baum illegally diverted profits on municipal bond deals.  That settlement covered more than $2 billion worth of blind pool deals entered into between 1997 and 2001.  The agency found evidence of big rigging in these deals.  Baum had rigged the deals to allow CDR, who was the winner on many of the deals, to underpay for the GIC and simultaneously overpay for other investment agreement and remarketing fees, diverting arbitrage profits back to Baum.  In one ease, CDR paid a large fee directly to David Lail of Baum.

60.     Bank of America also provided the GIC, on at least one of the Baum transactions targeted by the IRS, a $100 million issue from the Illinois Development Finance Authority sold in 2000 by Rural Enterprises of Oklahoma, Inc.  Rural Enterprises disclosed in July 2003 that the provider of the GIC made a significant hidden payment to Baum.

61.     The objective of the unlawful contract, combination or conspiracy was to artificially suppress interest rates paid on, lower the value of, and reduce and stabilize the market prices of Municipal Derivatives sold by Defendants.

## E.     The Internal Revenue Service Investigation

62.     The IRS was the first agency to launch an investigation of collusive practices in the Municipal Derivatives industry.  Its inquiry initially focused on dozens of municipal bond deals where the providers failed to pay $100 million in taxes by engaging in abusive arbitrage devices.

63.     In 2005, Charles Anderson, field operations manager for the IRS's tax-exempt bond office, publicly stated that "[i]t looks like bid rigging is wider and more pervasive than we thought." Mark Scott, director of the IRS's tax-exempt bond office, publicly stated that "[w]hen a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided."  These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair

15

market value," according to Scott. "We have seen transactions where the winning bid is the only bid high enough to make the deal work." As Scott went on to note, "[t]hat's basically what we've been doing ... is following those, what I like to refer to as 'tentacles of abuse.'"

64.    As the agency's investigation progressed in 2006, Anderson stated that the regulators "think we have evidence of bid rigging." The IRS probe showed that investment contracts were sold at below market rates, according to Anderson. That means lower returns for municipalities and less tax revenue for the IRS. He added, "[p]eople were winning GICs at below fair market values and there were obviously deliberate losing bids by the losing bidders, thereby allowing the winner to win a sweetheart deal."

65.    The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market.

66.    On February 7, 2007, Bank of America announced that it would pay $14.7 million to the IRS for its role in providing GICs in blind pool deals to some state and local government entities.

67.    In addition to the IRS regulations concerning arbitrage, as well as the federal antitrust laws, the IRS regulations governing GIC bidding also have been broken. Besides discovering illegal arbitrage, the IRS has stated that it has come across instances of price-fixing, bid-rigging and kickbacks.

## F.    The Antitrust Division Investigation

68.    The Antitrust Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other Municipal Derivatives. On November 15, 2006, the Federal Bureau of Investigation ("FBI") raided the offices of and seized documents from three Broker Defendants: CDR, IMAGE, and Sound Capital.

16

69. Following the FBI raids, the industry players were served with subpoenas which sought detailed information from the companies dating back to 1992. According to news reports and company filings, the following entities have received governmental subpoenas: GE Funding; GE Trinity; CDR; FSA; FGIC; Security Capital; XL Capital; IMAGE; Sound Capital; FSA; First Southwest; IXIS (and through it, CDC); Kinsell; XL Capital Assurance, Inc.; Societe Generale; Baum; Feld Winters; JP Morgan; American International Group Inc.; Bear Stearns; UBS; Piper Jaffray; Wachovia; Cain Brothers; Morgan Keegan; Shockley; Genworth Financial; and SunAmerica.

70. On December 11, 2006, prosecutors based out of the DOJ, Antitrust Division's New York field office were tasked with investigating the alleged bid-rigging and brought their case to a federal grand jury sitting in the Southern District of New York.

## G. The DOJ Grants Conditional Amnesty to Bank Of America

71. On February 9, 2007, Bank of America, the second largest bank in the United States, announced that it was cooperating with the DOJ's investigation into bidding practices in the municipal bond business in exchange for leniency as part of the DOJ's amnesty program.

72. On February 9, 2007, Bank of America issued a press release and stated the following:

Bank of America Corporation has entered a leniency agreement with the United States Department of Justice in Connection with the Department's investigation into bidding practices in the municipal derivatives industry. This amnesty grant was as a result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation.

The amnesty agreement provides that, in return for the company's continuing cooperation with the Justice Department's investigation, the Justice Department will not bring any criminal antitrust prosecution against the company in connection with matters that the company reported to the Justice Department.

\* \* \*

In addition, in a matter involving the Internal Revenue Service (IRS), Bank of America has agreed to a $14.7 million settlement with the IRS

17

relating to the company's role in providing guaranteed investment contracts and other agreements in connection with certain "blind pool" bond transactions.

73. It was reported that key derivatives officials at the bank were on "administrative leave," including Dean Pinard.

74. On February 28, 2008, Bank of America, in its SEC Form 10-K stated the following:

Municipal Derivatives Matters

The Antitrust Division of the U,S. Department of Justice (DOJ), the SEC, and the IRS are investigating possible anticompetitive bidding practices in the municipal derivatives industry involving various parties, including BANA [co-conspirator Bank of America], from the early 1990s to date. The activities at issue in these industry-wide government investigations concern the bidding process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds. The Corporation has cooperated, and continues to cooperate, with the DOJ, the SEC and the IRS. On February 4, 2008, BANA received a Wells notice advising that the SEC staff is considering recommending that the. SEC bring a civil injunctive action and/or an administrative proceeding "in connection with the bidding of various financial instruments associated with municipal securities." BANA intends to respond to the notice. An SEC action or proceeding could seek a permanent injunction, disgorgement plus prejudgment interest, civil penalties and other remedial relief.

On January 11, 2007, the Corporation entered into a Corporate Conditional Leniency Letter (the Letter) with DOJ. Under the Letter and subject to the Corporation's continuing cooperation, DOJ will not bring any criminal antitrust prosecution against the Corporation in connection with the matters that the Corporation reported to DOJ. Civil actions may be filed. Subject to satisfying DOJ and the court presiding over any civil litigation of the Corporation's cooperation, the Corporation is eligible for (i) a limit on liability to single, rather than treble, damages in certain types of related civil antitrust actions, and (ii) relief from joint and several antitrust liability with other civil defendants.

18

## CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this action on behalf of itself and as a class action under the provisions

of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the

following Class:

> All state, local and municipal government entities, independent
> government agencies and private entities that purchased by competitive
> bidding or auction Municipal Derivatives directly from a Defendant, or
> through a broker, at any time from January 1, 1992 through the present
> in the United States and its territories or for delivery in the United States
> and its territories.

76.    Plaintiff does not know the exact number of class members because such information

is in the exclusive control of the Defendants and the unnamed co-conspirators. Due to the nature of

the trade and commerce involved, Plaintiff believes that there are thousands of Class members, the

exact number and their identities being known by the Defendants and unnamed co-conspirators.

77.    The Class is so numerous and geographically dispersed that joinder of all members is

impracticable.

78.    There are questions of law and fact common to the Class, including:

    a.    Whether Defendants and their co-conspirators engaged in a contract,
          combination or conspiracy among themselves to fix, raise, maintain or stabilize
          prices, and to rig bids or allocate customers and markets of Municipal
          Derivatives;

    b.    The identity of the participants of the alleged conspiracy;

    c.    The duration of the alleged conspiracy and the acts carried out by
          Defendants and their co-conspirators in furtherance of the conspiracy;

    d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15
          U.S.C. § 1;

    e.    Whether the conduct of Defendants and their co-conspirators, as alleged in this
          Complaint, caused injury to the business or property of the Plaintiff and the
          other members of the Class;

     f.       The effect of the alleged conspiracy on the prices of Municipal Derivatives sold in the United States during the Class Period;

     g.      Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the other members of the Class; and

     h.      The appropriate class-wide measure of damages.

79.     Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a purchaser of Municipal Derivatives, and its interests are coincident with, and not antagonistic to, those of the other members of the Class.

80.     Plaintiff is represented by counsel who is competent and experienced in the prosecution of antitrust and class action litigation.

81.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

82.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

83.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

84. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

85. During the Class Period, Defendants and their co-conspirators issued and/or sold Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to class members located in states all across the nation.

## FRAUDULENT CONCEALMENT

86. At all times relevant during the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

87. Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Neither Defendants nor their co-conspirators told Plaintiff or other class members that they were rigging bids. To the contrary, Plaintiff and members of the Class were falsely assured that bids for Municipal Derivatives were fair and competitively priced in compliance with specific IRS rules and regulations that required brokers to obtain at least three commercially reasonable bids. Thus, Plaintiff and Class members could not have discovered the violations alleged herein earlier until shortly before the filing of this Complaint because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

88. Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

21

a.  By meeting secretly to discuss prices, customers and markets of Municipal Derivatives sold in the United States and elsewhere;

b.  By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

c.  By intentionally creating the false appearance of competition by engaging in sham auctions in which the results were pre-determined;

d.  Through covert sharing of profits or other secret compensation paid to losing bidders;

e.  By secretly communicating about bids that would be won or lost by the Defendants;

f.  By paying kickbacks to brokers;

g.  By submitting cover or courtesy bids, or unrealistically low or other artificial bids, and/or deliberately losing bids, to create the appearance of competition where there was none; and

h.  By covert agreements not to bid;

i.  By giving false and pretextual reasons for the pricing of Municipal Derivatives sold during the Class Period, including by falsely describing such pricing as being the result of competitive factors rather than collusion.

j.  Through other schemes and devices which will be learned during discovery.

89.    As a result of Defendants and their co-conspirators' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class's claims have been tolled.

## COUNT I

### (Violation of Sherman Act 15 U.S.C. §1)

90.    Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1-89 herein.

91.    Beginning at least as early as January 1, 1992, and continuing until the present, the exact dates being unknown to the Plaintiff, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy in restraint of trade to artificially fix, raise, maintain, or stabilize prices for Municipal Derivatives in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

22

92.     During the Class Period, Plaintiff and members of the Class purchased Municipal

Derivatives directly from a Defendant or through an agent.

93.     The contract, combination or conspiracy alleged herein has had the following effects,

among others:

   a.     Price competition in the sale of Municipal Derivatives has been restrained,
          suppressed and/or eliminated in the United States;

   b.     Bids charged by Defendants and their co-conspirators to Plaintiffs and the
          members of the Class for Municipal Derivatives were fixed, stabilized and
          maintained at non-competitive levels throughout the United States;

   c.     Customers and markets of Municipal Derivatives were allocated among
          Defendants and their co-conspirators;

   d.     Plaintiffs and the other members of the Class received lower interest rates on
          Municipal Derivatives than they would have received in a competitive
          marketplace, unfettered by Defendants and their co-conspirators' collusive and
          unlawful activities; and

   e.     Competition in the sale of Municipal Derivatives was restrained, suppressed
          and eliminated in the United States.

94.     As a direct and proximate result of the unlawful contract, combination or conspiracy,

Plaintiff and the members of the Class have been injured and financially damaged in their business

and property in amounts to be determined.

95.     Plaintiff and members of the class seek injunctive relief, and treble damages and such

other relief that the court deems necessary by reason of the violations alleged herein.

## COUNT II

### (Restitution/Disgorgement/Unjust Enrichment)

96.     Plaintiff incorporates by reference the allegations contained in the preceding

paragraphs of this Complaint.

97.     Defendants benefited from their unlawful acts through the receipt of overpayments by

Plaintiff and other Class members. It would be inequitable for Defendants to be permitted to retain

the benefit of these overpayments, which were conferred by Plaintiff and members of the Class and

retained by Defendants.

98.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of the benefits to Defendants of, or as the result of such overpayments from which Plaintiff and other Class members may make claims on a pro-rata basis for restitution.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays as follows:

A.      That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been *a per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      That judgment be entered for Plaintiff and members of the Class against Defendants for treble damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees and expenses;

D.      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.      That Plaintiff and members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims

asserted in this Complaint so triable.

Dated: March 24, 2008
      New York, New York

                            **POMERANTZ HAUDEK BLOCK**
                            **GROSSMAN & GROSS LLP**

                          By:

                            Michael M. Buchman (MB-1172)
                            J. Douglas Richards (JDR-6038)
                            100 Park Avenue, 26th Floor
                            New York, New York 10017
                            Telephone: (212) 661-1100
                            Facsimile: (212) 661-8665

                            Michael J. Banks
                            Banks Law Firm
                            108 S. Washington Avenue
                            Brownsville, Tennessee 38012
                            Telephone: (731) 772-5300
                            Facsimile: (731) 772-5302

                            *Attorneys for Plaintiff*