UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 |
| | Master Docket No. 08 Civ. 2516 (VM)(JCF) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
APPOINTMENT OF INTERIM LEADERSHIP STRUCTURE**

Magda M. Jimenez
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022

- *and* -

William Christopher Carmody
SUSMAN GODFREY L.L.P.
654 Madison Avenue, 5th Floor
New York, NY 10065-8440

- *and* –

Robert G. Eisler
COHEN, MILSTEIN, HAUSFELD &
TOLL P.L.L.C.
150 East 52nd Street
Thirtieth Floor
New York, NY 10022

Attorneys for Plaintiffs
(Additional counsel listed in signature block)

## TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................1

II.   PROCEDURAL BACKGROUND ........................................................................3

III.  ARGUMENT.......................................................................................................4

    A.  The Proposed Lead Firms are superbly qualified to represent the proposed class under the factors enumerated in Rule 23(g)(1)(A). ....................................5

        1.  Our investigative work made this lawsuit possible. .................................6

        2.  As Congress intended, we used an innovative technique to identify and advance claims on behalf of the proposed class. ....................................6

            a.  ACPERA ....................................................................................6

            b.  The Agreement with BoA. ........................................................8

            c.  The Pomerantz Firm's suggestion that the Agreement impairs claims of the proposed class is wrong...........................................9

    B.  The Proposed Lead Firms have the requisite experience, knowledge, and resources to manage and prosecute this action on behalf of the proposed class and a strong track record of accomplishment in antitrust class actions. ......................12

        1.  We are experienced in antitrust class actions of similar size and scope...............13

            a.  Cohen Milstein ...........................................................................13

            b.  Boies Schiller............................................................................15

            c.  Susman Godfrey ........................................................................16

        2.  We have unique experience as trial counsel in antitrust class actions. ................17

        3.  We have negotiated landmark settlements in antitrust cases. ...............................19

        4.  We have uncovered antitrust conspiracies before government action. ...............20

    C.  Given the magnitude of this litigation, an Executive Committee would be useful in managing and coordinating the prosecution of this case. ...........................25

IV.   CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   240 F.R.D. 56 (E.D.N.Y. 2006) ........................................................................23

*In re Auction Houses Antitrust Litig.*,
   2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) ...................................................20

*Bell Atlantic Corp v. Twombly*,
   127 S. Ct. 1955 (2007) ....................................................................................22

*In re Benedictin Litig.*,
   857 F.2d 290 (6th Cir. 1988) ............................................................................5

*Billings v. Credit Suisse First Boston Ltd.*,
   127 S. Ct. 2383 (2007) ....................................................................................22

*In re Cargo Shipping Servs. Antitrust Litig.*,
   240 F.R.D. 56 (E.D.N.Y. 2006). ........................................................................6

*In re Lorazepam and Chlorazepate Antitrust Litig.*,
   2003 WL. 22037741 (D.D.C. June 16, 2003) ................................................11

*MacAlister v. Guterma*,
   263 F.2d 65 (2d Cir. 1958) ...............................................................................5

*Parkinson v. Hyundai North America*,
   2006 WL. 2289801 (C.D. Cal. Aug. 7, 2006) ..................................................6

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   2006 U.S. Dist. LEXIS 45727 (S.D.N.Y. 2006) .............................................23

*In re Scrap Metal Antitrust Litig.*,
   2006 W.L. 2850453 (N.D. Ohio, Sept. 30, 2006) ..........................................18

*In re Sulfuric Acid Antitrust Litig.*,
   231 F.R.D. 320 (N.D. Ill. 2005) ........................................................................2

*In re Vitamins Antitrust Litig.*,
   2000 WL 1737867 (D.D.C. Mar. 31, 2000) .................................................3, 20
   1999 WL 1335318 (D.D.C. Nov. 23, 1999) ...................................................11

Pursuant to Federal Rule of Civil Procedure 23(g)(3), Plaintiffs Fairfax County, Virginia; the State of Mississippi; the Mayor and City Council of Baltimore; the City of Chicago; the City of Fall River, Massachusetts; the Charleston County School District; Berkeley County, South Carolina; Central Bucks School District; and Hinds County, Mississippi and the undersigned counsel, respectfully request that this Court: (1) appoint Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein"), Boies, Schiller & Flexner LLP ("Boies Schiller"), and Susman Godfrey L.L.P. ("Susman Godfrey") (collectively the "Proposed Lead Firms") Interim Co-Lead Counsel for the proposed class; and (2) authorize Interim Co-Lead Counsel to appoint an Interim Executive Committee to assist them. We also submit this memorandum in opposition to the separate motion filed by the Pomerantz Haudek Block Grossman & Gross law firm (the "Pomerantz Firm") seeking appointment as interim lead counsel.

## I.    INTRODUCTION

This case involves an unlawful conspiracy among 40 corporate defendants and others to illegally rig bids, limit competition, and fix prices in the trillion-dollar municipal derivatives market. Defendants' illegal conduct has caused issuers of municipal bonds—and thus taxpayers—throughout the United States untold losses.

The Proposed Lead Firms submit that absent their exhaustive investigation over the past 18 months, this litigation might well never have been brought. A press report appeared in January, 2005 that disclosed that agencies of the United States had begun investigating industry participants,[1] but no plaintiff filed a private antitrust action until plaintiffs represented by Cohen Milstein and Boies Schiller sued in the District of Columbia on March 12, 2008. These initial Complaints were facilitated by an innovative cooperation agreement ("the Agreement") (attached as Exhibit B) with admitted conspirator Bank of America ("BoA") that gave the

---

[1] Emily Newman and Lynne Hume, *IRS Steps Up Probe Of GIC Bid-Rigging, Justice, SEC Also Looking At Abuses*, BOND BUYER, Vol. 351 (Jan. 7. 2005), attached as Exhibit A.

Proposed Lead Firms a crucial roadmap of Defendants' complex conspiracy.  Absent BoA's

cooperation, prospective plaintiffs would have had access only to the sparse publicly available

information about the conspiracy, and any complaints filed on the basis of that information

alone would likely have been vulnerable to motions to dismiss.

In September 2007, BoA, an admitted conspirator that entered into the United States

Department of Justice's ("DOJ") antitrust corporate leniency program, agreed to cooperate with

the Cohen Milstein firm (which had been investigating this case for months) and entered into a

process of disclosure and exploration of settlement.[2]  The Proposed Lead Firms leveraged BoA's

obligations under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004

("ACPERA")[3] to obtain the specific information about Defendants' conspiracy that made this

suit possible—information that the Pomerantz Firm incorporated in its own Complaint before

questioning the propriety of the Agreement that produced it.  The Agreement appears to be

unique,[4] but the Proposed Lead Firms submit that it should serve as a model for plaintiffs in

future cases, and that the Pomerantz Firm's criticism of the Agreement is misplaced.

The Agreement provides for a mediated disclosure and settlement process with BoA

before the Hon. Daniel Weinstein, a well-respected former California state judge and nationally

prominent mediator with JAMS.  But no settlement has yet been reached.  The Agreement

---

[2] Recognizing the scope of the effort that will be required to bring this huge, complex case to a successful resolution, Cohen Milstein and Boies Schiller, which led the mediation process with BoA from its inception and filed the first complaints, later asked Susman Godfrey—their co-lead counsel in the *Vitamins* case—to work with them in developing and pursuing these claims. Susman Godfrey has since invested substantial time and resources in doing so.  Both Boies Schiller and Susman Godfrey—and their clients—have embraced and executed the Agreement with BoA, recognizing the benefit it offers plaintiffs in these actions.

[3] H.R. 1086, 108th Cong., Title II, §§ 201-221 (2004).

[4] There was a similar ACPERA-based cooperation agreement in *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 320 (N.D. Ill. 2005).  But *defendants* proposed that agreement long after suit was filed; it did not facilitate the investigation and filing of the suit.  *See In re Sulfuric Acid Antitrust Litigation*, MDL No. 1536, Case No. 03 C 4576, "Cooperating Defendants' Memorandum of Law in Support of Agreed Motion for Satisfactory Cooperation Pursuant to the Act", at p. 3 (June 30, 2005).  Defendants in other cases, such as Degussa Corporation in *In re Hydrogen Peroxide Antitrust Litig.*, No. 05-666 (E.D. Pa.), have cooperated informally.

2

further provides that, so long as BoA provides full cooperation, the settlement talks will be governed by the provisions of ACPERA.

As noted above, the Agreement made these suits possible. Indeed, despite publicized criminal investigations into this industry, their retention of industry experts and economists, and purported months of factual investigation, the other firms applying for appointment as Lead Counsel were unable to file claims on behalf of their clients until after our clients sued. The Pomerantz Firm filed two weeks later, and Lieff Cabraser Heimann and Bernstein ("Lieff") filed six weeks later; both draw their descriptions of the conspiracy essentially verbatim from our pleadings. Hausfeld Decl. at ¶¶ 16-24.

The Proposed Lead Firms have already materially advanced the claims of the proposed class by uncovering the underlying conspiracy and identifying the defendants involved and are superbly qualified to represent the proposed class under the criteria established for selection of lead counsel by Fed. R. Civ. P. 23(g)(1)(A). We have the experience, knowledge, skill, and resources to litigate this matter effectively and efficiently, as we demonstrated in the *Vitamins Antitrust Litigation* where, working together as co-lead counsel, we secured what Judge Hogan described as an "unprecedented" $1.1 billion settlement for the class. *See In re Vitamins Antitrust Litig.*, Case No. 99-197 TFH, 2000 WL 1737867, at *2 (D.D.C. Mar. 31, 2000) (noting that the "total dollar value to the class is the largest settlement of a price fixing class action" in history).

## II.    PROCEDURAL BACKGROUND

Cohen Milstein began investigating anticompetitive conduct in the municipal derivatives industry approximately 18 months ago and, together with Boies Schiller, began confidential discussions with BoA, overseen by Judge Weinstein, about 11 months ago. Those discussions led directly to Cohen Milstein's and Boies Schiller's March 12, 2008 filing of the lawsuits against BoA and its co-conspirators in the United States District Court for the District of Columbia, styled *Fairfax County, Virginia, et al., v. Packerkiss Securities, Inc., et al.*, Case No. 08-432(JR) (D.D.C),

3

and *Fairfax County, Virginia, et al., v. Bank of America*, Case No. 08-433 (JR) (D.D.C.).[5]

Since the Proposed Lead Firms filed the initial suits, five copycat actions have been filed: (1) *Hinds County, Mississippi v. Wachovia Bank, N.A., et al.*, Case No. 08-2516 (VM) (S.D.N.Y.) (filed March 13, 2008); (2) *Haywood County, Tennessee v. Bank of America, N.A., et al.*, Case No. 08-3002 (VM) (S.D.N.Y.) (filed March 24, 2008); (3) *City of Oakland, California v. AIG Financial Products Corp., et al.*, Case No. 08-2116 (SBA) (N.D. Ca.) (filed April 23, 2008); (4) *Central Bucks School District v. Bank of America N.A.*, Case No. 08-955 (RJL) (D.D.C.) (filed June 4, 2008); and (5) *Central Bucks School District v. Wachovia Bank N.A., et al.* Case No. 08-955 (JR) (D.D.C.) (filed June 4, 2008). The complaints in those actions draw heavily upon our initial complaints.

On June 16, 2008, the Judicial Panel on Multidistrict Litigation ("JPML") sent all related actions to this District and ordered that they, along with any subsequently filed related actions, be assigned to this Court for coordinated or consolidated pretrial proceedings. This Court has consolidated the *Fairfax County, Hinds County,* and *Haywood County* actions. *See* "Order" (June 23, 2008) (D.I. 52).). The *City of Oakland* action is subject to a JPML Conditional Transfer Order and we expect that the other actions will be transferred as well.

## III.    ARGUMENT

Rule 23 of the Federal Rules of Civil Procedure provides that a court "may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3). The Advisory Committee notes to Rule 23(g)(2)(A) explain that the rule "authorizes [a] court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class." The *Manual for Complex Litigation (Fourth)* (2004) elaborates:

---

[5] On July 3, 2008, Susman Godfrey and Cohen Milstein filed two additional actions on behalf of the City of Baltimore in this District: *Mayor and City Counsel of Baltimore v. Bank of America, N.A.*, Case No. 08-6140 (UA) (S.D.N.Y.) and *Mayor and City Counsel of Baltimore v. Wachovia Bank, N.A., et al.*, Case No. 08-6142 (UA) (S.D.N.Y.).

> If . . . there are a number of overlapping, duplicative, or competing suits pending in other courts, and some or all of those suits may be consolidated, a number of lawyers may compete for class counsel appointment. *In such cases, designation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities,* such as making and responding to motions, conducting any necessary discovery, moving for class certification and negotiating settlement.

Manual § 21.11 (emphasis added).

In complex cases, a district court can, and customarily does, appoint lead counsel to coordinate the prosecution of the case. *See, e.g., In re Benedictin Litig.,* 857 F.2d 290, 297 (6th Cir. 1988), *cert denied,* 488 U.S. 1006 (1989). "The benefits achieved by consolidation and the appointment of general counsel, *i.e.,* elimination of duplication and repetition and in effect the creation of a coordinator of diffuse plaintiffs through whom motions and discovery proceedings will be channeled, will most certainly redound to the benefit of all parties to the litigation." *MacAlister v. Guterma,* 263 F.2d 65, 69 (2d Cir. 1958).

Here, approval of the proposed interim leadership structure will both make for efficient prosecution of this action pending a decision on class certification and facilitate the ongoing mediation process, a critical and time-sensitive pre-trial activity the Proposed Lead Firms have handled for almost a year. *See* Fed. R. Civ. P. 23(g)(2)(A) advisory committee's note. It will assure all parties that these firms are empowered to act on behalf of the proposed class, which will further the ongoing settlement talks with BoA and certain other defendants.

### A. The Proposed Lead Firms are superbly qualified to represent the proposed class under the factors enumerated in Rule 23(g)(1)(A).

Each Proposed Lead Firm is superbly qualified under the criteria set forth in Rule 23(g)(1)(A), which sets forth four factors that courts are to consider in appointing class counsel: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). Courts appointing

*interim* class counsel also apply those factors. *See, e.g., Parkinson v. Hyundai North America*, Nos. CV06-345(AHS), 2006 WL 2289801, at *2 (C.D. Cal. Aug. 7, 2006); *In re Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006).[6] These factors strongly support appointing the Proposed Lead Firms as interim co-lead counsel.

### 1. *Our investigative work made this lawsuit possible.*

The Proposed Lead Firms have been investigating allegations of anticompetitive activity in the municipal derivatives market for at least 18 months. Declaration of Michael Hausfeld ("Hausfeld Decl.") at ¶ 2 (attached as Exhibit C). As a result of that work—including BoA's cooperation Agreement—we learned enough about the conspiracy to file claims on behalf of the proposed class. *Id.* And we have engaged with BoA and preliminarily with other defendants in confidential discussions. *Id.* We have also invested significant resources to retain experienced, knowledgeable economists to prepare damages models to use in these discussions. *Id.*

Our efforts have advanced the proposed class' interests in a way and to an extent that exceeds the efforts of any other plaintiffs' counsel in these actions and weighs heavily in favor of naming the Proposed Lead Firms interim lead counsel.

### 2. *As Congress intended, we used an innovative technique to identify and advance claims on behalf of the proposed class.*

The Proposed Lead Firms' ability to enter an agreement obligating BoA to cooperate with plaintiffs was the key to getting this action off the ground. Our use of this innovative technique has benefited the proposed class and materially advanced its claims by uncovering facts probative of a conspiracy in the complicated and relatively opaque municipal derivatives market.

#### a. *ACPERA*

In 2004, Congress enacted ACPERA to provide an "additional incentive for corporations

---

[6] These cases refer to the factors contained in former rule Fed. R. Civ. P. 23(g)(1)(C), which was renumbered to Fed. R. Civ. P. 23(g)(1)(A) by the December 1, 2007 Amendments to the Federal Rules of Civil Procedure.

to disclose antitrust violations by limiting their liability in related civil claims to actual damages."
*See* 150 Cong. Rec. H3654-01 at H3657 (Statement of Rep. Sensenbrenner). Without ACPERA,
"the threat of exposure to a possible treble damage lawsuit" was a "major disincentive" to
corporations approaching DOJ regarding the Antitrust Division's Corporate Leniency Program.
*See* Cong. Rec. S3610-02 at S3614 ("[b]efore voluntarily disclosing its criminal conduct, a
potential amnesty applicant must weigh the potential ruinous consequences of subjecting itself to
liability for three times the damages the entire conspiracy caused.") (Statement of Sen. Hatch).

   ACPERA removed that "disincentive" to self-report by offering a "significant incentive"
for whistle-blowing leading to increased participation in its amnesty program, which it considers
the single most effective tool for cartel detection, prosecution, and deterrence.[7]  Indeed, the DOJ
stated that ACPERA would "greatly enhance" one of the Antitrust Division's "core missions, its
anti-cartel enforcement program": "The de-trebling provision of [ACPERA] removes a major
disincentive for submitting amnesty applications, encouraging the exposure of more cartels, and
making the Division's Corporate Leniency Program even more effective."[8]

   ACPERA limits a cooperating party's civil damages to "actual damages . . . attributable to"
that party's conduct and provides:

> . . . in any civil action alleging a violation of section 1 or 3 of the Sherman Act . . .
> based on conduct covered by a currently effective antitrust leniency agreement,
> the amount of damages recovered by or on behalf of a claimant from an antitrust
> leniency applicant who satisfies the [cooperation requirements] . . . shall not
> exceed that portion of the actual damages sustained by such claimant which is
> attributable to the commerce done by the applicant in the goods or services
> affected by the violation.

---

[7] *See* R. Hewitt Pate, Assistant Attorney General, Antitrust Division, USDOJ, International Anti-Cartel Enforcement, (Nov. 21, 2004) ("[w]e frequently heard that applicants did not apply for amnesty because of the prospect of U.S. treble damage litigation. The removal of this disincentive in fact, the offering of a significant incentive will lead to more amnesty applications in the United States. . ."), *available at* http://www.usdoj.gov/atr/public/speeches/206428.htm.

[8] Press Release, USDOJ, Assistant Attorney General for Antitrust, R. Hewitt Pate, Issues Statement on Enactment of Antitrust Criminal Penalty Enhancement And Reform Act of 2004 (June 23, 2004), *available at* http://www.usdoj.gov/atr/public/press_releases/2004/204319.htm

§ 213(a). This provision has to be read *in pari materia* with Section 212(4), which states that the term "claimant" does not include "a State or subdivision of a State with respect to a civil action brought to recover damages by the State or subdivision."

Nothing in ACPERA precludes claiming all damages suffered by plaintiffs from the non-cooperating defendants, who remain jointly and severally liable for treble damages. *See* 150 Cong. Rec. § 3610-02 at S3615 ("while a party that receives leniency would only be liable for the portion of the damages actually caused by its own actions, [its]co-conspirators would remain jointly and severally liable for the entire amount of damages, which would then be trebled, to ensure that no injured party will fail to enjoy financial redress.") (Statement of Sen. Leahy). Thus, as a practical matter, in this case with many deep-pocketed defendants, ACPERA and the Agreement with BoA described below will not reduce plaintiffs' aggregate potential recovery because the non-cooperating conspirators remain jointly and severally liable for all damages caused by the entire conspiracy, including the acts caused by BoA.

ACPERA defines providing "satisfactory cooperation" to the plaintiffs, to include:

(1)     providing a full account to the claimant of all facts known to the applicant . . . that are potentially relevant to the civil action;

(2)     furnishing all documents or other items potentially relevant to the civil action that are in the possession, custody, or control of the applicant . . . .wherever they are located; and . . .

(3)(B)     . . . using its best efforts to secure and facilitate from cooperating individuals [the cooperation described above].

*See* ACPERA, § 213(b)(1)-(3)(B). The legislative history makes clear ACPERA's provisions require timely and adequate cooperation with both DOJ investigators and civil plaintiffs.[9]

### b.     The Agreement with BoA.

The Agreement benefits plaintiffs by securing BoA's cooperation in settlement or

---

[9] *E.g.*, 150 Cong. Rec. S3610-02 at S3614 ("Importantly, this limitation on damages is only available to corporations and their executives if they provide adequate and timely cooperation to both the Government investigators as well as any subsequent private plaintiffs bringing a civil suit based on the covered criminal conduct.") (Statement of Sen. Hatch).

litigation:

> BoA agrees to provide to Plaintiffs' Counsel and their clients . . . the cooperation
> set forth in Section 213(b) of ACPERA, in conjunction with either their settlement
> of or litigation of claims regarding the municipal derivatives business. Even if no
> settlement is reached during this process, BoA shall still be obligated to provide
> the cooperation set forth in Section 213(b) of ACPERA to Plaintiffs' Counsel and
> their clients in preparation and pursuit of any claim regarding the municipal
> derivatives business.

*See* Exh. 2, at ¶ 12. In return, it was agreed that BoA's liability to our clients would be limited to

actual damages stemming from BoA's unlawful conduct, so long as BoA met ACPERA's

cooperation standard.

Importantly, the Agreement does not impair the aggregate value of the proposed class'

claims because it expressly reserves plaintiffs' rights to seek treble damages from the other

defendants under joint and several liability, based on the harm caused by the entire conspiracy:

> [T]his Agreement does not foreclose any client from seeking additional damages
> above and beyond actual damages related to BoA's conduct from other defendants
> under joint and several liability, as BoA's sales will remain in the case for purposes
> of calculating the potential liability of other defendants in the action; all such
> rights for treble damages from other defendants are specifically reserved by
> Plaintiffs' Counsel on behalf of all of their clients. *Id.*

> c. *The Pomerantz Firm's suggestion that the Agreement impairs claims of the
> proposed class is wrong.*

The Pomerantz Firm suggests the Agreement somehow impairs the claims of the

proposed class because it contemplates limiting BoA's liability consistently with the provisions of

ACPERA. Specifically, it points out that ACPERA's damage limitations do not apply to claims

brought by states and their subdivisions, and complains that Proposed Lead Counsel have

impaired the aggregate value of the proposed class' claims. While it is true that ACPERA's de-

trebling provisions do not apply to states and their subdivisions, the assertion that the proposed

class' interests have been impaired is incorrect.

*First*, not all the members of the proposed class are states or their subdivisions. As to those

who are not, ACPERA's de-trebling provisions would apply to BoA if it meets the other

requirements of the statute, even absent the Agreement.

*Second,* as previously discussed, the proposed class has derived an enormous benefit from the Agreement: without it, there would be no lawsuit. Tellingly, the Pomerantz Firm does not explain why it was unable to file a complaint based on its own investigation before we filed the first cases in the District of Columbia. Nor does it explain why its complaint so closely mirrors the complaints that we prepared based on information provided by BoA—indeed, the Pomerantz Firm's complaint simply parrots verbatim many of the substantive allegations of our first-filed Complaints, including allegations derived from BoA's cooperation pursuant to the Agreement.

*Third,* the proposed class' claims have not been impaired because this Court, of course, must review and approve any proposed settlement. *See* Fed. R. Civ. P. 23(e)(1)-(4). Any dissatisfied class member can object to any settlement. *See* Fed. R. Civ. P. 23(e)(5). Thus, the concern that the class' ability to evaluate any settlement with BoA will somehow be impaired if the Pomerantz Firm is not in the lead counsel group is unfounded. Every plaintiff in the class— whoever its lawyer—can be heard in connection with any settlement, and can object if it deems the terms unfair. Moreover, any damages limitations under ACPERA and the Agreement are expressly conditioned upon BoA's proving to the Court that it has provided "satisfactory cooperation" throughout this civil litigation.[10]

*Fourth,* nothing in the Agreement reduces the aggregate value of the proposed class' claims because any settlement with BoA would leave the remaining defendants jointly and severally liable for treble damages for the unlawful conduct *of the entire cartel, including BoA.* This is expressly set forth in Paragraph 12 of the Agreement and is the result that Congress intended. As a practical matter, were BoA to pay only single damages, the remaining defendants—including some of the richest companies in the world—could satisfy settlement or judgment for treble damages for the entire conspiracy's unlawful acts.

---

[10] *See* ACPERA, § 213(b) (stating that an antitrust leniency applicant satisfies the de-trebling provisions if "the court in which the civil action is brought determines, after considering any appropriate pleadings from the claimant, that the applicant or cooperating individual, as the case may be, has provided satisfactory cooperation to the claimant with respect to the civil action. . .").

*Fifth*, the Agreement confers no improper benefit upon BoA. While it is true that ACPERA's de-trebling provisions do not apply to civil damages claims brought by a "State or subdivision of a State"—a description covering some, but not all, members of the proposed class—this argument misses the point. In conspiracy cases where defendants face the prospect of joint and several liability and plaintiffs seek information to advance their claims, the first defendant to cooperate routinely receives more favorable terms than later-settling defendants.[11] This is consistent with the principles behind ACPERA and the DOJ's Corporate Leniency Policy: each confers a significant benefit upon a whistle-blowing cartel member that self-reports.

Here, despite publicized criminal investigations into this industry, it was not until the Proposed Lead Firms investigated and obtained the Agreement that it became possible for the proposed class to file claims. This is the same type of benefit to the public that the Department of Justice regularly promotes through the use of its criminal amnesty program. Thus, as shown by the documented results, the Agreement provides only a benefit to the proposed class.

The Pomerantz Firm's argument would deprive civil plaintiffs of the advantages of early cooperation agreements. The DOJ has explained that its amnesty program, which provides blanket amnesty from criminal prosecution to cooperating defendants, has become the key to antitrust law enforcement. *See* 2004 WL 234125, at *20 (U.S. Feb. 3, 2004), Brief for the United States as Amicus Curiae submitted in *F. Hoffman-LaRoche LTd. v. Empagran, S.A.*, 542 U.S. 155 (2004) (DOJ's amnesty program has been responsible for "cracking more international cartels than all of the Division's search warrants, secret audio or videotapes, and FBI interrogations *combined*") (emphasis in original). Denying civil plaintiffs the discretion to enter cooperation

---

[11] In these complex cases, early cooperation and settlement benefit all parties and the Court, and should be encouraged. *See In re Lorazepam and Chlorazepate Antitrust Litig.*, 2003 WL 22037741 at *84, (D.D.C. June 16, 2003) (early settlement of these types of cases is encouraged); *In re Vitamins Antitrust Litig.*, 1999 WL 1335318 at *4 (D.D.C. Nov. 23, 1999) ("The pursuit of early settlement is a tactic that merits encouragement; it is entirely appropriate to reward expeditious and efficient resolution of disputes").

agreements before filing or early in litigation would hamper civil enforcement of the antitrust laws and deprive private plaintiffs of a tool that the Antitrust Division has demonstrated is immensely valuable and that Congress explicitly intended to make available to private plaintiffs.

Finally, the overwhelming majority of the firms representing plaintiffs in these actions have endorsed the Agreement despite the Pomerantz Firm's post-filing dissent. These firms recognize the value and appropriateness of that Agreement in these circumstances. It is also telling that this valuable Agreement has been criticized, not because of the cooperation or lack thereof provided by BoA, but primarily as a tool to advance an application for lead counsel.

**B. The Proposed Lead Firms have the requisite experience, knowledge, and resources to manage and prosecute this action on behalf of the proposed class and a strong track record of accomplishment in antitrust class actions.**

The Proposed Lead Firms possess the requisite experience, knowledge, size, and resources to skillfully and efficiently handle this litigation on behalf of the proposed class. Both individually and together, we have served as lead counsel in such cases and will be able to draw upon our experience and resources to represent Plaintiffs and the proposed class in this litigation. A summary of our qualifications is provided below and further factual detail is provided in the attached Declarations of Michael Hausfeld, William Isaacson, and Marc Seltzer.[12]

We have demonstrated an ability to serve successfully as lead counsel in similarly large and complex antitrust class actions. Specifically, we served as co-lead counsel in the *Vitamins Antitrust Litigation*, not only obtaining a $1.1 billion settlement, but also winning a $148.5 million jury verdict after trial against four non-settling defendants.

---

[12] *See* Exhibit C (Hausfeld Decl.). The Declaration of Mr. Isaacson ("Isaacson Dec.") is attached as Exhibit D; and the Declaration of Mr. Seltzer ("Seltzer Dec.") is attached as Exhibit E.

### 1. *We are experienced in antitrust class actions of similar size and scope.*

#### a. *Cohen Milstein*

Cohen Milstein has 78 attorneys in six offices; it opened offices in San Francisco and London during 2007. It also has offices in Washington, New York, Philadelphia, and Chicago.

Michael Hausfeld of Cohen Milstein is regarded as one of the country's top civil litigators. He was recently recognized as one of the "Top 100 Influential Lawyers in America," by the *National Law Journal.* Chief Judge Edward Korman of the Eastern District of New York has stated that Mr. Hausfeld is one of the two "leading class action lawyers in the United States." Furthermore, the *New York Times* has referred to Mr. Hausfeld as one of the "most prominent antitrust lawyers" in the nation. Mr. Hausfeld is featured in *Done Deal* (Platinum Press 2005) as one of the world's best negotiators. In 2003, Mr. Hausfeld was the only private attorney permitted to attend the European Commission's closed hearings in the Microsoft antitrust investigation, where he represented the interests of consumers worldwide.

Cohen Milstein's current CV is attached as Exhibit 1 to the Hausfeld Decl. and lists the many antitrust class actions where Cohen Milstein has served as co-lead counsel, including the *Rubber Chemicals Antitrust Litigation*, where settlements of $320 million were ultimately obtained, and *Domestic Air Transportation Antitrust Litig.*, where settlements of travel discounts and cash valued at $458 million were ultimately obtained. Cohen Milstein has more than 35 years of experience litigating some of the nation's most complicated antitrust cases and recovering billions of dollars in overpayments made by its clients to monopolists, price-fixers, and other violators of the antitrust laws. *See* Hausfeld Decl., Exh. 4. In 2002 and 2003, the *National Law Journal* named Cohen Milstein one of the top 25 plaintiffs' firms in the nation, and in 2006, named Cohen Milstein one of the top 11 plaintiffs' firms in the nation.

A substantial portion of Cohen Milstein's practice—indeed, its largest practice group—is devoted to antitrust class actions. Cohen Milstein has served or is serving as lead counsel in many important antitrust cases, including the following:

- *In re International Air Transportation Surcharge Antitrust Litigation*, MDL No. 1793 (N.D. Cal.). Cohen Milstein is one of the co-Lead Counsel in this action, where preliminary approval has been given to a historic settlement of claims by U.S. and U.K. air passengers who traveled on British Airways and Virgin Airlines, which is valued at $210 million.

- *In re Air Cargo Shipping Services Antitrust Litigation*, MDL No. 1775 (E.D.N.Y.). Cohen Milstein serves as co-Lead Counsel with special responsibility for non-US claims in this action, which involves allegations of price-fixing among air carriers who provide cargo transport services. The firm principally negotiated an $85 million settlement with Lufthansa Airlines, for which approval was sought in July of 2007.

- *Meijer, Inc. v. 3M Co.*, No. 04-5871 (E.D. Pa.). As lead counsel, Cohen Milstein represented a class of direct purchasers of 3M invisible and transparent tape products who alleged that 3M monopolized the relevant market through anticompetitive rebates and other unlawful practices. A settlement of $28.9 million recently received final approval.

- *Kruman v. Christie's International plc*, No. 01-7309 (S.D.N.Y.). Cohen Milstein served as one of three lead counsel on behalf of foreign plaintiffs and obtained a $40 million settlement. This case marked the first time that claims based on foreign transactions were resolved in U.S. court under U.S. antitrust law.

- *In Re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.) Plaintiffs alleged that Bristol Myers-Squibb Company, a producer of the drug BuSpar®, unlawfully maintained a monopoly in violation of federal and state antitrust and unfair competition laws. A $90 million settlement was preliminarily approved in April 2003. Cohen Milstein served as one of four co-lead counsel.

- *In re Relafen Antitrust Litigation*, No. 01-12239-WGY (D. Mass.). Cohen Milstein served as co-lead counsel on behalf of a class of direct purchasers alleging that the defendant drug manufacturer unlawfully extended its monopoly in the U.S. market for Relafen and its generic equivalents by fraudulently procuring an invalid patent and using it to prevent generic competition. The case settled for $175 million.

- *In re Vitamins Antitrust Litigation*, MDL No. 1285 (D.D.C.). Cohen Milstein represented as co-lead counsel two certified classes of businesses who directly purchased bulk vitamins and were overcharged as a result of a ten-year global price-fixing and market allocation conspiracy. Chief Judge Hogan approved four major settlements between certain vitamin defendants and Class Plaintiffs, including a landmark partial settlement of $1.1 billion. And Cohen Milstein tried the case to a $49.5 million jury verdict (trebled to $148.5 million) against four non-settling defendants.

- *Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al.*, Case No. 1:01CV02313 (D.D.C.). Cohen Milstein served as co-Lead Counsel in this case in which plaintiffs alleged that Bristol-Myers Squibb unlawfully monopolized the United States market for paclitaxel, a cancer drug discovered and developed by the United States government, which Bristol sells under the brand name Taxol. Cohen, Milstein's investigation and prosecution of this litigation on behalf of direct purchasers of Taxol led to a settlement of $65,815,000 that was finally approved by U.S. District Judge Emmet G. Sullivan on August 14, 2003 and preceded numerous Taxol-related litigations brought by the FTC and State Attorneys General.

14

- *North Shore Hematology-Oncology Associates, P.C. v. Bristol-Meyers Squibb Co.*, Case No. 1:04CV00248 (D.D.C.). Plaintiffs alleged that Bristol-Meyers Squibb Company unlawfully monopolized the United States market for cisplatin, a cancer drug, in violation of federal antitrust laws. Cohen Milstein's investigation and prosecution of this litigation on behalf of direct purchasers of Platinol led to a settlement of $50 million in November 2004. Cohen Milstein served as lead counsel.

- *Ferko v. National Association for Stock Car Auto Racing, Inc.*, Civ. No. 4:02-CV-50 (E.D. Tex.). Cohen Milstein had a lead role in representing shareholders of Speedway Motorsports, Inc. ("SMI") in a lawsuit challenging NASCAR's refusal to award a second annual Nextel Cup Series ("NCS") race date to SMI's speedway. The suit alleged, among other things, that NASCAR maintained an unlawful monopoly and conspired with a competing speedway company in allocating NCS race dates to speedways.

- *In re Domestic Air Transportation Antitrust Litigation*, MDL No. 861 (N.D. Ga.). As co-lead counsel in this price-fixing case brought against airlines, Cohen Milstein obtained a settlement of travel discounts and cash totaling $458 million for a class of approximately 12 million individuals and businesses.

- *In re Intel Corp. Microprocessor Antitrust Litigation*, MDL No. 1717 (D. Del.) Cohen Milstein is one of the four co-lead counsel in this major antitrust class action involving alleged illegal monopolization of the worldwide x86 microprocessor market.

### b. Boies Schiller

Boies Schiller is one of the most experienced and accomplished law firms in the field of class actions and complex antitrust litigation in the United States, and has a demonstrated ability to prepare and try complex cases to verdict. A copy of the firm's résumé is attached to the Isaacson Decl. as Exh. 1. As that résumé reflects, Boies Schiller's more than 220 lawyers have extensive experience in such cases, having repeatedly (and recently) shown themselves able and willing to prepare and try complex cases to verdict—a significant factor weighing in favor of its appointment as lead counsel. This experience is particularly valuable here, where these large, well financed defendants will vigorously contest Plaintiffs' claims.

Boies Schiller has been lead or co-lead counsel in a number of other significant antitrust class actions, including:

- *In re Auction Houses Antitrust Litigation* (S.D.N.Y.)—Acted as sole lead counsel on behalf of a class of direct purchasers and obtained a settlement of $512 million.

- *In re Vitamins Antitrust Litigation* (D.D.C.)—Acted as co-lead counsel on behalf of a class of direct purchasers and obtained settlements exceeding $1.3 billion (representing more than 30% of the class' purchases of affected products over a ten year period).

- *In re Cardizem Antitrust Litigation* (E.D. Mich.)—Served as co-lead counsel on behalf of direct purchasers of the drug Cardizem; the case settled for $110 million.

- *In re Buspirone Antitrust Litigation* (S.D.N.Y.)—Served as co-lead counsel on behalf of direct purchasers of the drug Buspirone; the case settled for $220 million.

- *In re Terazosin Hydrochloride Antitrust Litigation* (S.D. Fla.)—Served as co-lead counsel on behalf of direct purchasers of the drug Terazosin Hydrochloride; the case settled for $75 million.

- *In re Scrap Metal Antitrust Litigation* (N.D. Ohio)—Serving as sole lead counsel for direct purchasers in securing over $12 million in settlement plus an additional $23 million judgment that was recently affirmed on appeal.

- *In re First Databank Antitrust Litigation* (D.D.C.)—Served as co-lead counsel in $24 million settlement.

- *Meijer, Inc. v. Warner Chilcott* (D.D.C.)—Serving on the lead executive committee on behalf of direct purchasers of the drug Ovcon.

- *In re Graphic Processing Units Litigation* (N.D. Cal.)—Currently serving as sole lead counsel on behalf of a class of direct purchasers of graphic chips

- *In re Vitamin C Antitrust Litigation* (E.D.N.Y.)—Serving as co-lead counsel on behalf of direct purchasers of Vitamin C.

The Boies Schiller partners who will play leading roles should Boies Schiller be selected as lead counsel have substantial antitrust, trial, and class action experience. Isaacson Decl, ¶¶ 5-9.

### c. Susman Godfrey

Beginning with the landmark *Corrugated Container* price-fixing case in 1980, Susman Godfrey has been in the forefront of antitrust and complex class litigation. The firm has recovered hundreds of millions of dollars for plaintiffs, and specializes in taking high-stakes cases to trial and verdict. The firm has devoted more than 25 years to helping businesses and individuals achieve optimal outcomes in some of the biggest and most-publicized commercial lawsuits in the nation. A copy of the firm's résumé is attached to the Seltzer Decl. as Exh. 1. Susman Godfrey is currently one of the nation's leading litigation boutique law firms with locations in Houston, Dallas, Los Angeles, Seattle, and New York. Each of the firm's 85 trial attorneys devotes all of his or her time and talent to achieving excellent outcomes within the complex commercial litigation environment. In addition to the Vitamins case, described above,

where Susman Godfrey served as co-lead counsel with Cohen Milstein and Boies Schiller, high

profile victories achieved by the firm include:

- *In re Corrugated Container Antitrust Litigation* (S.D. Tex.)—Represented as lead counsel the plaintiffs in over 50 consolidated class action cases brought under the federal antitrust laws.  Resulted in $500 million in settlements before and after trial.

- *Novell v. Microsoft* (D. Utah)—Represented Novell in negotiating a $536 million settlement of antitrust claims against Microsoft.

- *In re Gas Royalty Litig.* (Okla. state court)—In November 2004, Susman Godfrey, led by partner William Christopher Carmody, obtained a settlement of $60 million for a class of gas production royalty interest owners against a major oil company.  The oil company agreed to a settlement after Susman Godfrey successfully obtained class certification.

- *In re Equinox Int'l Corp.* (D. Nev.)—Together with government lawyers, settled a securities class action for $40 million and equitable relief.  Worked closely with the Federal Trade Commission and attorneys general from Hawaii, Maryland, Michigan, Nevada, North Carolina, Tennessee, and Virginia to achieve this result.

- *White, et al. v. NCAA* (C.D. Cal.)—Antitrust class action against the NCAA.  Led by Marc Seltzer, we negotiated a settlement that, if approved, will result in $218 million being made available over five years to a fund for student athletes and other monetary and equitable relief.

As the Seltzer Decl. and attached firm résumé further demonstrate, Susman Godfrey, and

specifically the partners who will play a lead role in this proceeding, whose firm biographies are

attached to the Seltzer Decl. as Exhs. 2-4, have substantial experience in "bet the company"

matters, trying, and achieving large settlements, in complex civil cases, including antitrust class-

action cases such as this one.

### 2.  *We have unique experience as trial counsel in antitrust class actions.*

While it is true that most large antitrust cases settle before trial, it is also true that the

proven ability and willingness of its counsel to try such a case benefits the class, by among other

things giving it additional leverage in settlement negotiations.  We have tried many complex

cases, including the leading exemplars of antitrust class actions prosecuted through a jury trial in

the past decade.  These trials show defendants our willingness to try cases and thus demonstrate

that it may be advantageous to offer meaningful settlement at an early stage of the litigation.

For example, in 2003, after obtaining then-record settlements of over a billion dollars from the initially settling defendants in the *Vitamins Antitrust Litigation*, Cohen Milstein's Michael Hausfeld, Boies Schiller's William Isaacson and Tanya Chutkan, and Susman Godfrey's James Southwick tried the class' case against four non-settling defendants and won a jury verdict of $49.5 million (10% more than was requested from the jury), which was then trebled to $148.5 million (the judgment was later reduced slightly to reflect offsets for other settlements).

In the *Scrap Metal* case, Boies Schiller's William Isaacson and Tanya Chutkan—as sole lead counsel—won an $11.5 million jury verdict, which, after trebling and reduction for other settlements, became a $23 million judgment. The district court denied defendants' post-trial motions and held that Mr. Isaacson's cross examination had revealed "conduct tantamount to suborning perjury by a key [defense] witness." *In re Scrap Metal Antitrust Litig.*, 2006 WL 2850453, at *3 (N.D. Ohio, Sept. 30, 2006), *aff'd*, 527 F.3d 517 (6th Cir. 2008).

Cohen Milstein served as co-lead counsel on behalf of a class of wild blueberry growers in *Pease v. Jasper Wyman & Son, Inc.*, Civil Action No. 00-015 (Knox Cty., Me. Sup. Ct.). In 2003, a jury found three blueberry processing companies liable for participating in a four-year price-fixing and non-solicitation conspiracy that depressed the prices defendants paid to approximately 800 growers of wild blueberries and awarded $18.68 million in damages. After mandatory trebling under Maine's antitrust law, judgment was entered for approximately $56 million

Notably, each of these trials involved defendants whom the government had not prosecuted and who maintained that they were not involved in the subject conspiracies.

Susman Godfrey has a long history of being at the forefront of antitrust class action cases: In the *Corrugated Container Antitrust Litigation*, Steve Susman, with Marc Seltzer and others, represented the plaintiffs in over 50 consolidated class action antitrust cases. Together with our co-counsel, Susman Godfrey recovered $500 million for plaintiffs as a result of settlements achieved both before and after a verdict in the plaintiffs' favor.

In April 2000, Susman Godfrey settled a securities class action for $40 million and other relief in Las Vegas federal court. The case settled after three weeks of trial and just before plaintiffs rested their case-in-chief. Susman Godfrey attorneys worked closely with the Federal Trade Commission and attorneys general from Hawaii, Maryland, Michigan, Nevada, North Carolina, Tennessee, and Virginia to achieve this result.

More recently, in 2005, a federal jury in Los Angeles, California reached a $140 million trial verdict in favor of Susman Godfrey client Masimo Corporation, against Tyco Healthcare Group LP and its affiliate, Mallinckrodt, Inc. Steve Susman and Marc Seltzer were the plaintiffs' lead trial lawyers. While the trial court vacated the damages award and certain liability findings post-trial (rulings currently on appeal), on re-trial before the court, a judgment in Masimo's favor for $43.5 million, plus attorneys' fees and costs, was entered.

### 3. We have negotiated landmark settlements in antitrust cases.

The Proposed Lead Firms specialize in trying highly complex litigation, and our partners have litigated some of the most significant antitrust cases in recent times, both in terms of the legal issues at stake and the recoveries obtained for consumers and businesses. Our proven track record of success at trial has enabled us to obtain highly advantageous settlements for our clients.

The Proposed Lead Firms—including undersigned counsel—negotiated a $1.1 billion settlement in the *Vitamins* case. As Chief Judge Hogan wrote:

> The Settlement is unprecedented for many reasons: *the percentage rate on which the Agreement is predicated is in the highest tier of settlements for price-fixing class actions; the total dollar value to the class is the largest settlement of a price-fixing class action* . . . .

*In re Vitamins Antitrust Litig.*, 2000 WL 1737867, at *2 (D.D.C. Mar. 31, 2000) (emphasis added).

Boies Schiller also served as sole lead counsel in the *Auction Houses Antitrust Litigation*, winning a $512 million settlement for the class and moving Judge Kaplan to write:

> Indeed, there could be no greater testament to the process than some of the comments made at the settlement hearing by two of the interim lead counsel who were ousted as a result of the Court's decision to hold an auction to select lead

counsel. Mr. Furth, on behalf of all of the interim lead counsel, said that he "never in [his] fondest dreams ... believed that these defendants would pay $512 million" and that *this settlement "is the most outstanding result I have ever heard of in the history of the antitrust laws."*

*In re Auction Houses Antitrust Litig.*, 2001 WL 170792, at *6 (S.D.N.Y. Feb. 22, 2001) (emphasis added) (Lead counsel applicants Buchman and Richards were co-lead counsel for foreign purchasers and subsequently helped achieve a $40 million settlement).

In addition to obtaining a superior settlement for the class, Boies Schiller moved that case through discovery exceptionally fast. At Judge Kaplan's request, counsel created, and adhered to, a schedule that completed all discovery and motion practice within a 12-month period. Boies Schiller and Cohen Milstein are current lead counsel in the *In Re Graphic Processing Units Antitrust Litigation*, MDL No. 1826 (N.D. Cal.), with approximately the same schedule.

Most recently, in *American Express Travel Related Services Co., Inc. v. Visa U.S.A., et al.* (S.D.N.Y.), Boies Schiller litigated American Express' claims against Visa, MasterCard, and many large banks; settling them for over $4 billion, the largest antitrust settlement in history.

In addition to its nine-figure settlement in the *Corrugated Container* case, in 2004 Susman Godfrey obtained a settlement from Microsoft for $536 million on behalf of its client Novell. Susman Godfrey represented Novell in negotiating the settlement of antitrust claims related to Novell's NetWare business. As Novell's general counsel stated, "This is a significant settlement, particularly since we were able to achieve our objectives without filing expensive litigation."

### 4. *We have uncovered antitrust conspiracies before government action.*

The Proposed Lead Firms filed the first complaints in the *Vitamins Antitrust Litigation* based on counsel's investigation before the announcement of any government investigation. A commentator wrote about the unique accomplishment: "[t]he results of a private investigation by an intrepid class-action law firm in mid 1997 . . . were shared with DOJ prosecutors who decided

to reopen an investigation of vitamins price fixing . . ."[13]  Approximately one year after we filed those first complaints, defendant F. Hoffmann La Roche pled guilty, agreed to pay the U.S. government a criminal fine of $500 million, and explained at a press conference the role of the private actions in its plea:

> Roche initiated an internal inquiry of its own, which at the time did not turn up any evidence of wrong doing. **A second internal inquiry prompted by class action lawsuits filed** against Roche and other companies in early 1998 for alleged price fixing in the bulk vitamins market revealed that further action was needed. The findings from this second investigation formed the basis for Roche's decision to offer, on 1 March this year its full cooperation in U.S. Justice Department Investigation.[14]

Since the *Vitamins* case, undersigned counsel has also investigated, uncovered, and filed the first class actions showing the existence of cartels in Chinese products exported to the United States. Boies Schiller, Cohen Milstein, and Susman Godfrey have acted as lead counsel since 2005 for a class of plaintiffs in the first such action filed against Chinese manufacturers of Vitamin C.

In addition, Cohen Milstein, along with co-counsel, uncovered a nationwide price-fixing and market allocation conspiracy for polyether polyols, MDI, and TDI before the Department of Justice launched its own investigation into the matter. That case is styled *In re Urethane Antitrust Litigation (Polyether Polyol Cases)*, No. 04-md-01616-JWL, MDL No. 1616 (D. Kans.). Cohen Milstein secured a $55.3 million settlement with one defendant, Bayer Corporation, in 2006, and has received and continues to receive valuable cooperation from Bayer as part of the settlement. The firm is vigorously prosecuting the case against the remaining non-settling defendants.

\* \* \* \* \*

The Proposed Lead Firms are experienced in handling antitrust class actions and other complex litigation, command superior knowledge of antitrust and class certification law, and will

---

[13] Prof. John M. Connor, *The Great Global Vitamins Conspiracy,* 2006 American Antitrust Institute Paper, p. 28.
[14] Available at http://www.roche.com/media-news-1999-05-21-e.pdf.

commit whatever resources are necessary to represent the interests of the proposed class. Individually, each Proposed Lead Firm more than satisfies the Rule 23(g)(1)(A) factors. Together, we have a demonstrated history of working together as co-lead counsel and securing substantial (and groundbreaking) recoveries for antitrust class plaintiffs.

Here, where defendants include some of the best-funded financial institutions in the world and are represented by some of the largest defense firms in the country, it is important also to note the resources that we bring to the table. Collectively, our nearly 400 lawyers, and two dozen offices around the country, compare favorably to the Pomerantz Firm's 21 lawyers.

Messrs. Richards and Buchman, the Pomerantz Firm partners applying for lead counsel, do not explain what work they have done on this case. And the quotes they cite praising the Pomerantz Firm's past work on class actions (in 1980 and 1991) are not directly relevant here as they only joined the Pomerantz Firm from the firm now known as Milberg L.L.P. in 2007. They, themselves (at p. 2), list three cases as their leading credentials: (1) *Bell Atlantic Corp v. Twombly*, 127 S.Ct. 1955 (2007), where the Supreme Court held that the plaintiffs' complaint should be dismissed at the Rule 12(b)(6) stage because the claim of conspiracy was implausible; (2) *Billings v. Credit Suisse First Boston Ltd.*, 127 S.Ct. 2383 (2007), where the plaintiffs' antitrust claims were dismissed as preempted; and (3) *Krumans v. Christies Intl. PLC* (S.D.N.Y.) where foreign purchaser plaintiffs achieved a $40 million settlement. These were no doubt valiant efforts by able counsel—and no one wins them all—but their experience in those cases does not show an ability to prosecute a case like this one successfully.[15]

---

[15] Indeed, in none of the cases listed in their brief have Messrs. Buchman and Richards supervised the prosecution of a case approaching the size and complexity of this one. By contrast with this 40-defendant case, the cases they cite involved just one or two defendants, and Messrs. Richards and Buchman merely served as one of a group of co-lead counsel. Any suggestion that Judges Kaplan, Koeltl, and Young singled out Messrs. Buchman and Richards for special praise is unsupported by any citation to opinions or transcripts for the very good reason that those materials make clear that the courts' praise was directed at plaintiffs' counsel as a whole—a group that more often than not included one or more of the Proposed Lead Firms in leadership roles.

The Pomerantz Firm attorneys nonetheless argue that, as experienced counsel and skeptics of the Agreement (but beneficiaries of it[16]), they should be appointed as lead counsel or co-lead counsel. They rely on the Magistrate Judge's decision in *In re Air Cargo Shipping Services Antitrust Litig.*, 240 F.R.D. 56 (E.D.N.Y. 2006) ("*Air Cargo*"). That case involved a situation where Cohen Milstein led a group of 48 firms that had negotiated four settlements, which some other firms vying for co-lead counsel positions criticized. The Magistrate Judge did not disqualify Cohen Milstein; rather, he appointed it one of four co-lead counsel for the class. And the Pomerantz Firm neglects to mention that the *Air Cargo* settlements were ultimately endorsed by all other co-lead counsel, reviewed for fairness and benefit to the class by Magistrate Judge Edward Infante (retired), and preliminarily approved by the court. *See* Hausfeld Decl. at ¶ 7 (citing Declaration of Magistrate Judge Edward A. Infante (Ret.), which is attached as Exh. 2 thereto, at ¶ 25 (finding that the Lufthansa Settlement "is consistent with the policies underlying ACPERA and that the terms are fair, reasonable and adequate to the settling class members")).

*Air Cargo* does not demonstrate that a skeptic of proposed co-lead counsel should be appointed as co-lead counsel on that basis. That court confronted four competing applications for lead counsel, including two from competing groups with extensive support from other firms and two from firms without extensive support. The Court appointed all four co-lead counsel, noting that each of the co-lead counsel without extensive support:

> have many years of experience and have served as co-lead counsel in the past with other attorneys in the litigation [and], will hopefully provide a leavening effect if rivalries between the major constituencies begin to interfere with decisionmaking.

240 F.R.D. at 59. Unlike *Air Cargo*, this is not a case in which "rivalries" between "major constituencies" may be mediated by the leavening influence of an additional firm or firms.[17]

---

[16] Tellingly, the Pomerantz Firm's *Haywood County* complaint deleted only 719 of the 10,798 words in our earlier-filed complaints. In other words, 93% of our complaint reappears in theirs. Hausfeld Decl. at ¶ 23.

[17] *Air Cargo*'s forced-marriage-with-"leavening" approach has not been followed by other courts. Nor is it commonly accepted as a wise practice. *See In re Payment Card Interchange Fee and*

Instead, the Proposed Lead Firms have shown in other cases—including the *Vitamins Antitrust Litigation*, which required organization and supervision of the work of approximately 60 plaintiffs' law firms—that we can work together as a coordinated, efficient, and effective team. We also propose to give other firms prominent roles in the action.

At bottom, these two attorneys' eagerness to assume the role of "skeptics" does not qualify them to be co-lead counsel. Numerous counsel have objectively reviewed the Agreement and agreed with its merits. Others may disagree, but the proper time to air their skepticism is in an objection to a settlement submitted for the Court's approval, which has not happened here because there has been no settlement with BoA. We seek only to continue vigorous prosecution of this action as we have done in other cases. When compared to the application of the Proposed Lead Firms, no other lead counsel application demonstrates similar work to advance this case or a comparable ability to prosecute it to a successful conclusion.

We understand that Lieff Cabraser Heimann and Bernstein ("Lieff") will also apply to be appointed as interim co-lead counsel in this action. But Lieff has not demonstrated, and to the best of our understanding, cannot demonstrate that it has undertaken anything other than an investigation of publicly available facts, with the aid of industry and economic experts, which failed to lead them to an understanding of the underlying conspiracy that permitted them to file a Complaint on their own. Instead, six weeks *after* we filed the Fairfax County complaints, Lieff filed on behalf of the City of Oakland, with a complaint that drew heavily from the Fairfax County pleadings.

We recognize and appreciate the great interest taken in this litigation by the City of Oakland and by Alameda County. We are confident that it is comparable to the interest

---

*Merchant Discount Antitrust Litig.*, 2006 U.S. Dist. LEXIS 45727 at *30-38 (S.D.N.Y. 2006) (rejecting both Richards' and Buchman's application for sole lead counsel status and their alternative request that, in view of their anticipated disagreements with the co-lead counsel group appointed by the court, that they also be appointed co-lead counsel).

expressed by all of the entities who stepped forward to serve as class representatives in this action, and if this Court appoints us to serve as Interim Co-Lead Counsel, we will serve the interests of all of the plaintiffs and the proposed class equally and to the best of our abilities.

### C. Given the magnitude of this litigation, an Executive Committee would be useful in managing and coordinating the prosecution of this case.

This litigation presents legal, factual, and logistical issues that will require significant efforts and substantial coordination in order to bring these claims to trial. This is a complex antitrust case that involves a pervasive conspiracy that took place over a period of at least sixteen years. The anticompetitive acts that damaged the proposed class include potentially tens of thousands of intricate transactions, each of which involved multiple parties (*e.g.*, brokers, providers, issuers, and government agencies, etc.), sophisticated financial instruments, a myriad of rules and regulations, and specific acts of unlawful conduct. Pretrial fact discovery will be a substantial undertaking. There are currently 40 corporate defendants in these consolidated cases and potentially hundreds of non-parties—including co-conspirators and the parties' former employees—with information relevant to the claims at issue. Each of the defendants is represented by national and international law firms with significant resources.

Under these circumstances, an Executive Committee might usefully assist the Proposed Lead Firms and benefit the plaintiffs and the proposed class. Accordingly, if we are appointed as interim co-lead counsel, the Proposed Lead Firms would ask the Court to authorize them to appoint an interim Executive Committee, subject to the Court's approval.

## IV.    CONCLUSION

We respectfully request that this Court grant our Motion for Interim Leadership Structure and enter an order: (a) appointing Cohen Milstein, Boies Schiller, and Susman Godfrey as Interim Lead Counsel for the proposed class and (b) authorizing Interim Lead Counsel to appoint an interim Executive Committee.

Dated: July 10, 2008

William A. Isaacson
Tanya Chutkan
Jonathan Shaw
Jack A. Simms (DC Bar No. 501921)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

Magda M. Jimenez
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350

William Christopher Carmody
SUSMAN GODFREY L.L.P.
654 Madison Avenue, 5th Floor
New York, NY 10065-8440
Telephone: (212) 336-8330
Fax: (212) 336-8340

H. Lee Godfrey
SUSMAN GODFREY L.L.P.
Suite 5100
1000 Louisiana
Houston, TX 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
Suite 950
Avenue of the Stars
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150

Jonathan W. Cuneo (DC Bar No. 939389)
Daniel M. Cohen (DC Bar No. 470056)
CUNEO GILBERT & LADUCA, LLP
507 C Street NE
Washington, D.C. 20002
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

By: _____

Michael D. Hausfeld
Richard A. Koffman
Megan E. Jones
Christopher J. Cormier
COHEN, MILSTEIN, HAUSFELD &
TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Michael P. Lehmann
Christopher L. Lebsock
Jon T. King
COHEN, MILSTEIN, HAUSFELD &
TOLL P.L.L.C.
One Embarcadero Plaza
San Francisco, CA 94111
Telephone: (415) 229-2080
Facsimile: (415) 986-3643

Robert G. Eisler
COHEN, MILSTEIN, HAUSFELD &
TOLL P.L.L.C.
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Carol V. Gilden
COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone: (716) 664-2967
Facsimile: (716) 664-2983

Joel Davidow (DC Bar No. 50849)
Clifford K. Williams
KILE GOEKJIAN REED & McMANUS
PLLC
1200 New Hampshire Avenue, NW
Suite 570
Washington, DC 20036
Telephone: (202) 659-8000
Facsimile: (202) 659-8822

Allen Black
Roberta Liebenberg
Donald Perelman
FINE KAPLAN & BLACK, RPC
1835 Market Street
28th Floor
Philadelphia, PA 19103
Telephone: (215) 567-6565
Facsimile: (215) 568-5872

Samuel D. Heins
Vincent J. Esades
Dylan J. McFarland
HEINS MILLS & OLSON
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

Allan Steyer
D. Scott Macrae
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
Telephone:    (415) 421-3400
Facsimile:    (415) 421-2234

Steven Greenfogel
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust St., 8th Floor
Philadelphia, PA 19102
Telephone: (215) 564-5182
Facsimile: (215) 569-0958

Arnold Levin
Laurence S. Berman
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Armand Derfner
DERFNER ALTMAN & WILBORN
40 Calhoun Street, Suite 410
Charleston, SC 29401
Telephone: (843) 723-9804
Facsimile: (843) 723-7446

Steven A. Kanner
FREED KANNER LONDON &
 MILLEN LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015
Telephone: (224) 224-632-4500
Facsimile: (224) 632-4521
Brent Hazzard

HAZZARD LAW, LLC
6360 I 55 N, Suite 340
Jackson, MS 39211
Telephone: (601) 977-5253
Facsimile: (601) 977-5236

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Paul F. Bennett
Steven O. Sidener
C. Andrew Dirksen
GOLD BENNETT CERA & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

Roland G. Riopelle
SERCARZ & RIOPELLE, LLP
152 W. 57th Street, Suite 24C
New York, NY 10019
Telephone: (212) 586-4900
Fax: (212) 586-1234

Precious Martin, Sr.
PRECIOUS MARTIN, SR. & ASSOC.
821 N. Congress Street
Jackson, MS 39201
Telephone: (601) 944-1447
Fax: (601) 944-1448

*Attorneys for One or More Plaintiffs*

27

# EXHIBIT A

1/7/05 Bond Buyer 1
2005 WLNR 488216

Bond Buyer (USA)
Copyright 2005 Thomson Media, All Rights Reserved.

January 7, 2005

Volume 351

Section: News32045

IRS   Steps   Up   Probes   of   GIC   Bid   Rigging
Justice ,   SEC   Also   Looking   at   Abuses

By Emily Newman and Lynn Hume

WASHINGTON  The Internal Revenue Service is broadening its investigation into possible bid-rigging practices involving guaranteed investment contracts in the municipal market, and the Justice Department and the Securities and Exchange Commission are looking at alleged abuses in this area as well, key market sources said yesterday.

The heightened concerns about GIC transactions come as regulators have obtained evidence showing that bid rigging is much more prevalent in the municipal market than believed.

"It looks like bid rigging is wider and more pervasive than we thought," said Charles Anderson, field operations manager for the IRS' tax-exempt bond office, who would not specifically comment on any IRS investigations or other agencies' activities.

"I think the investigation is broadening at this point," said Mark Scott, director of the tax-exempt bond office, who also declined to provide any specific details.

With as many as 20 IRS investigations of GIC bid rigging ongoing in the municipal market, the agency has increasingly found over the past year that some firms are providing so-called courtesy bids, or unrealistic bids, for GICs.

An issuer generally selects its GIC provider through a competitive bidding process, often hiring a GIC broker to conduct the bidding. Bid rigging can occur when only one of the firms vying to provide the GIC submits a financially viable, bona fide bid and the other two firms submit courtesy bids that are unrealistic and that virtually guarantee the company with the viable bid will win the bidding process.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

"When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided," Scott said.

These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fair market value," Scott said. "We have seen transactions where the winning bid is the only bid high enough to make the deal work."

IRS investigations of some transactions have led the agency to probe other transactions.

"We are going to continue following up," Scott said. "To the extent that we're out looking with respect to one particular transaction and we come across evidence that points to two or three or 10 other transactions, we're going to broaden our investigation to those transactions as well."

"That's basically what we've been doing ... is following those, what I like to like to refer to as 'tentacles of abuse,' " he said. "It's hard to say how widespread the problem is, but there is a significant problem out there at this point."

While neither Scott nor Anderson would provide any specific information, sources said that evidence of bid rigging was uncovered as a result of one of the IRS investigations of a municipal securities transaction.

The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations involving an employee that indicated the employee and other market participants were involved in bid rigging on GICs in the municipal market. The firm turned the documents over to the SEC and the Justice Department, which can be expected to investigate the matter further.

The investigation involving the transcripts does not include Kansas City, Mo.-based George K. Baum & Co., although recent IRS investigations have accused the firm of bid rigging, sources said.

The IRS' GIC investigations reveal situations where broker-dealers or investment providers are engaging in bid rigging to do an end run around Treasury rules that was designed to be helpful to issuers.

Under Treasury rules, municipal bond issuers are supposed to use the fair market value of their investments to compute their investment yields. Fair market value is the price at which a willing buyer would purchase the investment from a willing seller in a bona fide, arm's-length transaction.

The rules provide issuers with a safe harbor for establishing the fair market value of GICs, which provide an issuer with fixed rates of interest, and other investment products.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Under that safe harbor, as long as an issuer obtains three bona fide reasonable bids for a GIC, then the GIC is presumed to be at fair market value and will not affect the tax-exempt status of the bonds.

In cases where the IRS determines that GIC bid rigging has occurred, it can try to levy so-called Section 6700 penalties on the GIC brokers or GIC providers involved.

Under Section 6700 of the tax code, the IRS can fine transaction participants for violating the tax laws if they know or have reason to know a statement related to the tax benefits is false or fraudulent. The fine is 100% of the fees obtained or $1,000, whichever is less, for abusive transactions that occurred before Oct. 22, and 50% of the fees earned in abusive transactions that occurred after that date.

In the past year, the IRS has expanded its investigation of abusive tax-exempt bond transactions under Section 6700 of the tax code and the office currently has roughly 40 Section 6700 cases under review, nearly half of those involving alleged bid rigging, agency officials have said.

The IRS investigations of GIC bid rigging has ramifications for bond lawyers, who typically obtain certifications from the GIC broker that the issuer received three bids for GICs in order to qualify for the safe harbor.

IRS officials have been warning, in proposed amendments to Circular 230 that are designed to set standards for muni bond opinions and in public speeches, that bond lawyers cannot blindly accept such certifications and must do some due diligence to ensure they are valid.

Sources said that IRS officials investigating GIC transactions will likely press bond lawyers to defend why they accepted certifications of three bids when it should have been obvious that only one of them was financially reasonable.

Copyright 2005 Thomson Media Inc. All Rights Reserved. http://www.thomsonmedia.com
http://www.bondbuyer.com

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Taxation (1TA10); Economics & Trade (1EC26))

INDUSTRY:  (Accounting, Consulting & Legal Services (1AC73))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (BAUM CO; GIC; GICS; INTERNAL REVENUE SERVICE; IRS; JUSTICE DEPARTMENT; SEC; SECURITIES AND EXCHANGE COMMISSION; THOMSON MEDIA INC)  (Anderson; Charles Anderson; IRS; Mark Scott; Rigging Justice; Scott)

Word Count: 1195
1/7/05 BONDBYR 1

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1/7/05 BONDBYR 1                                                    Page 4

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT B

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") is entered into by the law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Plaintiffs' Counsel"), on behalf of their clients, and Bank of America Corporation ("BoA"), (together, "the Parties"), regarding potential claims arising out of alleged anti-competitive activity in the municipal derivatives business. The Effective Date of this Agreement is September 12, 2007.

The Parties hereby agree that the terms of this Agreement shall apply from the Effective Date.

The Parties hereby agree and acknowledge that they each are entering this Agreement with the intent of working in good faith to attempt to settle and resolve all potential claims described above.

The Agreement shall apply to all information, materials, oral communications, and documents (and the contents of all of the foregoing) disclosed, produced, or conveyed in any form by BoA to Plaintiffs' Counsel in connection with or during settlement discussions between the Parties related to the municipal derivatives business, and all copies thereof ("Settlement Materials").

1.      All Settlement Materials shall be confidential, shall be used only in connection with the settlement discussions between the Parties related to potential claims arising out of alleged anti-competitive activity in the municipal derivatives business, shall not be used directly or indirectly for any other purpose and shall not be disclosed to any person or entity except in accordance with the terms of this Agreement.

2.      Plaintiffs' Counsel shall not disclose Settlement Materials to any other person or entity, *provided,* however, that Plaintiffs' Counsel may disclose Settlement Materials to economic consultants retained by Plaintiffs' Counsel for the purpose of assisting in settlement discussions related to the above-referenced

1

litigation and/or additional plaintiffs' counsel not mentioned in this Agreement. Prior to any such disclosure, Plaintiffs' Counsel shall provide BoA with the names of all such economic consultants and/or additional counsel to whom Plaintiffs' Counsel intends to provide access to Settlement Materials and must receive from BoA its prior written consent. Any consultants provided Settlement Materials under this paragraph first must sign Addendum A to this Agreement and agree to be bound by each and every one of the terms of this Agreement. Additional counsel provided Settlement Materials under this paragraph first must: (i) sign Addendum A to this Agreement on behalf of their firm and agree to be bound by each and every one of the terms of this Agreement, and (ii) comply with Paragraph 3 of this Agreement.

3.    Plaintiffs' Counsel agree that, prior to receiving any Settlement Materials, Plaintiffs' Counsel will provide BoA a list of all of the clients that have retained Plaintiffs' Counsel in connection with potential claims arising out of alleged anti-competitive activity in the municipal derivatives business and executed versions of Addendum B executed by each of Plaintiffs' Counsel's clients. Plaintiffs' Counsel further agree to provide BoA with the names of any additional clients that retain Plaintiffs' Counsel in connection with potential claims arising out of alleged anti-competitive activity in the municipal derivatives business during the settlement negotiations and executed versions of Addendum B executed by each of Plaintiffs' Counsel's additional clients, and to provide such notice and the executed Addenda B within five (5) calendar days of such retention.

4.    Any summaries or copies of Settlement Materials prepared by Plaintiffs' Counsel, additional plaintiffs' counsel, or any of their agents (including any economic consultants), including any attorney work product referencing or containing any Settlement Materials, shall be subject to the terms of this Agreement to the same extent as the Settlement Materials themselves. The application of this Agreement to any attorney work product shall not constitute any waiver of attorney work product or attorney-client privilege.

2

5.    BoA may, in its sole discretion, terminate settlement discussions at any time. If settlement discussions are terminated under any circumstances, then within ten (10) calendar days after such termination of settlement discussions, Plaintiffs' Counsel shall return to BoA all Settlement Materials; shall destroy all work product derived from, including and/or referencing Settlement Materials; and shall certify by affidavit that the requirements of this Agreement have been complied with fully. The foregoing obligations apply to all Settlement Materials and work product that is in the custody of additional plaintiffs' counsel or any agent of Plaintiffs' Counsel (or additional plaintiffs' counsel that receive Settlement Materials pursuant to Paragraph 2). However, the return of Settlement Materials shall not affect BoA's agreement to cooperate pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA") (pursuant to Paragraph 12) with Plaintiffs' Counsel and their clients in the event no settlement is reached.

6.    Plaintiffs' Counsel agrees that if BoA discloses information protected from disclosure by the attorney-client privilege or the attorney work-product doctrine during settlement discussions, such disclosure shall not be deemed a waiver in whole or in part of BoA's claim of attorney-client privilege or work-product protection over that information and/or the subject matter covered by that information, and Plaintiffs' Counsel will not argue to anyone (including, but not limited to, any court, tribunal or arbitration panel) that such disclosure is a waiver. BoA agrees to notify Plaintiffs' Counsel if it learns of inadvertent or unintentional disclosure of privileged information and Plaintiffs' Counsel agrees that they will return all originals and copies of the privileged information within five (5) calendar days of being notified of such disclosure by BoA.

7.    In the event that Plaintiffs' Counsel inadvertently discloses Settlement Materials to a third party, Plaintiffs' Counsel shall provide BoA notice within three (3) calendar days of knowledge of doing so and use all reasonable efforts to retrieve all copies of the inadvertently produced Settlement Materials from any person or persons in possession of such copies. The inadvertent disclosure of Settlement

3

Materials to third parties by any person or party shall not waive the confidentiality of the information or the obligations hereunder, and Plaintiffs' Counsel agrees that it will not argue to anyone (including but not limited to, any court, tribunal or arbitration panel) that such disclosure is a waiver. Notwithstanding anything in this paragraph 7, any disclosure of Settlement Materials not in strict accordance with all of the terms of this Agreement (inadvertent or otherwise) shall constitute a breach of this Agreement.

8.     Plaintiffs' Counsel agree that they will not, at any time, use the fact that BoA produced material during the settlement discussions to argue to anyone (including, but not limited to, any court, tribunal or arbitration panel), that such material should be produced by BoA in any proceeding. Subject to the preceding sentence, the Parties agree that Plaintiffs' Counsel may use the fact that BoA produced factual material during settlement discussions to establish that such factual information existed.

9.     The protections afforded Settlement Materials under this Agreement shall exceed those provided in Federal Rule of Evidence 408.

10.     During the course of settlement negotiations with Plaintiffs' Counsel pursuant to this Agreement, and to promote efficiency, economy, and the confidentiality of Settlement Materials (as defined on page 1), Plaintiffs' Counsel shall coordinate, organize, and manage any and all cooperation with any potential civil plaintiffs to be provided by BoA as the antitrust leniency applicant to satisfy its cooperation obligations to civil plaintiffs under ACPERA, except as otherwise agreed by the Parties. The designation of Plaintiffs' Counsel to be responsible for such coordination, organization and management applies to all aspects of any settlement negotiations regarding potential claims arising out of alleged anti-competitive activity in the municipal derivatives business while this Agreement is effective, including the conveyance of Settlement Materials, except as otherwise agreed by the Parties. BoA agrees that, unless and until BoA terminates settlement discussions pursuant to Paragraph 5 and subject to Paragraph 11, it will not convey Settlement

4

Materials to any potential civil plaintiff (or counsel for such potential civil plaintiff) regarding potential claims arising out of alleged anti-competitive activity in the municipal derivatives business that is not represented by Plaintiffs' Counsel. BoA agrees that, unless BoA terminates settlement discussions pursuant to Paragraph 5 and subject to Paragraph 11, if BoA is contacted by any potential civil plaintiff (or counsel for such potential civil plaintiff) requesting cooperation materials related to or seeking to discuss settlement of potential claims arising out of alleged anti-competitive activity in the municipal derivatives business who is not represented by Plaintiffs' Counsel, BoA shall notify Plaintiffs' Counsel within three (3) calendar days and refer the potential civil plaintiff (or counsel for such potential civil plaintiff) to Plaintiffs' Counsel without divulging anything conveyed between the Parties under this Agreement. Likewise, Plaintiffs' Counsel shall notify BoA within three (3) calendar days if contacted by any potential civil plaintiff (or counsel for such potential civil plaintiff) not represented by Plaintiffs' Counsel.

11.     The Parties agree that if counsel for a party that may have a claim arising out of alleged anti-competitive activity in the municipal derivatives industry informs BoA in writing that: (i) such counsel has executed Addendum A and its clients have executed Addendum B, and (ii) Plaintiffs' Counsel has, nonetheless, failed to provide such counsel with access to all Settlement Materials, then BoA shall immediately notify Plaintiffs' Counsel in writing and Plaintiffs' Counsel shall have five (5) calendar days to provide that counsel with such Settlement Materials. The Parties further agree that, if BoA does not receive within those five (5) calendar days written confirmation from the requesting counsel that all requested Settlement Materials have been provided, then Paragraph 10 shall not apply to BoA.

12.     BoA agrees to provide to Plaintiffs' Counsel and their clients (as identified pursuant to Paragraph 3) the cooperation set forth in Section 213(b) of ACPERA, in conjunction with either their settlement of or litigation of claims regarding the municipal derivatives business. Even if no settlement is reached during this process, BoA shall still be obligated to provide the cooperation set forth in Section 213(b) of ACPERA to Plaintiffs' Counsel and their clients in preparation and

pursuit of any claim regarding the municipal derivatives business. In exchange for BoA's ongoing cooperation, each person or entity represented by Plaintiffs' Counsel at any time on or after the Effective Date of the Agreement with regard to potential claims arising out of alleged anti-competitive activity in the municipal derivatives business (as identified pursuant to Paragraph 3) agrees to accept in any settlement with or judgment against BoA only (whether or not a settlement is ultimately reached with BoA in this process) an amount of damages that shall not exceed that portion of the actual damages sustained by them which is attributable to the commerce done by BoA in the municipal derivatives business affected by the alleged anti-competitive activity, and agrees not to seek damages in excess of the foregoing in any settlement or litigation with BoA. However, this Agreement does not foreclose any client from seeking additional damages above and beyond actual damages related to BoA's conduct from other defendants under joint and several liability, as BoA's sales will remain in the case for purposes of calculating the potential liability of other defendants in the action; all such rights for treble damages from other defendants are specifically reserved by Plaintiffs' Counsel on behalf of all of their clients.

13.   It is the intent of the Parties that this Agreement is binding on the Parties, as well as all persons or entities represented by Plaintiffs' Counsel at anytime on or after the Agreement's Effective Date with regard to potential claims arising out of alleged anti-competitive activity in the municipal derivatives business (as identified pursuant to Paragraph 3) and that all obligations set forth in this Agreement (including but not limited to the confidentiality obligations set forth in Paragraph 1), except those obligations set out in Paragraphs 10 and 11 (which are specifically tied to ongoing settlement discussions between the Parties), shall survive and be binding on the Parties even if settlement discussions between the Parties are terminated.

14.   This Agreement may not be amended or modified, except if done in writing and executed by all parties hereto.

6

15.    The Parties agree that, due to the inadequacy of any remedy at law, equitable relief would be appropriate in the event of any threatened or actual violation of this Agreement.

Dated:

_____

Michael D. Hausfeld
COHEN, MILSTEIN,
HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005

*For Cohen, Milstein, Hausfeld & Toll, P.L.L.C.*

Dated: September 12, 2007

_____

Kevin R. Sullivan
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

*For Bank of America Corporation*

7

**ADDENDUM A**

**STATEMENT REQUIRED OF ALL PERSONS
RECEIVING ACCESS TO SETTLEMENT MATERIALS**

I hereby attest to my understanding that Settlement Materials may be provided to me
pursuant to the terms, conditions, and restrictions of the Confidentiality Agreement
between the law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., on behalf of their
clients in connection with settlement discussions regarding potential claims arising out
of alleged anti-competitive activity in the municipal derivatives business ("Plaintiffs'
Counsel"), and Bank of America Corporation ("BoA") (together, "the Parties") dated
September 12, 2007 (the "Agreement"), that I have been given a copy of and have read
the Agreement; that I have had its meaning and effect explained to me by the attorneys
providing me with such Settlement Materials; and that I hereby agree to be bound by the
Agreement and each and every one of its terms.

By: _____

Date: _____

**ADDENDUM B**

**ACKNOWLEDGMENT OF CLIENTS**

_____ hereby attests that it has been given a copy of and has read the Confidentiality Agreement dated September 12, 2007 between the law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Bank of America Corporation regarding settlement discussions related to potential claims arising out of alleged anti-competitive activity in the municipal derivatives business (the "Agreement"); that it has had the Agreement's meaning and effect explained to its representatives by the attorneys who it has retained in connection with potential claims arising out of alleged anti-competitive activity in the municipal derivatives business; and that it hereby agrees to be bound by the Agreement and each and every one of its terms. The individual executing this Addendum on behalf of corporations or other entities represents and warrants that he or she has been authorized by the corporation or entity on whose behalf they are signing to execute the Addendum on the corporation's or entity's behalf.

[CLIENT NAME]

By: _____

Its: _____

Date: _____

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION** | **MDL No. 1950** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | **Master Docket No. 08 Civ. 2516** |

### DECLARATION OF MARC M. SELTZER
### IN SUPPORT OF
### <u>MOTION FOR APPOINTMENT OF INTERIM LEADERSHIP STRUCTURE</u>

I, MARC M. SELTZER, hereby declare:

1.     I am an active member of the State Bar of California and a partner of the firm of Susman Godfrey L.L.P ("SG").   My firm serves as attorney of record for the City of Baltimore, one of the plaintiffs in this litigation.  The matters set forth herein are within my personal knowledge, and if called as a witness, I could and would testify competently thereto.

2.     All facts contained in the accompanying Motion for Appointment of Interim Leadership Structure and Memorandum of Law that pertain to SG and partners of SG are true and correct to the best of my knowledge.

3.     Attached hereto as Exhibit 1 is a true and correct copy of SG's firm resume.

4.     The partners from SG's New York, Houston, and Los Angeles offices who will play leading roles in this litigation should SG be selected as co-lead counsel have substantial antitrust, trial, and class action experience.

5.     Attached hereto as Exhibit 2 is a true and correct copy of the firm biography of H. Lee Godfrey.  Mr. Godfrey is one of two co-managing partners of SG.  He is a trial lawyer and

has, for over thirty years, represented plaintiffs and defendants on matters involving a wide range

of complex litigation and arbitration issues.  In 2007, Mr. Godfrey was named a "Leader In His

Field" by Chambers USA in the areas of Antitrust, Energy and Natural Resources Litigation and

General Commercial Litigation.  He was also named a "Leading Plaintiffs' Lawyer in America"

by Lawdragon.  Mr. Godfrey has been selected as one of the top lawyers in Texas by The

National Law Journal and was listed among the top 15 American commercial trial lawyers in a

recent survey conducted by the International Commercial Litigation magazine.  The attached

biography provides further details regarding Mr. Godfrey's many accomplishments over his

years of practice.

6.      Attached hereto as Exhibit 3 is a true and correct copy of the firm biography of

William Christopher Carmody.  Before joining SG, Mr. Carmody headed his own trial firm in

Dallas, Texas, making his reputation as a successful plaintiffs' lawyer. It was in his own firm

that he found his forté, representing clients in "bet the company" cases – the kind case that can

mean the difference between the life and death of a business.  While he still maintains an office

in Dallas, Mr. Carmody is now primarily resident in the firm's New York City office.  Working

under the broad rubric of complex business litigation, Mr. Carmody has handled a wide variety

of cases including commercial and securities fraud, antitrust, fatal and catastrophic injuries

(including airplane crashes), oil and gas, trade secrets and patent infringement.  The attached

biography details Mr. Carmody's numerous achievements as a trial lawyer.

7.      Attached hereto as Exhibit 4 is a true and correct copy of my firm biography.  I

have practiced law for more than thirty years in Los Angeles, California, litigating complex cases

in both state and federal courts.  My relationship with the partners of SG began in the late 1970's

when Steve Susman and I worked together on the *Corrugated Container* antitrust case, in which

$500 million was recovered for the plaintiffs.  I concentrate my practice in the prosecution and

defense of complex business law cases, including antitrust, securities, corporate and financial institution law matters. Seltzer's involvement in nationally prominent litigation began in the mid-1970's on the *Equity Funding* securities litigation. That case consisted of more than 100 consolidated class and private action cases, and was settled in 1976 for over $60 million, then the largest recovery ever achieved in a securities fraud class action. Later, in the 1980's, I was appointed by the Los Angeles federal court to serve as sole lead counsel to represent the plaintiff class in the *ZZZZ Best* securities fraud case. The case was settled for more than $40 million and resulted in several important decisions sustaining plaintiffs' claims. *See, e.g., In re ZZZZ Best Securities Litigation*, 864 F. Supp. 960 (C.D. Cal. 1994). More recently, I was part of the SG trial team representing approximately 90 financial institutions in a negligent misrepresentation case against one of the "Big Four" accounting firms. Over the years, I have played an active role in numerous antitrust class actions. Earlier this year, I was appointed as one of three co-lead counsel for plaintiffs in *In re Korean Air Lines Co., Ltd. Antitrust Litigation*, MDL No. 1891 (C.D. Cal.), which consists of over 70 actions that have coordinated in the Los Angeles federal court. I was also named by Lawdragon as one of the 500 leading plaintiffs' lawyers in the United States. The attached biography provides additional details regarding my experience in prosecuting and defending complex litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of July, 2008, at Los Angeles, California.

*Marc Seltzer*

MARC M. SELTZER

# EXHIBIT 1
# (To M. Seltzer Declaration)

## SUSMAN GODFREY L.L.P

WWW.SUSMANGODFREY.COM

| SUITE 5100 | SUITE 5100 | SUITE 3800 | SUITE 950 | 5TH FLOOR |
|---|---|---|---|---|
| 1000 LOUISIANA | 901 MAIN STREET | 1201 THIRD AVENUE | 1901 AVENUE OF | 654 MADISON AVENUE |
| HOUSTON, TEXAS | DALLAS, TEXAS | SEATTLE, WASHINGTON | THE STARS | NEW YORK, NEW YORK |
| 77002-5096 | 75202-3775 | 98101-3000 | LOS ANGELES, CA | 10065-8440 |
| (713) 651 - 9366 | (214) 754 - 1900 | (206) 516 - 3880 | 90067-6029 | (212) 336-8330 |
| | | | (310) 789-3100 | |

# EXPERIENCE IN ANTITRUST AND CLASS ACTIONS

Susman Godfrey is one of the preeminent firms in the country in antitrust and class action litigation. Beginning with the landmark Corrugated Container price-fixing case in 1980, in which Susman Godfrey served as plaintiffs' lead counsel, Susman Godfrey has a long history of being at the forefront of antitrust class action cases. In *In re Corrugated Container Antitrust Litigation*, Steve Susman, assisted by Marc Seltzer and others, represented the plaintiffs in over 50 consolidated class action cases brought under the federal antitrust laws. Together with our co-counsel, Susman Godfrey recovered $500 million on behalf of plaintiffs as a result of settlements and a verdict after a three-month jury trial.

Susman Godfrey represents clients in antitrust cases across the United States. We have handled antitrust cases in Anchorage, Detroit, Reno, Baltimore, Los Angeles, Orange County, Salt Lake City, San Francisco, Minneapolis, Houston, and Kansas City, as well as numerous cities in Texas. Our partners have served on the Council of the ABA Antitrust Section, the Texas Bar Antitrust Section, the Washington State Bar Antitrust and Consumer Protection Section, and the Executive Committee of the Antitrust and Unfair Competition Law Section of the State Bar of California. They regularly publish and lecture around the country on antitrust subjects. Susman Godfrey partner Marc Seltzer is co-author of California Antitrust and Unfair Competition Law (Third 2003), published by the Antitrust and Trade Regulation Law Section, State Bar of California.

### Examples of Recent Antitrust Class Action Cases

- Susman Godfrey is one of two co-lead counsel representing current and former Division I football and basketball players in a class action in the United States District Court for the Central District of California challenging the NCAA's restrictions on athletics-based financial aid, under which schools are not permitted to cover certain costs of attending school. After the Court denied the NCAA's motions to dismiss and for judgment on the pleadings and granted plaintiffs' motion for class certification, Susman Godfrey, led by Marc Seltzer, and together with co-counsel, negotiated a settlement that, once approved, would provide substantial additional benefits to current and former student athletes, including the contribution of $218 million over five years to an expanded fund that schools may use to cover current student athletes' costs of attendance, a new NCAA rule that for the first time will allow schools to provide student athletes with comprehensive year-round health insurance, and a $10 million fund that former student athletes in the class may use to cover educational and professional development expenses. Hearing on approval of the settlement is scheduled for August 2008.

- Susman Godfrey currently represents long-distance telephone subscribers in a class action lawsuit alleging that Sprint, AT&T, and MCI/WorldCom illegally fixed prices. In

March 2008, the United States District Court for the District of Kansas approved a $30 million settlement with Sprint. Trial against AT&T is scheduled to begin in October 2008. Susman Godfrey, led by Marc Seltzer and Barry Barnett, is co-lead counsel with two other firms.

- Susman Godfrey represents airline passengers in a class action lawsuit alleging that Korean Air Lines and Asiana Airlines engaged in a conspiracy to fix the prices of airfares to and from the United States and Korea. The litigation involves more than 70 class action cases which have been transferred to the United States District Court for the Central District of California by the Judicial Panel on Multidistrict Litigation. In February 2008, the Court appointed Susman Godfrey, led by Marc Seltzer, as one of plaintiffs' co-lead counsel to represent plaintiffs and the putative class.

- Susman Godfrey, led by partner William Christopher Carmody, represents PacifiCare, a third-party payor of the drug TriCor, as an opt-out plaintiff in an antitrust class action currently pending in the United States District Court for the District of Delaware. PacifiCare's complaint alleges that Defendants Abbott Laboratories and Fournier Laboratories unlawfully engaged in anticompetitive conduct to prevent generic competitors from competing against the brand-name drug TriCor. The case is currently set for trial in November 2008.

- Susman Godfrey, led by partner William Christopher Carmody, represents Medical Mutual of Ohio, a third-party payor of the drug Wellbutrin, as an opt-out plaintiff in an antitrust class action currently pending in the United States District Court for the Eastern District of Pennsylvania. Medical Mutual of Ohio's complaint alleges that Defendants unlawfully engaged in anticompetitive conduct to prevent generic competitors from entering the market by filing sham patent suits against potential generic competitors. Discovery in this case will be completed by the winter of 2009.

- Susman Godfrey is co-lead counsel for a class of several million Comcast cable subscribers in the Boston, Chicago, and Philadelphia metropolitan areas who allege that Comcast conspired with competitors to divide markets by, among other ways, "swapping" subscribers in other areas for subscribers in Boston, Chicago, and Philadelphia, and that Comcast monopolized those markets. The United States District Court for the Eastern District of Pennsylvania denied Comcast's motions to dismiss and for judgment on the pleadings and certified the Chicago and Philadelphia classes. Comcast's appeals of the class certification issues did not succeed; the Third Circuit denied review. The Court also rejected Comcast's efforts to send the cases to arbitration on a non-class basis. The litigation could result in an award of several billion dollars.

- Susman Godfrey is co-lead counsel and represents a class of direct purchasers of vitamin C in a federal price-fixing case against industrial defendants from the Peoples Republic of China. The case is pending in the Eastern District of New York, raises significant issues concerning the Chinese central and provincial governments' roles in the pricing and output decisions of Chinese manufacturers.

- In June 2003, Susman Godfrey and its co-counsel Boies Schiller & Flexner and Cohen Milstein Hausfeld & Toll obtained a verdict from a federal jury in Washington D.C. against defendants, Mitsui & Co. of Japan, Mitsui USA, DCV, Inc. and DuCoa L.P., who were found to have participated in a global conspiracy to allocate world markets and fix the price of vitamin B4 during the ten year period from 1988 to 1998. The 11-member jury unanimously awarded our clients, a class of direct purchasers of vitamin B4, $49.5 million in damages, for a total award of over $150 million after trebling and attorneys' fees. This recovery was in addition to recoveries of hundreds of millions of dollars for the class

pursuant to prior settlements.

### *Examples of Recent Antitrust Cases*

- Susman Godfrey, led by partner Marc Seltzer, represents Tessera Technologies, Inc., which develops and owns a wide range of semiconductor packaging, interconnect and consumer optics technologies, in an antitrust case against Hynix Semiconductor, Inc. and Hynix Semiconductor America, Inc. Tessera alleges that Hynix violated the Cartwright Act by conspiring with the other major DRAM manufacturers to boycott Tessera's proprietary packaging technology as well as the Rambus memory technology known as "RDRAM," to monopolize the market, and to fix prices. Tessera also accuses Hynix of unfair competition and intentional interference with contract and prospective economic relations in violation of California law. The case is pending in the California Superior Court in San Jose, California.

- Susman Godfrey represents start-up mainframe computer company Platform Solutions, Inc. in a major antitrust and intellectual property case against IBM, the dominant player in the multi-billion dollar worldwide mainframe market. PSI alleges that IBM is abusing its monopoly power in that market by tying its mainframe operating systems to its mainframe computer products, and through discriminatory licensing of intellectual property relating to its mainframe products. IBM claims that PSI's product infringes patents relating to IBM's mainframe architecture, and also is asserting copyright and trade secrets claims against PSI. PSI obtained a confidential settlement in 2008.

- Susman Godfrey represents defendant ACE Limited and several of its subsidiaries in *In re Insurance Brokerage Antitrust Litigation*. The plaintiffs allege that ACE conspired with brokers and other insurers to allocate property and casualty insurance markets over a ten-year period. In September 2007, the United States District Court for the District of New Jersey dismissed plaintiffs' claims in their entirety. The case is now on appeal to the Third Circuit Court of Appeals.

- In January 2006, Susman Godfrey settled the multi-million dollar antitrust claims of Chevron Phillips Chemical Company and Chevron Oronite against four international parcel tanker shipping companies. We initiated two separate arbitrations asserting that the parcel tanker shipping companies had violated antitrust laws by conspiring to increase prices and allocate shipping markets and trade lanes, all to the financial detriment of our clients and other chemical companies. Over the course of several months, and before we engaged in any formal discovery, we negotiated separate settlements with all four shipping companies on behalf of both of our clients. The amounts of these eight settlements are confidential.

- In September 2005, Susman Godfrey finalized the settlement of an antitrust claim brought by ChoiceParts against General Motors, Ford Motor Company, DaimlerChrysler, and OE Connection. The terms of the settlement are confidential. ChoiceParts alleged that the Big 3 automakers conspired to refuse to license parts data to ChoiceParts' revolutionary electronic parts locating service. After a request for injunction was denied, ChoiceParts hired Susman Godfrey to assist in preparing the case for trial.

- In April 2005, Susman Godfrey represented Gateway, Inc. in negotiation of an agreement pursuant to which Microsoft will pay Gateway a multi-million dollar settlement over four years; as part of the agreement, Gateway released antitrust claims against Microsoft.

- Susman Godfrey, led by partner Lee Godfrey, was hired by Hollywood's major movie Studios to defend antitrust claims brought by small video rental stores against the Hollywood studios and Blockbuster. Susman Godfrey was brought in to try the case after

discovery was completed and after summary judgment was briefed.  After two weeks of trial in federal court in San Antonio, Judge Edward Prado granted a motion for judgment as a matter of law in favor of the Hollywood studios and Blockbuster.  During the trial, the Plaintiffs called a dozen Hollywood studio executives as adverse witnesses, including Sumner Redstone and Michael Eisner.  Although the Hollywood studios had separate counsel, Lee Godfrey spoke on behalf of all them -- handling the opening statement, presenting studio witnesses who were called adverse, and cross-examining the plaintiffs and their antitrust expert.  The case was brought on behalf of three plaintiffs, whose lawyers represent hundreds of other independent retailers, and hoped to use this case as a test case, after the Court denied plaintiffs' motion for class certification.  The Fifth Circuit affirmed the trial court's decision to grant our clients' motion for judgment as a matter of law.  A related class action was brought in the California Superior Court in Los Angeles by certain of the same plaintiffs' lawyers who filed the Texas action.  Like the trial court in Texas, the California court denied plaintiffs' motion for class certification.  The California court also granted summary judgment.  Plaintiffs appealed, and Marc Seltzer, together with co-counsel, was retained to argue the appeal on behalf of all of the Hollywood studios.  The Court of Appeal affirmed summary judgment in favor of the studios on the antitrust claim but reversed it on the California Unfair Business Practices Act claim.

- On March 21, 2005, a federal jury in Los Angeles, California reached a verdict in favor of Susman Godfrey client, Masimo Corporation, against Tyco Healthcare Group LP and its affiliate, Mallinckrodt, Inc.  Steve Susman and Marc Seltzer were plaintiff's lead trial lawyers.  Masimo brought claims under the federal antitrust laws based on Tyco's anticompetitive practices that prevented Masimo from selling its competing pulse oximetry products to hospitals located throughout the United States.  After the trial court vacated the damages award and certain liability findings in its ruling on Tyco's post-trial motions, the issue of damages was re-tried at a bench trial, and the trial court entered a judgment in Masimo's favor for $43.5 million, plus attorneys' fees and costs.  Both parties have appealed the judgment to the United States Court of Appeals for the Ninth Circuit.

- In November 2004, our client, Novell, Inc., obtained a settlement from Microsoft for $536 million, of which $88 million was awarded in attorneys' fees.  Susman Godfrey represented Novell in negotiating the settlement of antitrust claims related to Novell's NetWare business.  As Novell's general counsel Joseph A. LaSala, Jr. stated, "This is a significant settlement, particularly since we were able to achieve our objectives without filing expensive litigation."

- In August 2003, Susman Godfrey obtained a mediated settlement with Microsoft on behalf of former operating system competitor Be, Incorporated, of an antitrust suit filed on behalf of Be in which it was alleged that Microsoft's predatory conduct and exclusive dealing had destroyed Be's business.  Under the settlement agreement, Be would receive a payment of $23,250,000 from Microsoft after $8,645,000 in attorneys' fees and expenses.  All other terms of the settlement remain confidential.

- In August 2003, Susman Godfrey represented plaintiff Duramed in a lawsuit alleging monopolization of the market for estrogen replacement and hormone replacement drugs.  Duramed alleged that Wyeth-Ayerst, the maker of market-dominant estrogen replacement and hormone replacement drugs, had violated the Sherman Act and Clayton Act by, among other things, entering into contracts with managed care entities to exclude Duramed's drug Cenestin from managed care formularies.  The parties reached a confidential settlement providing favorable terms for Duramed.

- Susman Godfrey represented defendant Clear Channel Communications, Inc. in a suit brought by Spanish Broadcasting Corporation, Inc. in June 2002 in the United States

District Court for the Southern District of Florida.  SBS alleged $1.5 billion in damages from supposed anticompetitive conduct by Clear Channel and another defendant.  On behalf of Clear Channel, Susman Godfrey filed a motion to dismiss the complaint in its entirety, arguing that the allegations were legally insufficient.  On January 31, 2003, after argument by Steve Susman, the Court dismissed each of SBS' antitrust claims against Clear Channel with prejudice.  SBS appealed to the Eleventh Circuit, which affirmed the dismissal.

- In January 2000, Susman Godfrey settled our client Caldera Inc.'s multi-hundred million dollar monopolization case against Microsoft Corporation.  Our massive discovery efforts included taking the depositions of such top Microsoft executives as Bill Gates and Steve Ballmer.  We defeated Microsoft's repeated summary judgment motions and settled the case just two weeks before trial.  The amount of the settlement is confidential.

Additionally, Susman Godfrey has extensive experience serving as lead plaintiff's counsel in other types of class action litigation.

### Recent Examples of Other Types of Class Action Cases

- In March 2007, Susman Godfrey settled a class action suit against Gold Bank and its parent, Gold Banc Corporation.  The lawsuit, filed in Kingfisher County, Oklahoma, accused the bank of charging excessive and illegal interest rates and fees on federally guaranteed Farm Service Agency loans.  The settlement resulted in more than $5 million being distributed among 224 farmers.

- In November 2005, the trial court approved Oxy USA, Inc.'s settlement to pay $12 million in a class action lawsuit brought by Susman Godfrey.  The lawsuit was filed on behalf of a class of royalty owners who leased mineral rights to Oxy for the production of carbon dioxide from the Bravo Dome Carbon Dioxide Unit in northeastern New Mexico.  The $12 million settlement, of which $3.5 million was awarded for attorneys' fees, represents approximately 90 percent of the total amount of actual damages sought by the class.  The settlement also required Oxy to pay litigation expenses of up to $400,000 and settlement administration expenses of up to $200,000.  Oxy agreed to change how it calculates plaintiffs' royalty on a going-forward basis.  This change ties the value of carbon dioxide to the price of oil and is expected to result in a near doubling of the royalty amounts Oxy was paying class members before the filing of this lawsuit in 2004.

- In November 2005, the United States District Court for the Eastern District of Texas entered an order and final judgment approving settlements in the Fleming Securities Class Action Litigation.  The settlements total $94 million, or $73 million net of attorneys' fees.  In late 2002, 15 securities class action lawsuits were filed against Fleming Companies, Inc., which at the time was one of the largest food wholesalers in the United States.  In April 2003, Fleming Companies, Inc. declared bankruptcy and thereafter was liquidated.  Plaintiffs pursued claims against former directors and officers of Fleming, Fleming's auditor, and underwriters of one of Fleming's public offerings.  In June 2004, the Court largely denied motions to dismiss brought by several defendants, and the case subsequently was set for trial in March 2006.  Over the course of 2005, counsel for plaintiffs negotiated separate settlements with each of the defendants.

- In November 2004, Susman Godfrey, led by partner William Christopher Carmody, obtained a settlement of $60 million for a class of gas production royalty interest owners against a major oil company.  The oil company agreed to a settlement after Susman Godfrey successfully obtained class certification.

- In December 2003, several large financial institutions paid more than $130 million to settle a class action brought by Susman Godfrey to help restore fiscal stability to scores

of injured people who were victimized when bonds held in trust used to pay for future medical care and living expenses pursuant to structured settlements were looted from the trust. Susman Godfrey, led by partner Marc Seltzer, represented the plaintiffs.

- In February 2001, Susman Godfrey obtained a $9 million settlement for 20 health plans on whose behalf we objected to the subrogation provisions of the nationwide Fen-Phen class action settlement. Our efforts in the Fen-Phen case continued Susman Godfrey's long history of successfully representing subrogation interests in mass tort cases, a field which we pioneered in the breast implant litigation.

- In April 2000, Susman Godfrey, together with government lawyers, settled a securities class action for $40 million and obtained preliminary approval of the settlement from a federal court in Las Vegas, Nevada. We represented a class of investors that sued Equinox International Corporation and its affiliates for operating an allegedly illegal pyramid scheme in violation of Nevada and federal securities laws. The case settled after three weeks of trial in federal court and just before plaintiffs rested their case-in-chief. In addition to the $40 million, the settlement also imposes on defendants a permanent ban on operating any multi-level marketing company, rescission of all distributorship agreements with past and current Equinox distributors, and pro rata restitution to the class members of the funds they paid to Equinox. Susman Godfrey attorneys worked closely with the Federal Trade Commission and attorneys general from Hawaii, Maryland, Michigan, Nevada, North Carolina, Tennessee, and Virginia to achieve this result.

The information contained herein is revised frequently and is only accurate and current as of the date printed above. Please call us for the most recent edition.

# EXHIBIT 2
# (To M. Seltzer Declaration)

## SUSMAN GODFREY L.L.P.

# H. Lee Godfrey
# Partner



Houston, Texas
Phone: 713.653.7857
Fax: 713.654.3366
lgodfrey@susmangodfrey.com*

H. LEE GODFREY, P.C., born Palestine, Texas; admitted to
bar, 1969, Texas; 2001, District of Columbia; 2006, New York.

- Recognized in *Who's Who Legal: Texas 2007* as a pre-eminent lawyer in the area of commercial litigation.
- Received Anti-Defamation League's 2007 Karen H. Susman Jurisprudence Award

## LECTURER

- Author, "Civil Voir Dire in Texas: Winning the Appeal Based on Bias or Prejudice," 31 South Texas Law Review 409 (1990). Lecturer: American College of Trial Lawyers Texas Trial Academy for Public Interest Lawyers, 2006; American Bar Association Antitrust Litigation Course (2003 and 2004 programs); "Affiliate Marketing Transactions," Southwest Kansas Royalty Owners Assn. Annual Conference, 2003; "Diagnosis of a Dispute," Third Annual Conference on Resolving Commercial Disputes Without Trial, Tulane University and The University of Texas, 1993; "Expert Witnesses; Preparation and Examination," Houston Bar Association, 1989; "Jury Selection & Opening Statements in Texas Civil Practice," South Texas College of Law 1989 Discovery and Civil Trial Practice Institute; "Arguing the Complex Case," The Art of Persuasion (A Performance Enhancement Course), The State Bar of Texas, 1989; "What You Need to Know About Discovery to Avoid Paying Sanctions," Houston Bar Association Discovery Institute, 1987; "Pleadings and Attacks on Pleadings," Advanced Civil Trial Practice, The State Bar of Texas Evidence Series, 1983.

## PROFESSIONAL AFFILIATIONS

- American Law Institute
- Fellow, American College of Trial Lawyers
- American Board of Trial Advocates
- International Academy of Trial Lawyers
- International Society of Barristers
- American Bar Association, Section of Litigation
- Fellow, American Bar Foundation
- State Bar of Texas
- District of Columbia Bar Association
- New York Bar Association
- Houston Bar Association
- Fellow, Houston Bar Association
- Texas Bar Foundation
- Chairman, State Bar of Texas Committee on Child Abuse and Neglect, 1995-1996 and a committee member until 1998
- Member, Texas Commission on Judicial Efficiency Judicial Task Force, 1995-present
- Chairman, Judicial Selection Advisory Committee for the Southern District of Texas, 1993
- Committee on Selection, Tenure & Compensation of State Judges, State Bar of Texas, 1980-81

*Internet mail is not fully secure or private. Therefore, please do not transmit confidential information via Internet mail. Transmission of information is not intended to and does not create an attorney-client relationship. Please do not assume that your communications sent using Internet mail is privileged or confidential. Please do not send Susman Godfrey any confidential information via the Internet without previously consulting one of our attorneys.

# EXHIBIT 3
# (To M. Seltzer Declaration)

# SUSMAN GODFREY

NEW YORK    DALLAS

unparalleled **experience**, unprecedented **success**



win. win.

win. win.

bcarmody@susmangodfrey.com
New York, NY   Tel: 212-336-8334
Fax: 212-336-8340

Dallas, Texas   Tel: 214-754-1984
Fax: 214-754-1933

Admitted in New York and Texas

**EDUCATION:** United States Merchant Marine Academy, Kings Point, N.Y. (B.S. 1981) • The University of Tulsa College of Law (J.D., with honors, 1988) • Trial Lawyers College (2000).

**HONORS:** Order of the Curule Chair • Claude Rosenstein Scholar • Senior Staff Member TULSA LAW JOURNAL, 1987-1988.

**PUBLICATIONS:** The Logical Recognition of Gradual Stress Disability Under Oklahoma's Workers' Compensation Act, 23 TULSA L.J. 461 (1988) • Deceptive Trade Practices Act, 48 SMU LAW REVIEW 1113 (1995) (with Eve Pouliot) • Deceptive Trade Practices Act, 47 SMU LAW REVIEW 1033 (1994) (with Mark Anderson).

**ADMISSIONS:** All Federal District Courts in New York and Texas • U.S. Court of Appeals, Second Circuit, Fifth Circuit, Eighth Circuit, Ninth Circuit, Tenth Circuit, Eleventh Circuit • United States Supreme Court.

WILLIAM CHRISTOPHER **CARMODY**

### PARTNER

Carmody's Competitive Edge ......... *pg. 2*

Eight Selected Case Briefs ......... *pg. 2*

Representative Plaintiffs' Cases ......... *pg. 7*

Representative Defendants' Cases ......... *pg. 8*

Trial References ......... *pg. 9*

BILL CARMODY is an AV-rated (*Martindale Hubbell*'s highest rating) lawyer who works out of NYC but tries cases for plaintiffs and defendants in State and Federal courts throughout America. Carmody is listed in The *Lawdragon 500 – Lawdragon*'s most definitive guide to America's leading 500 lawyers. *Lawdragon* has also named Carmody as one of the leading plaintiffs' lawyers in America. He's been listed in *The Best Lawyers in America* and his peers have voted him a "Texas Super Lawyer," as recognized by *Texas Monthly* magazine. Carmody's clients run the gamut in number and name, from individuals and small companies, to those in Fortune 100. Author, speaker and commentator, Carmody has appeared in national and international media, from ABC's *Nightline* to German TV. His trial victories have been profiled in numerous periodicals, including *The National Law Journal, Business Week, The Wall Street Journal, Dallas Business Journal, Texas Lawyer, Forbes* and *The American Lawyer*. He enjoys contributing to the legal community by sharing his experience and enthusiasm as a trial advocacy instructor at the Southern Methodist University School of Law and by serving on the law school's Executive Board.



① RIGHT TO DIE ON TRIAL
BILL CARMODY
CIVIL TRIAL LAWYER

LIVE
Court tv
NEWS

**SUSMAN GODFREY**

## CARMODY'S COMPETITIVE EDGE

Before being recruited by Susman Godfrey, Carmody ran his own trial firm in Dallas, Texas, making his reputation first as a successful plaintiffs' lawyer then becoming equally accomplished representing defendants as well. It was in his own firm that he found his forté, the so-called "bet your company" case – the kind that can mean the difference between the life and death of a business. While he still maintains an office in Dallas, Carmody now heads the firm's New York City office. Working under the broad umbrella of complex business litigation, Bill has handled a wide variety of cases including commercial and securities fraud, antitrust, fatal and catastrophic injuries (including airplane crashes), oil and gas, trade secrets and patent infringement.



Everybody hates to lose, but Carmody loves trying lawsuits almost as much as he loves to win. Whether he is representing plaintiffs or defendants, his work is defined by one credo: Expect the Unexpected. Most lawsuits are tried the same old way. But Carmody's career has been defined by his success in treading a different path. Unlike many lawyers caught in the habit of traditional "lawyer think," Bill's creativity often provides the margin of victory. This creativity gives him maximum flexibility in analyzing and presenting the case. Consider these case briefs:

## EIGHT SELECTED CASE BRIEFS

### 1 *of* 8    Worth Every Penny

> "I've dealt with lots of trial lawyers and, by far, Bill Carmody is the best I've ever seen."

In a huge defense victory, Carmody orchestrated events outside the lawsuit to defeat a local hero in his hometown court. Carmody's client, a Dallas investment brokerage, got sued for over $50 million. A loss was sure to break the company. The plaintiff was a "big fish" businessman who had sued Bill's client in his "small pond," the little town of Rockport, Texas.

The case stood second on the trial docket. If the first case went as set, Carmody's case would be bumped for months. A postponement could have cost the brokerage an advantage it had gained during discovery: although Carmody had deposed all of the opponent's experts, he had shielded his client's key expert from deposition. So, the opposition was ill prepared for the expert's trial testimony. If the case was reset, the opposition would be able to depose the expert and erase their disadvantage.

To prevent this, Bill took the unprecedented step of brokering a deal in which his client funded a $180,000 settlement of the first case on the docket. This enabled Carmody's case to be tried while the brokerage still had the edge. Bill and his client did go to trial and won a resounding take-nothing judgment – and jury debriefing confirmed the deciding role of the key expert's testimony. The brokerage also won its counterclaim of almost $700,000.

Despite the plaintiff's vigorous attempts to overturn the take-nothing judgment, this remarkable victory withstood appellate scrutiny – it was affirmed by both the Corpus Christi Court of Appeals and the Texas Supreme Court. Wowed with Carmody's results throughout the trial and appellate process, the company's CEO remarked "I've dealt with lots of trial lawyers and, by far, Bill Carmody is the best I've ever seen." *Bill Woodruff, CEO, Wm. K. Woodruff and Co., Dallas, Texas.* For media coverage of the brokered settlement, see *National Law Journal*, February 2, 1998, "Two Texas Litigators Leapfrog to Trial Win."

### 2 *of* 8    David Beats Goliath

By uncovering evidence of commercial fraud, Carmody helped a small contractor conquer a multi-national conglomerate. This "David v. Goliath" scenario pitted Carmody's plaintiff client against one of the world's largest oil companies. The case centered around the defendant's refusal to pay for refinery construction work performed by the plaintiff in El Paso. But Bill capitalized on then-favorable venue rules to hold the case more than 800 miles away, in Beaumont – where the oil company had recently laid off hundreds of workers.

> "Any firm can supply lots of bodies. I'd rather have just one brain like Bill Carmody's."

**Master the Milieu**

The case was originally viewed only as a million-dollar breach of contract claim; however, Carmody identified a claim that the company's previous lawyers missed. The argument was novel: the defendant's false assurances of safe working conditions constituted fraudulent misrepresentations. After an arduous 2-month trial – featuring a paperless, multi-media presentation, complete with an in-court, full-size model of a quarter section of a crude oil tower – the jury found that the oil company committed fraud and awarded Bill's client over $61 million.

To cash in on this big verdict, Bill quickly negotiated a substantial confidential settlement on behalf of his client. The client's reaction to this happy ending? "Any firm can supply lots of bodies. I'd rather have just one brain like Bill Carmody's." *Jerry Strickland, CEO, AltairStrickland, Inc., Houston, Texas.    See, National Law Journal,* February 10, 1997, "The Big Numbers of 1996" and *Dallas Business Journal,* January 17-23, 1997, "Carmody Firm May be Tiny, but Judgment was Mighty."

### 3 *of* 8    Crush Or Be Crushed

> "When litigation is threatening your company's bottom line, hiring Bill Carmody is the best business decision you can make."

In some cases, an innovative trial lawyer may be the only thing that can keep momentum from crushing his client. The world's then-largest recycler of aluminum found this out the hard way. When the recycler was sued for negligence by an employee injured in a fire at one of its plants, things looked bad. When the recycler then got tagged with a $4 million adverse judgment in the case, things looked even worse. When the recycler's umbrella insurance company sought a declaratory



Innovate

judgment that it did not have to cover the judgment because it had not received timely notice of the negligence suit, things looked downright bleak. If momentum was not reversed fast, the recycler would be crushed like an old tin can and left on the scrap heap.

**Panic Never**

The recycler replaced its counsel and hired Carmody to dig it out of this $4 million hole. One big problem – the company had in fact given its umbrella carrier only 18 hours notice of the negligence suit. Carmody developed two creative theories to get around this potentially devastating fact. First, he argued that the recycler had fulfilled the umbrella policy's notice provision by giving timely notice of the negligence suit to its own insurance agent. Devising a fresh use of the theory of dual agency, Bill established that notice to the recycler's agent served as notice to the insurance company as well – because the insurance agent was effectively an agent for both the recycler and the umbrella carrier. Second, pointing to the insurer's participation in settlement talks of the underlying suit, Bill proved that, even if the insurer had not received timely notice, it had not been prejudiced by this fact.

The jury found for Carmody's client on all counts and the court granted the recycler complete relief. Soon afterward, the case settled on appeal with the insurer paying the entire underlying $4 million judgment

and paying the recycler over $600,000 in attorneys' fees. The momentum had not only turned but had carried Bill's client to victory. Don Ingram, then CEO and Chairman of IMCO Recycling, summed up his impressions: "When litigation is threatening your company's bottom line, hiring Bill Carmody is the best business decision you can make." *See, Verdict Search Commercial Litigation,* July 2004, p. 19.

## 4 *of* 8    Know Thy Jury

A case in which he sued a large steel company on behalf of one of its former employees thrust Carmody into the national spotlight as a leader in the use of mock trials. The steel company fired Bill's client, branding him a thief. But Bill discovered that the defendant had based the firing on the dubious word of an unreliable third party – without verifying the accusations or giving its 15-year employee any chance to tell his side of the story. Although employee discharges are not uncommon, Carmody honed in on the inherent unfairness of this unceremonious axing. Then, to test the impact of the company's wrongdoings, he tried the case to a mock jury.

> "Bill took a case that everyone told me was a loser and found a way to win – and win big."

At the same time Bill was preparing this slander trial, the nation's eyes were focused on another big case – the O.J. Simpson murder trial. Recognizing that the jury was the key unpredictable factor in the Simpson case, the media was focusing its attention on juries and what makes them tick. ABC News, having heard of Carmody's extensive use of mock trials, dispatched a film crew to Dallas, to capture his mock trial of the steel company case. ABC filmed not only Carmody's presentation of the evidence to the mock jurors, but also the mock jury's deliberations.

These deliberations underscored the defendant's significant exposure. The mock jurors not only heavily favored Carmody's client, but also agreed that his damages were enormous. When probed for advice for the steel company, the mock jurors replied in unison: "Settle!" At a court-ordered mediation on the eve of trial, Bill played the tape of the mock jurors' reactions for the steel company's representatives and attorneys. The mock jurors' message rang loud and clear, and Bill's client received a handsome settlement. The client recalls how Bill Carmody "took a case that everyone told me was a loser and found a way to win – and win big." *Harold Franklin, Dallas, Texas.*

**Practice winning**

## 5 *of* 8    Faster than a Speeding Fiber-Optic Transmission

**Strike first**

OK, so maybe he can't outrace bullets or leap tall buildings in a single bound but, when a rift between the "money man" and the "idea man" of a North Dallas high-tech company turned ugly, Carmody fought and won an uphill battle to defend his client. Bill represented the funding partner of a fiber-optics company, fighting against the majority shareholder and inventor of the patented technology that was the basis of the company's business. Anticipating that the opponent was about to sue his client in state court for wrongful termination and misappropriation of the patents, Bill gained a strategic advantage by firing the first shot: he filed an arbitration claim of fraudulent misrepresentation against the inventor. This effectively turned his "defense" client into the plaintiff and put the opponent on the defensive. Then it was time to go into high gear. Under the arbitration rules, Carmody had only 45 days to get trial-ready. "Getting ready" included:

- obtaining a stay of the opponent's state court case pending the outcome of the arbitration proceeding;
- taking nearly 30 depositions throughout America;
- locating and retaining top-notch experts (including the Einstein of the fiber-optics field and a venture capital professor from Harvard Business School); and
- drafting and arguing crucial pre-trial motions;
- designing a high-tech, multi-media trial presentation for optimal effect

Thriving under this "crunch time" pressure, Carmody pulled out a great result for his client. After a 2-week trial, the arbitrator ordered the opponent to sell his 44% ownership stake in the company to Bill's client for only $1.1 million. This forced sale gave the client full ownership of the company and all its technology. Carmody then got the opponent's state court case dismissed on the grounds that all those claims were subject to the arbitrator's ruling. Only eight months later, the company was valued at over $508 million. Not a bad return on investment. *See, Dallas Business Journal*, August 4-10, 2000, "Who Got The Ventures/Angels Money."

### 6 *of* 8    Class Warfare

In some cases, certain pre-trial battles are so crucial that their outcome will determine which party walks away happy. In such a case, Carmody and his partners represented the plaintiffs, a multi-state group of gas production royalty interest owners. The plaintiff class alleged that one of the world's leading oil and gas companies had underpaid them royalties on gas production by charging improper deductions for production-related costs.

After Susman Godfrey and their Oklahoma counsel obtained class certification in a hotly-contested five-day hearing, one key pre-trial issue loomed over the case – choice of law. Knowing that Oklahoma law would be the most favorable to their clients' claim, Bill and his co-counsel urged the court to apply the law of that state to the case. The oil company argued for the application of the law of each sub-class state, which would severely diminish many of the plaintiffs' claims. The choice of law question was a sticky one. The prevailing position supported the oil company's arguments. Carmody's team argued that the court should apply the law of the state in which the underpayment of royalties had actually occurred. This was a progressive torts principle that had never previously been adopted in Oklahoma in a contract case. Bill and his colleagues took 30 depositions to uncover the evidence they needed – the oil company's alleged improper accounting practices and unlawful charges stemmed from activities in Tulsa, Oklahoma. Then, in consultation with the top choice-of-law experts in the country, Carmody's group filed persuasive briefing showing the court why Oklahoma law should be applied. Shortly before the choice-of-law hearing was to be held, the oil company – knowing a ruling applying Oklahoma law would destroy their bargaining position – agreed to a hefty settlement which stands as one of the largest paid in a case of this type.

Under the terms of the settlement agreement, the oil company paid the plaintiffs' class a net of $40 million – enough to reward each individual class member handsomely. War may be hell but, with the right lawyers conducting the battles, the spoils can be heavenly.  *See, e.g., The Daily Oklahoman*, November 23, 2004, "Notice of Settlement."

SUSMAN GODFREY

### 7 *of* 8    Fight Fire With Fire

**"We needed bold, innovative action — that's what we got with Bill Carmody."**

Having made his reputation by employing aggressive plaintiffs' lawyer tactics, Bill has shown himself to be a "go-to guy" for defendants facing just such tactics. When one of the Southwest's largest health care systems was sued by a plaintiffs' lawyer notorious for reaping high-dollar recoveries from corporate defendants, it knew it needed a change of its usual strategy. The plaintiff class claimed the non-profit health care system had violated its federal tax exemption by unlawfully charging uninsured patients more than the insured. In a rare move, the health care system decided to by-pass its usual outside defense counsel. Following the ancient battle philosophy "know thy enemy", the company hired Carmody who spent years mastering the same strategies as the opposing plaintiffs' counsel. As the client's then-general counsel put it: "Are we sending a message? Absolutely, and there are no white flags attached to it."

**Know thy enemy**

Step one of Carmody's treatment plan – defeat the plaintiffs' motion to have the class action consolidated with others into a Multi-District Litigation (MDL). If the case became an MDL, it could become a slow-moving morass of litigation, tying up even more of his client's time and money. Bill then moved to Step Two of the treatment – total eradication. Carmody's team persuaded the federal court to dismiss the entire case. The final diagnosis? The company was thrilled with the results of Carmody's alternative medicine. John Thomas, General Counsel for Baylor Health Care System at the time, put it simply: "We needed bold, innovative action – that's what we got with Bill Carmody." See, *Dallas Morning News*, August 23, 2004, "Are Higher Fees for Uninsured Fair?"

### 8 *of* 8    Better Late Than Never

In a perfect world, a lawyer would always have unlimited time and resources to prepare for trial. But the world is not perfect and, often, time is not on your side. In yet another case where he suited up for the defense, Carmody demonstrated the experience and guts required to take over and win big at the eleventh hour.

**"Bill was a clutch performer winning us an incredible trial victory"**

The case arose when a life insurance company was sued in a class action case by 25,000 of its policyholders. The plaintiff class alleged that the insurer had breached the terms of its policies, causing the plaintiffs to be overcharged for their insurance. The class sought $108 million in damages. In this bet-your-company case, a loss could have wiped out the company's net worth – and forced a shut down.

**Thrive Under Pressure**

The case had been pending for five years, as the insurance company was represented by a large, full-service law firm. But with the make-or-break trial looming, the insurance company decided it needed a proven trial lawyer – someone who made his reputation in the courtroom. So, just 6 days before trial, the insurer asked Carmody to try the case. Carmody quickly learned the case cold, devised the trial strategy, and presented the case during an eight-day jury trial. The jury quickly and unanimously delivered a complete defense verdict – and the case was dismissed. Given a new lease on life, the company heaved a sigh of relief and its General Counsel praised Carmody's command: "Just six days before trial, most lawyers would have refused to take the case. But Bill Carmody thought of, and seized upon, every tactical advantage. Bill was a clutch performer winning us an incredible trial victory." Bryan R. Newcombe, General Counsel, Legal & General America, Inc., Rockville, Maryland.  See, *The American Lawyer*, Sept. 2007, Big Suits, "Beller et al. v. William Penn."



SUSMAN GODFREY

# REPRESENTATIVE **PLAINTIFFS'** CASES

Carmody's record of success has been built on both sides of the bar, with cases covering a wide variety of subject matters. Some of his plaintiffs' cases include:

| Type of Case | Court | Result |
|---|---|---|
| Breach of Contract, Fraud | State Court Beaumont, Texas | In 2-month trial against large oil company, turned simple breach of contract case into commercial fraud case resulting in $61M jury verdict. See *National Law Journal*, February 10, 1997, "The Big Numbers of 1996." |
| Negligence | State Court Dallas, Texas | After client sustained a minor soft tissue injury from an automobile collision, but was later diagnosed with RSD, negotiated $1.75M settlement – which is believed to be the largest RSD Settlement at that time in Dallas County. |
| Securities Fraud | State Court Rockwall, Texas | Developed egregious liability facts to settle before trial for confidential amount. See *Wall Street Journal*, January 3, 2003, "Lucent Clears Legal Decks for 2003." |
| Slander | State Court Dallas, Texas | After this case was mock tried on ABC's *Nightline* and portions of jury deliberations shown to Defendants, negotiated significant confidential settlement just before trial. |
| Securities Fraud | State Court Houston, Texas | Representing opt-out shareholders in a $48M securities fraud suit, developed new theories of liability and obtained confidential settlement granting Plaintiffs more than 40 times what they would have received in a federal class action. |
| Commercial Fraud | State Court Daytona Beach, FL | Successfully prosecuted claims against National Bank, resulting in confidential settlement to over 100 people victimized in Ponzi scheme. |
| Breach of implied duty to market Class Action | State Court Washita County, Oklahoma | By developing evidence favoring application of state law most unfavorable to Defendant oil company, settled multi-state gas royalty owner class action for net of $40M to the class. See, *The Daily Oklahoman*, November 23, 2004, "Notice of Settlement." |
| Quantum Meruit | Federal Court Dallas, Texas | Effectively conveyed value for a one-call business referral to a jury who awarded $1.2M "finder's fee," then negotiated $900k settlement after overcoming two Fifth Circuit appeals. |
| Fraud and Civil Conspiracy mass action | State Court Dallas, Texas | After arduous month-long jury trial, received dubious distinction of being on losing side of *National Law Journal's* "1999 Defense Win of the Year." See *National Law Journal*, May 17, 2000, "Fighting Back." |
| Shareholder derivative suit | State Court Dallas, Texas | While this high-profile lawsuit was dismissed after exploiting powerful evidence of Defendant's abuse, this closely-held corporation agreed to pay $4.2M to purchase all of client's stock. See *Dallas Morning News*, December 5, 1997, "Former CEO Sues First Southwest"; *Dallas Morning News*, April 12, 1998, "First Southwest Embroiled in Legal Battle – Co-owners Trade Allegations in Lawsuit Over Firm's 1996 Stock-Cleaning Losses." |
| Fraud | State Court Baltimore, Maryland | After overcoming Defendants' Motions to Dismiss and, later, their Motions for Summary Judgment, settled for a confidential amount on the eve of trial in which Plaintiffs sought to recover over $400M. See, *The Daily Record*, Vol. 5, No. 527, March 28, 2006, "Tech Court Draws Sparse Crowd at UM Law." |

## REPRESENTATIVE **DEFENDANTS'** CASES

Although many know Carmody as a successful plaintiffs' lawyer, much of his work is
done on behalf of defendants. Some of his significant defense cases include

| Type of Case | Court | Result |
|---|---|---|
| Securities Fraud, Violation of Texas Business Corp. Act | State Court Rockport, Texas | Called in to replace previous counsel after discovery of evidence damaging to Defendant; to limit further discovery, brokered deal to obtain first trial slot and obtained take-nothing judgment and recovery of $696K of attorneys' fees for client. See *National Law Journal*, February 2, 1998, "Two Texas Litigators Leapfrog to Trial Win." |
| Breach of Contract | State Court Dallas, Texas | Prevailed on Summary Judgment in difficult liability case in which Plaintiff sought over $20M in damages. |
| Breach of Contract Fraud | Federal Court Chicago, Illinois | Negotiated minimal settlement on the eve of trial, despite egregious liability facts and multi-million dollar exposure. |
| Breach of Contract Fraud | State Court Fort Worth, Texas | After replacing previous counsel 60 days before trial, deposed key top officers and exposed plaintiff's questionable business tactics, resulting in a "walk-away" settlement. |
| Breach of Contract DTPA | Federal Court Dallas, Texas | In class action suit brought by high-profile plaintiffs' lawyer, contained case by over-coming request for MDL and then obtained complete dismissal with prejudice of Plaintiffs' case. See, *Dallas Morning News*, August 23, 2004, "Are Higher Fees for Uninsured Fair?" |
| Theft of Trade Secrets | State Court Houston, Texas | In injunction case brought by national computer company against its upstart rival, forced "walk-away" settlement and obtained Plaintiff's grant of license allowing rival Defendant to use Plaintiff's proprietary technology. |
| Declaratory Judgment Action | Federal Court St. Louis, Missouri | When client's insurer sought to avoid covering state court judgment entered against client, won jury trial and obtained ruling ordering insurer to completely cover $4M judgment and pay client's significant attorneys' fees. See, *Verdict Search Commercial Litigation*, July 2004, p. 19. |
| Breach of Contract, Breach of Warranty | Common Pleas Court Lima, Ohio | In a case with no counter-claim, forced Plaintiff to pay client's significant attorneys' fees and costs after exposing Plaintiff's potential Medicare fraud. |
| Breach of Contract Class Action | State Court Minola, New York | Hired just 6 days before class action trial, won unanimous defense jury verdict in $108 million case for insurance company client. See, *The American Lawyer*, Sept. 2007, Big Suits, "Beller et al. v. William Penn." |
| Corporate "squeeze-out", misappropriation of patents, Fraud | American Arbitration Association Dallas, Texas | Successfully ousted founder/44% share-holder for $1.1M forced stock sale only 8 months before company's $508M valuation. See *Dallas Business Journal*, August 4-10, 2000, "Who Got The Ventures/Angels Money." |

SUSMAN GODFREY

## TRIAL REFERENCES

It's one thing to just read about the way Bill Carmody tries a case. But the best proof of his unique approach comes from talking to people who have actually seen Carmody at work. The following people (not aligned according to case) are clients who hired Carmody to represent them, attorneys who tried a case with or against him, and judges who presided over one of Carmody's trials. All are willing to speak with you about Bill Carmody's efficacy in the courtroom.

### Clients

**Jerry Strickland**  CEO  *Altair Strickland, Inc.*  Houston, Texas  281-478-6200

**John Thomas**  President and CDO  *Cirrus Health*  817-837-1187

**John Peloza, M.D.**  *Center for Spine Care*  Dallas, Texas  214-378-7200

**Bob Burggraf**  CEO  *R & B Appliances, Inc.*  Chino, CA  909-591-9365

**Kevin Knight**  CEO  *Knight Transportation*  Phoenix, AZ  602-269-2000

**Charlie Lamar**  *Lamar Advertising*  Baton Rouge, LA  225-926-1000

**Bryan Newcombe**  Gen. Counsel  *Legal & General America*  Rockville, MD  301-294-6968

### Co-counsel

*Gilbert Adams, Jr.*  Law Offices of Gilbert Adams  Beaumont, Texas  409-835-3000

*Eric Moyé*  **Vincent & Moyé**  Dallas, Texas  214-979-7400

*Daryl Barger*  Hartline, Dacus, Barger, Dreyer & Kern  Corpus Christi, TX  361-866-8009

*George Henry*  Law Offices of George Henry  Dallas, Texas  972-788-0811

*Jim Dowd*  Dowd & Dowd  St. Louis, Missouri  314-421-6600

*Tom Hill*  Kegler, Brown, Hill & Ritter  Columbus, Ohio  614-462-5490

*Paul Bekman*  410-539-6633  *Ben Rosenberg*  410-727-6600  Baltimore, Maryland

### Opposing Counsel

*Paul Saunders*  **Cravath, Swaine & Moore**  New York, New York  212-474-1404

*Barry McNeil*  **Haynes and Boone**  Dallas, Texas  214-651-5000

*Bob Krakow*  **Gibson, Dunn & Crutcher**  Dallas, Texas  214-698-3100

*Jim Foland*  **Foland & Wickens**  Kansas City, Missouri  816-472-7474

*Gary Davis*  **Crowe & Dunlevy**  Oklahoma City, Oklahoma  405-235-7700

*Tim McCormick*  **Thompson & Knight**  Dallas, Texas  214-969-1103

*Christopher Hall*  **Morgan, Lewis & Bockius**  New York, New York  212-309-6702

### Judges

Hon. Jerry Buchmeyer  *U.S. District Court*  Dallas, Texas  214-753-2295

Hon. Edward McManus  *U.S. District Court*  Cedar Rapids, Iowa  319-286-2350

Hon. Charles Shaw  *U.S. District Court*  St. Louis, Missouri  314-244-3480

Hon. David Godbey  *U.S. District Court*  Dallas, Texas  214-753-2700

Hon. Ronald Yeager  *36th District Court*  Aransas Co., Texas  361-364-6200

Hon. Gary Sanderson  *60th District Court*  Jefferson Co., Texas  409-835-8472

Hon. Ira Warshawsky  *Supreme Court, Comm. Div.*  Nassau Co., New York  516-571-3351

*Attorney advertising  **Prior results do not guarantee similar future outcomes  ***Internet mail is not fully secure or private. Therefore, please do not transmit confidential information via Internet mail. Transmission of information is not intended to and does not create an attorney-client relationship. Please do not assume that your communications sent using Internet mail are privileged or confidential. Please do not send Susman Godfrey any confidential information via the Internet without previously consulting one of our attorneys.  ****Nothing on this web page is intended to represent that Susman Godfrey currently represents any particular clients mentioned because matters and client relationships naturally terminate from time to time.  Copyright © 2007 SUSMAN GODFREY L. L. P. Attorneys at Law. All rights reserved. Unless otherwise noted in website - Not certified by Texas Board of Legal Specialization.

# EXHIBIT 4
# (To M. Seltzer Declaration)

## SUSMAN GODFREY L.L.P



# Marc M. Seltzer
# Partner

Los Angeles, California
Phone: 310.789.3102
Fax: 310.789.3006
mseltzer@susmangodfrey.com*

MARC M. SELTZER, born Los Angeles, California; admitted
to bar, 1972, California.

Section, State Bar of California
- President of the Ninth Judicial Circuit Historical Society, past President and current member of the Board of Directors of the Legal Aid Foundation of Los Angeles, member of the Board of Directors of the National Equal Justice Library, Board of Directors, Equal Justice Works, Board of Directors, American Friends of Hebrew University, Western Region
- Board of Editors of Class Action Reports
- Board of Trustees, Lawyers Committee for Civil Rights Under Law
- Selden Society

## HONORS & DISTINCTIONS

- Named a "Super Lawyer" by *Southern California Law & Politics* magazine (2004, 2005, 2006, 2007)
- 2004 American ORT Jurisprudence Award

Marc Seltzer has practiced law for more than thirty years in Los Angeles, California, litigating complex cases in both state and federal courts. For twenty years, he was a principal in the law firm of Corinblit & Seltzer, a Professional Corporation. Marc Seltzer's relationship with the partners of Susman Godfrey began in the late 1970's when Steve Susman and Marc Seltzer worked together on the *Corrugated Container* antitrust case. In the ensuing years, Mr. Seltzer and the lawyers of Susman Godfrey worked together on a number of cases. In February 1998, Marc Seltzer became a partner of Susman Godfrey L.L.P., and opened the firm's Los Angeles office. Since then, the office has become one of the leading litigation boutiques in Los Angeles.

Marc Seltzer concentrates his practice in the prosecution and defense of complex business law cases, including antitrust, securities, corporate and financial institution law matters.

Mr. Seltzer's involvement in nationally prominent litigation began in the mid-1970's, when he was tapped by Jack Corinblit to work on the massive *Equity Funding* securities litigation. That case consisted of more than 100 consolidated class and private action cases, and was settled in 1976 for over $60 million, then the largest recovery ever achieved in a securities fraud class action. *See In re Equity Funding Corp. of America Securities Litigation,* 438 F. Supp. 1303 (C.D. Cal. 1977). Later, in the 1980's, Mr. Seltzer was appointed by the Los Angeles federal court to serve as sole lead counsel to represent the plaintiff class in the *ZZZZ Best* securities fraud case. The *ZZZZ Best* fraud was described by the United States Attorney for the Central District of California as "the most massive and elaborate securities fraud perpetrated on the West Coast in over a decade," harking back to the *Equity Funding* case. The case was settled for more than $40 million and resulted in several important published decisions sustaining plaintiffs' claims. *See, e.g., In re ZZZZ Best Securities Litigation,* 864 F. Supp. 960 (C.D. Cal. 1994). More recently, Mr. Seltzer was, together with Steve Susman, part of the Susman Godfrey trial team representing approximately 90 financial institutions in a negligent misrepresentation case against one of the "Big Four" accounting firms. That case settled just prior to the commencement of trial. Among other cases Mr. Seltzer has litigated are:

*Masimo v. Tyco Healthcare L.P.,* an antitrust case in which Marc Seltzer served as co-trial counsel for the plaintiff, together with Steve Susman, Vineet Bhatia and Steve Morrissey. The case was tried to a verdict resulting in an award of $140 million (before trebling) in favor of the plaintiff in March 2005. A new trial has been granted as to damages. Post-trial proceedings are pending.

*In re Structured Settlement Litigation,* consolidated class actions brought in the Los Angeles Superior Court in which Marc Seltzer served as one of the lead counsel for the plaintiffs. The

case was settled in 2004 for approximately $135 million.

*In Motorcar Parts & Accessories Securities Litigation*, fourteen consolidated securities class actions in which Marc Seltzer was appointed by the Los Angeles federal court to serve as lead counsel for the class. The case was settled for $7.5 million in cash. *See Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*, 231 F.3d 1215 (9th Cir. 2000).

*In re IDB Communications Group, Inc. Securities Litigation*, in which Marc Seltzer served as one of four co-lead counsel appointed by the Los Angeles federal court to represent the plaintiff class in more than twenty consolidated class action cases. The case was settled for $75 million.

*In re Taxable Municipal Bond Securities Litigation*, in which four lawyers, including Marc Seltzer, served on Plaintiffs' Executive Committee, and together with plaintiffs' lead counsel, supervised and managed every aspect of the litigation. This case was a consolidated multi-district proceeding brought on behalf of defrauded purchasers of municipal bonds. The case resulted in numerous reported decisions on important recurring issues arising under the federal securities laws. *See, e.g., In re Taxable Municipal Bond Litigation*, [1993 Transfer Binder] Fed. Sec. L. Rep. (CCH) 97,742 (E.D. La. 1993). After several years of intense litigation, the case was settled for approximately $110 million.

*Financial Federation, Inc. v. Ashkenazy*, in which Marc Seltzer and his co-counsel successfully defended a case brought by a savings and loan association against persons who sought to take control of the institution in a bench trial in Los Angeles federal court. *See Financial Federation, Inc. v. Ashkenazy*, [1984 Transfer Binder] Fed. Sec. L. Rep. (CCH) 91,489 (C.D. Cal. 1983).

*Green v. Occidental Petroleum Corp.*, in which Marc Seltzer, together with co-counsel, represented plaintiffs in consolidated securities class action cases that established important precedent in the Ninth Circuit regarding the certification of plaintiff classes and the computation of damages in securities fraud cases. *See Green v. Occidental Petroleum Corp.*, 541 F.2d 1335 (9th Cir. 1976). The case was settled for $12 million.

*Wool v. Tandem Computers, Inc.*, a securities class action in which Marc Seltzer played a leading role. One of the notable achievements in this case was a victory for the plaintiffs in the Ninth Circuit which established important precedent concerning the measure of damages recoverable in federal securities fraud class action cases, the standard for "controlling person" liability under the federal securities laws and the requirements for pleading fraud with the particularity specified under Rule 9(b), Fed.R. Civ. P. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir. 1987). Following the issuance of the Ninth Circuit's opinion, the case was settled for $16.5 million.

*Plaine v. McCabe*, a securities class action, in which Marc Seltzer argued before the Ninth Circuit, obtaining a substantial victory for plaintiffs, establishing significant precedent in the Ninth Circuit regarding the standards for liability for violations of tender offer disclosure rules under the federal securities laws. *See Plaine v. McCabe*, 797 F.2d 713 (9th Cir. 1986).

*Biben v. Card*, where Marc Seltzer served as co-lead counsel for plaintiffs. The plaintiffs achieved substantial pretrial victories, including establishing the validity of their claims under the federal securities laws against the director, accountant and attorney defendants in that case. *See Biben v. Card*, [1984-1985 Transfer Binder] Fed. Sec. L. Rep. (CCH) 92,010 (W.D. Mo. 1985), *on denial of motion for reconsideration*, [1984-1985 Transfer Binder] Fed. Sec. L. Rep. (CCH) 92,083 (W.D. Mo. 1985). The case settled for approximately $12 million.

*Sanwa Bank California v. Facciani*, where Marc Seltzer was co-lead counsel for a class of investors in a state court securities case and a companion federal case in which settlements

totaling approximately $26 million were obtained on behalf of defrauded investors.

*In re California Indirect-Purchaser Infant Formula Antitrust Class Action Litigation* was comprised of several consolidated consumer class actions brought for the alleged price-fixing of infant formula products. Marc Seltzer was appointed by the court to serve as one of two co-lead counsel for plaintiffs and the class. The case was settled for more than $20 million.

*Lilienthal v. Levi Strauss & Co.*, an individual minority shareholder's action for breach of fiduciary duty by the majority owners, which resulted in a judgment after trial for the plaintiff providing for a recovery in excess of $3 million.

*Small v. Sunset Park*, where Marc Seltzer was counsel for a class of investors in a state court class action involving an alleged Ponzi scheme in which settlements totaling more than $16.8 million were obtained, including $12 million paid in settlement by a then "Big Five" accounting firm.

*Schneider v. Traweek*, federal and state court securities class actions in which Marc Seltzer was lead counsel for the plaintiffs. Significant victories were obtained on plaintiffs' behalf in defeating motions to dismiss and in obtaining class certification. *See Schneider v. Traweek* [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) 95,419 and 95,505 (C.D. Cal. 1990). The case was settled for approximately $14 million.

*Johnson v. Boston,* where Marc Seltzer was co-lead counsel for a class of investors in a nationwide class action in state court in which approximately $20 million in settlements were achieved for investors.

In 1972 and 1973, he was a Deputy Attorney General for the State of California specializing in criminal appellate cases. In 1985, Mr. Seltzer was elected to the membership of the American Law Institute.

*Internet mail is not fully secure or private. Therefore, please do not transmit confidential information via Internet mail. Transmission of information is not intended to and does not create an attorney-client relationship. Please do not assume that your communications sent using Internet mail is privileged or confidential. Please do not send Susman Godfrey any confidential information via the Internet without previously consulting one of our attorneys.

**Nothing on this web page is intended to represent that Susman Godfrey currently represents any particular clients mentioned because matters and client relationships naturally terminate from time to time.

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 |
| | Master Docket No. 08 Civ. 2516 (VM)(JCF) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF WILLIAM A. ISAACSON IN SUPPORT OF
MOTION FOR APPOINTMENT OF INTERIM LEADERSHIP STRUCTURE**

WILLIAM A. ISAACSON declares:

1.       I am a member of the law firm of Boies, Schiller & Flexner LLP ("BSF").  My firm serves as attorney of record for the State of Mississippi and Hinds County, Mississippi.  The matters set forth herein are within my personal knowledge, and if called upon and sworn as a witness I could competently testify regarding them.

2.       All facts contained in the attached Motion for Appointment of Interim Leadership Structure and Memorandum of Law in Support of Appointment of Interim Leadership Structure which pertain to BSF and the members of BSF are true and correct to the best of my knowledge.

3.       Attached hereto as Exhibit 1 is a true and correct copy of BSF's firm resume.

4.       The partners from BSF's Washington, D.C., and New York, NY offices who will play leading roles in this litigation should BSF be selected as co-lead counsel have substantial antitrust, trial and class action experience.

5.       <u>William A. Isaacson:</u>   I have been a partner in the Washington, DC office of BSF since the inception of Boies & Schiller in 1997.  I am a graduate of the University of Redlands and the University of Virginia School of Law where I was an editor for the University of Virginia Law

Review, and received the honor of Order of the Coif and the Margaret G. Hyde Award. I am a former law clerk for Chief Judge Harrison L. Winter of the United States Court of Appeals for the Fourth Circuit.

        a.      In 2006, I acted as sole lead counsel in *In re Scrap Metal Antitrust Litigation* (N.D. Ohio), a multi-week trial of price fixing and market allocation claims, resulting in an $11.5 million verdict and a $23 million award after trebling and judgment reduction for other settlements. That verdict was recently affirmed by the Sixth Circuit Court of Appeals in *In re Scrap Metal Antitrust Litigation*, 527 F.3d. 517 (6th Cir. 2008). I was also appointed sole lead counsel for the class of direct purchasers in *In re Graphics Processing Units Antitrust Litigation* (N.D. Cal.). In recent years, I have also acted as a trial counsel for the class plaintiffs in *In re Vitamins Antitrust Litigation* (D.D.C.), a three-week jury trial of price fixing and market allocation claims in an international cartel case resulting in a jury verdict for the class of $49.5 million (before trebling). (National Law Journal, August 4, 2003, p. 13). I also acted as a Steering Committee Member in *In re Vitamins Antitrust Litigation* in which the firm represented purchasers of a range of vitamins in pursuing price fixing and market allocation claims ("Not Your Father's Class Action," National Law Journal, June 7, 1999, A5), resulting in over $1 billion in settlements. In addition, I have filed the first class actions uncovering cartels in the vitamin C industry in China and among magnesite producers in China. I have also acted as co-lead counsel in *In First Databank Antitrust Litigation*, 205 F.R.D. 408, 411 (D.D.C. 2002) (approving $24 million settlement) and other class actions.

        b.      I have also acted as lead trial counsel for Claimant in *Homestore v. AOL* (AAA Arbitration/Washington D.C.) asserting claims for breach of contract arising out of an internet distribution agreement. Following a two week trial in 2002 and before a final award, the parties entered a settlement agreement restructuring the distribution agreement and terminating a $57 million payment due from Homestore and reducing future payments by $9 million per

quarter. (Fair Disclosure Wire, January 9, 2003). I have acted as trial counsel for Respondent in *Marketing Company v. Telecommunications Company* (AAA arbitration/ New York) in which Claimant was denied its request for $30 million in lost profits. I have also acted as a trial counsel in *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274 (5th Cir. 2004) (arbitration award of $261 million) and *Worldspan v. Abacus* (ICC Arbitration / London) (award of $39.5 million).

6.    <u>Tanya S. Chutkan</u>:    Tanya Chutkan is a partner in BSF's Washington, D.C. office. She graduated from the University of Pennsylvania School of Law in 1987, where she was an associate editor of the Law Review and an Arthur Littleton Legal Writing Instructor. She received her Bachelor of Arts Degree in Economics from George Washington University in 1983. Prior to joining BSF in 2002, Ms. Chutkan was a trial attorney and supervisor with the D.C. Public Defender Service, where she tried over fifty jury trials, including numerous serious felony cases and complex white collar matters, and argued several appellate cases. She tried and won acquittal in the first blackmail case to go to trial in the District of Columbia and also won the first known acquittal in the District of Columbia against DNA evidence. Her recent cases include the trial, together with William Isaacson, of two federal antitrust class actions on behalf of plaintiff classes, *In re Vitamins Antitrust Litigation* (D.D.C 2003), which resulted in an award of $149.5 million, and In *re Scrap Metal Antitrust Litigation* (N.D. Ohio 2006). Currently, she represents plaintiff classes in three pending class actions in federal courts in Pennsylvania, Tennessee, and New York, and recently represented a multinational corporation in a Department of Justice grand jury investigation.

7.    <u>Jonathan M. Shaw</u>:    Jonathan M. Shaw is a partner in BSF's Washington, D.C. office. He is a 1992 *cum laude* graduate of the University of Pennsylvania Law School, where he was an Associate Editor of the *Law Review* and a former law clerk for the Hon. Frank A. Kaufman on the United States District Court for the District of Maryland. Before joining BSF in 2005, he

was a partner at Susman Godfrey L.L.P. Mr. Shaw has devoted much of his practice to antitrust and class action litigation. Recently, Mr. Shaw has: (a) served as co-lead counsel for the plaintiff class in *Van Roden v. Termeer* (S.D.N.Y. 2007) a securities class action which settled for $64 million less than a week before trial and (b) served as trial counsel for Genesco, Inc. in *Genesco, Inc. v. The Finish Line, Inc. et al.* (Tenn. Chancery Ct. 2007-08), in which, following a bench trial, the court rejected the defendants' claims that a merger agreement was unenforceable due to fraud or the occurrence of a Material Adverse Event and ordered Finish Line to close on its $1.6 billion merger with Genesco.

8.    <u>Magda M. Jimenez</u>:    Magda M. Jimenez is a partner in BSF's New York City office. Ms. Jimenez has significant experience in complex commercial litigation, antitrust litigation and white collar criminal defense. Her antirust experience includes defending a leading telecommunications company against federal and state claims alleging monopolization in the pay telephone business, and in connection with the company's opposition to the government's settlement of *United States v. Microsoft*. She also represents some 3800 retail pharmacies in a federal antitrust action against the manufacturers of brand name prescription drugs. In addition, Ms. Jimenez has been involved in the defense and prosecution of class actions. Her trial experience includes the representation of a well-known mystery writer/anthologist in a federal jury trial alleging trademark and breach of contract claims that resulted in a favorable jury verdict; the representation of a testifying witness in the criminal trial of *United States v. Martha Stewart*; and the representation of numerous witnesses before federal and state grand juries. Ms. Jimenez graduated from the Benjamin N. Cardozo School of Law in 1995, where she was the Managing Editor of the *Cardozo Women's Law Journal* and a recipient of the Samuel L. Belkin Scholar Award. She received her Bachelor of Arts Degree in Political Science from New York University.

9.   <u>Jack A. Simms</u>:        Jack A. Simms is a partner in BSF's Washington, D.C. office. Mr. Simms' antitrust experience includes representation of both plaintiffs and defendants under the Sherman Act §§ 1 and 2 and the Robinson-Patman Act. Some of the notable recent antitrust cases that Mr. Simms has worked on include: litigating American Express' antitrust claims against Visa, MasterCard and several large banks which were recently settled for over $4 billion, the largest antitrust settlement in history; winning summary judgment (affirmed on appeal by the Sixth Circuit) for a Fortune 50 consumer products company on claims it had violated Section 2 of the Sherman Act and the Robinson Patman Act; winning dismissal for a Fortune 50 consumer products company on claims under Section 2 of the Sherman Act brought by a competitor. Mr. Simms also helped negotiate terms of individual settlements for multiple plaintiffs injured in a single catastrophic event; at the time, these individual settlements included some of the largest personal injury settlements in the state of Texas. Mr. Simms is a graduate of Haverford College and Northwestern University School of Law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of July, 2008.


William A. Isaacson

5

# EXHIBIT 1
# (To W. Isaacson Declaration)

# BOIES, SCHILLER & FLEXNER LLP

5301 WISCONSIN AVENUE, N.W. • WASHINGTON, D.C. 20015-2015 • PH. 202.237.2727 • FAX 202.237.6131

Boies, Schiller & Flexner LLP is one of the nation's premier law firms. Best known for landmark cases such as *United States v. Microsoft, Bush v. Gore, In re Vitamins,* and *American Express v. Visa and MasterCard,* we represent some of the largest and most sophisticated organizations in the world when the results matter most. Since our founding in 1997, we have won and saved our clients billions of dollars at trial, in arbitration, and at the settlement table. Today, with over 220 lawyers practicing in offices across the country, we regularly serve as lead counsel in the most significant and highest profile disputes in the world. We have been described by *The Wall Street Journal* as a "national litigation powerhouse" and by the *National Law Journal* as "unafraid to venture into controversial" and "high risk" matters.

In 1997 David Boies and Jonathan Schiller joined forces to build the most interesting and dynamic litigation practice anywhere. Two years later Don Flexner joined them. Since then, they have recruited and litigated side-by-side with a group of the most accomplished and effective lawyers in the country. Our lawyers have tried more than 400 cases, and include two former United States Attorneys, numerous former Justice Department officials and Assistant United States Attorneys, former Supreme Court clerks, and former partners of prestigious law firms. The talent of our partners is matched by the skill and diversity of our associates, who come mainly from judicial clerkships and top law schools. Likewise, our corporate practice brings our standard of excellence to bear in negotiating complex and sophisticated transactions. For that reason, the *American Lawyer* noted that the firm has assembled "a team of seasoned attorneys to form one of America's most successful and sought-after law firms for cases that matter."

Our clients—both plaintiffs and defendants—know and rely on our talent, standard of excellence, relentlessness, creativity, and track record of success in a wide variety of practice areas and industries. We have successfully represented our clients in some of their most high-stakes litigation:

- Representing American Express in its antitrust case against MasterCard, Visa, and certain of their member banks, we obtained the largest recovery for a single plaintiff in the history of United States private antitrust litigation—over $4 billion—about four times the previous record.

- Representing Genesco, Inc. at trial in its suit against The Finish Line, Inc. and UBS arising out of Finish Line's refusal to close on a $1.6 billion merger, we won an order rejecting Finish Line's and UBS's contract and fraud defenses and ordering Finish Line to specifically perform its obligations under the merger agreement. "The trial [was] closely watched on Wall Street, as investors and corporate boards look for guidance in how to handle a spate of litigation over scuttled merger agreements." Dennis Berman, *Judge Rules Finish Line Must Acquire Genesco,* THE WALL STREET JOURNAL, Dec. 28, 2007, at A3.

- Our investigation uncovered a worldwide vitamin price-fixing cartel which, in the words of a federal judge, "enable[ed] the criminal investigation to begin." We secured a $1.1 billion settlement for a class of vitamin purchasers, and later won a $148.5 million jury verdict against non-settling defendants.

1

BOIES, SCHILLER & FLEXNER LLP

- We won a $512 million settlement of antitrust claims against the world's major auction houses, Christie's and Sotheby's, which was 1.8 times the out-of-pocket damages—in the settlement approval process, no one could point to another antitrust class action that had settled for more than out-of-pocket damages.

- We are recognized internationally in arbitration where, among other matters, we successfully defended Siemens-Westinghouse against a $1.4 billion default judgment obtained in Pakistan; we won a $261 million award in Paris for Florida Power & Light against its joint venture partner after Indonesia cancelled a geothermal power project; and won an arbitral award on behalf of YES Network in the form of a long-term carriage agreement with Cablevision that substantially increased the enterprise value of YES.

- We won a New York jury verdict worth some $700 million for Lloyd's of London involving property insurance for the 9/11 destruction of the World Trade Center.

This record of success is the foundation on which the firm was built. It has distinguished Boies, Schiller & Flexner LLP as the law firm of choice for "the cases that matter."

## ANTITRUST

Boies, Schiller & Flexner has a highly successful and sophisticated antitrust practice counseling clients facing large challenges. We excel in the defense and prosecution of complex, high-stakes antitrust cases, and the defense of antitrust and competition-related government investigations. Our practice is both national and international in scope as it spans a broad range of industries. Among our partners are the former lead trial attorney for the United States in *United States v. Microsoft*; a former Deputy Assistant Attorney General in charge of the Antitrust Division; and the former lead attorney for the United States in *United States v. AT&T*.

Our partners have been lead trial counsel, or co-lead trial counsel, in some of the most important antitrust cases in history, including: *United States v. Microsoft*; *United States v. AT&T*; *United States v. IBM*; *United States v. Northwest Airlines and Continental Airlines*; *United States v. ADM and RJR Nabisco*; *In re Vitamins Antitrust Litigation*; *In re Auction Houses Antitrust Litigation*; *California Computer Products v. IBM*; *Square D Co. v. Niagara Frontier Tariff Bureau*; *American Express v. Visa and MasterCard*; and *In re Scrap Metal Antitrust Litigation*.

This experience translates into success on the cutting-edge of antitrust. For example, we became pioneers in plaintiffs' side international price fixing cases when we brought the first antitrust lawsuits against certain Chinese manufacturers for conspiring to fix the prices of Vitamin C and Magnesite sold in the United States. The firm also recently won summary judgment, affirmed on appeal, in a series of cases for a company alleged to have violated federal antitrust laws through its retail merchandising and wholesale distribution policies. Damages sought ranged from $85 million to more than $1 billion.

B O I E S,   S C H I L L E R   &   F L E X N E R   L L P

# CLASS ACTIONS

Boies, Schiller & Flexner enjoys one of the most selective and sophisticated class action practices in the country.  We have been trial counsel in two successful class action jury trials against non-settling defendants in *In re Vitamins Antitrust Litigation* (D.D.C.) (a $49.5 million verdict in 2004 before trebling) and *In re Scrap Metal Antitrust Litigation* (an $11.5 million verdict in 2006 before trebling).  The firm acted as lead counsel in *In re Auction Houses Antitrust Litigation* (S.D.N.Y.) (a $512 million settlement that another plaintiffs' counsel described as "the most outstanding result I have ever heard of in the history of the antitrust laws.").

We also served as co-lead counsel in *In re Vitamins Antitrust Litigation* (D.D.C.) (a $1.1 billion initial settlement followed by additional settlements of over $200 million); *In re Cardizem CD Antitrust Litigation* (E.D. Mich.) (a $110 million settlement); *In re Alcatel Alsthom Securities Litigation* (E.D. Texas) (a $75 million settlement); *In re Buspirone Antitrust Litigation* (S.D.N.Y.) (a $220 million settlement); *In re Terazosin Hydrochloride Antitrust Litigation* (S.D. Fla.) (a $72.5 million settlement); *In re First Databank Antitrust Litigation* (D.D.C.) (a $24 million settlement); *In re Scrap Metal Antitrust Litigation* (N.D. Ohio) (an $11 million settlement on top of a $23 million jury verdict); and *Van Roden v. Termeer* (S.D.N.Y.) (a $64 million settlement).

BOIES, SCHILLER & FLEXNER LLP

# William A. Isaacson

**Partner**
Washington, DC

t: 202 237 5607
f: 202 237 6131

wisaacson@bsfllp.com

**Areas of Practice**
Litigation
International Arbitration

**Education**
**University of Virginia School of Law**, J.D., 1986; Order of the Coif; Margaret G. Hyde Award

**University of Redlands**, B.A., Political Science & English, 1982; National Debate Tournament Finalist (1982)

**Clerkships**
Hon. Harrison L. Winter, Chief Judge, United States Court of Appeals for the Fourth Circuit, 1986-1987

**Admissions**
District of Columbia



Since joining the firm at its inception in 1997, Bill Isaacson's main practice areas have included complex commercial litigation and class actions, and arbitration.

In the area of plaintiff class actions, Legal 500.com describes Mr. Isaacson as a "key litigator" at BSF who "has emerged as the leader on the foreign antitrust front." For example, Mr. Isaacson has acted as trial counsel for class plaintiffs in *Animal Science Products v. Mitsui & Co.* (D.D.C.), an international cartel case, resulting in a jury verdict for the class of $49.5 million (before trebling) (National Law Journal, August 4, 2003 p. 13) and *In re Scrap Metal Antitrust Litigation* (N.D.Ohio) winning a jury verdict of $11.5 million before trebling. Mr. Isaacson also has acted as a Steering Committee Member in *In re Vitamins Antitrust Litigation* in which the firm uncovered an international conspiracy and represented purchasers of a range of vitamins in pursuing price fixing and market allocation claims ("Not Your Father's Class Action," National Law Journal, June 7, 1999, p.A5), resulting in an over $1 billion in settlements. In addition, Mr. Isaacson has filed the first class actions uncovering cartels in China responsible for exporting products to the United States, including the vitamin C industry. Mr. Isaacson is currently lead counsel for the direct purchaser class in *In re Graphic Processing Units Antitrust Litigation* (N.D. Cal.).

In the field of arbitration, Legal 500.com explains that "clients and peers agree that the two partners [Schiller and Isaacson] working in international arbitration are well equipped to handle major, complex cases." For example, Mr. Isaacson has acted as lead counsel in proceedings in the Southern District of Texas and the Fifth Circuit to enforce an international arbitration award under the New York Convention resulting in a $261 million judgment which was affirmed on appeal. *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274 (5th Cir. 2004); American Lawyer, 2005 Arbitration Scorecard. Mr. Isaacson also acted as lead trial counsel for Claimant Homestore v. AOL (AAA Arbitration/Washington D.C.) asserting claims for breach of contract arising out of an internet distribution agreement. Following a two week trial and before a final award, the parties entered a settlement agreement restructuring the distribution agreement and terminating a $57 million payment due from Homestore and reducing future payments by $9 million per quarter. (Fair Disclosure Wire, January 9, 2003). Mr. Isaacson has acted as trial counsel for Respondent in Marketing Company v. Telecommunications Company (AAA arbitration/ New York) in which Claimant was denied its request for $30 million in lost profits.

Mr. Isaacson also has acted as counsel in *Worldspan v. Abacus* (ICC Arbitration / London) (following a three week trial in 1999, a 300 page Award in August 2000 found for Claimant Worldspan on claims for fraud, breach of fiduciary duty, breach of contract, misappropriation of confidential information and conspiracy and awarded $39.5 million); *Kuwait Oil Company & UK Oil Company v. UK Oil Company et al.* (LCIA Arbitration/London) (following an arbitration in London and Kuwait, an arbitration award in December 2000 affirmed Claimant's contractual equity interest in billion barrel oil fields at issue, and awarded fees and costs to Claimants); *Shandling v. Grey* (representing comedian Garry Shandling against his former manager for breach of fiduciary duty through to settlement following a decision denying a motion for summary adjudication,

see "Shandling Claims Get New Life in a Stunning Reversal," *Variety* June 23, 1999, p. 1).

Mr. Isaacson is member of the Advisory Board for Legal Counsel for the Elderly and has lectured at Georgetown University Law School and made presentations and conducted mock trials at ABA seminars and meetings. Based on its own surveys, the publication Super Lawyers listed Mr. Isaacson as a D.C. Super Lawyer for 2008.

## Selected Publications

*Antifederalism Revisited*, 21 University of Toledo Law Review 147 (Fall 1989)

## Related News

Class Action Fraud and Racketeering Lawsuit Filed Against Mayan Resorts (April 3, 2008)

Firm Report: January 2008 (Volume III, Issue 1) (01.22.2008)

Ohio Savings Bank to Pay $14 Million to Settle Claims of Residential Mortgagors (10.12.2007)

Firm Report: July/August 2007 (Vol. 2, Iss. 2) (08.22.2007)

BS&F Ranked as Leading Law Firm By Legal 500 (May 24, 2007)

The Law Dragon Leading Litigators: Boies, Schiller & Flexner Partners Receive Highest Ranking (2007)

Firm Report: November 2006 (Vol. 1, Iss. 3) (11.01.2006)

Court Upholds $27 Million Treble-Damage Jury Award Won By BSF (10.01.2006)

Firm Report: July 2006 (Vol. 1, Iss. 2) (07.01.2006)

Firm Report: March 2006 (Vol. 1, Iss. 1) (03.01.2006)

As China's Trade Clout Grows, So Do Price-Fixing Accusations (02.10.2006)

© 2008 Boies, Schiller & Flexner LLP. All Rights Reserved.

BOIES, SCHILLER & FLEXNER LLP

# Tanya S. Chutkan

**Partner**
Washington, DC

t: 202 237 2727
f: 202 237 6131

tchutkan@bsfllp.com

**Areas of Practice**
Litigation
Antitrust
White-Collar /
Business Crimes

**Education**
**University of Pennsylvania
Law School,** J.D., 1987;
Associate Editor, University of
Pennsylvania Law Review;
Arthur Littleton Legal Writing
Fellow

**The George Washington
University,** B.A., Economics,
1983

**Admissions**
District of Columbia and
Pennsylvania
United States District Courts:
District of Columbia

Tanya Chutkan specializes in litigation and white collar criminal defense.

Ms. Chutkan's recent cases include the trial of two federal antitrust class actions on behalf of plaintiff classes, *In re Vitamins Antitrust Litigation* (D.D.C. 2003), which resulted in an award of $149.5 million, and *In re Scrap Metal Antitrust Litigation* (N.D. Ohio 2006), which resulted in an award of $34.5 million. Currently, she represents plaintiff classes in three pending class actions in federal courts in Pennsylvania, the District of Columbia, and New York, and is representing a multinational corporation in a Department of Justice grand jury investigation. She has also defended individuals as well as corporations in SEC and Department of Justice investigations and in securities and antitrust litigation.

Prior to joining the firm in 2002, Tanya was a trial attorney and supervisor with the District of Columbia Public Defender Service, where she tried over 50 jury trials, including numerous serious felony cases and complex white collar matters. She also argued several appellate cases. Ms. Chutkan tried and won acquittal in the first blackmail case to go to trial in the District of Columbia and also won the first known acquittal in the District of Columbia against DNA evidence.

## Selected Professional Awards and Associations

National Association of Criminal Defense Lawyers

## Related News

Firm Report: January 2008 (Volume III, Issue 1) (01.22.2008)

National Association of Women Lawyers Reports that BS&F Is Setting the Standard for Flexibility in the Workplace (December 2007)

Firm Report: April 2007 (Vol. 2, Iss. 1) (04.01.2007)

Firm Report: November 2006 (Vol. 1, Iss. 3) (11.01.2006)

Court Upholds $27 Million Treble-Damage Jury Award Won By BSF (10.01.2006)

Firm Report: March 2006 (Vol. 1, Iss. 1) (03.01.2006)

## Government Service

Assistant Public Defender, District of Columbia Public Defender Service, 1991-2002

© 2008 Boies, Schiller & Flexner LLP. All Rights Reserved.



**BOIES, SCHILLER & FLEXNER LLP**

# Jonathan M. Shaw

**Partner**
Washington, DC

t: 202 274 1123
f: 202 237 6131

jshaw@bsfllp.com

**Area of Practice**
Litigation

**Education**
**University of Pennsylvania,**
J.D., *cum laude*, 1992;
Associate Editor, Law Review

**Johns Hopkins University,**
B.A., History, 1989; Beneficial-
Hodson Scholar; Departmental
Honors

**Clerkships**
Hon. Frank A. Kaufman, U.S.
District Court for the District of
Maryland, 1992-1993

**Admissions**
Maryland, District of Columbia,
and Washington (inactive)

Jonathan Shaw's main practice area is complex commercial litigation.

Before joining Boies, Schiller & Flexner in 2005, Mr. Shaw was a partner in the Seattle office of Susman Godfrey, a national litigation boutique. There, he represented plaintiffs and defendants in high-stakes commercial, class action, and antitrust litigation throughout the United States. He was twice recognized in surveys of prominent Washington lawyers as a Rising Star of the Washington State Bar. From 1993-1998, Mr. Shaw was an associate at Wiley, Rein & Fielding, a Washington, DC law firm where he specialized in commercial, antitrust, and insurance-coverage litigation. His representative cases include:

Successfully represented Genesco Inc. in bench trial against UBS and Finish Line. Court rejected the defendants' fraud and material adverse event claims and ordered Finish Line to close on its $1.5 billion purchase of Genesco. (Tennessee Chancery Court);

Successfully represented a shareholder class in securities fraud action against Genzyme, Inc. Case settled on the eve of trial for $64 million. (New York federal court);

Successfully represented BS&F client in insurance coverage matter. Brought in after insurer had denied coverage for over a year worth of defense costs, I convinced them that their denial of coverage was improper and the coverage claim settled for substantially more than the total amount of my client's out-of-pocket defense costs;

Successfully defended the New York Yankees against emergency motions by community activists trying to derail construction of the new Yankee Stadium (New York state and federal courts);

Defending Qwest against multiple securities, fraud, and RICO actions in the United States and the Netherlands relating to its investment in a European joint venture (Arizona state court, New Jersey federal court; Dutch Enterprise Chamber, London arbitration);

Successfully defended Northwest Airlines in contract-based preliminary injunction case against Amadeus, a provider of computerized reservation services to travel agents (New York federal court);

Successfully represented Northwest Airlines when it asserted antitrust, Lanham Act, and state law claims against Sabre, another provider of computerized reservation services to travel agents. Case settled favorably (Texas and Minnesota federal courts);

Successfully defended Seattle-based REI against hundreds of millions of dollars in claims brought by Bank of America and Chase Manhattan Bank over affinity card programs. Case settled favorably (Washington state court);

Successfully defended Azurix Corporation against a $31 million lawsuit arising out of a real estate deal. Claims dismissed and client recovered

fees and costs (California federal court);

Represented the estate of a young cancer victim in medical malpractice action. Only lawyer in the United States to persuade a court to extend malpractice liability to a physician whose only connection to the patient's care was his negligent consultation with her treating physician. Case settled before trial (Washington state court);

Successfully defended Clear Channel Communications against five related lawsuits alleging various business torts, breaches of contract, and antitrust violations. After Clear Channel won summary judgment on most issues, the case settled for nuisance value on the eve of trial (Washington state and federal courts, Texas federal court);

Successfully defended Jacobs Engineering Group against more than $700 million in wrongful death and business interruption claims arising out of an explosion on the Olympic Pipeline. Defendant Olympic Pipeline impleaded Jacobs only four months before trial. Aggressive defense was so successful that Olympic Pipeline tried to dismiss its claims against Jacobs voluntarily a month before trial rather than have us and our experts in the courtroom. Because Olympic sought a dismissal without prejudice that would have permitted it to raise the claims in a later action, we opposed its motion to dismiss its own claims. The case settled confidentially and very favorably while that motion was still pending (Washington state court);

Successfully defended Alaska Airlines against a consumer class action challenging its refund policies. Obtained dismissal of all claims, which was upheld through multiple levels of appellate review (Washington state court);

Represented Alaska Airlines in a dispute over a leased aircraft engine. Case settled favorably after Alaska successfully opposed plaintiff's attempt to compel arbitration (Washington federal court);

Successfully defended a commercial plant nursery against Bank of America's attempts to collect on a promissory note. Creative, focused defense led to a confidential settlement that kept client in business (Washington state court);

Successfully represented Zurich Insurance Company in coverage litigation against Baxter relating to HIV-contaminated clotting factorate. Case settled confidentially and very favorably (California state court, Illinois state and federal courts);

Successfully defended Kohler in multi-million dollar dispute with its former Saudi distributor (Wisconsin federal court); and

Successfully assumed defense of law firm in dispute with former partners. The client had represented itself at trial and lost substantial jury verdict. The case settled favorably after post-trial motions convinced trial judge to cut damages awarded by more than 95% (D.C. Superior Court).

## Related News

American Lawyer "Big Suits" Column Features BS&F's $1.5 Billion Specific Performance Trial Verdict (March 1, 2008)

Firm Report: January 2008 (Volume III, Issue 1) (01.22.2008)

N.Y. Times Reports on Fallout of BS&F's Genesco Win (December 29, 2007, at B2)

BS&F Wins Trial Requiring Completion of $1.5 Billion Acquisition (December 28, 2007, at A3)

BS&F at the Center of UBS-Genesco-Finish Line Trial (December 19, 2007)

Genesco Lead Trial Counsel Jim Denvir Closes in Nashville Trial (December 19, 2007)

BS&F Obtains $64m Settlement for Class in Tracking Stock Litigation (August 10, 2007)

Firm Report: April 2007 (Vol. 2, Iss. 1) (04.01.2007)

Federal Judge Dismisses Lawsuit Challenging Construction of the New Yankee Stadium (11.16.2006)

Firm Report: November 2006 (Vol. 1, Iss. 3) (11.01.2006)

Tracking Stock Class Action Litigation Against Genzyme Gets Major Boost (August 17, 2006)

© 2008 Boies, Schiller & Flexner LLP. All Rights Reserved.

BOIES, SCHILLER & FLEXNER LLP

# Magda M. Jimenez



**Partner**
New York City

t: 212 446 2333
f: 212 446 2350

mjimenez@bsfllp.com

**Areas of Practice**
  Litigation
  Antitrust
  White-Collar /
  Business Crimes

**Education**
  **Benjamin N. Cardozo School
  of Law**, J.D., 1995; Managing
  Editor, Cardozo Women's Law
  Journal; Samuel L. Belkin
  Scholar Award

  **New York University**, B.A. ,
  Political Science, 1992;
  Trustees Scholar

**Language Spoken**
  Spanish

**Admissions**
  New Jersey and New York
  United States Courts of
  Appeals: Third and Eleventh
  Circuits
  United States District Courts:
  Southern and Eastern Districts
  of New York and District of New
  Jersey

Magda M. Jimenez's main practice areas include complex commercial litigation, white collar criminal defense and antitrust litigation. She specializes in trial work and in representing companies and their employees in criminal and administrative investigations.

In her more recent matters, Ms. Jimenez has represented: the largest entertainment company in Latin America in a tortious interference lawsuit against a United States-based Spanish language television company; a major Mexican beverage distributor in an action alleging violation of its minority shareholder rights; a national computer products marketer in a federal criminal investigation, including an internal investigation; an individual charged with federal securities law violations; the representation of fifteen employees of a major cruise line company who testified before the grand jury in a prosecution for environmental crimes; a testifying witness in the criminal trial of *United States v. Martha Stewart*; a leading telecommunications company against federal and state claims alleging monopolization in the pay telephone business, and in connection with the company's opposition to the government's settlement of *United States v. Microsoft*; a well-known mystery writer/anthologist in a federal jury trial alleging trademark and breach of contract claims that resulted in a favorable jury verdict; and some 3800 retail pharmacies in a federal antitrust action against the manufacturers of brand name prescription drugs.

Prior to joining Boies, Schiller & Flexner LLP, Ms. Jimenez was an associate at the law firm of Barrett Gravante Carpinello & Stern LLP.

Ms. Jimenez served as Secretary of the Criminal Advocacy Committee of the Association of the Bar of the City of New York from 2001 through 2003.

## Selected Professional Awards and Associations

New York City Bar Association
Hispanic National Bar Association

© 2008 Boies, Schiller & Flexner LLP. All Rights Reserved.

BOIES, SCHILLER & FLEXNER LLP

# Jack A. Simms Jr.

**Partner**
Washington, DC

t: 202 237 9616
f: 202 237 6131

jsimms@bsfllp.com

**Area of Practice**
    Litigation

**Education**
    **Northwestern University
    School of Law, J.D., 2000**

    **Haverford College, B.A.,**
    Political Science, 1995

**Admissions**
    District of Columbia and Illinois
    (inactive)
    United States District Courts:
    Northern District of Illinois

Jack Simms's practice areas include antitrust and complex litigation matters.

Mr. Simms has assisted in a Fortune 100 manufacturer's defense of antitrust claims brought under the Robinson-Patman Act and Section 2 of the Sherman Act. In that matter, Mr. Simms was part of the Boies, Schiller team that secured total summary judgment in favor of the firm's client. Mr. Simms is currently assisting in the representation of a financial services firm's prosecution of antitrust claims.

From the period beginning June 2005 through December 2005, Mr. Simms was associated with and later at partner at the law firm of Perry & Haas, LLP, in Corpus Christi, Texas. From September 2000 through February 2004, Mr. Simms was an associate in the Chicago office of Baker & McKenzie.

## Selected Professional Awards and Associations

American Bar Association

## Related News

Firm Report: January 2008 (Volume III, Issue 1) (01.22.2008)

BS&F $ 2.2 Billion Recovery for American Express Noted in American Lawyer's "Big Suits" Column (January 2008)

Firm Report: July/August 2007 (Vol. 2, Iss. 2) (08.22.2007)

Firm Report: April 2007 (Vol. 2, Iss. 1) (04.01.2007)

Firm Report: July 2006 (Vol. 1, Iss. 2) (07.01.2006)

© 2008 Boies, Schiller & Flexner LLP. All Rights Reserved.

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MUNICIPAL DERIVATIVES ANTITRUST LITIGATION | MDL No. 1950 |
| | Master Docket No. 08 Civ. 2516 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

### DECLARATION OF MICHAEL D. HAUSFELD IN SUPPORT OF MOTION FOR APPOINTMENT OF INTERIM LEADERSHIP STRUCTURE

MICHAEL D. HAUSFELD declares:

1.    I am a named Partner in the law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein"). My firm serves as attorney of record for Fairfax County, Virginia, the City of Chicago, Illinois and the City of Baltimore, Maryland. The matters set forth herein are within my personal knowledge, and if called upon and sworn as a witness I could competently testify regarding them.

2.    All facts contained in the attached Memorandum of Law in Support of Appointment of Interim Leadership Structure which pertain to Cohen Milstein and the members of Cohen Milstein are true and correct to the best of my knowledge. Specifically,

a. Cohen Milstein has been investigating allegations of anticompetitive activity in the municipal derivatives market for at least 18 months.

b. As a result of that work, including cooperation provided by Bank of America, Cohen Milstein learned enough about the details of the conspiracy to file claims on behalf of the proposed class.

c. Cohen Milstein has explored settlement possibilities with BoA, which have been overseen by Judge Weinstein. For that purpose, we have invested significant resources to retain an experienced, knowledgeable economist to examine damages models for use in these discussions.

d. Cohen Milstein has been approached by other defendants wishing to discuss settlement. To date, no settlement agreements have been reached with any of these defendants, and no transactional data has been produced by any of these defendants.

**Cohen Milstein**

3.    Attached hereto as Exhibit ("Ex.") 1 is a true and correct copy of Cohen Milstein's firm resume. It lists the many antitrust class actions where Cohen Milstein has served as lead or co-lead counsel. Those include *In re Vitamins Antitrust Litigation*, MDL No. 1285 (D.D.C.)., where settlements of $1.1 billion and a jury verdict of $148 million (after trebling) were obtained; *Rubber Chemicals Antitrust Litig.*, No. C-04-1648 MJJ (N.D. Cal.), where settlements of $320 million were obtained; and *Domestic Air Transportation Antitrust Litig.*, MDL No. 861 (N.D. Ga.), where settlements of travel discounts and cash valued at $458 million were obtained.

4.    Cohen Milstein has more than 35 years of experience litigating some of the nation's most complicated antitrust cases and recovering billions of dollars in

overpayments made by its clients to monopolists, price-fixers, and other violators of the antitrust laws.

5.    In 2002 and 2003, the *National Law Journal* named Cohen Milstein one of the top 25 plaintiffs' firms in the nation, and in 2006, named Cohen Milstein as one of the top 11 plaintiffs' firms in the nation.

6.    Cohen Milstein has also made significant contributions to the legal community through various publications, including:

- The Sedona Conference Glossary, 2nd Ed. (Dec. 2007)
  By Megan E. Jones, Co-Author
- Antitrust Class Actions: Continued Vitality
  By Michael Hausfeld, Steig Olson and Seth Gassman, An extract from The Antitrust Review of the Americas 2008, a Global Competition Review special report - www.GlobalCompetitionReview.com
- Managing Multi-District Litigation
  By Michael Hausfeld and Michael Lehmann, An extract from The Antitrust Review of the Americas 2008, a Global Competition Review special report - www.GlobalCompetitionReview.com
- Private Recovery Actions in the United States: Reducing - and Recouping - the 'Cartel Tax'
  By Michael Hausfeld, Ben Brown, Kathleen Konopka and Andrea Hertzfeld, An extract from The Antitrust Review of the Americas 2008, a Global Competition Review special report - www.GlobalCompetitionReview.com
- Collective Redress for Competition Law Claimants
  By Vincent Smith and Michael Hausfeld, An extract from The European Antitrust Review 2008, a Global Competition Review special report - http://www.globalcompetitionreview.com/
- Applying the Right Mix Inside the Minds: Political Powerhouses
  By Michael D. Hausfeld
- Speech at the University of Witwatersrand, South Africa
  By Michael D. Hausfeld, October 21, 2003
- Remarks at a Washington, D.C. Conference on Slave and Forced Labor
  By Michael D. Hausfeld.
- Speech on Actions Against Swiss Banks By Michael D. Hausfeld Volume 20, page 47, 1998.

7.    A substantial portion of Cohen Milstein's practice – indeed, its largest

practice group – is devoted to antitrust class actions. Cohen Milstein has served or is

serving as lead counsel in many important antitrust cases, including the following:

--*In re International Air Transportation Surcharge Antitrust Litigation*, MDL No. 1793
(N.D. Cal.). Cohen Milstein is one of the co-Lead Counsel in this action, where
preliminary approval has been given to a historic settlement of claims by U.S. and U.K.
air passengers who travelled on British Airways and Virgin Airlines, which is valued at
$210 million.

--*In re Air Cargo Shipping Services Antitrust Litigation*, MDL No. 1775 (E.D.N.Y.).
Cohen Milstein serves as one of co-Lead Counsel having special responsibility for non-
US claims in this action, which involves allegations of price-fixing among air carriers
who provide cargo transport services. The firm principally negotiated an $85 million
settlement with Lufthansa Airlines, for which approval was sought in July of 2007. The
settlements entered in the *Air Cargo* litigation were ultimately endorsed by all other co-
lead counsel, reviewed for fairness and benefit to the class by Magistrate Judge Edward
Infante (retired), and preliminarily approved by the Court. *See* Declaration of Magistrate
Judge Edward A. Infante (Ret.) at ¶25; Order Certifying Settlement Class, Preliminarily
Approving Proposed Settlement, Scheduling Hearing for Final Approval Thereof, and
Approving the Proposed Notice to the Class, 06-MD-1775 (E.D.N.Y.), Docket No. 732,
attached hereto as Ex. 2.

--*Meijer, Inc. v. 3M Co.*, No. 04-5871 (E.D. Pa.). As lead counsel, Cohen Milstein
represented a putative class of direct purchasers of 3M invisible and transparent tape
products. The plaintiffs alleged that 3M monopolized the relevant tape market through
anticompetitive rebates and other exclusionary pricing practices. A settlement of
$28.9 million recently received final approval.

--*Pease v. Jasper Wyman & Son, Inc.*, Civil Action No. 00-015 (Knox Cty., Me. Sup.
Ct.). Cohen Milstein served as co-lead counsel on behalf of a class of wild blueberry
growers. In 2003, a Maine state court jury found three blueberry processing companies
liable for participating in a four-year price-fixing and non-solicitation conspiracy that
artificially lowered the prices defendants paid to approximately 800 growers of wild
blueberries and awarded $18.68 million in damages. After mandatory trebling under
Maine's antitrust law, judgment was entered for approximately $56 million.

--*Kruman v. Christie's International plc*, No. 01-7309 (S.D.N.Y.). Cohen Milstein served
as one of three lead counsel on behalf of foreign plaintiffs and obtained a $40 million
settlement. This case marked the first time that claims based on foreign transactions
were resolved in U.S. court under U.S. antitrust law.

--*In Re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.) Plaintiffs alleged that
Bristol Myers-Squibb Company, a producer of the drug BuSpar®, unlawfully maintained

a monopoly in violation of federal and state antitrust and unfair competition laws. A $90 million settlement was preliminarily approved in April 2003. Cohen Milstein served as one of four co-lead counsel.

--*In re Relafen Antitrust Litigation*, No. 01-12239-WGY (D. Mass.). Cohen Milstein served as co-lead counsel on behalf of a class of direct purchasers alleging that the defendant drug manufacturer unlawfully extended its monopoly in the U.S. market for Relafen and its generic equivalents by fraudulently procuring an invalid patent and using it to prevent generic competition. The case settled for $175 million.

--*In re Vitamins Antitrust Litigation*, MDL No. 1285 (D.D.C.). Cohen Milstein represented as co-lead counsel two certified classes of businesses who directly purchased bulk vitamins and were overcharged as a result of a ten-year global price-fixing and market allocation conspiracy. Chief Judge Hogan approved four major settlements between certain vitamin defendants and Class Plaintiffs, including a landmark partial settlement of $1.1 billion. In a recent trial before Chief Judge Hogan of four of Class Plaintiffs' remaining unsettled Vitamin B4 (choline chloride) claims, a federal jury in Washington unanimously found Japan's second largest trading company, Mitsui & Co., Ltd., its wholly owned U.S. subsidiary Mitsui & Co. (U.S.A.), Inc., DuCoa, LP, a choline chloride manufacturer based in Highland, Illinois, and DuCoa's general partner, DCV, Inc. liable for participating in the conspiracy and ordered them to pay $49,539,234, which was trebled to $148,617,702 under the federal antitrust laws.

--*Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al.*, Case No. 1:01CV02313 (D.D.C.). Cohen Milstein served as co-Lead counsel in this case in which plaintiffs alleged that Bristol-Myers Squibb unlawfully monopolized the United States market for paclitaxel, a cancer drug discovered and developed by the United States government, which Bristol sells under the brand name Taxol. Bristol's scheme included a conspiracy with American BioScience, Inc., a generic manufacturer, to block generic competition. Cohen, Milstein's investigation and prosecution of this litigation on behalf of direct purchasers of Taxol led to a settlement of $65,815,000 that was finally approved by U.S. District Judge Emmet G. Sullivan on August 14, 2003 and preceded numerous Taxol-related litigations brought by the Federal Trade Commission and State Attorneys General offices.

--*North Shore Hematology-Oncology Associates, P.C. v. Bristol-Meyers Squibb Co.*, Case No. 1:04CV00248 (D.D.C.). Plaintiffs allege that Bristol-Meyers Squibb Company unlawfully monopolized the United States market for cisplatin, a cancer drug which Bristol sells under the brand name Platinol, in violation of federal antitrust laws. Cohen Milstein's investigation and prosecution of this litigation on behalf of direct purchasers of Platinol lead to a settlement of $50 million in November 2004. Cohen Milstein served as lead counsel.

--*Ferko v. National Association for Stock Car Auto Racing, Inc.*, Civ. No. 4:02-CV-50 (E.D. Tex.). Cohen Milstein had a lead role in representing shareholders of Speedway Motorsports, Inc. ("SMI") in a lawsuit challenging NASCAR's refusal to award a second

annual Nextel Cup Series ("NCS") race date to SMI's Texas Motor Speedway. The suit alleged, among other things, that NASCAR maintained an unlawful monopoly and conspired with a competing speedway company in the allocation of new NCS race dates to speedways.

--*In re Domestic Air Transportation Antitrust Litigation*, MDL No. 861 (N.D. Ga.). As co-lead counsel in this price-fixing case brought against airlines, Cohen Milstein obtained a settlement of travel discounts and cash totaling $458 million for a class of approximately 12 million individuals and businesses.

--*In re Intel Corp. Microprocessor Antitrust Litigation*, MDL No. 1717 (D. Del.) Cohen Milstein is on of the four co-lead counsel in this major antitrust class action involving alleged illegal monopolization of the worldwide x86 microprocessor market.

8.    Cohen Milstein now has 78 attorneys in six offices; it opened offices in San Francisco and London during 2007. It also maintains offices in Washington, D.C., New York, Philadelphia, and Chicago.

9.    The partners from Cohen Milstein's Washington, D.C., San Francisco, CA and New York, NY offices who will play leading roles in this litigation should Cohen Milstein be selected as co-lead counsel have substantial antitrust, trial and class action experience.

10.    Michael Hausfeld: I am a Partner at Cohen Milstein and head of the Antitrust practice group. I am a graduate of Brooklyn College, where I received a B.A. in Political Science with a minor in Russian History (*cum laude*, 1966) and the National Law Center, George Washington University (J.D., *with honors*, 1969). I was a member of the Order of the Coif and the Board of Editors for the George Washington Law Review (1968-69).

11.    I have had a long record of successful litigation in the antitrust field, on behalf of both individuals and classes, in cases involving monopolization, tie-ins, exclusive dealings and price fixing. I am or have been co-lead counsel in antitrust

cases against manufacturers of genetically engineered foods, managed healthcare companies, bulk vitamin manufacturers, technology companies and international industrial cartels. I am actively involved in ongoing investigations into antitrust cases abroad, and was the only private lawyer permitted to attend and represent the interests of consumers worldwide in the 2003 closed hearings by the EU Commission in the Microsoft case. Chief Judge Edward Korman (E.D.N.Y.), has noted that I am one of the two "leading class action lawyers in the United States." I have been profiled in, and recognized by, many articles and surveys. Recently, a *Forbes* magazine article reported on my work to establish an international alliance for the protection of consumers and investors worldwide, and I was named a "Visionary" by the Legal Times and "One of The 90 Greatest Washington Lawyers of the Last 30 Years." I was named one of thirty master negotiators in *Done Deal: Insights from Interviews with the World's Best Negotiatiors*, by Michael Benoliel, Ed.D. *The Wall Street Journal* profiled me and my practice, and I have been recognized by *The National Law Journal* as one of the "Top 100 Influential Lawyers in America." I have been described by one of the country's leading civil rights columnists as an "extremely penetrating lawyer", and by a colleague (in a *Washington Post* article) as a lawyer who "has a very inventive mind when it comes to litigation. He thinks of things most lawyers don't because they have originality pounded out of them in law school." *The New York Times* referred to me as one of the nation's "most prominent antitrust lawyers," and *Washingtonian Magazine* has listed me in several surveys as one of Washington's 75 best lawyers, saying I "consistently bring in the biggest judgments in the history of law" and that I am "a Washington lawyer determined to change the world -- and succeeding."

12.    I am a frequent speaker on antitrust issues, most recently participating in a panel discussion at the Spring Meeting of the ABA Section of Antitrust Law entitled "International Antitrust: Developments After Empagran and Intel." I taught Masters Degree courses at Georgetown University Law Center from 1980 to 1987, and was an Adjunct Professor at the George Washington University Law School from 1996 to 1998 and now sit on its Board of Directors.

13.    Richard A. Koffman: Richard A. Koffman is a Partner at Cohen Milstein and a member of the Antitrust practice group. He is currently serving as counsel for plaintiffs in, among other cases, *In re Rubber Chemicals Antitrust Litigation* (N.D. Ca.); *In re Polyester Staple Antitrust Litigation* (W.D.N.C.); and *In re Urethane Antitrust Litigation* (D. Kan.). Mr. Koffman came to Cohen Milstein after four years as a senior trial attorney with the Antitrust and Civil Rights Divisions of the United States Department of Justice. Prior to joining the Department of Justice, he spent seven years in private practice, with Fine, Kaplan and Black in Philadelphia (working primarily on antitrust class actions and other complex commercial litigation) and then with Bernabei & Katz in Washington, D.C. (handling employment discrimination cases). While at Fine Kaplan, Mr. Koffman was actively involved in litigating several successful antitrust class actions on behalf of plaintiffs and classes, including *In re Nasdaq Market-Makers Antitrust Litigation* (S.D.N.Y.) (settled for more than $1 billion); *In re Polypropylene Carpet Antitrust Litigation* (N.D. Ga.); *In re Commercial Explosives Antitrust Litigation* (D. Utah); and *In re Drill Bits Antitrust Litigation* (S.D. Tex.). Immediately after law school, he served as a judicial clerk for Judge James B. McMillan of the Western District of North Carolina, and for Judge Anthony J. Scirica of the U.S. Court of Appeals for the

Third Circuit. Mr. Koffman is a graduate of Yale Law School (J.D., 1990), where he was a Senior Editor of the Law Journal, and Wesleyan University, from which he received a B.A., *with honors,* in English (1986).

14.    Robert G. Eisler: Robert Eisler, a Partner at Cohen Milstein and head of the New York office, is a member of the Antitrust practice group. Prior to joining Cohen Milstein, Mr. Eisler was a partner at Lieff Cabraser Heimann and Bernstein. Mr. Eisler has extensive experience in complex litigation at the trial and appellate levels, particularly in the prosecution of antitrust class actions. He has served as lead or co lead counsel in many cases in the state and federal courts, including *In re Buspirone Antitrust Litigation,* ($90 million settlement), *In re Oxycontin Antitrust Litigation,* and *In re Ciprofloxacin Hydrochloride Antitrust Litigation.* Mr. Eisler is currently involved in the prosecution of numerous major antitrust actions throughout the United States. Mr. Eisler is a 1986 graduate of LaSalle University, and a 1989 graduate of Villanova Law School.

15.    Michael P. Lehmann: Michael P. Lehmann, a Partner at Cohen Milstein and head of the San Francisco office, is a member of the Antitrust practice group. Mr. Lehmann brings to the firm 29 years of experience as a business litigator, with a practice that ranged from class action litigation to business litigation on behalf of individual clients to extensive regulatory work before federal, state and international bodies to domestic and international arbitration. Prior to joining Cohen Milstein, Mr. Lehmann had worked since graduating from law school at what became Furth Lehmann LLP, where he eventually served as Managing Partner and in recent years has served as lead counsel for direct or indirect purchaser classes in numerous antitrust cases. Mr.

Lehmann is a 1977 graduate of Hastings College of the Law, University of California, and a 1974 graduate of University of California, Berkeley.

### The Pomerantz and Lieff Complaints

16.    At my direction, a paralegal electronically compared our complaint to the Pomerantz and Lieff complaints.

17.    The paralegal obtained copies of three complaints: The Fairfax County complaint, filed by Cohen Milstein, and the Oakland and Haywood County complaints, filed by the Lieff and Pomerantz firms, respectively.

18.    The paralegal utilized a computer program, Litera Change-Pro, which is designed to compare documents, first to compare the Fairfax County complaint to the Oakland complaint and then to compare the Fairfax County complaint to the Haywood County complaint.

19.    After comparing the Fairfax County complaint to the Oakland complaint, the computer program generated a copy of Oakland complaint, color coded, to identify the text that remained unchanged from our original complaint (identified by plain black text), the text that had been added to our original complaint (identified by blue text), and the text that was identical to our complaint, but had been moved around within the Oakland complaint (identified by green text).  *See* Litera Change-Pro Oakland complaint, attached hereto as Ex. 3.

20.    In addition, the program generated a report that identified the number of words that were deleted from our original complaint.  That analysis demonstrated that the Oakland complaint deleted only 567 of the 10,798 words in our Fairfax County

complaint. In other words, it appears that 95 percent of our complaint reappears in the Oakland complaint.

21.    For example, Paragraphs 61 and 70 from the Oakland complaint are identical to Cohen Milstein's complaint.

22.    After comparing the Fairfax County complaint to the Haywood County complaint, the computer program generated a copy of the Haywood County complaint, color coded, to identify the text that remained unchanged from our original complaint (identified by plain black text), the text that had been added to our original complaint (identified by blue text), and the text that was identical to our complaint, but had been moved around within the Haywood County complaint (identified by green text). *See* Litera Change-Pro Haywood County complaint, attached hereto as Ex. 4.

23.    In addition, the program generated a report that identified the number of words that were deleted from our original complaint. That analysis demonstrated that the Haywood County complaint deleted only 719 of the 10,798 words in our Fairfax County complaint. In other words, it appears that 93 percent of our complaint reappears in the Haywood County complaint.

24.    For example, Paragraphs 6, 35, 49, 62, 65, 72, 73, 77, 82, and 83 from the Haywood County complaint are identical to Cohen Milstein's complaint.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of July, 2008.

Michael D. Hausfeld

# EXHIBIT 1
# (To M. Hausfeld Declaration)





## COHEN MILSTEIN
## HAUSFELD & TOLL PLLC

**Firm Resume**



For decades, Cohen, Milstein, Hausfeld & Toll, P.L.L.C. has represented individuals, small businesses, institutional investors, and employees in many of the major class action cases litigated in the United States for violations of the antitrust, securities, environmental, consumer protection, civil rights/discrimination, ERISA and human rights laws. Cohen Milstein is at the forefront of numerous innovative legal actions that are expanding the quality and availability of legal recourse for aggrieved individuals and businesses both domestic and international.

The firm was established in March 1986 and is based in Washington, D.C. with offices in New York, Philadelphia, Chicago, San Francisco and London. From 1969 until 1986, the Firm was the Washington, D.C. office of the Philadelphia law firm currently known as Kohn, Swift & Graf, P.C.

Cohen Milstein is an innovator in new areas of the law. Cohen Milstein was in the forefront of filing antitrust claims on behalf of indirect purchasers in 1993 and 1994, when it filed state-court actions in 18 states on behalf of indirect purchasers of infant formula. This was the first effort to systematically and simultaneously pursue treble damages claims on behalf of indirect-purchasing consumers in all states where antitrust laws permitted such claims. This approach, and variations of it, has since become the accepted model for pursuing antitrust damages on behalf of indirect-purchasing consumers.

The firm also has been in the forefront of the development of international antitrust theory and litigation of claims. As the global economy has produced worldwide conglomerates, so, too, has the nature of antitrust violations changed. For example, in *Kruman v. Christie's International PLC, et al.* Docket No. 01-7309 and *In re Bulk Vitamins Antitrust Litigation*, MDL 1285 (D.D.C.), both the parties and the anticompetitive actions were played out on a world, rather than domestic, stage. Cohen Milstein also represents and won Lead Plaintiff status for domestic and foreign investors in a foreign company's bonds, in a PSLRA litigation being pursued in the United States, *In re Parmalat Securities Litigation*, Master Docket 04 Civ 0030 (LAK) (S.D.N.Y.).

Cohen Milstein has also served as lead or co-lead counsel, or on Plaintiffs' Executive Committee(s), in many dozens of antitrust, securities, consumer protection or product liability, civil rights, and human rights class action cases.

Cohen Milstein has contributed over 37,000 hours of time to human rights and *pro bono* cases since 1996. As an example, the Firm represented eight survivors and/or families of the victims of the September 11, 2001 attack on the Pentagon before the Federal compensation fund. Cohen Milstein has obtained a substantial recovery for each, including the highest recovery to date, $6.8 million, for an injured individual.

**COHEN MILSTEIN**
HAUSFELD & TOLL<sup></sup>

Over its history, Cohen Milstein has obtained many landmark judgments and settlements for individuals and businesses in the United States and abroad. The firm's most significant past cases include:

*In re Vitamins Antitrust Litigation, MDL No. 1285 (D.D.C.)*
Cohen Milstein served as co-lead counsel for two certified classes of businesses that directly purchased bulk vitamins and were overcharged as a result of a ten year global price-fixing and market allocation conspiracy. Chief Judge Hogan approved four major settlements between certain vitamin defendants and Class Plaintiffs, including a landmark partial settlement of $1.1 billion. In a later trial before Chief Judge Hogan concerning four Class Plaintiffs' remaining unsettled Vitamin B4 (choline chloride) claims, a federal jury in Washington unanimously found Japan's second largest trading company, Mitsui & Co., Ltd., its wholly-owned U.S. subsidiary Mitsui & Co. (U.S.A.), Inc., DuCoa, LP, a choline chloride manufacturer based in Highland, Illinois, and DuCoa's general partner, DCV, Inc. liable for participating in the conspiracy and ordered them to pay $49,539,234, which is trebled to $148,617,702 under the federal antitrust laws. The case was subsequently settled against those defendants.

*Dukes v. Wal-Mart Stores, Inc., No. C-01-2252 (N.D. Cal.)*
Cohen Milstein is one of the co-lead counsel in this discrimination case. In June 2004, U.S. District Court Judge Martin Jenkins ruled that six current and former Wal-Mart employees from California may represent all female employees of Wal-Mart who worked at its U.S. stores anytime after December 26, 1998 in a nationwide sex discrimination class action lawsuit (appeal pending). As the largest civil rights class action ever certified against a private employer, the Judge described the case as "historic in nature, dwarfing other employment discrimination cases that came before it." The action charges that Wal-Mart discriminates against its female retail employees in pay and promotions. The class in this case includes more than 1.5 million current and former female employees of Wal-Mart retail stores in America, including Wal-Mart discount stores, super centers, neighborhood stores, and Sam's Clubs.

*In re Lucent Technologies Securities Litigation, Civ. Action No. 00-621 (JAP) (D.N.J.)*
A settlement in this massive securities fraud class action was reached in late March 2003. The class portion of the settlement amounts to over $500 million in cash, stock and warrants and ranks as the second largest securities class action settlement ever completed. Cohen Milstein represented one of the co-lead plaintiffs in this action, a private mutual fund.

*Nate Pease, et al. v. Jasper Wyman & Son, Inc., et al., Civil Action No. 00-015 (Knox County Superior Court, Me.)*
In 2004, a state court jury from Maine found three blueberry processing companies liable for participating in a four-year price-fixing and non-solicitation conspiracy that artificially lowered the prices defendants paid to approximately

800 growers for wild blueberries. The jury ordered defendants Cherryfield Foods, Inc., Jasper Wyman & Son, Inc., and Allen's Blueberry Freezer, Inc. to pay $18.68 million in damages, the amount which the growers would have been paid absent the defendants' conspiracy. After a mandatory trebling of this damage figure under Maine antitrust law, the total amount of the verdict for the plaintiffs is just over $56 million. The Firm served as co-lead counsel.

*In re StarLink Corn Products, Liability Litigation, MDL No. 1403. (N.D. Ill.,*
Cohen Milstein successfully represented U.S. corn farmers in a national class action against Aventis CropScience USA Holding and Garst Seed Company, the manufacturer and primary distributor of StarLink corn seeds. StarLink is a genetically modified corn variety that the United States government permitted for sale as animal feed and for industrial purposes, but never approved for human consumption. However, StarLink was found in corn products sold in grocery stores across the country and was traced to widespread contamination of the U.S. commodity corn supply. The Firm, as co-lead counsel, achieved a final settlement providing more than $110 million for U.S. corn farmers, which was approved by a federal district court in April 2003. This settlement was the first successful resolution of tort claims brought by farmers against the manufacturers of genetically modified seeds.

*In re Diet Drug Litigation (Fen-Phen), MDL No. 1203 (E.D. Pa.)*
As a member of the Plaintiffs' Management Committee and Sub-Class Counsel, Cohen Milstein played a major part in the success of the Fen-Phen diet drug litigation and settlement *(In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation,* MDL 1203). CMHT and other plaintiffs' counsel achieved the largest settlement ever obtained in a mass tort case - $3.75 billion – on behalf of millions of U.S. consumers who used Pondimin (fenfluramine) or Redux (dexfenfluramine), either alone or in combination with phentermine, diet drugs that are associated with heart valve damage.

*Snyder v. Nationwide Mutual Insurance Company, No. 97/0633 (Sup. Ct. N.Y. Onondaga Cty.)*
Cohen Milstein served as one of plaintiffs' principal counsel in this case on behalf of persons who held life insurance policies issued by Nationwide through its captive agency force. The action alleged consumer fraud and misrepresentations. Plaintiffs obtained a settlement valued at more than $85 million. The judge praised the efforts of Cohen Milstein and its co-counsel for having done "a very, very good job for all the people." He complimented "not only the manner" in which the result was arrived at, but also the "time … in which it was done."

*Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al., No. 1:01CV02313 (D.D.C.)*
Cohen Milstein has been co-lead counsel in this case since its inception in 2001. Plaintiffs alleged that Bristol-Myers Squibb unlawfully monopolized the United States market for paclitaxel, a cancer drug discovered and developed by the United States government, which Bristol sells under the brand name Taxol.



Bristol's scheme included a conspiracy with American BioScience, Inc., a generic manufacturer, to block generic competition. Cohen, Milstein's investigation and prosecution of this litigation on behalf of direct purchasers of Taxol led to a settlement of $65,815,000 that was finally approved by U.S. District Judge Emmet G. Sullivan on August 14, 2003 and preceded numerous Taxol-related litigations brought by the Federal Trade Commission and State Attorneys General offices.

### *Kruman v. Christie's International PLC, et al., Docket No. 01-7309*
A $40 million settlement on behalf of all persons who bought or sold items through Christie's or Sotheby's auction houses in non-internet actions was approved in this action. Cohen Milstein served as one of three leading counsel on behalf of foreign plaintiffs. The Court noted that approval of the settlement was particularly appropriate, given the significant obstacles that faced plaintiffs and plaintiffs' counsel in the litigation. The settlement marked the first time that claims on behalf of foreign plaintiffs under U.S. antitrust laws have been resolved in a U.S. court, a milestone in U.S. antitrust jurisprudence.

### *In re Infant Formula Consumer Antitrust Litigation (multiple state courts)*
Cohen Milstein instituted price-fixing cases on behalf of indirect-purchasers in 17 states under state antitrust laws against three companies who conspired to drive up the price of infant formula. The cases resulted in settlements of $64 million for purchasers of infant formula.

### *Domestic Air Transportation Antitrust Litigation (N.D. Ga.)*
Plaintiffs alleged a conspiracy among major airlines to set prices. In one of the largest consumer class actions ever brought to a successful conclusion, Cohen Milstein was one of the lead counsel and obtained a settlement of travel discounts and cash totaling $458 million for the class of individuals and businesses.

### *In re The Exxon Valdez Litigation, No. A89-095 Civ. (D. Ak.)*
The firm was selected from dozens of law firms around the country by federal and state judges in Alaska to serve as co-lead counsel for plaintiffs in the largest environmental case in United States history that resulted in a jury verdict of more than $5 billion (reversed and remanded for revised punitive damages award; further proceedings pending).

### *Holocaust Litigation*
In the historic Swiss Banks litigation, CMHT served, *pro bono,* as co-lead counsel for Holocaust survivors against the Swiss banks that collaborated with the Nazi regime during World War II by laundering stolen funds, jewelry and art treasures. Cohen Milstein obtained a $1.25 billion settlement, leading the presiding judge to call the firm's work "indispensable." *See In re Holocaust Victim Assets Litig.,* Case No. CV 96-4849 (ERK) (MDG) (Memorandum of Chief Judge Korman dated July 26, 2002). The Firm was also a lead counsel in litigation by survivors of World War II-era forced and slave labor in litigation against the German companies that profited from using the labor of concentration camp inmates. This

**COHEN MILSTEIN**
HAUSFELD & TOLL™

litigation, which resulted in an unprecedented settlement of $5.2 billion, was resolved by multinational negotiations involving the defendants, plaintiffs' counsel, and the governments of several countries for approximately two million claimants.

*Roberts v. Texaco, Inc., 94-Civ. 2015 (S.D.N.Y.)*
Cohen Milstein represented a class of African-American employees in this landmark litigation that resulted in the then-largest race discrimination settlement in history ($176 million in cash, salary increases and equitable relief). The Court hailed the work of class counsel for, *inter alia,* "framing an imaginative settlement, that may well have important ameliorative impact not only at Texaco but in the corporate context as a whole ...".

*Conanan v. Tanoue, No. 00-CV-3091 (ESH)*
Cohen Milstein represented African-American employees at the Federal Deposit Insurance Corporation (FDIC) in this race discrimination suit, which settled for $14 million. The settlement provides the largest payment made in an employment discrimination class action based on race against a federal agency.

*Trotter v. Perdue Farms, Inc., Case No. 99-893 (RRM) (JJF) (MPT), D. Del.*
This suit on behalf of hourly workers at Perdue's chicken processing facilities – which employ approximately 15,000 people – forced Perdue to pay employees for time spent "donning and doffing," that is, obtaining, putting on, sanitizing and removing protective equipment that they must use both for their own safety and to comply with USDA regulations for the safety of the food supply. The suit alleged that Perdue's practice of not counting donning and doffing time as hours worked violated the Fair Labor Standards Act and state law. In a separate settlement with the Department of Labor, Perdue agreed to change its pay practices. In addition, Perdue is required to issue retroactive credit under one of its retirement plans for "donning and doffing" work if the credit would improve employees' or former employees' eligibility for pension benefits. CMHT was co-lead counsel.

*In re North Atlantic Air Travel Antitrust Litigation, Civ. Action No. 84-1103 (D.D.C.)*
The firm, as co-lead counsel, obtained a class settlement of $30 million in coupons for air travelers between the United States and England.

*In re Screws Antitrust Litigation, MDL No. 443 (D. Mass.)*
The firm, as co-lead counsel, obtained a class settlement of approximately $50 million.

*Ocean Shipping Antitrust Litigation, MDL No. 395 (S.D.N.Y)*
The firm, as co-lead counsel, obtained a class settlement of approximately $50 million.

*In re Corrugated Container Antitrust Litigation, MDL No. 310 (S.D. Tex.)*
The firm was one of a handful of firms involved in the successful trial of this



COHEN MILSTEIN
HAUSFELD & TOLL™

massive antitrust case which was eventually settled for approximately $366 million.

*Murphy, Derivatively On Behalf of Nominal Defendant National Health Laboratories Incorporated v. Perelman, Case No. 659511 (Cal. Sup. San Diego Cty.)*
As one of co-lead counsel in the derivative action, the firm and others obtained a global settlement of class and derivative litigation for $65 million.

*In re Flat Glass Antitrust Litigation, MDL No.1200, (W.D. Pa.)*
The firm as co-lead counsel obtained a total of $ 61.7 million in settlement funds on behalf of glass shops, window manufacturers, and others who directly purchased the affected products from the defendants.

*Buspirone Antitrust Litigation, MDL No. 1413 (S.D.N.Y.)*
As one of four co-lead counsel, the firm and others obtained a $90 million settlement for the class.

*Masonite Hardboard Siding Litigation, Civ. Action No. 996787 (Cal. Super. Ct.)*
The firm, as one of the lead counsel, obtained a settlement valued at hundreds of millions of dollars.

*Polybutylene Pipe Litigation, Civ. Action No. W 2004-017770COA-R3-CV (W.D. Tenn.)*
The firm helped obtain a settlement valued at $900 million.

*Biben v. Card, No. 84-0844-CV-W-6 (W.D. Mo.)*
The firm, as one of two co-lead counsel, negotiated settlements for $11.9 million, which was 93% of class members' damages.

*In re Newbridge Networks Securities Litigation, Civ. Action No. 90-1061 (D.D.C.)*
The firm, as co-counsel, obtained a cash and stock class settlement valued at approximately $20 million.

*Jiffy Lube Securities Litigation, Civ. Action No. Y-89-1939 (D. Md.)*
The firm, as co-lead counsel, obtained class settlements for a total of $12 million.

*In re Saxon Securities Litigation, Civ. Action No. 82 Civ. 3103 (S.D.N.Y.)*
The firm, as co-lead counsel, obtained a class settlement of approximately $20 million.

*Grossman v. Waste Management, Civ. Action No. 83 Civ. 2167 (N.D. Ill.)*
The firm, as co-lead counsel, obtained a class settlement of approximately $13 million.

*In re Warner Communications Securities Litigation, 618 F. Supp. 735 (S.D.N.Y. 1986)*
The firm was one of plaintiffs' counsel in this case where a class settlement of



**COHEN MILSTEIN**
HAUSFELD & TOLL™

$18.4 million was obtained.

*In re Tandon Securities Litigation, No. CV86-4566 (C.D. Cal.)*
The firm played a major role in this class action where settlement was valued at approximately $16 million.

*Immunex Securities Litigation, No. C92-548WD (W.D. Wash.)*
The firm was one of lead counsel where the largest securities class action settlement in Seattle -- $14 million -- was recovered.

*In re Caremark Securities Litigation, Case No. 94 C 4751 (N.D. Ill.)*
The firm, as co-lead counsel, obtained a class settlement of $25 million.

*In re Commercial Explosives Antitrust Litigation, Consolidated Case No. 2:96md 1093S (D. Utah)*
The firm, as co-lead counsel, obtained a settlement of $77 million.



COHEN MILSTEIN
HAUSFELD & TOLL™

### Awards & Recognition

**50 Most Powerful People in DC**
GQ Magazine
September, 2007
Michael Hausfeld named #40.

**Beacon of Justice Award**
From the National Legal Aid and Defender Association
Summer 2007
For Cohen Milstein's work on the Guatanamo cases.

**Fierce Sister Award**
Summer 2007
For Cohen Milstein's work on the comfort woman case.

**500 Leading Plaintiffs' Lawyers in America**
Lawdragon
January-February, 2007

**Top Antitrust Plaintiffs' Firm**
Competition Law 360
February 14, 2007
Cohen Milstein named #1

**International World-shakers**
The Lawyer (UK)
February 8, 2007
Michael Hausfeld named as one of top 40 international lawyers "making waves" in the UK

Joseph Sellers has been selected by his peers to be included in the upcoming 2007 edition of **The Best Lawyers in America®** in the specialty of Civil Rights Law.

**500 Leading Litigators in America**
LawDragon
Spring 2006
Michael Hausfeld, Steven Toll and Joseph Sellers are named to the list.

**The Plaintiffs' Hotlist**
The National Law Journal
October 9, 2006

**100 Most Influential Lawyers**
The National Law Journal
June 19, 2006
Michael Hausfeld is named as one of "the most influential lawyers in America."

**Runner up for Matter of the Year**
Global Competition Review
February, 2005
On Empagran matter, praised for ingenuity in how the case was prosecuted.

**COHEN MILSTEIN**
HAUSFELD & TOLL™

### Attorney Profiles - Partners

#### Herbert E. Milstein

Herbert E. Milstein began practicing law with Jerry S. Cohen in 1970 – the birth of the Firm. Mr. Milstein has been lead or principal counsel in many of the best known securities class actions litigated during the past 37 years. He is the senior member of the Securities Fraud/Investor Protection practice group.

Mr. Milstein is the author of numerous articles on topics involving class action litigations and the Federal securities laws. He recently authored an article on current issues involving federal securities laws. He also wrote a separate article in the book entitled *The Burger Years*. He is the author of a monograph on the attorney-client privilege.

As an adjunct Professor of Law at Georgetown University Law Center from 1980-1987, he taught complex litigation and continues to lecture on securities litigation and class actions at law schools and seminars sponsored by the American Bar Association, state bar associations, and continuing legal education organizations. In 1985, he received a Silver Gavel award from the American Bar Association for his distinguished example of public service.

Mr. Milstein formerly served on the staff of the Securities and Exchange Commission for five and one-half years, and last held the position of Chief Enforcement Attorney, Division of Corporate Regulation. From 1976-1980, Mr. Milstein served as Equity Receiver for National American Life Insurance Company, appointed by Judge Charles R. Richey, in *SEC v. National Pacific Corp.* For that work, the Chairman of the SEC said Mr. Milstein and the Firm served "with distinction."

Formerly the President of the National Association of Securities and Commercial Law Attorneys (NASCAT), he also served as Treasurer of that organization for six years. He is a member of the American Law Institute, and a member and former Chairman of the Executive Council of the Securities Law Committee of the Federal Bar Association.

Mr. Milstein is currently on the Board of Directors of several organizations, including the Appleseed Foundation and The Studio Theatre of Washington, DC.

Mr. Milstein graduated from Harvard College (*cum laude*, 1958) and Columbia University School of Law (LL.B., 1961).

Mr. Milstein is admitted to practice in the District of Columbia and Massachusetts.

#### Michael D. Hausfeld

Michael Hausfeld, one of the country's top civil litigators, joined the Firm in 1971. He is the head of the Antitrust and International practice groups.

Mr. Hausfeld's career has included some of the largest and most successful class actions in the fields of human rights, discrimination and antitrust law. He long has had an abiding interest in

**COHEN MILSTEIN**
HAUSFELD & TOLL™

social reform cases, and was among the first lawyers in the U.S. to assert that sexual harassment was a form of discrimination prohibited by Title VII; he successfully tried the first case establishing that principle. He represented Native Alaskans whose lives were affected by the 1989 Exxon Valdez oil spill; later, he negotiated a then-historic $176 million settlement from Texaco, Inc. in a racial-bias discrimination case.

In *Friedman v. Union Bank of Switzerland*, Mr. Hausfeld represented a class of victims of the Holocaust whose assets were wrongfully retained by private Swiss banks during and after World War II. The case raised novel issues of international banking law and international human rights law. He successfully represented the Republic of Poland, the Czech Republic, the Republic of Belarus, the Republic of Ukraine and the Russian Federation on issues of slave and forced labor for both Jewish and non-Jewish victims of Nazi persecution during World War II. He currently represents Jubilee 2000, Khulumani, and other NGOs in litigation involving abuses under apartheid law in South Africa, and is pursuing a RICO litigation against the tobacco industry with regard to the sale of and representations on "light" cigarettes.

Mr. Hausfeld has a long record of successful litigation in the antitrust field, on behalf of both individuals and classes, in cases involving monopolization, tie-ins, exclusive dealings and price fixing. He is or has been co-lead counsel in antitrust cases against manufacturers of genetically engineered foods, managed healthcare companies, bulk vitamin manufacturers, technology companies and international industrial cartels. He is actively involved in ongoing investigations into antitrust cases abroad, and was the only private lawyer permitted to attend and represent the interests of consumers worldwide in the 2003 closed hearings by the EU Commission in the Microsoft case.

Chief Judge Edward Korman (E.D.N.Y.), has noted that Mr. Hausfeld is one of the two "leading class action lawyers in the United States." He has been profiled in, and recognized by, many articles and surveys. Most recently, a *Forbes* magazine article reported on Mr. Hausfeld's work to establish an international alliance for the protection of consumers and investors worldwide. He was named one of thirty master negotiators in *Done Deal: Insights from Interviews with the World's Best Negotiators*, by Michael Benoliel, Ed.D. *The Wall Street Journal* profiled him and his practice, and he has been recognized by *The National Law Journal* as one of the "Top 100 Influential Lawyers in America." He has been described by one of the country's leading civil rights columnists as an "extremely penetrating lawyer", and by a colleague (in a *Washington Post* article) as a lawyer who "has a very inventive mind when it comes to litigation. He thinks of things most lawyers don't because they have originality pounded out of them in law school." *The New York Times* referred to Mr. Hausfeld as one of the nation's "most prominent antitrust lawyers," and *Washingtonian Magazine* has listed Mr. Hausfeld in several surveys as one of Washington's 75 best lawyers, saying he "consistently brings in the biggest judgments in the history of law" and that he is "a Washington lawyer determined to change the world -- and succeeding."

His most recent awards include the 2002 B'Nai Brith Humanitarian of the Year award; the Simon Wiesenthal Center Award for Distinguished Service; and the U.S. Department of Energy's Human Spirit Award, presented "in tribute to a person who understands the obligation to seek truth and act on it is not the burden of some, but of all; it is universal."



He is a frequent speaker on antitrust, human rights and international law, most recently participating in a panel discussion at the Spring Meeting of the ABA Section of Antitrust Law entitled "International Antitrust: Developments After Empagran and Intel" and at the School of Oriental and African Studies (SOAS) Annual Meeting in London entitled "Human Rights in An Integrated World: The Apartheid Reparations Litigation in the USA." He taught Masters Degree courses at Georgetown University Law Center from 1980 to 1987, and was an Adjunct Professor at the George Washington University Law School from 1996 to 1998 and now sits on its Board of Directors.

Mr. Hausfeld is a graduate of Brooklyn College, receiving a B.A. in Political Science with a minor in Russian History (*cum laude*, 1966) and the National Law Center, George Washington University (J.D., *with honors*, 1969). He was a member of the Order of the Coif and the Board of Editors for the George Washington Law Review (1968-69).

Mr. Hausfeld is admitted to practice in the District of Columbia.

### Steven J. Toll

Steven J. Toll joined the Firm in 1979 and has been lead or principal counsel in some of the most highly publicized stock fraud cases over the past 28 years. He has been Managing Partner of the Firm since 1997 and is Head of the Securities Fraud/Investor Protection practice group. Mr. Toll was profiled in the February 1996 *Washington Business Journal* as one of five attorneys that stand out as the "cream of the crop" in the Washington D.C. legal community. In the Fall 2006 edition of LawDragon, he was named as one of the 500 Leading Lawyers in America.

In July 2005, Mr. Toll was lead trial counsel in one of the few securities class actions to go to trial involving Globalstar, a satellite manufacturer. Mr. Toll successfully argued the motions before and during trial and ultimately achieved a settlement of $20 million shortly before the case was scheduled to go to the jury. In approving the settlement, U.S. District Judge Kevin Castel remarked that Mr. Toll and his colleagues had "done a terrific job in presenting the case for the plaintiffs."

Some of Mr. Toll's other notable cases include those against Lucent Technologies, which was settled in 2001 for approximately $575 million, at the time, the second largest securities class action settlement ever achieved; *Southmark Securities Litigation*, where he helped achieve a settlement of $70 million from the company's auditors, Drexel Burnham and Michael Milken; *Norman v. Salomon Smith Barney*, where he negotiated a $50 million settlement on behalf of customers of Salomon's Guided Portfolio Management Program, who alleged that Salomon invested their money in companies in order to boost Salomon's investment banking business, *In re ECI Telecom Securities Litigation* (E.D.Va.)(telecom company accused of presenting false revenue and earnings figures; recovery of $22.75 million); *Gilat Securities Litigation* (company accused of misreporting revenue for a period of years -- recovery of $20 million).

Mr. Toll also served as co-lead counsel in one of the most publicized frauds of the 1990s -- Cascade International (S.D. Fla.) where the mastermind of the fraud, Victor Incendy, is still a fugitive from justice. The case settled on the eve of trial against Raymond James Inc. -- the only securities class action ever successfully litigated against a brokerage firm for its role as a research analyst.



COHEN MILSTEIN
HAUSFELD & TOLL^{PLLC}

He is currently leading the Firm's team serving as co-lead counsel in one of the most highly publicized fraud cases of this era, the securities fraud class action involving Parmalat, the Italian dairy manufacturer; the case is known as Europe's "Enron," because of the similarities of the fraudulent schemes and the non-existence of billions of dollars of assets that had been recorded on Parmalat's financial statements. He is also heading up numerous securities fraud cases against other public companies.

He has written for and spoken at various conferences about securities law issues, including, *inter alia, The Plaintiffs' Perspective, Securities Regulation and the New Law,* National Legal Center for the Public Interest, No. 1, Sept. 1996; *The Sarbanes-Oxley Bill Provides No Assistance To Investors Seeking To Recovery From Corporate Fraud,* ABA Annual Meeting, August 2002; and *The Analyst Cases Involving Merrill Lynch, and Its Internet Analyst Henry Blodget, and Salomon Smith Barney and Its Telecommunications Analyst Jack Grubman,* Mass Torts Made Perfect (presented January 2003).

Mr. Toll is an honors graduate of the Wharton School of the University of Pennsylvania (B.S., Accounting, *cum laude,* 1972). He graduated from Georgetown University Law Center (J.D., 1975) where he was Special Project Editor of the Tax Lawyer.

Mr. Toll is admitted to practice in Virginia and the District of Columbia.

### Lisa M. Mezzetti

Lisa Mezzetti, a Partner at Cohen Milstein, joined the Firm in 1984, and is a member of the Securities Fraud/Investor Protection and the Consumer Protection practice groups.

In her securities work, Ms. Mezzetti represented the corporate plaintiff in a private litigation alleging damages from the purchase of a healthcare technology company; in a separate matter, she represented 1,900 plaintiffs in a series of 25 federal court suits concerning municipal bonds. Her shareholder class actions include *In re VeriSign Securities Litigation* (settled for approximately $78 million); *Murphy, Derivatively On Behalf of Nominal Defendant National Health Laboratories Inc. v. Perelman* (Cal. Super. San Diego Cty.) (global settlement of class and derivative litigations for total of $65 million); *Flecker v. Hollywood Entertainment Corp.* (D. Or.) ($15 million settlement, reached the day before trial was to begin); *Biben v. Card* (W.D. Mo.)(93% of class members' damages recovered in settlement) and, currently, *In re Parmalat Securities Litigation* (S.D.N.Y.), which is litigating the alleged largest fraud in European corporate history. She also has represented parties in securities arbitrations (both as claimant's counsel or defense counsel for the broker) and defended clients in investigations and enforcement actions of the Securities and Exchange Commission.

In consumer cases, Ms. Mezzetti is or was one of the lead counsel in *In re Lupron Marketing and Sales Practices Litigation* (D. Mass.) (brought against pharmaceutical companies on pricing policies and methods; combined $150 million settlement); *Howard v. Ford Motor Co.* (Cal. Sup. Ct.) (order of the Court on equitable count required prospective recall of 1.7 million cars; settled immediately before scheduled second jury trial); and *Fischl v. Direct Merchants Credit Card*



COHEN MILSTEIN
HAUSFELD & TOLL

*Bank, N.A.* (Henn. Cnty., Minn.) (brought by credit card consumers, alleging improper charges and payment processes; settlement included credits for overpayments and changes in business practices). She has litigated class actions under the ERISA laws, and brought one of the first class actions filed under the federal Family and Medical Leave Act.

Ms. Mezzetti is a public arbitrator for the National Association of Securities Dealers, hearing disputes between customers and brokers. She speaks at legal education seminars and has been quoted in the media on issues concerning both consumer law and securities class actions. Ms. Mezzetti was a panelist at the Federal Trade Commission's Workshop on Consumer Class Actions and at the annual conference of the Association of Trial Lawyers of America (now American Association for Justice) on unfair trade practices and deceptive trade practices statutes. The transcript of the FTC workshop, and her related article, *The Coupon Can Be the Ticket: The Use of "Coupon" and Other Non-Monetary Redress in Class Action Settlements* (co-authored with Whitney Case) are published at 18.4 Geo. J. Legal Ethics 1431 (2005). She also speaks on corporate governance issues at conferences of institutional investors, and was a guest panelist on a Washington, D.C. cable television show concerning hiring and working with stock brokers and financial advisors.

Before joining Cohen Milstein, Ms. Mezzetti was a litigation associate of Shea & Gould of New York City.

Ms. Mezzetti serves as a member of the Boards of Directors of two non-profit organizations: The International Alliance for Women (a worldwide organization that supports and promotes women entrepreneurs, professionals and executives; www.tiaw.org) and The Financial Women's Association of New York (www.fwa.org). She also serves on the Corporate Affiliate Board of the National Association of State Treasurers and has served on the D.C. Advisory Board of The Joffrey Ballet of Chicago.

Ms. Mezzetti graduated from the Columbus School of Law, Catholic University of America in 1980, where she served as a Vice-Chancellor of the Moot Court Board and was a Teaching Assistant for the Legal Writing and Research Course for first-year students. In 1986, she received a Master of Laws degree, with a specialty in Securities Regulation, from Georgetown University Law Center. Her bachelor's degree was awarded by Stonehill College (B.A, English, *magna cum laude*, 1977).

Ms. Mezzetti is admitted to practice in the District of Columbia and New York.

**Andrew N. Friedman**

Andrew Friedman, a Partner at the Firm, joined Cohen Milstein in 1985. He is the head of the Consumer Protection practice group and a member of the Securities Fraud/Investor Protection practice group.

In the consumer protection area, Mr. Friedman is litigating numerous class actions including cases relating to various insurance companies' failure to deliver promised benefits to thousands of persons who held flood insurance policies and suffered damage to their houses in September 2003 from Hurricane Isabel, *Howell v. State Farm Insurance* (D. Md.) and defective automobile

COHEN MILSTEIN
HAUSFELD & TOLL

engine coolants, *In re General Motors Dex-Cool Products Liability Litigation* (S.D. Ill). He has been instrumental in securing significant recoveries on behalf of thousands of consumers. He was one of the principal counsel in *Snyder v. Nationwide Mutual Insurance Company* (Sup. Ct., Onondaga Cnty, N.Y.), a class action that resulted in a settlement valued at between $85 million and $103 million. As one of two co-lead counsel in a class action against Thomson Consumer Electronics, Mr. Friedman reached a court-approved agreement that made up to $100 million available for persons who paid for unreimbursed repairs to televisions.

Mr. Friedman also has been involved in many successful securities class actions. In July, 2005, Mr. Friedman served as one of lead trial counsel at the trial of a certified class action in *In re Globalstar Secururites Litigation* in the United States District court for the Southern District of New York. Near the end of the second week of trial, a cash settlement of $20 million was reached for the benefit of the certified class. The settlement was approved by Judge P. Kevin Castel, who was highly complimentary of counsel:

> This case has been litigated by top trial lawyers, each of whom, as to both lead counsel and the other counsel in the case, have been exceptionally fine in their presentation of the evidence. Mr. Toll, Mr. Friedman, Mr. Shalov, their colleagues Mr. Devore, Ms. Peterson, have all done a terrific job in presenting the case for the plaintiffs.

In addition, Mr. Friedman served as one of co-lead or principal counsel in *Norman Frank et al. v. David L. Paul* (recovery of over $18 million); *In re Jiffy Lube Securities Litigation* (D. Md.) (recovery of over $12 million); and *In re Immunex Securities Litigation* (W.D.Wash.) (recovery of $14 million, then the largest securities class action settlement in Seattle). Mr. Friedman was one of the Firm's attorneys selected by the County of Cuyahoga, Ohio to prosecute a lawsuit that sought to recover losses from the County's Secured Assets Fund Earnings Program (S.A.F.E.). The lawsuit alleged that broker/dealers and a financial institution assisted the County in engaging in unsuitable and inappropriate investments and trading activity. The case settled favorably for $9.5 million.

Mr. Friedman has been a speaker on numerous panels for legal education seminars and institutional investor conferences on the issues of securities class actions, accounting fraud and corporate governance. He was featured in a November 15, 1997 *Washington Post* article about securities class actions and profiled in the April 14, 2000 edition of *The Washington Business Journal*. In 2007, LawDragon named Mr. Friedman as one of the 3,000 Leading Plaintiffs' Lawyers in America.

Prior to joining Cohen Milstein, Mr. Friedman served as an attorney with the U.S. Patent and Trademark Office.

Mr. Friedman graduated from Tufts University with a B.A. in Psychology (1980, *magna cum laude*, Phi Beta Kappa) and is a 1983 graduate of the National Law Center, George Washington University.

Mr. Friedman is admitted to practice in the District of Columbia and New York.

**Richard S. Lewis**


COHEN MILSTEIN
HAUSFELD & TOLL™

Richard Lewis, a Partner at the Firm, joined Cohen Milstein in 1987 and is the head of the
Unsafe Drugs & Environmental Health Threats practice group, for both domestic and
international matters.

He has been appointed to serve as co-lead counsel in mass tort and class action cases including
*In re StarLink Corn Products* (N.D. Ill) (settlement of $110 million) and *In re PPA* (asserting
claims by users of unsafe over-the-counter medicines). He has also been appointed to the MDL
Steering Committee in *In re Prempro Products Liability Litigation* (E.D. Ark.).

In addition, Mr. Lewis served as lead counsel in numerous actions to obtain medical monitoring
relief for communities exposed to toxic chemicals from hazardous waste disposal practices or
unsafe drugs. These include *In re Diet Drug Litigation* (Fen-Phen) (E.D. Pa), which resulted in a
$4 billion settlement providing medical monitoring in addition to individual personal injury
awards in the hundreds of thousands of dollars, and *Harman v. Lipari*, a Superfund case that
resulted in a settlement providing medical monitoring for thousands of residents who lived on or
played near a landfill. He has litigated both individual and class childhood lead poisoning cases
and he is presently lead counsel in a case against the lead pigment industry, *City of Milwaukee v.
NL Industries Inc.* Mr. Lewis is also handling mass tort cases involving Vioxx, Celebrex, Bextra
and Hormone Therapy, and environmental cases in India and Zambia.

Mr. Lewis graduated from Tufts University with a B.A. in English (*cum laude*, 1976), and earned
his Master's in Public Health degree from the University of Michigan (1981) and his law degree
from the University of Pennsylvania (J.D., *cum laude*, 1986). He was Comments Editor for the
University of Pennsylvania Law Review (1985-86) and authored the Comment, *O.C.A.W. v.
American Cyanamid: The Shrinking of the Occupational Safety and Health Act*, U. Pa. L. Rev.
(July, 1985). After law school, he was a law clerk for the Honorable Stanley S. Brotman, U.S.
District Court for the District of New Jersey.

Mr. Lewis is admitted to practice in the District of Columbia.

**Daniel S. Sommers**

Daniel Sommers, a Partner at the Firm, joined Cohen Milstein in 1988. He has served as the
head of the firm's Securities Fraud/Investor Protection practice group and currently is the chief
operating lawyer for that group.

During his career at Cohen Milstein, Mr. Sommers served as lead or co-lead counsel or
otherwise played a significant role in numerous securities fraud class actions in federal courts
throughout the United States. Many of those cases resulted in multi-million dollar recoveries for
individual and institutional investors. For example, these cases include: *Steiner v. Southmark
Corporation* (N.D.Tex.) (over $70 million recovery ); *In re PictureTel Inc. Securities Litigation*
(D.Mass.) ($12 million recovery); *In re Physician Corporation of America Securities Litigation*
(S.D. Fla.) ($10.2 million recovery); *In re Gilat Satellite Securities Litigation* (E.D.N.Y.) ($20
million recovery); *In re Pozen Inc. Securities Litigation* (M.D.N.C.) ($11.2 million recovery); *In
re Nextel Communications Securities Litigation* (D.N.J.) (up to $27 million recovery); *In re
PSINet Inc. Securities Litigation* (E.D. Va.) ($17.8 million recovery); *In re Cascade
International Inc. Securities Litigation*, (S.D. Fla.) (global recovery of approximately $10

million); and *In re ECI Telecom Securities Ltd. Litigation* (E.D.Va.) ($21.75 million recovery). He currently is actively involved in the prosecution of the *In re Fannie Mae Securities Litigation* (D.D.C).

Mr. Sommers is also experienced in non-class action litigation. He represented TBG Inc., a multi-billion dollar privately-held overseas corporation, in a multi-party, complex action alleging fraud in a corporate acquisition and represented individuals in connection with investigations brought by the United States Securities and Exchange Commission. He also has represented publicly traded corporations in the prosecution and defense of claims. Mr. Sommers has litigated cases covering a wide-range of industries including the financial services, computer software, pharmaceutical, insurance, real estate and telecommunications industries among others. He also has substantial experience in cases presenting complex accounting and auditing issues.

Mr. Sommers is a frequent commentator on the federal securities laws and corporate governance issues and addresses institutional investor groups and others on these topics as illustrated below:

- Guest panelist on "It's Your Business," a nationally syndicated television program, where he spoke on investor lawsuits.
- Panelist at the George Washington University Law School, where he spoke on the practice of law from the plaintiff's perspective.
- Addressed the California State Association of County Retirement Systems, to whom he spoke on corporate governance and fiduciary duties and liabilities.
- Spoke at a District of Columbia Bar Association program in 2005 where he addressed "Attorney Liability in the Post-Enron, Post Sarbanes-Oxley Era."
- Panelist at a 2006 presentation to Illinois-based institutional investors on the topic of "The Growing Emphasis on Fiduciary Responsibility: Implications For Illinois Pension Funds and the Emergence of Guiding Principles."
- Addressed the Professional Liability Underwriting Society in 2007 on the topic of "Global Companies, Global Risk: Exposure Arising Outside the U.S."

In 2007, Mr. Sommers was appointed to serve as the chairman of the Investor Rights Committee of the Corporation, Finance and Securities Law Section of the District of Columbia Bar. In addition, he is a member of the Securities Litigation Committee of the American Bar Association and is a member of the National Association of Public Pension Attorneys.

He is a 1983 graduate of Union College, earning a B.A. in Political Science (*magna cum laude*), and a 1986 graduate of the George Washington University Law School. Mr. Sommers is admitted to practice in federal courts including the United States District Courts for the Districts of New Jersey, Maryland, Eastern District of Michigan and the District of Columbia as well as the United States Courts of Appeals for the District of Columbia, Fourth, Ninth, Tenth and Eleventh Circuits. Mr. Sommers is also admitted to practice before the Supreme Court of the United States.

Mr. Sommers is a member of the bar of the states of New York and New Jersey as well as the District of Columbia.

**COHEN MILSTEIN**
HAUSFELD & TOLL™

## Daniel A. Small

Dan Small, a Partner at Cohen Milstein, joined the Firm in 1988 and is a member of the Antitrust practice group.

Among the antitrust cases on which Mr. Small is currently working are: *In re Microsoft Antitrust Litigation* (D. Md.), in which he serves as chair of the experts committee and *Rasmussen v. General Motors* (Cir. Ct., Milwaukee Cty., Wisc.) (and related cases in eight other states), a state-wide class action alleging conspiracy among auto manufacturers and distributors to maintain dual price systems between the United States and Canada. He was co-lead counsel for the end-user plaintiffs in *In re Buspirone Antitrust Litigation* (S.D.N.Y.), a case alleging monopolization and market allocation claims against a brand name drug manufacturer for delaying generic entry to the market that settled for $90 million. Mr. Small also was lead counsel for the plaintiffs in *Pease, et al. v. Jasper Wyman & Son, et al.* (Super. Ct., Knox Cty., Me), a price-fixing class action brought on behalf of Maine wild blueberry growers. The case was tried in November 2003, and the jury returned an $18.68 million verdict for the Class, which after trebling and other additions, resulted in a $56 million judgment.

Mr. Small's substantial appellate experience includes briefing and arguing *Free v. Abbott Laboratories* in the United States Supreme Court. The case presented the issue of whether a supplemental jurisdiction statute overruled *Zahn v. International Paper Co.* The Court split 4-4, with Justice O'Connor recusing herself. Mr. Small successfully briefed and argued appeals before the Seventh Circuit Court of Appeals in *In re Brand Name Prescription Drug Antitrust Litigation* (7th Cir. 1997) on the issue of whether the district court had subject matter jurisdiction, and in *Paper Systems, Inc. v. Nippon Paper Industries Co., Ltd.* (7th Cir. 2002) holding that the federal direct purchaser rule does not immunize a defendant from liability for the direct sales of its co-conspirators. Mr. Small also briefed and argued the appeal in *Mack v. Bristol-Myers Squibb* (Fla. 1st DCA 1996), the first opinion construing the Florida Deceptive and Unfair Trade Practices Act to permit indirect purchasers to sue for damages for antitrust violations.

He has been a speaker at events organized by the American Antitrust Institute, the Conference Board, the American Bar Association and the District of Columbia Bar, among others.

Mr. Small is a 1981 graduate of Colgate University, receiving a B.A. (*cum laude*) in History. He graduated from the American University's Washington College of Law in 1986 and joined Cohen Milstein after serving as Law Clerk to the Honorable Roger Vinson, U.S. District Judge for the Northern District of Florida (1986 to 1988).

Mr. Small is admitted to practice in Maryland and the District of Columbia.

## Joseph M. Sellers

Joseph Sellers, a Partner at the Firm and head of the Civil Rights & Employment practice group, joined Cohen Milstein in 1997.



COHEN MILSTEIN
HAUSFELD & TOLL™

Mr. Sellers has represented victims of discrimination and other illegal employment practices individually and through class actions. He has tried several civil rights class actions to judgment before juries and has argued more than 25 appeals in the federal and state appellate courts, including the United States Supreme Court. He has served as class counsel, and typically lead counsel, in more than 30 civil rights and employment class actions.

Those cases have included: *Beck. v. Boeing Company* (W.D. Wash.), which included a class of more than 28,000 women employees at Boeing facilities in Washington state alleging sex discrimination in pay and overtime decisions; *Conway, et al. v. Deutsch* (E.D. Va.), for a class of all female undercover case officers at the CIA alleging sex discrimination in promotions and job assignments; *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.), where the Court has certified the largest class in such a case: more than 1.5 million women employees at Wal-Mart stores, alleging sex discrimination in promotions and pay decisions; *Johnson, et al. v. Freeh* (D.D.C.), for a class of African-American FBI special agents alleging racial discrimination in promotion and job assignments; *Keepseagle v. Venamen* (D.D.C.), for a class of Native American farmers and ranchers denied equal credit opportunities by USDA; *Neal v. Director, D.C Dept. of Corrections* (D.D.C.), the first sexual harassment class action tried to a jury, for a class of women correctional employees and men subject to retaliation at the D.C. Department of Corrections; and *Trotter, et al. v. Perdue Farms* (D.Del.), for a company-wide collective action brought under the Fair Labor Standards Act for violations of federal wage and hour law.

Throughout his career, Mr. Sellers has also been active in legislative matters. He has testified more than 20 times before Committees of the United States Senate and House of Representatives on various civil rights and employment matters. He worked on the passage of the Civil Rights Act of 1991 and the Americans with Disabilities Act of 1990.

Mr. Sellers has trained lawyers at the U.S. Equal Employment Opportunity Commission and the U.S. Department of Justice on the trial of civil rights cases and has lectured extensively throughout the country on various civil rights and employment topics. He was an Adjunct Professor at the Washington College of Law at American University, where he taught Employment Discrimination law, and at the Georgetown University Law Center, where he taught a course on Professional Responsibility.

He served on the Clinton/Gore Transition Team in 1992 and 1993. He headed the teams reviewing the operations of the EEOC, the Office of the Assistant Attorney General for Civil Rights, and various sections of the Civil Rights Division of the Department of Justice. He also served as a Co-Chair of the Task Force of the D.C. Circuit on Gender, Race and Ethnic Bias and was appointed by panels of the D.C. Circuit Court of Appeals and the U.S. District Court for the District of Columbia.

At the request of the Ford Foundation and the American Bar Association, Mr. Sellers delivered a series of lectures and designed and delivered a mock trial on civil rights law to Chinese judges, lawyers and government officials.



Mr. Sellers has been recognized as one of the top lawyers in Washington and as one 10 the top plaintiffs' employment lawyers in the country. He is a professionally-trained mediator and has served as the President of the Washington Council of Lawyers.

Prior to joining Cohen Milstein, Mr. Sellers served as head of the Employment Discrimination Project of the Washington Lawyers' Committee for Civil Rights and Urban Affairs for over 15 years.

Mr. Sellers received a J.D. from Case Western Reserve School of Law (1979), where he served as Research Editor of the *Case Western Reserve Law Review*, and a B.A. in American History and Literature from Brown University (1975).

Mr. Sellers is admitted to practice in the District of Columbia.

### Mark S. Willis

Mark Willis joined the Firm in 1989 and is a Partner in the Securities Fraud/Investor Protection practice group. Mr. Willis heads the Firm's international securities practice as well as its domestic client development work.

Mr. Willis focuses his practice on investor protection issues, including the enforcement of the federal securities laws. In that role he works with a number of European and domestic institutional investors on investor protection and corporate governance matters. He currently acts as co-lead counsel in the *In re Parmalat Securities Litigation* (S.D.N.Y.), the largest fraud in European corporate history that is frequently referred to as Europe's "Enron". Mr. Willis represents Italian, French and Belgian institutions in that action. He also represented Brussels-based KBC Asset Management in the *In re Royal Dutch/Shell Securities Litigation*. Among other notable cases, Mr. Willis litigated against Caremark International in which Caremark was accused of federal Medicare fraud, subsequently pled guilty and paid the U.S. Government a fine of approximately $160 million and $25 million in a civil settlement. Mr. Willis also litigated against National Health Labs, which resulted in a $65 million settlement, and settled claims against Nextel Communications and Motorola.

Mr. Willis has written extensively on corporate, securities and investor protection issues, often with an international focus. He authored Chapter 60 of *Securities Law Techniques*, titled *Admission of Securities to Official Listing on Stock Exchanges Within the European Union and the Subsequent Disclosure Obligations* (1998). He published a related article in the Fall 1997 issue of the International Law News, *A Brief Overview of the European Union's Efforts to Harmonize the Requirements for Listing Securities*. He also authored Chapter 196 of *Business Organizations with Tax Planning*, titled *Company Laws of the European Union* (1998). Mr. Willis wrote about investor protection issues in an article published in the July/August 2003 edition of *Professional Investor*, a United Kingdom-based journal for institutional investors and investment professionals. A second article, co-authored by Mr. Willis, appeared in the same publication's May 2005 edition. He was also the co-author of the Comment entitled *Corporation Code Sections 309 and 1203: California Redefines Directors' Duties Towards Shareholders*, Pepperdine Law Review, Volume 16, No. 4 (1989).

COHEN MILSTEIN
HAUSFELD & TOLL™

Mr. Willis has been a frequent speaker at institutional investor conferences on the issues of investor protection through the federal securities laws and the importance of using corporate governance measures to force companies to put the interests of their shareholders first. In addition to numerous forums in the United States, Mr. Willis was invited to address these topics at institutional investor conferences held in London and Paris in January 2003 and spoke at similar conferences in Munich and Milan in the Spring of 2005. He also addressed corporate governance issues at the Annual Conference of the National Council on Teacher Retirement in October 2004.

Mr. Willis obtained a Masters in International Law, with an emphasis in securities regulation, from the Georgetown University Law Center in 1993. He graduated from Pepperdine University School of Law in 1989 where he was a member of the Moot Court Team and won the Dalsimer Moot Court Competition. Mr. Willis received his B.A. in English History from Brigham Young University in 1986.

Mr. Willis is admitted to practice in the District of Columbia and Massachusetts.

**Marc I. Machiz**

Marc Machiz, a Partner at Cohen Milstein, joined the Firm in 2000 and is the head of the Employee Benefits (ERISA) practice group. He is the resident Partner of the Philadelphia office.

Mr. Machiz litigates ERISA class actions involving a range of benefits cases including inappropriate pension plan investments, the inappropriate investment in company stock by 401(k) plans, discharges to interfere with pension rights and illegal plan terminations including, among others, *Hans v. Tharaldson et al.*(D.N.D.) (purchase by ESOP of employer stock allegedly imprudently and for more than adequate consideration); *Mehling, et al. v. New York Life Insurance Co., et al.*, (E.D. Pa.) (investment in allegedly overpriced mutual funds proprietary to the sponsor) and *In re Williams Company ERISA Litigation* (N.D. Okla) (investment by 401(k) plan in allegedly inflated company stock); *In re Dynegy ERISA Litigation* (S.D. Texas ) (same); Simpson v. Firemen's Fund Insurance Co. (N.D. Cal.) (discharge of disabled employees allegedly to interfere with their attainment of health benefits); *Stoeffels v. SBC Communications, Inc.*, (S.D. Texas).(termination of retiree telephone concession alleged to be a pension plan); *Wagener v. SBC Communications Inc. Pension Plan* (D.D.C.) (alleged failure to pay promised pension benefits); *Zhu v. Fujitsu*, N.D. Cal.(alleged vesting violation); *Banyai v. Mazur* (S.D.N,Y.) (alleged illegal transfer of fund assets). Mr. Machiz has submitted amicus curiae briefs to the Supreme Court and lower courts on behalf of the Pension Rights Center and the National Association of Insurance Commissioners. He consults with the AFL-CIO on state legislation to expand healthcare coverage so as to minimize the chance that such legislation will be held preempted, and he represents Fiduciary Counselors. Inc. in evaluating the adequacy of both ERISA and Securities settlements on behalf of plans participating in settlements with their plans sponsors and the officers of the plan sponsors, including evaluation of settlements in the the Enron Securities litigation.

He joined the Plan Benefits Security Division ("PBS") of the Office of the Solicitor of Labor as a trial attorney in 1978, and was appointed Assistant Counsel for Fiduciary Litigation in 1982. At the start of 1984, he joined Beins, Axelrod and Osborne, P.C. practicing general labor and

COHEN MILSTEIN
HAUSFELD & TOLL

ERISA law on behalf of unions and multiemployer plans. In 1986 he returned to the Department of Labor as Counsel for General Litigation at PBS, and from 1988 to 2000 held the position of Associate Solicitor, heading the Division. As Associate Solicitor, Mr. Machiz was the Department of Labor's chief ERISA lawyer charged with responsibility for all enforcement litigation brought by the Secretary of Labor under the statute, which governs the vast majority of privately sponsored health, welfare and pension plans. He was also responsible for all legal advice under the statute provided to the Pension & Welfare Benefits Administration, which administers Title I of ERISA.

Mr. Machiz worked to institute the Department's innovative amicus program which aggressively advocated the Department's views throughout the judicial system on a wide range of ERISA issues ranging from the need to limit ERISA preemption of state worker and consumer protection laws to the need to strengthen participants' rights and remedies under the Act.

Mr. Machiz's expertise in ERISA has been recognized by his colleagues in the ERISA bar, who made him a Charter Fellow of the American College of Employee Benefits Counsel. Mr. Machiz is a frequent speaker on ERISA issues for the ABA, ALI-ABAPLI, and private seminars, and has served as plaintiffs' co-chair of a subcommittee of the Employees Benefits Committee of the ABA's Labor Section. He is also a member of the *BNA Pension and Benefits Reporter* Advisory Board.

Mr. Machiz has authored several articles including *Understanding DOL's New Class Exemption for the Release of Claims and Extensions of Credit in Connection with Litigation*, Pension & Benefits Reporter, Vol. 31, No. 2, January, 2004; and *ESOPS, ERISA, and Employer Stock: A Litigator's Approach*, ATLA Commercial Litigation Section Newsletter, Volume 7, Number 3 (Spring/Summer 2001).

He attended the University of Pennsylvania, where he earned a B.A. in History, and received his law degree from the University of California at Berkeley (Boalt Hall) in 1978.

Mr. Machiz is admitted to practice in the District of Columbia and Pennsylvania.

**Christine E. Webber**

Christine Webber, a Partner at the Firm and a member of the Civil Rights & Employment Practice group, joined Cohen Milstein in 1997. She is the Partner in charge of the law clerk and summer associate program.

Ms. Webber represents plaintiffs in class action employment discrimination and Fair Labor Standards Act cases. Ms. Webber's current docket includes *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.), a certified class action for over 1.6 million current and former female employees of Wal-Mart with complaints of discrimination in pay and promotion; *Hnot v. Willis* (S.D.N.Y.), representing a class of women at the vice-president level and above challenging sex discrimination in compensation and promotions; and *Jenkins v. BellSouth* (N.D. Ala.), representing a proposed class of African-American employees challenging race discrimination in promotions and compensation.



She represented plaintiffs in *Beck v. The Boeing Co.* (W.D. Wash.), a class action alleging sex discrimination in compensation and promotions which settled in 2004 for $72.5 million. She was counsel in *Trotter v. Perdue* (D. Del.), representing plaintiffs who were wrongly denied payment of overtime wages, and obtaining a $10 million settlement. She is also representing workers in a similar case against Tyson Foods, Inc.

In 2004, Ms. Webber was named one of the Top Lawyers in Washington, D.C. by *Washingtonian Magazine* and named as one of the 2007 Washington, D.C. *Superlawyers* in the Civil Rights category.

Prior to joining Cohen Milstein, Ms. Webber received a Women's Law and Public Policy fellowship and worked for four years at the Washington Lawyers' Committee for Civil Rights and Urban Affairs in their Equal Employment Opportunity Project. She worked on a variety of employment discrimination cases, and focused in particular on the sexual harassment class action *Neal v. Director, D.C. Department of Corrections, et al.* Ms. Webber participated in the trial of this ground-breaking sexual harassment class action in 1995. Ms. Webber also tried the race discrimination case *Cooper v. Paychex* (E.D. Va.), and successfully defended the plaintiffs' verdict before the Fourth Circuit.

Ms. Webber is a member of the National Employment Lawyers' Association (NELA) and co-chair of their Class Action Committee. She speaks regularly at CLE programs on employment discrimination class actions, including presentations for NELA, and most recently participated in a panel on Evidentiary Issues and Jury Instructions in Employment Discrimination Litigation for ALI-ABA's program at Georgetown University Law Center in February 2007.

She graduated from Harvard University with a B.A. in Government (*magna cum laude*, 1988) and the University of Michigan Law School (J.D., *magna cum laude*, 1991, Order of the Coif). Following law school, Ms. Webber clerked for the Honorable Hubert L. Will, United States District Judge for the Northern District of Illinois.

Ms. Webber is admitted to practice in Illinois and the District of Columbia.

**Richard A. Koffman**

Richard Koffman, a Partner at the Firm, joined Cohen Milstein in 2003 and is a member of the Antitrust practice group. He is also a member of the firm's *Pro Bono* Committee.

He is currently serving as counsel for plaintiffs in, among other cases, *In re Rubber Chemicals Antitrust Litigation* (N.D. Ca.); *In re Polyester Staple Antitrust Litigation* (W.D.N.C.); and *In re Urethane Antitrust Litigation* (D. Kan.).

Mr. Koffman came to Cohen Milstein after four years as a senior trial attorney with the Antitrust and Civil Rights Divisions of the United States Department of Justice. Prior to joining the Department of Justice, he spent seven years in private practice, with Fine, Kaplan and Black in Philadelphia (working primarily on antitrust class actions and other complex commercial litigation) and then with Bernabei & Katz in Washington, D.C. (handling employment discrimination cases). While at Fine Kaplan, Mr. Koffman was actively involved in litigating



COHEN MILSTEIN
HAUSFELD & TOLL

several successful antitrust class actions on behalf of plaintiffs and classes, including *In re Nasdaq Market-Makers Antitrust Litigation* (S.D.N.Y.) (settled for more than $1 billion); *In re Polypropylene Carpet Antitrust Litigation* (N.D. Ga.); *In re Commercial Explosives Antitrust Litigation* (D. Utah); and *In re Drill Bits Antitrust Litigation* (S.D. Tex.).

Immediately after law school, he served as a judicial clerk for Judge James B. McMillan of the Western District of North Carolina, and for Judge Anthony J. Scirica of the U.S. Court of Appeals for the Third Circuit.

Mr. Koffman is the author of *It's Not The First Time: Fudging the Truth in Discovery Proceedings Didn't Start with Clinton, Legal Times,* August 24, 1998.

He is a graduate of Yale Law School (J.D., 1990), where he was a Senior Editor of the Law Journal, and Wesleyan University, from which he received a B.A., *with honors,* in English (1986).

Mr. Koffman is admitted to practice in the District of Columbia.

**Agnieszka M. Fryszman**

Agnieszka Fryszman, a Partner at the Firm, joined Cohen Milstein in 1998 and is a member of the International Human Rights and Antitrust practice groups.

She currently represents Indonesian villagers in a lawsuit against Exxon Mobil over torture and extrajudicial killings allegedly committed by the defendant's security forces (a unit of the Indonesian military). For the past several years, she has represented the former "comfort women," women and girls who were forced into sexual slavery by the government of Japan during World War II. Her past successes include cases brought by survivors of Nazi-era forced and slave labor against the German and Austrian companies that allegedly used and profited from slave labor, which were resolved by international negotiations that resulted in multi-billion dollar settlements.

In the Antitrust practice group, she represents small businesses that have been victims of alleged price-fixing in the polyester staple and rubber chemicals markets.

She has represented, *pro bono,* a number of victims of the September 11 attack on the Pentagon and obtained significant recoveries, including one of the highest awards for an injured survivor, from the Victim's Compensation Fund. She also represents, *pro bono,* individuals indefinitely detained without charge by the United States at Guantanamo Bay.

Before joining the Firm, Ms. Fryszman was Democratic counsel to the United States House of Representatives Committee on the Judiciary, Subcommittee on Commercial and Administrative Law. She also served as counsel to Representative Henry Waxman, Ranking Member on the House Government Reform and Oversight Committee.



COHEN MILSTEIN
HAUSFELD & TOLL""'

Ms. Fryszman graduated from Brown University with a B.A. in International Relations and Georgetown University Law Center (J.D., *magna cum laude*, 1996, Order of the Coif), where she was a Public Interest Law Scholar.

Ms. Fryszman is admitted to practice in the District of Columbia and New Jersey.

### Charles E. Tompkins

Charles Tompkins, a Partner at Cohen Milstein, joined the Firm in 1999 and is a member of the Antitrust and Civil Rights & Employment practice groups, with an emphasis on obtaining redress on behalf of employees who have not been paid all of the wages they are owed.

In the antitrust field, Mr. Tompkins currently represents Registered Nurses employed by hospitals in Albany, Chicago, Detroit, Memphis, and San Antonio in lawsuits alleging that their employers unlawfully fixed their wages in violation of federal antitrust laws. Mr. Tompkins also is serving as a member of the co-lead counsel team in *In Re Air Cargo Antitrust Litigation* (E.D.N.Y.), a multi-billion dollar antitrust action alleging that the world's major cargo airlines colluded in setting the amounts of various surcharges they imposed on their customers, and *In Re Air Transportation Antitrust Litigation* (N.D. Cal.), a federal antitrust action challenging a conspiracy among airlines to fix the amount of the fuel surcharge imposed on flights to and from Heathrow airport in London. Mr. Tompkins was a member of the trial team that, following a two-week jury trial, obtained a $56.4 million judgment on behalf of Maine wild blueberry growers who alleged their suppliers fixed the prices of wild blueberries. Mr. Tompkins also was a member of the team that litigated the federal antitrust action *Paper Systems, Inc. v. Mitsubishi Corp. et al.* (E.D.Wisc.), which settled for $20 million on the eve of trial.

In the employment field, Mr. Tompkins has represented a wide variety of employees, and twice obtained summary judgment on behalf of nationwide classes of Auto Damage Adjusters whose employer, GEICO, refused to pay them overtime. See *Robinson-Smith v. GEICO* (D.D.C.); *Lindsay v. GEICO* (D.D.C.). GEICO began paying overtime shortly after the adjusters' victory, and the United States Department of Labor has since cited *Robinson-Smith* in an official opinion letter. Mr. Tompkins also was part of the legal team that obtained a $10 million settlement on behalf of chicken-processing workers who were not paid for the time they spent putting on and taking off their required safety equipment, *Trotter v. Perdue Farms, Inc., et al.* (D. Del.). Perdue Farms changed its practices as part of a global settlement and now pays its employees for this time. Mr. Tompkins also is a member of the team litigating *Dukes v. Wal-Mart Stores, Inc.* (N.D.Cal.), the largest certified Title VII class action in history, in which female employees of Wal-Mart seek redress for unfair gender discrimination, and *Hnot v. Willis, et al.* (S.D.N.Y.), in which a certified class of over one hundred female insurance brokerage executives allege sexual discrimination in compensation and promotions. Mr. Tompkins also serves, on a *pro bono* basis, as a consultant for the Immigrant and Refugee Rights Project at the Washington Lawyers Committee for Civil Rights And Urban Affairs, providing guidance and oversight in litigations brought on behalf of immigrant workers subject to wage and hour violations.

Mr. Tompkins has significant appellate appearance. He second-chaired the argument of *Free v. Abbott Laboratories* before the United States Supreme Court; briefed and successfully argued *Lindsay v. GEICO* before the United States Court of Appeals for the District Of Columbia



Circuit; and briefed and argued *Manchester v. Primerica Financial Services, et al.*, which was successfully settled prior to the issuance of a decision, before the United States Court of Appeals for the Eleventh Circuit.

Mr. Tompkins is the author of "Damages Issues in Fair Labor Standards Act Collective Action Litigation," which is scheduled to appear in Volume 10, Issue Number 2, of the Employee Rights and Employment Policy Journal of the Chicago-Kent School of Law; and the co-author, with Michael Hausfeld and Kalpana Kotagal, of "Innovation, Economics and the Law: The Health Care Industry's Exposure to Antitrust Liability," to be published by the ABA Antitrust Law Section in 2007. He has been asked on several occasions to lecture on employment law matters by both the American Bar Association and the National Employment Law Association.

Prior to joining Cohen Milstein, Mr. Tompkins was an associate with the Washington, D.C. office of Akin, Gump, Strauss, Hauer & Feld, L.L.P. He graduated *magna cum laude* from Colgate University and received his J.D. from the University of Virginia School of Law. He is licensed to practice in New York and the District of Columbia.

**Julie Goldsmith Reiser**

Julie Goldsmith Reiser, a Partner at the Firm, joined Cohen Milstein in 1999 and has specialized in complex litigation involving violations of the federal securities laws and employment discrimination.

Currently, she is working on *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.) class action which has been certified for 1.5 million current and former female employees of Wal-Mart on complaints of discrimination in pay and promotion, and *In re Parmalat Securities Litigation* (S.D.N.Y.), a securities fraud class action alleging artificial inflation in the price of Parmalat's securities. She has also been involved in the litigation and successful settlement of *Beck v. The Boeing Co.* (W. D. Wash.), which alleged sex discrimination in compensation and promotions; *In re P-Com Securities Litigation* (N.D.Cal.) ($16 million settlement); and *In re Sabratek Securities Litigation* (N.D.Ill.) ($15.3 million settlement).

Ms. Reiser co-authored *Companies in the Cross Hairs: When Plaintiffs Lawyers Choose Their Targets, They Look for These Employment Practices*, The Legal Times, February 21, 2005. In 1999, she co-authored *Antitrust Introduction for the General Practitioner*, a chapter in the Washington Lawyer's Practice Manual.

Prior to joining Cohen Milstein, Ms. Reiser worked in Seattle, Washington where she focused primarily on guardianship and healthcare litigation. She was President of the Board of Directors of Seattle Works and chaired the Nominating Committee for the Board of Directors of the Eastside Domestic Violence Program. She also served a term as a Trustee for the Pacific Northwest Ballet. In 1997, Ms. Reiser worked as a Legal Intern for U.S. Senator Patty Murray.

Julie Reiser graduated from Vassar College (B.A. with honors 1992) and the University of Virginia Law School (J.D. 1997). While in law school, she was a member of the Virginia Journal of Law and Social Policy.

Ms. Reiser is admitted to practice in Washington State and the District of Columbia.



COHEN MILSTEIN
HAUSFELD & TOLL™

### Victoria S. Nugent

Victoria Nugent, a Partner at the Firm, joined Cohen Milstein in 2000 and is a member of the Consumer Protection practice group.

Ms. Nugent has focused on consumer protection and public health litigation throughout her career, including *In re StarLink Product Liability Litigation* (N.D. Ill.), representing farmers who sued Aventis Cropscience after an unapproved variety of genetically modified corn was detected in the U.S. corn supply and drove down prices for all U.S. corn exports. More than $100 million was recovered for the class in a landmark settlement. She is currently working on *In re General Motors Dex-Cool Products Liability Litigation* (S.D.Ill.), representing car owners seeking to enforce product warranties for an extended life coolant and *Howell v. State Farm* (D.Md.), representing flood policy holders who were denied the full benefits of their government-backed insurance policies following Hurricane Isabel. Ms. Nugent has argued cases before the high courts of Georgia, Nebraska and the District of Columbia, as well as the federal D.C. Circuit Court of Appeals.

Before joining Cohen Milstein, Ms. Nugent worked for seven years at Public Citizen, a national consumer advocacy organization. During that time, she worked on many legislative and regulatory campaigns addressing issues that ranged from automobile safety to international trade policy. In 1998, Ms. Nugent received a two-year fellowship sponsored by the National Association for Public Interest Law (NAPIL). As a NAPIL Fellow, she worked at Trial Lawyers for Public Justice (TLPJ), where she helped develop and prosecute impact litigation in the areas of arbitration, banking, credit and insurance.

Ms. Nugent received her undergraduate degree in History from Wesleyan University in 1991 and graduated from Georgetown University Law Center in 1998.

Ms. Nugent is admitted to practice in the District of Columbia and Maryland.

### Benjamin D. Brown

Benjamin Brown, a Partner at the Firm, joined the firm in 2005 and is a member of the Antitrust practice group. He has extensive experience in complex litigation and class actions.

He is currently serving as counsel for plaintiffs in, among other cases, *In re Aspartame Antitrust Litigation* (E.D. Pa.); *Brookshire Bros., Ltd., et al. v. Chiquita Brands Int'l., Inc., et al.* (S.D. Fla.); *In re Pressure Sensitive Labelstock Antitrust Litigation* (M.D. Pa.); and *In re Rail Freight Fuel Surcharge Antitrust Litigation* (D.D.C.).

Mr. Brown came to Cohen Milstein after four years as a trial attorney with the Antitrust Division of the United States Department of Justice. While there, Mr. Brown led and assisted in numerous investigations, litigations and trials involving anticompetitive conduct and mergers. Mr. Brown also prosecuted criminal cases as a Special Assistant United States Attorney in the Eastern District of Virginia. Prior to joining the Department of Justice, he spent three years as a litigator in private practice: first with Heller Ehrman White & McAuliffe in San Francisco,



California, working on complex commercial litigation, including class actions, and then with Covington & Burling in Washington, D.C., handling insurance coverage and antitrust litigation. Prior to entering private practice, Mr. Brown served as a judicial law clerk for Chief Judge Juan R. Torruella of the U.S. Court of Appeals for the First Circuit.

Since 2005, Mr. Brown has served as a state editor for the ABA's annual survey of state class action law. He also co-authored a chapter on private antitrust recovery actions for the forthcoming 2008 Global Competition Review's Antitrust Review of the Americas. He has been a guest on CNBC's "Power Lunch" and has also been interviewed regarding antitrust class actions by various television affiliates and radio networks.

Mr. Brown is a graduate of Harvard Law School (J.D., *cum laude*, 1997), where he was an editor and executive board member of the Harvard Civil Rights - Civil Liberties Law Review, and the University of Wisconsin - Madison (B.A.in Philosophy, with distinction, Phi Beta Kappa, 1992).

Mr. Brown is admitted to practice in California and the District of Columbia.

**Avi S. Garbow**

Avi Garbow, a Partner at the Firm, joined Cohen Milstein in 2005 and is a member of the Securities Litigation practice group and Co-Chair of the International Human Rights practice group.

In the securities field, Mr. Garbow focuses his practice on representing both domestic and international investors. Mr. Garbow is currently involved in several major securities fraud actions, including *In re Parmalat Securities Litigation* (S.D.N.Y.) and *In re Converium Holding AG Securities Litigation* (S.D.N.Y.), and also provides counsel to the independent fiduciary of the Enron employees stock ownership plans in connection with the Enron federal securities class action.

Prior to joining the Firm, Mr. Garbow was a Junior Partner at Wilmer Cutler Pickering Hale and Dorr in their Securities and Litigation Departments , where he focused on complex civil and criminal litigation, with an emphasis on internal investigations and financial fraud matters. Mr. Garbow also served over ten years in government as a federal prosecutor in the Justice Department's Environmental Crimes Section, a Special Assistant United States Attorney, and a Special Assistant to the Assistant Adminstrator for Enforcement at the U.S. Environmental Protection Agency. Mr. Garbow has also served as an instructor at the Justice Department's National Advocacy Center. He received special commendations from both the Department of Justice and the Environmental Protection Agency for his trial work.

Mr. Garbow serves as Co- Chair of the American Bar Association's International Human Rights Committee. He has also done work on behalf of the Robert F. Kennedy Memorial Center for Human Rights, and serves on the Board of Directors for International Rights Advocates (an international human rights organization) and Urban Ecology Institute (an environmental, and community development organization) .

COHEN MILSTEIN
HAUSFELD & TOLL™

He is a graduate of the University of Virginia School of Law (J.D., 1992) (where he was the recipient of the Robert F. Kennedy Award for Public Service), the University of Virginia Graduate School of Arts and Sciences (M.A. in Marine Affairs, 1994), and the University of Michigan (B.A., *magna cum laude*, 1988). He is also a former firefighter.

Mr. Garbow is a member of the Virginia and District of Columbia bars.

### William P. Butterfield

William Butterfield, a Partner of the firm, is a member of the Antitrust practice group.

For several years, Mr. Butterfield has been leading plaintiffs' discovery efforts in *In Re New Motor Vehicles Canadian Export Antitrust Litigation*, MDL 1532. He is also working on *In Re Hydrogen Peroxide Antitrust Litigation*, (E.D. Pa.), *In Re OSB Antitrust Litigation*, (E.D. Pa.), and *In Re Methyl Methacrylate (MMA) Antitrust Litigation*, (E.D. Pa.).

Previously, Mr. Butterfield was one of the principal attorneys involved in nationwide litigation challenging lending practices conducted by one of the nation's largest sub-prime lenders. In that case, Mr. Butterfield worked extensively with the FTC, and was responsible for generating nationwide media and Congressional attention to lending practices conducted by Associates Finance. Plaintiffs and the FTC eventually settled with Citigroup (which had acquired Associates Finance) for $240 million (*In Re Citigroup Loan Cases*, J.C.C.P. 4197). Mr. Butterfield was also a principal attorney for the plaintiff classes in *In re Prudential Securities Limited Partnerships Litigation*, MDL No. 1005 (S.D.N.Y.), which settled for $137 million, and *In re PaineWebber Securities Litigation*, 94 Civ. 8547 (S.D.N.Y.), which settled for $200 million.

Mr. Butterfield is recognized as a leader in the field of electronic discovery. He has developed electronic document management solutions since the early 1990s, when he helped design and led the implementation of an electronic document repository to manage more than 15 million pages of documents produced in *In re Prudential Securities Limited Partnerships Litigation*, MDL No. 1005 (S.D.N.Y.). That system was recognized by Senior U.S. District Judge Milton Pollack as one of the most innovative and sophisticated high-tech document management/litigation support systems available @ 163 F.R.D. 200, 208 (S.D.N.Y. 1995). In 2005, Mr. Butterfield testified before the U.S. Judicial Conference Rules Committee regarding proposed electronic discovery amendments to the Federal Rules of Civil Procedure. He speaks at conferences internationally on electronic discovery issues. Mr. Butterfield is also a member of The Sedona Conference, a nonprofit research and educational institute dedicated to the advanced study of law and policy. His comments appeared recently in an article entitled, "E-Discovery: Business is Booming and Lawyers are getting in on the Trend." *Lawyers Weekly*, March 14, 2006.

Mr. Butterfield has also served as an adjunct professor at American University, Washington College of Law, where he taught a course in commodities law and regulation.

Before joining CMHT, Mr. Butterfield was a partner at Finkelstein, Thompson & Loughran, where he focused on antitrust, securities, consumer and banking litigation. While at FT&L, he



COHEN MILSTEIN
HAUSFELD & TOLL™°

also served extensively as outside counsel for federal banking agencies, where he investigated and litigated claims in connection with failed financial institutions. Mr. Butterfield has also defended individuals and companies in federal courts and administrative tribunals in matters involving securities and commodities fraud, insider trading, takeover litigation, broker-dealer violations and registration issues. He began his legal career as an assistant prosecuting attorney for Montgomery County, Ohio.

Mr. Butterfield graduated from the University of Toledo, College of Law in 1978, and earned his undergraduate degree from Bowling Green State University in 1975.

Mr. Butterfield is admitted to practice in the District of Columbia and is an inactive member of the Ohio bar.

**Carol V. Gilden**

Carol Gilden, a Partner at Cohen Milstein, is a member of the Securities Fraud/Investor Protection practice group. She is the resident Partner at the Firm's Chicago office.

Prior to joining Cohen Milstein, Ms. Gilden served as the head of Much Shelist's securities class action practice and as the Firm's Vice Chair of the Class Action Department. She also worked as an enforcement attorney with the Midwest Regional Office of the Securities and Exchange Commission.

Ms. Gilden has served as co-lead counsel in the Sears/Sears Acceptance Corp. Securities Litigation, Sara Lee Securities Litigation, 99 Cents Only Stores Securities Litigation, Quokka Sports Securities Litigation and the City of Chicago's case against on-line travel providers. Ms. Gilden also served on the Executive Committees of the Global Crossing Securities Litigation (settlements of $448 million) and the Merrill Lynch & Co. Research Reports cases ($125 million settlement). Among other notable cases, Ms. Gilden served as co-lead counsel in the ML Lee Securities Litigation and Smith Kline Litigation which settled for $33 million and $30 million respectively, as well as lead counsel in *Pacha et. al. v. McKesson Corporation, et.al.*, a private action which settled for a confidential sum, and as liaison counsel and a litigation team member in the Waste Management Litigation, which settled for $220 million. Under her leadership, the firm also served as active members of the litigation teams in the *AOL Time Warner Securities Litigation* ($2.5 billion settlement) and *Salomon Analyst Litigation/In re AT&T* ($75 million settlement).

In addition to her work on behalf of clients, Ms. Gilden publishes scholarly articles and course materials, and lectures at key industry conferences and seminars. She is an author and co-author of articles published by the National Law Journal, *Courts Grapple with Lead-Counsel Auctions*; IICLE on Illinois Causes of Action, *Shareholder Derivative Suits*; the American Bar Association, *The Impact of Central Bank on Securities Fraud Litigation: The Plaintiffs' Perspective*; Illinois Bar Journal, *Proposed Rule 225: A Death Warrant for Class Actions in Illinois* and Practising Law Institute on Class Actions Litigation: Prosecution and Defense Strategies *A Hybrid 23(B)(2) Rule For Hybrid Class Actions? New Developments In The Use Of Rule 23(B)(2) In Class*

**COHEN MILSTEIN**
HAUSFELD & TOLL™

*Certification.* In January 2005, Ms. Gilden testified against Proposed Rule 225 before the Illinois Supreme Court's Rules Committee.

Ms. Gilden is a regular presenter at conferences and seminars around the country and has spoken at seminars sponsored by the American Bar Association, Chicago Bar Association, Practising Law Institute, Illinois CPA Foundation, Hines Insurance Symposium, the Ohio and Wisconsin Bar Associations, and the National Association of Shareholders and Consumer Attorneys, as well as at other symposiums.

Ms. Gilden was selected as an "Illinois Super Lawyer" in 2005, 2006, 2007 and 2008 by Law & Politics, which published its selections in Chicago magazine (May 2005, February 2006, February 2007 and February 2008 issues). Only 5 percent of Illinois attorneys are awarded this honor.

Ms. Gilden also is a frequent commentator in the national media on various class action topics. She frequently appears on CNBC, including on a special segment titled *I Want My Money Back*, where she was described as "one of the top investor advocacy attorneys in the country." She also has been featured on the ABC news programs *World News Tonight, World News Now* and *Good Morning America*, as well as has made multiple appearances on *First Business Morning News*. Ms. Gilden recently appeared on the cover of *Chicago Lawyer* in connection with a feature article on The Ebb and Flow of Securities Class Actions.

Ms. Gilden is the President of the National Association of Shareholder and Consumer Attorneys (NASCAT), which is the preeminent trade association for securities class action attorneys, and serves on its Executive Committee. Prior to becoming President, she first served as Treasurer, then President-Elect for NASCAT. Ms. Gilden is the first woman in NASCAT's 18-year history to be elected Treasurer, President-Elect and subsequently, President. Ms. Gilden is also Vice President of the Institute for Law and Economic Policy (ILEP). She also was a member of Illinois Attorney General Lisa Madigan's Prescription Drug Transition Working Group. Ms. Gilden is a member of the American Bar Association, Illinois State Bar Association, Chicago Bar Association and the Association of Securities and Exchange Commission Alumni.

Ms. Gilden is a graduate of the University of Illinois (B.S., Business Administration, 1979). She graduated from Chicago-Kent College of Law (J.D., *with honors,* 1983) where she was a member of the Chicago-Kent Law Review.

Ms. Gilden is admitted to practice in Illinois, the federal district court for the Northern District of Illinois, the U.S. Court of Appeals for the Seventh Circuit and the United States Supreme Court.

**Robert G. Eisler**

Robert Eisler, a Partner at Cohen Milstein, joined the Firm in 2007 and is a member of the Antitrust practice group. He is the resident partner in the New York office. Prior to joining Cohen Milstein, Mr. Eisler was a partner at Lieff Cabraser Heimann and Bernstein.

Mr. Eisler has extensive experience in complex litigation at the trial and appellate levels, particularly in the prosecution of antitrust class actions. He has served as lead or co lead counsel



in many cases in the state and federal courts, including In re Buspirone Antitrust Litigation, ($90 million settlement), In re Oxycontin Antitrust Litigation, and In re Ciprofloxacin Hydrochloride Antitrust Litigation. Mr. Eisler is currently involved in the prosecution of numerous major antitrust actions throughout the United States.

Mr. Eisler is a 1986 graduate of LaSalle University, and a 1989 graduate of Villanova Law School.

He is admitted to practice in New York and Pennsylvania.

**Michael P. Lehmann**

Michael P. Lehmann has joined Cohen Milstein as a partner and will head our new San Francisco office. Mr. Lehmann brings to the firm 29 years of experience as a business litigator, with a practice that ranged from class action litigation to business litigation on behalf of individual clients to extensive regulatory work before federal, state and international bodies to domestic and international arbitration.

Prior to joining Cohen Milstein, Mr. Lehmann had worked since graduating from law school at what became Furth Lehmann LLP, where he eventually served as Managing Partner and in recent years has served as lead counsel for direct or indirect purchaser classes in numerous antitrust cases.

**Lynda J. Grant**

Lynda J. Grant joined Cohen Milstein in 2007 as a Partner in our New York office, and will concentrate her efforts in the securities practice area.

Ms. Grant is an accomplished lawyer with over 20 years of experience at Labaton Sucharow representing shareholders and limited partners. Throughout this time, her practice has consisted of class and derivative actions, ranging from large securities fraud cases to those seeking to enjoin unfair buy outs, acquisitions and mergers. Ms. Grant has also represented employees and pensioners in ERISA class actions. Her clients have included individual shareholders and limited partners, sophisticated hedge fund managers, major state, local and city pension funds, and union funds.

Ms. Grant's early career centered on representing limited partners and REIT holders in high-profile matters. In that capacity, she acted as Lead or Co-Lead Counsel in such cases as: *The Gillette Family Trust v. Insignia Financial Group, Inc., Inc. et al.* (the "Shelter Properties" Action); *Warren Heller v. McNeil Partners, L.P., et al.; Irving Zakin v. William Dockser, et al.* (the "CRITEF" Action): *Joan King v. Oxford Tax Exempt Fund II Corporation, and William Wallace v. Devon Associates, et al.* (the "Growth Hotel Investors" Action); and *Carlstrom v. Arvida/JMB Managers, Inc.,* (in which she helped to obtain a preliminary injunction after trial, which stopped a $160 million defensive recapitalization). She also commenced the action, *In Re Estate Associates Limited Partnership Litigation,* which eventually resulted in a $184 million jury verdict. Subsequently, Ms. Grant was part of a team which successfully tried the action *Gelfman, et al. v. Weeden Investors, L.P.,* and helped obtain an injunction in the action *In re*



COHEN MILSTEIN
HAUSFELD & TOLL™

*MONY Group Inc. Shareholder Lit.*, temporarily stopping the $1.5 billion buyout of MONY Insurance Co. by AXA Financial. Ms. Grant also successfully tried the books and records action captioned *Forsythe, et al. v. CIBC Employee Private Equity Fund (U.S.) L.P. et al.*

More recently, she was instrumental in obtaining a $67.5 million settlement for the class in *In re St. Paul Securities Litigation*, was part of a team which settled the action *In re DHB Industries, Inc. Class Action Litigation*, for $40 million and significant corporate governance reforms, and obtained an $8 million settlement in *In re Van der Moolen Securities Litigation*. She was one of the Lead Counsel in the action *In re Marsh ERISA Litigation*, and *In re St. Paul Travelers Sec. Litig. II*, and numerous other actions.

Ms. Grant is a member of the American Bar Association, and serves as a co-chairperson of the Class and Derivative subcommittee on securities litigation. Her article "CAFA: Is the Remedy Worse than the Illness?" was published in the *ABA Class and Derivative Action* newsletter. She is also a regular speaker on securities and class action related topics, having recently served as a panelist on the ABA program entitled Class Certification: Looking Beyond the Pleadings, and at the ABA Annual Convention in 2006, on the panel entitled, "It's a Small World After All: The Increasing Influence of Foreign and Multinational Class Actions." Late last year, she also spoke at a conference in Sydney, Australia regarding the international reach of the federal securities laws. Recently she moderated an ABA Panel concerning the impact of the IPO decision, and was a panelist for a telephone presentation regarding the extraterritorial effect of the federal securities laws. Given her vast experience in representing investors, Ms. Grant has earned the distinction of being named as one of the top female attorneys in the corporate governance area.

Ms. Grant received a J.D. from Cornell University Law School, and is admitted to practice in New York, and the United States District Courts for the Southern and Eastern Districts of New York.

**Brian A. Ratner**

Brian Ratner, a Partner at Cohen Milstein, joined the firm in 2001 and is Deputy Head of the International Practice Group and a member of the Antitrust Practice Group.

Mr. Ratner has extensive experience representing domestic and foreign businesses and individuals in complex litigation at the trial and appellate levels, particularly in the prosecution of antitrust class actions in state and federal courts throughout the United States. Mr. Ratner has litigated and is currently involved in numerous major antitrust class actions on behalf of direct and indirect purchasers alleging price-fixing and monopolization.

Specifically, Mr. Ratner has litigated the matter of *In Re Vitamins Antitrust Litigation* (D.D.C.) on behalf of two certified classes of vitamin direct purchasers who were overcharged as a result of a ten-year global price-fixing and market allocation conspiracy, which settled for over $1 billion. Mr. Ratner was a key member of a 2003 trial team in the case, in which a jury awarded a class of choline chloride purchasers more than $148 million in trebled damages. The National Law Journal ranked this verdict as the 12th largest in 2003. Mr. Ratner has also litigated, among other matters: *Empagran, S.A. et al. v. F. Hoffmann-LaRoche, Ltd., et al.* (D.D.C.), a case



alleging a global vitamins price-fixing and market allocation conspiracy on behalf of foreign purchasers (remanded by U.S. Supreme Court); *Oncology & Radiation Associates v. Bristol-Myers Squibb Co.* (D.D.C.), alleging monopolization against a drug manufacturer, which settled for $65 million; *Molecular Diagnostics Laboratories v. Hoffmann-La Roche, Inc., et al.* (D.D.C.), alleging unlawful monopolization on behalf of a class of purchasers of an enzyme used in DNA amplification, human-genome research, and medical diagnostics; and *In Re Vitamin C Antitrust Litigation* (E.D.N.Y.), alleging a conspiracy by Chinese manufacturers to fix prices and control the supply of vitamin C for export.

Mr. Ratner's substantial international work has included lecturing, organizing conferences, and writing articles and papers on issues such as the private civil enforcement of competition laws around the world and the mechanisms for collective redress in Europe.

Prior to joining Cohen Milstein, Mr. Ratner worked for Jones, Day, Reavis & Pogue where he focused on complex civil and commercial litigation, antitrust counseling, and merger clearance work related to the CBS/Viacom and AOL/Time Warner mergers.

Mr. Ratner graduated from Indiana University-Bloomington with a B.A. in Journalism (1996) and a second major in Political Science. In college, he was a member of the Mortar Board National Honor Society, did undergraduate work at Hebrew University in Jerusalem, Israel, and worked on several political campaigns including the re-election campaign of former U.S. Senator Harris Wofford. Mr. Ratner obtained his law degree from the University of Pittsburgh School of Law (1999), where he was the Managing Editor of the Journal of Law and Commerce. During law school, Mr. Ratner externed for the Hon. Donetta W. Ambrose (W.D. Pa.).

Mr. Ratner is admitted to practice in New Jersey, Pennsylvania, and the District of Columbia.

**Jenny R. Yang**

Jenny Yang joined the Firm in 2003 and is a Partner in the Civil Rights & Employment practice group.

Currently, Ms. Yang works on *Aaron v. Pilgrim's Pride Corp.*, Civ. No. 06-1082 (W.D. Ark.), and related actions in a multi-district litigation proceeding, in which workers seek redress for unpaid overtime. Ms. Yang is also litigating *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.), the largest certified Title VII class action in history, in which female employees allege sex discrimination in promotions and pay decisions. In addition, Ms. Yang represented the plaintiffs and class in *Beck v. The Boeing Company* (W.D. Wash.), a class action alleging gender discrimination, which settled in 2004 for $72.5 million. She is also working on *Jenkins v. BellSouth* (N.D. Ala.), a race discrimination case alleging systemic discrimination in pay and promotions and *Robinson-Smith v. GEICO* (D.D.C.) and *Lindsay v. GEICO* (D.D.C.), two separate nationwide lawsuits challenging GEICO's refusal to pay auto damage adjusters overtime.

Ms. Yang is a contributing editor of the American Bar Association, Labor & Employment Law Section's employment discrimination treatise, Lindemann & Grossman, *Employment*



COHEN MILSTEIN
HAUSFELD & TOLL^{PLLC}

*Discrimination Law,* upcoming 4th Edition. She is a member of the National Employment Lawyers Association (NELA) and has served as a speaker on race discrimination issues at their National Convention.

Prior to joining the Firm, Ms. Yang was a Senior Trial Attorney with the United States Department of Justice, Civil Rights Division, Employment Litigation Section, where she worked for five years on both pattern or practice and individual federal employment discrimination cases against state and local governments. She litigated cases involving discrimination based on race, sex, and national origin. Before her work at the Department of Justice, Ms. Yang received a community service fellowship to work at the National Employment Law Project in New York City, a non-profit organization focusing on low-wage workers' rights. While there, she worked on ground-breaking joint-employer liability litigation to hold garment manufacturers liable for unpaid wages owed to garment workers under the Fair Labor Standards Act. After law school, Ms. Yang clerked for the Honorable Edmund Ludwig on the United States District Court for the Eastern District of Pennsylvania. In 1992-1993, Ms. Yang worked on the Presidential Transition and at the White House, Office of Presidential Personnel.

Ms. Yang serves as a member of Board of Directors of the Asian Pacific American Legal Resource Center. From 2001-2003, she served as a government fellow for the American Bar Association, Labor and Employment Section, Equal Employment Opportunity Committee. She also served as a National Co-Chair and Board Member of the National Asian Pacific American Women's Forum from 1998-2004.

Ms. Yang graduated from Cornell University (B.A., Government, *with distinction,* 1992) and New York University School of Law (J.D., *cum laude,* 1996) where she was a Root-Tilden Public Interest Scholar and a Note and Comment Editor of the Law Review.

Ms. Yang is admitted to practice in the District of Columbia, New York, and New Jersey.

**Daniel W. Sigelman**

Daniel Sigelman, a Partner at the Firm, joined Cohen Milstein in 2005 and is a member of the Unsafe Drugs & Environmental Health Threats and International practice groups.

Mr. Sigelman concentrates on mass tort/product liability and economic injury litigation against pharmaceutical and medical device manufacturers. His work has included class action medical monitoring lawsuits focusing on the safety of heart valves; mass tort, ERISA, and securities fraud cases involving drug products; and third party payor litigation against drug and medical device companies. He has held lead roles in product liability actions against FDA-regulated companies, including his appointment to the MDL Plaintiffs' Steering Committee in In re St. Jude Medical, Inc., Silzone Heart Valves Products Liability Litigation (D. Minn.).

Mr. Sigelman is an Adjunct Assistant Professor at the George Washington University Department of Health Policy and Health Services, where he teaches pharmaceutical policy. He is a frequent lecturer and commentator on health care and pharmaceutical/medical device issues, including the role of FDA regulation in pharmaceutical litigation and congressional oversight of FDA's regulation of drug safety.



COHEN MILSTEIN
HAUSFELD & TOLL

From 1979 to 1981, Mr. Sigelman served as a staff attorney to the Public Citizen Health Research Group. From 1981 to 1988, he was counsel to the House Subcommittee on Human Resources and Intergovernmental Relations, where he conducted investigative oversight of the Food and Drug Administration. His investigations produced numerous congressional hearings on the FDA's regulation of unsafe drugs, many of which were removed from the market for safety reasons. Some of his investigative findings forced changes in the FDA's regulations as well as review procedures and policies, while others led to several successful federal prosecutions of pharmaceutical manufacturers for violating the federal Food, Drug, & Cosmetic Act. He authored numerous congressional committee reports on his investigations of the FDA's regulation of the safety of the nation's human and animal drug and food supply. From 1988-2000, he practiced in Atlanta, Georgia, where he worked on drug and medical device cases and other types of litigations.

Mr. Sigelman is a graduate of Dartmouth College (summa cum laude, 1972), where he received a B.A. in English. He attended the University of California, Berkeley, earning a Master's degree in English (1975), and the Boalt Hall School of Law, the University of California, Berkeley (J.D., 1979).

Mr. Sigelman is admitted to practice in the District of Columbia and Georgia.



COHEN MILSTEIN
HAUSFELD & TOLL™

## Attorney Profiles – Of Counsel & Associates

**Sahar F. Aziz**

Sahar Aziz, an Associate at Cohen Milstein, joined the Firm in 2007 and is a member of the Civil Rights & Employment practice group.

Ms. Aziz currently is involved in *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.), a class action which has been certified for over 1.6 million current and former female employees of Wal-Mart on complaints of discrimination in pay and promotion; *M.H. Fox, et al. v. Tyson Foods, Inc.*, a class action on behalf of chicken-processing workers who were not paid for the time they spent putting on and taking off their required safety equipment; *Chase v. AIMCO*, alleging that the U.S.'s largest apartment management company violates the Fair Labor Standards Act by failing to pay its maintenance employees for time spent responding to emergency tenant service requests; and *O'Connor v. BASF Corp.*, which alleges a nationwide pattern of age discrimination in layoffs from BASF, a major chemical company based in Germany, with North American headquarters in New Jersey. Ms. Aziz is also involved in a mediation involving a group of female employees alleging a pattern and practice of discrimination in pay and promotion. Ms. Aziz represented pro bono a female Afghan civil rights activist before the Asylum Office and Immigration Court and obtained asylum on behalf of her client.

Prior to joining the Firm, Ms. Aziz was an Associate at Wilmer, Cutler, Pickering, Hale & Dorr LLP in the Securities and Litigation Departments. At WilmerHale, Ms. Aziz was the lead Associate in an independent human rights investigation on the use of child camel jockeys in the Middle East. She also worked on white collar crime investigations and securities litigation. Prior to joining WilmerHale, Ms. Aziz clerked for the Honorable Andre M. Davis on the United States District Court for the District of Maryland.

Ms. Aziz graduated from the University of Texas at Arlington (B.S. in Management Information Systems, *magna cum laude*, 1997), the University of Texas Graduate School College of Liberal Arts (M.A. in Middle Eastern Studies, 2004), and the University of Texas School of Law (J.D., *cum laude*, 2004). At the University of Texas School of Law, Ms. Aziz served as an Associate Editor on the Texas Law Review, participated in the Immigration Clinic, and organized an academic conference entitled "Islam and the Law: The Question of Sexism." She authored two Notes, *The Laws on Providing Material Support to Terrorist Organizations: The Erosion of Constitutional Rights or a Legitimate Tool for Preventing Terrorism?*, 9 Tex. J. on C.L. & C.R. 45 (Winter 2003), and *Linking Intellectual Property Rights in Developing Countries with Research and Development, Technology Transfer, and Foreign Direct Investment Policy: A Case Study of Egypt's Pharmaceutical Industry*, 10 ILSA J Int'l & Comp L 1 (Fall 2003). While in law school, Ms. Aziz interned at the American Civil Liberties Union of Texas where she conducted community outreach regarding post September 11 civil rights and national security issues. Ms. Aziz also interned at the Commercial Law Development Program at the United States Department of Commerce where she focused on international development projects in Egypt.

Ms. Aziz is a member of the National Employment Lawyers Association. Ms. Aziz is fluent in Arabic and proficient in Spanish.



COHEN MILSTEIN
HAUSFELD & TOLL ᴾᴸᴸᶜ

Ms. Aziz is admitted to practice in Texas and the District of Columbia.

**Arthur N. Bailey, Jr.**

Arthur N. Bailey, Jr., an Associate, joined Cohen Milstein in 2008 and is a member of the Antitrust practice group.

Mr. Bailey is currently working on In re Intel Corporation Microprocessor Antitrust Litigation (D. Del.), alleging monopolization of the market for x86 microprocessors, resulting in higher prices to consumers who purchased computers containing Intel chips. Prior to joining the firm, Mr. Bailey was employed by Kaplan Fox & Kilsheimer LLP where he worked on antitrust, securities fraud and consumer fraud class action cases.

Mr. Bailey is a graduate of the College of Wooster where he received a Bachelor of Music Education. He received his law degree from the University of Tulsa College of Law (1999).

Mr. Bailey is admitted to practice in California.

**R. Joseph Barton**

Joseph Barton joined Cohen, Milstein, Hausfeld & Toll P.L.L.C. as an associate in 2001 and is a member of the Antitrust, Securities and Employee Benefits practice groups. Prior to joining the firm, Mr. Barton served as a judicial law clerk to the Honorable Lenore C. Nesbitt, United States District Judge for Southern District of Florida (2000-2001). Since joining the firm, Mr. Barton has been actively involved in a diverse number of class action cases.

Mr. Barton has been actively involved in a number of employee benefit cases. For example, in *Beam v. HSBC Bank*, No. (W.D.N.Y.) (settlement of $9.25 Million) which challenged the sale of stock for $25 million by the family shareholders to the Azon Corporation ESOP, Mr. Barton briefed and argued the motions for summary judgment, resulting in denial of defendants' motions and granting plaintiffs' motion for partial summary judgment. In *Simpson v. Fireman's Fund Insurance Company* (N.D. Cal.), Mr. Barton represented a class of active and terminated employees alleging that FFIC's policy of terminated persons on disability violated the discrimination provisions of ERISA, and obtained a settlement which included restoring their right to benefits for a period of years and also reimbursement of past expenses. Additionally, Mr. Barton has also been involved in a number of cases alleging breach of fiduciary duty by investing the 401k plan in company stock. Mr. Barton is currently working on a case against certain insiders at Tharaldson Motels who sold stock to the ESOP for $500 million, *Hans v. Gary Tharaldson et al.* (D.N.D.) and a case against SBC Communications (now AT&T), *Stoffels et al. v. SBC Communications* (W.D. Tex.) alleging that their provision and subsequent elimination of cash payments via a program known as Telephone Concession constituted a defined benefit pension plan under ERISA and violated ERISA. At the hearing on the class certification motion, in *Stoffels*, the Court complimented Mr. Barton on the quality of his advocacy and subsequently certified the class as requested.

Mr. Barton has been active in a number of securities fraud lawsuits including *In re Physician Corporation of America Securities Litigation* (S.D. Fla.) (settlement of $10.2 million), and *In re*



COHEN MILSTEIN
HAUSFELD & TOLL

*MCI Securities Litigation* (D.D.C.) (settlement of $4.5 million) and also represented a small class of former Sterling shareholders who received Uniroyal stock in a merger in *Avery v. Uniroyal Technology Corp.,* (M.D. Fla.) (settlement of $2.3 million). Mr. Barton currently represents limited partners of Lipper Convertibles, a now-defunct hedge fund, in a class action arbitration against the former general partners, *Levitt v. Lipper Holdings et al.* (AAA), and also in litigation against the outside auditor in federal district court, *Levitt v. PricewaterhouseCoopers* (S.D.N.Y.) alleging violations of the federal securities laws in connection with their investments in the Partnership which were allegedly overvalued for over 5 years.

Mr. Barton has also worked on a number of antitrust actions. Mr. Barton was a part of the team that engaged in intensive trial preparations in *In re High Fructose Corn Syrup Antitrust Litigation,* (C.D. Ill.) a class action alleging price-fixing by the manufacturers of high fructose corn syrup, which settled for more than $500 million shortly before trial. Mr. Barton is currently working on *In re Mercedes-Benz Antitrust Litigation* (D.N.J.), a class action alleging price-fixing of new Mercedes-Benz vehicles in the New York Region. In connection with the *Mercedes-Benz* litigation, Mr. Barton briefed and argued and obtained summary judgment on a matter of first impression that established that lessee-plaintiffs had standing to sue as direct purchasers under the federal antitrust laws.

Additionally, Mr. Barton considers pro bono activities to be an important part of his practice. Along with the non-profit law firm Midwest Environmental Advocates, Mr. Barton provided pro bono representation to the grassroots citizens action group Clean Water Action Council of Northeastern Wisconsin, in objecting to a settlement by the United States Department of Justice and the State of Wisconsin concerning natural resource damages in the Fox River area of Wisconsin. Mr. Barton also represented a client in D.C. Superior Court against her former employer who refused to pay her wages and overtime, in which the Judge described Mr. Barton's representation as follows: "everything done on behalf of the Plaintiff has been professional, timely and thorough."

Mr. Barton received his undergraduate degree from the College of William & Mary (B.A. 1991) where he majored in History and minored in Classical Studies, and graduated *Order of the Coif* from the College of William & Mary, Marshall-Wythe School of Law (J.D. 2000). At law school, he received the Lawrence W. I'Anson Award for outstanding student scholarship, character and leadership, the William B. Spong Award for professionalism and ethics, the Robert R. Kaplan Award for excellence in legal writing and *Order of the Barristers*. He served on the editorial board of the *William & Mary Law Review* and was a staff member of the *William & Mary Bill of Rights Journal*. Mr. Barton was a member of the William & Mary National Trial Team and served as Vice-President of the William & Mary Chapter of the Association of Trial Lawyers of America.

Mr. Barton is the author of *Determining the Meaning of "Direct Evidence" in Discrimination Cases Within the Eleventh Circuit: Why Judge Tjoflat was (W)right,* 77 Fla. B.J. 42 (2003), *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims,* 41 Wm. & Mary L. Rev. 1789 (2000), and *Utilizing Statistics and Bellwether Plaintiff Trials: What do the Constitution and the Federal Rules of Civil Procedure Permit?,* 8 Wm. & Mary Bill Rts. J. 199 (1999). Each of Mr. Barton's published articles has been cited by both courts and commentators.



COHEN MILSTEIN
HAUSFELD & TOLL™

Mr. Barton is admitted to practice in the State of California and the District of Columbia and is listed in the *Marquis' Who's Who in American Law.*

### Elizabeth A. Berney

Elizabeth Berney joined the Firm as Of Counsel in 2005 and is a member of the Securities Fraud/Investor Protection practice group. Her work includes securities fraud class actions in federal courts throughout the country, including the Parmalat litigation in New York, and other class actions on behalf of shareholders, including the *In re Yahoo! Inc., Takeover Litigation* and the Mattel Lead Paint derivative case. For several of the firm's securities fraud cases, Ms. Berney has also led the investigations of witnesses which uncovered fraudulent activities.

Ms. Berney is the co-author of *Restoring Investor Trust in Auditing Standards and Accounting Principles*, published in the *Harvard Journal of Legislation* (Winter 2004). She also has written extensive materials for legal seminars and speeches. She served as a guest lecturer for a Cardozo Law School ethics class and a guest lecturer for a Harvard Law School corporations class regarding securities fraud, was a featured speaker and panelist for the Women's National Book Association, and appeared in a German television documentary. She is a member of the Federal Bar Council.

Prior to joining Cohen Milstein, Ms. Berney was an active member of the plaintiffs' legal teams in leading securities fraud, consumer, and human rights class actions including the *Enron* and *Xerox* shareholder litigations, the *Ford Explorer/Firestone Tire* litigation, and the *Holocaust Assets* cases. From 2000-2005, Ms. Berney practiced law at another prominent plaintiffs' class action firm. Previously, she worked at Dewey Ballantine in the tax and municipal bonds fields, where she obtained the rulings needed to finance construction of the Intrepid Museum; at Gilbert Segall and Young (now part of Holland & Knight), where she focused on foreign sovereign immunities and general commercial litigation; as in-house counsel for a college; and in her own legal and literary practice, where she negotiated agreements for computer companies and notable authors.

Ms. Berney is an avid amateur violinist. She played violin in the Chicago Civic Orchestra while in law school, and, more recently, has played in COSMOS (the Chamber Orchestra of Science and Medicine). She currently plays first violin in the New York City Bar Association Lawyers' Orchestra.

Ms. Berney is a graduate of Cornell University, where she earned a B.S. in industrial and labor relations with a minor in music (*with honors*, 1975), and the University of Chicago Law School (J.D., 1978).

Ms. Berney is currently running for U.S. Congress in the 5th Congressional District of New York.

Ms. Berney is admitted to practice in New York and Pennsylvania.

### Andrew B. Bullion



COHEN MILSTEIN
HAUSFELD & TOLL™

Andrew Bullion joined Cohen Milstein as an Associate in February 2006 and is a member of the firm's Antitrust and International practice groups.  He has extensive complex litigation experience on both the plaintiff and defense sides.  Prior to joining the firm, Mr. Bullion spent several years as a litigator in private practice in Philadelphia, handling complex commercial matters, including class actions, as well as tort law and intellectual property matters.

He is currently working on several national and international antitrust actions, including: *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), alleging price-fixing of rates for airfreight shipping services by dozens of major international flagship airlines; and the *In re Air Passenger Antitrust Litigation* (N.D.Ca.), alleging price-fixing by British Airways and Virgin Atlantic airlines of surcharges added to the price of passenger tickets for long-haul flights.

Mr. Bullion is a graduate of Villanova University School of Law (J.D. 1996) and Villanova University (B.A. 1989).  During law school he clerked for the Federal Trade Commission's Bureau of Competition, and with Advokatfirman Vinge KB, Sweden's largest law firm.

Mr. Bullion is admitted to practice in Pennsylvania, New Jersey, and the District of Columbia.

**S. Douglas Bunch**

Doug Bunch, an Associate at the Firm, joined Cohen Milstein in 2006 and is a member of the Securities practice group.

Mr. Bunch is currently working on several active securities fraud actions against issuers of securities for allegedly misleading investors, including *In re Pozen Securities Litigation* (M.D.N.C.), *Blatt v. Corn Products International, Inc.* (N.D. Ill.), and *Levitt v. PricewaterhouseCoopers, LLP* (S.D.N.Y.).

Mr. Bunch is a graduate of the William & Mary School of Law (2006), where he was a recipient of the Benjamin Rush Medal. A member of Phi Beta Kappa, he graduated *summa cum laude* from the College of William & Mary in 2002 with a Bachelor's degree in Government and Classical Studies. Mr. Bunch is also a 2003 graduate of Harvard University's Graduate School of Education, from which he holds a Master's degree in Administration, Planning, and Social Policy. At Harvard, he served as an intern in the Boston office of the U.S. Department of Education's Office for Civil Rights, where he worked closely with attorneys to enforce federal laws that protect students from discrimination on the basis of race, gender, age, and disability.

Mr. Bunch is actively involved in several nonprofit endeavors. He serves as Chairman of *Global Playground, Inc.*, an organization which promotes education in developing countries; as Executive Director of *Ascanius: The Youth Classics Institute*, which promotes the study of classics in the elementary school; and as a member of the Board of Directors of the *Northeast Conference on the Teaching of Foreign Languages*, which promotes the study of world languages more broadly.

Mr. Bunch is admitted to practice in New York, the District of Columbia and the Court of Appeals for the Second Circuit.

**Whitney R. Case**



COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

Whitney R. Case joined Cohen Milstein as an Associate in 2005 and is a member of the Employee Benefits and Consumer Protection practice groups.

Ms. Case has been actively involved in a number of class action employee benefit cases, including a case against SBC Communications, Inc., which alleges widespread miscalculation of pension benefits owed to their employees in violation of ERISA. Ms. Case also represents Tharaldson Motels, Inc. Employee Stock Ownership Plan in an action for breach of fiduciary duties against the Trustee and other fiduciaries. In addition, Ms. Case is involved in a case alleging breach of fiduciary duty owed to participants in the TXU Corp. 401(k) Plan and a case against Qwest Communications alleging that it violated ERISA regarding certain benefits provided to its retirees.

In the area of consumer protection, Ms. Case represents homeowners whose properties were severely damaged by floods from Hurricane Isabel in a class action filed against eight insurance companies who allegedly mishandled class members' claims and ultimately failed to pay proceeds to which the policyholders were entitled.

Ms. Case is the author of *The Coupon Can Be the Ticket: The Use of "Coupon" and Other Non-Monetary Redress in Class Action Settlements*, 18 Geo. J. Legal Ethics 1431 (2005) (co-authored with Lisa Mezzetti).

Prior to joining the Firm, Ms. Case served as a summer associate and as a law clerk at the District of Columbia Bar's Board on Professional Responsibility. She also studied International Law at University College in London, England and was a student attorney in the Domestic Violence Clinic at Georgetown University Law Center.

Ms. Case received her law degree from Georgetown University Law Center in 2005. She received her undergraduate degree from Tulane University (B.A., Political Economy and French, *cum laude*, 2002) during which time she spent a year studying at Universite de Paris IV, La Sorbonne.

Ms. Case is admitted to practice in New York, New Jersey and the District of Columbia.

**Llezlie Green Coleman**

Llezlie Green Coleman, an Associate at Cohen Milstein, joined the Firm in 2004 and is a member of the Civil Rights & Employment practice group.

Ms. Coleman currently is involved in *Keepseagle v. Veneman* (D.D.C.), where plaintiffs allege the USDA discriminated in granting access to and servicing of farm loans to Native American farmers and ranchers; *Chase v. AIMCO*, alleging that the U.S.'s largest apartment management company violates the Fair Labor Standards Act by failing to pay its maintenance employees for time spent responding to emergency tenant service requests; and *Amos v. GEICO*, alleging *GEICO* discriminates against African-Americans through its use of occupation and level of education in setting automobile insurance rates.



Ms. Coleman is a member of the American Bar Association, the National Employment Lawyers Association and the Washington Council of Lawyers. She is co-chair of the ABA's Committee on Equal Opportunity in the Legal Profession.

Before joining Cohen Milstein, Ms. Coleman worked for Wilmer Cutler & Pickering, where she focused on complex litigation and securities investigations and worked on various civil rights and international human rights *pro bono* projects. Ms. Coleman then clerked for the Honorable Alexander Williams, Jr. on the United States District Court for the District of Maryland.

Ms. Coleman graduated from Dartmouth College with a B.A. in Government (*cum laude*, 1997) and Columbia Law School (J.D., 2002), where she was a Harlan Fiske Stone Scholar. At Columbia, Ms. Coleman was active in the Black Law Students Association, participated in the Human Rights Clinic, and served as an Articles Editor for the Columbia Human Rights Law Review. She authored a Note, *Gender Hate Propaganda and Sexual Violence in the Rwandan Genocide: An Argument for Intersectionality in International Law*, 33 Colum. Hum. Rts. L. Rev. 733 (2002). While in law school, Ms. Coleman interned at the Center for Constitutional Rights and the NAACP Legal Defense and Educational Fund.

Ms. Coleman is admitted to practice in New York and the District of Columbia.

**Christopher J. Cormier**

Christopher J. Cormier joined Cohen Milstein in 2003 as an Associate in the Antitrust practice group.

Mr. Cormier is actively involved in antitrust actions alleging both concerted and unilateral anticompetitive conduct. For example, in *In re Urethane Antitrust Litigation (Polyether Polyol Cases)*, Civ. No. 04-md-1616-JWL (D. Kan.), he represents a putative class of direct purchasers of several types of chemicals who allegedly were overcharged as a result of a nationwide price-fixing and market allocation conspiracy. One defendant, Bayer, already has settled for $55.3 million and is providing cooperation pursuant to its obligations under the settlement agreement. In *In re Municipal Derivatives Antitrust Litigation*, he represents a putative class of direct purchasers of guaranteed investment contracts, advance refunding escrows, swaps, and other financial products whose interest rates were artificially maintained pursuant to a wide-ranging bid-rigging conspiracy. In *In re Endosurgical Products Direct Purchaser Antitrust Litigation*, CV 05-8809-JVS(MLGx) (C.D. Cal.), he represents a putative class of direct purchasers of certain medical instruments used in laparoscopic surgery who allegedly were overcharged as a result of Johnson & Johnson's monopolistic conduct, which included sole source group purchasing organization contracts and tiered market share discounts to customers.

He also is involved in: *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group L.P.*, Master File No. CV-05-6419 MRP (AJWx) (C.D. Cal.) (alleging monopolistic conduct in the pulse oximetry market); *In the Matter of the Arbitration Between Animalfeeds International Corp., et al v. Stolt-Nielsen SA, et al.* (putative class arbitration alleging price-fixing and market allocation for parcel tanker shipping services); and *In re Cotton Yarn Antitrust Litigation*, Civ.



COHEN MILSTEIN
HAUSFELD & TOLL

No. 1:04MD1622 (M.D.N.C.) (putative class action alleging price-fixing of cotton yarn; $7.8 million settlement obtained from one defendant).

Mr. Cormier graduated from the University of Virginia (B.A., Government, 1999) and from the American University's Washington College of Law (J.D., *magna cum laude*, 2002). After his first year of law school, he served as a judicial intern to the Honorable Deborah K. Chasanow, United States District Court for the District of Maryland. During his second year of law school, he served as a legal intern in the National Criminal Enforcement Section of the United States Department of Justice's Antitrust Division.

Prior to joining Cohen Milstein, he practiced at a large Baltimore-based law firm, where he focused primarily on commercial litigation.

Mr. Cormier is admitted to practice in Maryland and the District of Columbia.

**Joshua S. Devore**

Joshua Devore, an Associate at the Firm, joined Cohen Milstein in 2000 as a member of the Securities Fraud/Investor Protection practice group.

He is currently working on several securities fraud class actions (including the litigation on the collapse of the Italian dairy conglomerate Parmalat), and has been heavily involved in litigation regarding Wall Street research analysts. He has actively participated in a number of cases that resulted in substantial recoveries for investors, including In re Lucent Technologies, Inc. *Securities Litigation* (settlement of approximately $575 million); *In re Merrill Lynch Research Reports Securities Litigation* (settlement of $125 million); *In re VeriSign Corp. Securities Litigation* (settlement of $78 million); and *Norman v. Salomon Smith Barney* (settlement of $51 million on behalf of Guided Portfolio Management Account holders).

Mr. Devore has been the primary author of numerous briefs addressing complex and novel issues of the federal securities laws, leading to notable reported decisions such as *In re Parmalat Securities Litigation*, 376 F.Supp.2d 472 (S.D.N.Y. 2003), that affirmed claims of "scheme" liability against a corporation's outside investment banks, and *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), that reversed a dismissal on statute of limitations grounds and reset the standards for pleading loss causation. He was also a member of the trial team in *In re Globalstar Securities Litigation*, which settled for $20 million during trial after Plaintiffs had fully presented their case.

Mr. Devore is actively involved in the representation of the firm's institutional investor clients and personally developed and oversees the analysis of the firm's clients' investments in securities that may have been affected by fraud.

Mr. Devore graduated from Rice University in 1997 with a B.A. in Chemistry, and obtained his law degree from Georgetown University Law Center in 2000. While at Georgetown, Mr. Devore served as an Executive Editor of the Georgetown International Environmental Law Review. Mr.

COHEN MILSTEIN
HAUSFELD & TOLL<sup>PLLC</sup>

Devore is co-author of *State Court Class Actions: Trends and Issues, in National Institute on Class-Actions*, C-1 (ABA CLE 1999).

Mr. Devore is admitted to practice in the District of Columbia and Virginia.

**George F. Farah**

George Farah joined the Firm as an Associate in 2005 and is a member of the Antitrust, Unsafe Drugs & Environmental Health Threats, and Human Rights practice groups.

Mr. Farah is currently working on *City of Milwaukee v. NL, Inc.*, in which he and other attorneys represent the City of Milwaukee in a public nuisance lawsuit against the leading lead paint manufacturer. He is also currently working on *Schwartz Lee, et al. v. Deutsche Bank AG and Desdner Bank AG*, in which he and other attorneys represent survivors of Nazi-era forced and slave labor against German companies for failing to provide sufficient compensation for allegedly using and profiting from slave labor.

Prior to joining the Firm, Mr. Farah worked on several issue-oriented campaigns. He is the founder of Open Debates, a nonprofit, nonpartisan Washington-based organization committed to reforming the presidential debate process. Before attending law school, Farah worked to expose the harms of media concentration and the IMF's structural adjustment programs at Ralph Nader's Center for the Study of Responsive Law.

Mr. Farah is the author of the book *No Debate: How the Republican and Democratic Parties Secretly Control the Presidential Debates* from Seven Stories Press (April, 2004). His articles have been published in *The Boston Globe, The Philadelphia Inquirer, The Denver Post, The Christian Science Monitor, Fort Lauderdale Sun-Sentinel, Extra! Magazine*, and other publications.

Mr. Farah has appeared on dozens of television programs, including "Nightline," "NOW with Bill Moyers,"."20/20," "CBS Evening News with Dan Rather," "NBC Nightly News with Tom Brokaw," "CNN Lou Dobbs Tonight," and "Countdown with Keith Olbermann." Mr. Farah has been interviewed on over 100 radio shows, including NPR's "To the Point," "Keep Hope Alive With Jesse Jackson," "Democracy Now!," "CounterSpin," and "Judicial Watch Report."

Farah has given several talks on the political process at colleges and universities, hosted numerous televised press conferences and was a Newsmaker at the National Press Club in 2004.

Mr. Farah is a graduate of Harvard Law School (J.D., 2005), and Princeton University (B.A., Woodrow Wilson School of Public and International Affairs, 2000). Mr. Farah was the recipient of a Paul and Daisy Soros Fellowship, and a delegate to the 2005 International Achievement Summit.

Mr. Farah is admitted to practice in New York.

**Elizabeth S. Finberg**



COHEN MILSTEIN
HAUSFELD & TOLL™

Elizabeth Finberg is a member of the Securities Litigation Group. Throughout her career, she has litigated a variety of large and complex commercial cases on behalf of clients such as Sun Microsystems, PricewaterhouseCoopers and Teva Pharmaceuticals USA, Inc., among many others. Ms. Finberg was also a part of the Firm's *In re Lupron and Sales Practices Litigation* team, which garnered a settlement of $150 million on behalf of individual consumers. She has actively litigated a number of high-profile lawsuits, including, *In re Fannie Mae Securities Litigation, In re Converium Securities AG,* In *re UICI Securities Litigation, In re SourceCorp Securities Litigation, In re Integrated Electrical Services Securities Litigation, In re Compuware Securities Litigation, In re Uniroyal Securities Litigation, In re Sirius Satellite Radio Securities Litigation* and *In re Royal Ahold Securities Litigation.* Ms. Finberg is also an experienced appellate advocate, having briefed multiple cases in the United States Courts of Appeal for the Third, Fourth, Fifth and District of Columbia Circuits.

Prior to entering the field of law, Ms. Finberg served in the United States Air Force as a Russian linguist from 1979-1983. She was stationed in West Berlin, Germany (FDR) and received the Air Force Commendation Medal for distinguished service. Thereafter, she raised a family before attending law school.

She is a 1998 graduate of The American University's Washington College of Law, (J.D., 1998, *summa cum laude*) and served on the WCL Moot Court Executive Board. She is the recipient of the 1998 Morton F. McDonald Scholarship Award for Excellence in Legal Research and Writing. Ms. Finberg earned her undergraduate degree from Rollins College (A.B. in International Relations, 1995, *summa cum laude*), where she earned numerous awards for scholarship.

Ms. Finberg is a member of the Virginia and District of Columbia bars.

**Shelly L. Friedland**

Shelly L. Friedland joined the Firm's New York office in 2005 as an associate in the Antitrust practice group.

Ms. Friedland is currently involved in *In re Wellbutrin SR* (E.D. Pa.) , *In re Foundry Resins Antitrust Litigation* (S.D. Ohio), *In re Aspartame Antitrust Litigation* (E.D. Pa), and *In re K-Dur Antitrust Litigation* (D.N.J.) (representing indirect purchasers). Ms. Friedland also currently represents Registered Nurses employed by hospitals in Albany and Memphis in lawsuits alleging that their employers unlawfully fixed their wages in violation of federal antitrust laws.

Prior to joining Cohen Milstein, Ms. Friedland was an associate in the litigation department at Kronish Lieb Weiner & Hellman (now known as Cooley Godward Kronish), where she practiced commercial litigation and white collar criminal law. While at Kronish Lieb, Ms. Friedland represented the family of a victim of the September 11 World Trade Center bombing in its application to the federal Victim Compensation Fund, and a defendant seeking to overturn a wrongful murder conviction. Previously, she was an associate in the litigation department at Paul, Weiss, Rifkind, Wharton & Garrison.



Ms. Friedland received a bachelor's degree in economics from Columbia University (1987), graduating summa cum laude as a member of Phi Beta Kappa. She spent her junior year studying at the Hebrew University of Jerusalem. Ms. Friedland received her law degree from Harvard Law School (J.D., 1997, *cum laude*), where she was an editor of the Human Rights Law Journal.

Ms. Friedland is admitted to practice in New York State, and United States District Court, Southern District of New York, Eastern District of New York, and District of New Jersey.

**Reena Gambhir**

Reena Gambhir joined Cohen Milstein as an Associate in 2004 and is a member of the Antitrust and International practice groups.

Ms. Gambhir is currently working on, among other antitrust class actions, *In re: Hydrogen Peroxide Antitrust Litigation* (E.D.Pa.) and *In re Pressure Sensitive Labelstock Antitrust Litigation* (M.D.Pa) alleging price-fixing on behalf of purchasers. Among other international and *pro bono* matters, Ms. Gambhir represents a detainee being held at the U.S. government's detention facility in Guantanamo Bay, and residents of Bhopal, India who are exposed to the 1984 Union Carbide gas leak's uncontrolled remaining toxic waste.

Prior to joining the Firm, Ms. Gambhir served as a summer associate and also as a law clerk at the Public Defenders Service for the District of Columbia and the Washington Legal Clinic for the Homeless. In addition, she studied in the International Human Rights Law program at Oxford University, and was a student attorney in the International Human Rights Clinic at the George Washington University Law School. Prior to law school, Ms. Gambhir worked as a paralegal at an immigration law firm in Boston, Massachusetts.

Ms. Gambhir received a B.A. from Boston College in English Literature (*cum laude*, 1999) with a minor in American Gender and Race Studies. She received a Master of Arts in the Humanities from the University of Chicago (2000), and her law degree from the National Law Center, George Washington University (*with honors,* 2004), where she was a Thurgood Marshall Scholar.

Ms. Gambhir is admitted to practice in Massachusetts, admission pending in New York.

**Seth R. Gassman**

Seth R. Gassman joined the Firm as an Associate in 2007 as a member of the Antitrust practice group.

He is currently involved in, among other cases, *Molecular Diagnostics Laboratories v. Hoffman-La Roche, Inc.* (D.D.C.), in which purchasers are suing two companies for the unlawful monopolization of an enzyme used in DNA amplification, human-genome research, and medical diagnostics, and *Weeks Marine, Inc. v. Bridgestone Corp., et al.* (S.D.N.Y.), which alleges that manufacturers and sellers of specialty hose used in connection with marine services conspired to



COHEN MILSTEIN
HAUSFELD & TOLL<sup></sup>

rig bids, fix prices, and allocate markets and customers in the United States and around the world.

Mr. Gassman is the author of *Direct Democracy As Cultural Dispute Resolution: The Missing Egalitarianism Of Cultural Entrenchment*, 6 NYU Journal of Legislation and Public Policy 525 (2002-2003). He also provided extensive research assistance to Professor Oscar Chase in preparing the fourth edition of Civil Litigation in New York.

Before joining Cohen Milstein, Mr. Gassman worked for Cahill Gordon & Reindel, where he focused on complex civil and commercial litigation and antitrust. He also performed merger clearance and corporate counseling antitrust work related to several mergers.

Mr. Gassman graduated from New York University School of Law (J.D., 2003), where he was awarded the Newman Prize, and the University of California at Berkeley with a B.A. in English (1999).

Mr. Gassman is admitted to practice in New York.

**Besrat Gebrewold**

Besrat J. Gebrewold joined Cohen Milstein as an associate in 2007 and is a member of the Antitrust practice group. Ms. Gebrewold will be working on *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), a multi-billion dollar antitrust action alleging that the world's major cargo airlines colluded in setting the amounts of various surcharges they imposed on their customers, *In Re Air Transportation Antitrust Litigation* (N.D. Cal.), a federal antitrust action challenging a conspiracy among airlines to fix the amount of the fuel surcharge imposed on flights to and from Heathrow airport in London, and *In Re Vitamin C Antitrust Litigation* (E.D.N.Y.), alleging a conspiracy by Chinese manufacturers to fix prices and control the supply of vitamin C for export.

Prior to joining the firm as an associate, Ms. Gebrewold worked as a paralegal in the firm's Antitrust, Unsafe Drugs & Environmental Health Threats, and Consumer Protection practice groups for four years and as a law clerk for three years. She also worked as a summer associate at Cohen Milstein in 2006.

Ms. Gebrewold has an LL.B from Addis Ababa University, Faculty of Law in Ethiopia and an LL.M in Common Law Studies from Georgetown University Law Center where she was a Fulbright Scholar. She received a J.D. from the American University Washington College of Law in May 2007 where she was a member of the *Journal of Gender, Social Policy & the Law*.

Ms. Gebrewold is admitted to practice in Maryland. Her application to the District of Columbia Bar is pending and she is currently practicing under the supervision of Charles E. Tompkins, an enrolled active member of the District of Columbia Bar, pursuant to Rule 49(c)(8) of the Rules of the District of Columbia Court of Appeals.

**Matthew K. Handley**



COHEN MILSTEIN
HAUSFELD & TOLL^^

Matthew Handley is a member of the International and Securities Fraud/Investor Protection practice groups.

Mr. Handley focuses much of his practice on enforcement of the federal securities laws on behalf of both domestic and international investors. He currently works on several active securities fraud actions seeking to return to investors monies lost due to corporate fraud, including *In re SCOR Holding (Switzerland) Securities Litigation* (S.D.N.Y.) and *In re Fannie Mae Securities Litigation* (D.D.C.).

Mr. Handley has been a frequent speaker at institutional investor conferences in Europe including the 2006 and 2007 U.K. and Irish Pension Summit in Dublin, the 2006 European Pension Investment Forum in Paris and similar educational seminars for institutional investors throughout Europe.

Mr. Handley is also involved in the Firm's international civil and human rights actions, including representation of a class of Indian residents who have suffered from groundwater pollution and representation of disability groups against a nationwide builder for failing to design and build accessible apartments.

In his *pro bono* work, Mr. Handley currently represents several detainees at the U.S. Naval base in Guantanamo Bay, Cuba in proceedings before U.S. Courts. Mr Handley also has represented Nepali citizens in United States Immigration Court in political asylum proceedings and currently represents the families of Nepali laborers who were trafficked and killed while working in Iraq. Mr. Handley's work on behalf of these Nepali families has been recently recognized by the U.S. Ambassador to Nepal and the Prime Minister of Nepal.

Mr. Handley currently serves as an Associate Trustee of the *Washington Lawyers' Committee for Civil Rights and Urban Affairs*, and is on the advisory board of *Global Playground, Inc.*, an organization which promotes education in developing countries.

Prior to joining the Firm, Mr. Handley was a litigation associate at Covington & Burling in Washington, D.C. He began his legal career as a law clerk for the Honorable William Wayne Justice, United States District Judge for the Eastern District of Texas. Before attending law school, Mr. Handley served two years as a Peace Corps Volunteer in Nepal, working as a rural construction engineer.

Mr. Handley graduated from Princeton University with a B.S.E in Civil and Environmental Engineering (1997) and attended the University of Texas School of Law where he graduated with *high honors* in 2002 and was selected for the Order of the Coif and Chancellors Honor Society. While at the University of Texas, he was an Articles Editor for the Texas Law Review and author of Why Crocodiles, Elephants, and American Citizens Should Prefer Foreign Courts: A Comparative Analysis of Standing to Sue, 21 Rev. Litig. 97 (2002).

Mr. Handley is admitted to practice in New York, the District of Columbia and the U.S. Court of Appeals for the Second Circuit.



COHEN MILSTEIN
HAUSFELD & TOLL™

## Karen L. Handorf

Karen Handorf joined the Firm in 2007 as Of Counsel and is a member of the Employee Benefits (ERISA) practice group.

Ms. Handorf began her legal career at the Office of the Solicitor of Labor in 1975. In 1982, she joined the Plan Benefits Security Division (PBS) as a trial attorney where she litigated actions brought by the Secretary of Labor for violations of the fiduciary standards of the ERISA. In 1989, she was appointed Counsel for Decentralized and Special Litigation. As Counsel, Ms. Handorf was responsible for establishing and supervising the Department's amicus brief writing program which addressed a wide range of novel and difficult ERISA issues in both state and federal court. Through her supervision of the amicus brief writing program, Ms. Handorf was instrumental in shaping the law relating to preemption, remedies available under ERISA, and standards for evaluating fiduciary conduct with respect to ESOPs, termination annuities, and employer stock purchases. As Counsel, she was also responsible for supervising the Department's ERISA appellate litigation, district court litigation brought by regional offices of the Solicitor of Labor and administrative litigation involving the civil penalty provisions of ERISA. In 2001, she was appointed Deputy Associate Solicitor of PBS. As the Deputy Associate Solicitor, she was responsible for overseeing litigation brought by the Secretary of Labor and legal advice provided to the Employee Benefit Security Administration, which administers Title I of ERISA. In 2005, she returned to her position as supervisor of the ERISA appellate and amicus brief writing program, serving as Counsel for Appellate and Special Litigation. Ms. Handorf is a recipient of the Department of Labor Distinguished Career Service Award.

Ms. Handorf received her law degree from the University of Wisconsin Law School in 1975, where she received the International Academy of Trial Lawyers Award, the Mathys Memorial Award for Appellate Advocacy, and First Place, Milwaukee Bar Association Moot Court Prize. Prior to law school, she attended the University of Wisconsin-River Falls where she received a B.S. in Speech and History.

Ms. Handorf is admitted to practice in Wisconsin. Her application to the District of Columbia Bar is pending and she is currently practicing under the supervision of Marc I. Machiz, an enrolled active member of the District of Columbia Bar, pursuant to Rule 49(c)(8) of the Rules of the District of Columbia Court of Appeals.

## Andrea L. Hertzfeld

Andrea Hertzfeld, an Associate at Cohen Milstein, joined the Firm in 2004. She is a member of the International and Antitrust practice groups.

Ms. Hertzfeld currently is working on *Schwab v. Philip Morris, USA Inc., et. al.* (E.D.N.Y.), the largest class action lawsuit certified in history, alleging RICO violations by the major tobacco companies in the sale and advertisement of "light" cigarettes on behalf of approximately 50 million smokers. In addition, Ms. Hertzfeld is working on *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), alleging price-fixing of rates for airfreight shipping services by dozens of major international flagship airlines. She is also involved in, among other matters, the *In re Air Passenger Antitrust Litigation* (N.D.Ca), alleging price-fixing by British Airways and



COHEN MILSTEIN
HAUSFELD & TOLL™

Virgin Atlantic airlines of surcharges added to the price of passenger tickets for long-haul flights and a related matter in the same court alleging similar price-fixing by Korean Air Lines and Asiana Airlines. Ms. Hertzfeld also works on the *In re LCD-TFT Flat Panel Antitrust Litigation* currently pending in the Northern District of California.

Ms. Hertzfeld worked as a summer associate at Cohen Milstein in 2003. She received a B.A. with University Honors in Economics from Bowling Green State University (2000, *summa cum laude*), where she was a Frazier Reams Scholar and a member of Phi Beta Kappa. She received her law degree from Harvard Law School in 2004, where she served as an Article Editor on the Women's Law Journal.

Ms. Hertzfeld is admitted to practice in Ohio and the District of Columbia.

**Megan E. Jones**

Megan E. Jones, an Associate at the Firm, joined Cohen Milstein in 2001 and is a member of the Antitrust practice group.

She is currently involved in, among other class actions: *In re Polyester Staple Antitrust Litigation* (D. Conn.); *In re EPDM Antitrust Litigation* (D. Conn.); and *ERC v. Archstone* (D. Md.).

Ms. Jones is the author of several publications and presentations including *Bankers Beware: The Risks of Syndicated Credits*, in The North Carolina Banking Institute (1999); *Navigating the Sea of E-Commerce Regulation*, in Global E-Commerce Law and Business Report (2000); *A Legal Toolkit for E-Commerce in Latin America*, presented in Miami, FL (2000); a live webcast interview on Internet Regulation, at www.wallstreetreporter.com (2000); and co-author of *The Sedona Conference Glossary: E-Discovery and Digital Management (2nd Ed).* (Dec. 2007).

Prior to coming to the Firm, Ms. Jones litigated intellectual property matters and represented clients before Congress at a Washington, D.C. law firm.

She received her B.A. in English from North Carolina State University in Raleigh, N.C. in 1995 (*magna cum laude*) and her J.D. from the University of North Carolina at Chapel Hill School of Law in 1999. During law school, she served as Article and Notes Editor of the Journal of the North Carolina Banking Institute. In addition, she competed as a member of the National Civil Trial Team. Ms. Jones also clerked for the Committee on the Judiciary, U.S. House of Representatives.

Ms. Jones is admitted to practice in North Carolina and the District of Columbia.

**Matthew B. Kaplan**

Matt Kaplan joined the Firm in 2005 as an Associate in the Securities Fraud/Investor Protection practice group.



Mr. Kaplan focuses his practice on litigation on behalf of individual and institutional investors. He is currently working on several active federal securities fraud actions, including *In re Buca Inc. Securities Litigation*, *In re C.P. Ships Securities Litigation*, *In re Dura Pharmaceuticals Securities Litigation*, and *In re ProQuest Securities Litigation*. He also represents the plaintiff in Conrad v. Blank, a derivative case in Delaware Chancery court which seeks to recover damages from Staples, Inc. executives who were improperly awarded backdated stock options.

Mr. Kaplan is also involved in the Firm's International Human Rights Practice Group. He currently represents several detainees at the U.S. Naval base in Guantanamo Bay, Cuba in proceedings before U.S. Courts.

Mr. Kaplan is a graduate of Georgetown University's School of Foreign Service (B.S.F.S., *with honors*). He received his law degree from The George Washington University Law School (J.D., *With Highest Honors*, Order of the Coif).

Before coming to Cohen Milstein, Mr. Kaplan was a litigation associate with White & Case, LLP. Prior to becoming an attorney he was a Foreign Service Officer with the U.S. Department of State and was stationed in Venezuela, Colombia, The Bahamas and Nicaragua.

Mr. Kaplan is admitted to practice in the District of Columbia and Virginia.

**Jon T. King**

Jon King joined the firm in 2008 as an Associate, and he is a member of the Antitrust Practice Group.

Among other matters, Mr. King is currently working on *In re Intel Corporation Microprocessor Antitrust Litigation*, MDL No. 1717 (D. Del.), in which plaintiffs allege monopolization of the market for x86 microprocessors. Mr. King also represents the Golden Gate Bridge, Highway & Transportation District in *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663 (D.N.J.), a case that has resulted in approximately $150 million in settlements to date.

Prior to joining the firm, Mr. King practiced antitrust law for eight years at The Furth Firm LLP, a San Francisco plaintiffs' firm, and worked on dozens of direct and indirect purchaser actions that resulted in hundreds of millions of dollars in settlements. He began his legal career in Los Angeles at Skadden, Arps, Slate, Meagher & Flom LLP. While in law school, Mr. King also served as a summer intern for the Honorable John M. Munter in San Francisco Superior Court.

At The Furth Firm, Mr. King was appointed as plaintiffs' interim liaison counsel in the complex antitrust case captioned *Hydrogen Peroxide Cases* (San Francisco Superior Court, JCCP No. 4416), and has been quoted on antitrust class action topics in *Rubber & Plastics News* and *Competition Law 360*.

Published opinion: *Jackson v. Kincaid, et al.*, 122 S.W. 3d 440 (Tex.-App.-Corpus Christi 2003). In that legal malpractice action, Mr. King represented the plaintiffs against the largest law firm in Oklahoma and various partners, and successfully obtained an appellate reversal



COHEN MILSTEIN
HAUSFELD & TOLL

establishing that Texas had personal jurisdiction over the defendant partners. The case subsequently was settled for a confidential sum.

Mr. King obtained his undergraduate degree from Santa Clara University, where he majored in Political Science and was a member of Pi Sigma Alpha, the national political science honor society. He received his law degree from the University of California, Hastings College of the Law in San Francisco, where he was Editor in Chief of the *Hastings Law Journal*, and graduated cum laude and as a member of the Order of the Coif.

Mr. King is admitted to practice in California, U.S. District Courts for the Northern and Central District of California, and the U.S. Court of Appeals for the Ninth Circuit.

### Kathleen M. Konopka

Kathleen Konopka joined Cohen, Milstein, Hausfeld & Toll in December 2006 as an associate in the Antitrust practice group.

Prior to joining the firm, Ms. Konopka served as an Assistant United States Attorney for the District of Columbia. In that capacity, she prosecuted criminal defendants in both the local and federal courts and defended the United States in civil litigation at both the trial and appellate levels. Ms. Konopka also conducted a large-scale review of the Federal Bureau of Investigation as an attorney advisor with the Department of Justice's Office of the Inspector General.

Ms. Konopka graduated from Northeastern University School of Law and Vassar College with a B.A. in Feminist Theory. She has also studied the impact of litigation on the enforceability of discrimination laws in Stockholm, Sweden.

Ms. Konopka is admitted to practice in Maryland and the District of Columbia.

### Kalpana Kotagal

Kalpana Kotagal joined the firm as an associate in November, 2006 and is a member of the Antitrust practice group. Ms. Kotagal represents Registered Nurses employed by hospitals in Albany, Chicago, Detroit, Memphis, and San Antonio in lawsuits alleging that their employers unlawfully fixed their wages in violation of federal antitrust laws.

Before attending law school, Ms. Kotagal worked in the environmental community as Assistant National Field Director of the United States Public Interest Research Group, running national legislative campaigns on energy and environmental issues, and as an organizer with Green Corps. She recently served as an advisor to a Congressional candidate.

While in law school, Ms. Kotagal was a summer associate at Cohen Milstein and served as law clerk in the Chambers of the Honorable J. Curtis Joyner, Eastern District of Pennsylvania. She was also involved in litigation under the Alien Tort Claims Act and RICO on behalf of Haider Mushin Saleh against contractors CACI and Titan for human rights abuses in Abu Ghraib prison. She served on the Editorial Board of the University of Pennsylvania Law Review as an Articles Editor.



Following law school, Ms. Kotagal clerked for the Honorable Betty Binns Fletcher, United States Court of Appeals for the Ninth Circuit.

Ms. Kotagal received her undergraduate degree from Stanford University (A.B., economics, B.S., earth systems, *with honors*, 1999) and was a Morris K. Udall Scholar. She received her law degree from the University of Pennsylvania (2005, *cum laude*), where she was a James Wilson Fellow.

Ms. Kotagal is the co-author, with Michael Hausfeld and Charles Tompkins, of "Innovation, Economics and the Law: The Health Care Industry's Exposure to Antitrust Liability," to be published by the ABA Antitrust Law Section in 2007.

Ms. Kotagal is admitted to practice in New York and the District of Columbia.

**Brent W. Landau**

Brent W. Landau, an Associate, joined Cohen Milstein in 2002 and is a member of the Antitrust practice group.

Mr. Landau currently is working on *Schwab v. Philip Morris USA, Inc., et al.* (E.D.N.Y.), alleging a RICO conspiracy and fraud in connection with the marketing and sale of "light" cigarettes; *In re Intel Corporation Microprocessor Antitrust Litigation* (D. Del.), alleging monopolization of the market for x86 microprocessors; and *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group, L.P.* (C.D. Cal.), alleging monopolization of the market for pulse oximetry products. Other cases in which he has been involved include *In re Vitamins Antitrust Litigation* (D.D.C.), where a 2003 trial resulted in a trial verdict in favor of the plaintiffs and the class of $49.5 million before trebling, the fifth largest that year; *Ferko v. National Association for Stock Car Auto Racing, Inc.* (E.D. Tex.), alleging anticompetitive conduct in the market for top-level stock car racing (a settlement in the case succeeded in bringing the inaugural second Nextel Cup Series race to Texas Motor Speedway); and *Meijer, Inc. v. 3M Co.* (E.D. Pa.), alleging monopolization of the market for invisible and transparent tape (an approximately $28 million settlement was approved in 2006).

Prior to joining the Firm, Mr. Landau served as a judicial law clerk to the Honorable Bruce W. Kauffman, United States District Court for the Eastern District of Pennsylvania.

He is the author of *State Employees and Sovereign Immunity: Alternatives and Strategies for Enforcing Federal Employment Laws*, 39 Harv. J. on Legis. 169 (2002); *State Bans on City Gun Lawsuits*, 37 Harv. J. on Legis. 623 (2000); and *Sovereign Immunity and You: How New York State Employees Can Enforce Their Federal Employment Rights*, United University Professions Working Paper Series (Dec. 2005) (presented at November 2005 UUP conference on "Preserving the Rights of Public Employees").

Mr. Landau graduated from the State University of New York at Binghamton, where he received a B.A. in History and Philosophy (*summa cum laude*, 1998) and was a member of Phi Beta Kappa. He obtained his law degree from Harvard Law School (*cum laude*, 2001), where he was



COHEN MILSTEIN
HAUSFELD & TOLL™

co-chairperson of the Tenant Advocacy Project and a supervising editor of the *Harvard Journal on Legislation*.

Mr. Landau is admitted to practice in Pennsylvania, New York, and the District of Columbia.

**Christopher L. Lebsock**

Christopher L. Lebsock, Of Counsel, joined Cohen Milstein in January 2008 and is a member of the Antitrust practice group.

Mr. Lebsock is currently working on a number of computer technology antitrust cases including *In re Flash Memory Antitrust Litigation* (N.D. Cal.), *In re TFT-LCD* (Flat Panel) Antitrust Litigation (N.D. Cal.), and *In re Intel Corp. Microprocessor Antitrust Litigation* (D. Del.).

Prior to joining the Firm, Mr. Lebsock was a principal attorney with The Furth Firm, LLP where he specialized in complex business litigation, particularly antitrust and labor and employment class actions. Mr. Lebsock was a principal member of the plaintiffs' trial team in *Savaglio v. Wal-Mart*, a class action of nearly 119,000 Wal-Mart hourly employees who sued their employer for wrongfully denying them meal periods and rest breaks. After more than three months of trial, the jury returned a verdict for the plaintiff class of more than $172 million, including $115 million in punitive damages. Mr. Lebsock was also the primary attorney at the firm responsible for litigating *In Re Automobile Antitrust Cases I & II*, (S.F. Superior Court), a California class action in which the plaintiffs alleged that major automobile manufacturers illegally conspired to prevent the export of Canadian vehicles to the United States. Mr. Lebsock authored and argued an appeal in that case before California's First District Court of Appeals. The decision is published at 135 Cal.App.4th 100 (2005).

Mr. Lebsock graduated from the University of Colorado, Boulder (1993), where he received a B.A. in Economics and was a member of Phi Beta Kappa. He obtained his law degree from the University of California, Hastings College of the Law (1996). He was Senior Managing Editor of the Hastings Constitutional Law Quarterly.

Mr. Lebsock is admitted to practice in California.

**Jason M. Leviton**

Jason M. Leviton, an Associate at Cohen Milstein, joined the Firm in 2004 as a member of the Securities Fraud/Investor Protection practice group. Prior to joining Cohen Milstein, Mr. Leviton was a securities class-action attorney with another well-known securities class action firm.

He has been involved in several major securities fraud cases at the Firm, including the class actions *In re Verisign Securities Litigation* (N.D. Cal.; settled for approximately $78 million); *Bovee v. Coopers & Lybrand, et al.* (S.D. Ohio; settled for $7.5 million); *In re Xybernaut Securities Litigation* (E.D. Va.; motions to dismiss denied); *Ong v. Sears, Roebuck, and Co.* (N.D. Ill; motions to dismiss denied and class certification pending); *Welmon, et al. v. Chicago,*



**COHEN MILSTEIN**
HAUSFELD & TOLL™

*Bridge & Iron N.A., et al.* (motions to dismiss denied and class certification pending); and *In re SOURCECORP Securities Litigation* (N.D. Tex.; motion to dismiss denied against non-speaking defendant pursuant to SEC Rule 10b-5(a) and (c)).

In addition to his securities litigation practice, Mr. Leviton is also heavily involved in many of the Firm's client outreach efforts. These efforts include working on the Firm's monthly and quarterly reports to its clients and also with responding to Requests for Proposals from pension funds seeking securities litigation monitoring counsel.

Mr. Leviton attended Gonzaga University where he received both a B.A. in Philosophy (2000) and a J.D. (*cum laude*, 2003). While in law school, he won the Linden Cup Moot Court competition and was a member of the Editorial Board of the International Law Journal. Mr. Leviton also received a Master of Laws (Dean's Certificate, 2004) in Securities and Financial Regulations from Georgetown University Law Center. While at Georgetown, he was the inaugural LL.M. student selected for an externship with the SEC's Division of Enforcement.

Mr. Leviton is admitted to practice in the District of Columbia, State of Washington, and Florida.

**James E. McGovern**

James McGovern focuses his practice on investor protection issues. Since joining Cohen Milstein, he has worked on several well-known securities fraud cases, including cases currently pending against WorldCom and Parmalat. Prior to joining Cohen Milstein, Mr. McGovern was an associate at Latham & Watkins where he worked on complex litigation and FIFRA arbitrations.

Mr. McGovern received his law degree from Georgetown University Law Center where he graduated magna cum laude (2002) and was selected for the Order of the Coif. Prior to law school, he attended American University where he received a B.A., International Studies (1994) and a M.B.A., Finance (1998), with high honors.

Mr. McGovern is admitted to practice in Maryland and the District of Columbia.

**Douglas J. McNamara**

Douglas McNamara, Of Counsel at the Firm, joined Cohen Milstein in 2001 as a member of the Antitrust and Consumer Protection practice groups.

He is currently involved in litigation surrounding defective products like multifunction printers made by Brother. He also works on a variety of product liability cases involving pharmaceuticals, like OxyContin and Vioxx.

Prior to joining Cohen Milstein, Mr. McNamara was a litigation associate at Arnold & Porter, specializing in pharmaceutical and product liability cases. He started his career at New York City's Legal Aid Society, defending indigent criminal defendants at trial and on appeal.



He has authored two law review articles: *Buckley, Imbler and Stare Decisis: The Present Predicament of Prosecutorial Immunity and An End to Its Absolute Means*, 59 Alb. L. Rev. 1135 (1996); and *Sexual Discrimination and Sexual Misconduct: Applying New York's Gender-Specific Sexual Misconduct Law to Minors*, 14 Touro L. Rev. 477 (Winter 1998).

A Phi Beta Kappa, Mr. McNamara graduated from SUNY Albany with a B.A. in Political Science (*summa cum laude*, 1992) and New York University School of Law (J.D., 1995).

Mr. McNamara is admitted to practice in New York and the District of Columbia.

**Steig D. Olson**

Steig D. Olson joined the Firm as an Associate in 2003 as a member of the Antitrust practice group.

He is currently involved in, among other cases, *In re Plastics Additives Antitrust Litigation*, (E.D.Pa) in which plaintiffs allege a price-fixing conspiracy by manufacturers of additives for plastics in the United States; *Molecular Diagnostics Laboratories v. Hoffman-La Roche, Inc.* (D.D.C.), for the unlawful monopolization of an enzyme used in DNA amplification, human-genome research, and medical diagnostics; and *Griffin v. Concord EFS, Inc.* (N.D.Cal.), which alleges that member banks of a network conspired to fix fees associated with ATM transactions.

Mr. Olson is the author of *Efforts to Delay Competition from Generic Drugs: Litigation Along a Seismic Fault Between Antitrust and Intellectual Property Law*, co-authored with Joshua P. Davis, 39 U.S.F.L. Rev. 1 (2004). He has also provided research assistance for several articles, including those of V. Schultz, *The Sanitized Workplace*, 11 Yale L.J. 2061 (2003); M. Mutua, *Savages, Victims, and Saviors: The Metaphor of Human Rights*, 42 Harv. Int'l L.J. 201 (2001); and L. Guinier, *Confirmative Action*, 25 L. & Soc. Inquiry 565 (2000).

Before joining Cohen Milstein, Mr. Olson clerked for the Honorable Barrington D. Parker, Jr. of the United States Court of Appeals for the Second Circuit, and the Honorable Vaughn R. Walker of the United States District Court for the Northern District of California.

Mr. Olson graduated from Harvard Law School, *magna cum laude* (J.D., 2001) and Vassar College with a B.A. in Philosophy (1997).

Mr. Olson is admitted to practice in New York.

**James J. Pizzirusso**

James Pizzirusso joined the Firm in 2001 as an Associate and is a member of the Unsafe Drugs & Environmental Health Threats, Consumer Protection and Antitrust practice groups.

Mr. Pizzirusso is currently working on several cases involving toxic products and public health. He represents the City of Milwaukee in a public nuisance lawsuit against lead paint manufacturers and was a member of the successful appellate team in that case. In overturning summary judgment in favor of defendants, the Wisconsin Court of Appeals became the first



COHEN MILSTEIN
HAUSFELD & TOLL™

appellate court in the country to recognize the right of a governmental entity to bring a public nuisance and conspiracy lawsuit against the lead paint industry. Mr. Pizzirusso was also one of the primary authors of the plaintiffs' class certification briefs in a RICO case involving "light" cigarettes - one of the largest class actions ever certified, *Schwab v. Philip Morris, Inc.*, 449 F. Supp. 2d 992 (E.D.N.Y. 2006).

Mr. Pizzirusso has served as a panelist at several conferences and CLEs and presented on topics including: "Strategies for Pursuing Litigation Remedies in Eliminating Childhood Lead Poisoning," "Developing Novel Theories of Recovery in Toxic Tort Litigation," "Consumer Protection Law," and "Public Interest Tort Litigation: Using Private Tort Actions to Further Environmental Justice & Public Ends." He has also served as a Visiting Associate Professor of Clinical Law and Co-Director of the Vaccine Injury Clinic at George Washington University Law School. He is the author of two published papers: *Agency Rule-Making Power and the Clean Air Act: Putting the Brakes on American Trucking, Spring 2001 Term: Whitman v. American Trucking Associations, Inc.*, 7 Envtl. Law. 729 (June, 2001) and *Increased Risk, Fear of Disease and Medical Monitoring – Are Novel Damage Claims Enough to Overcome Causation Difficulties in Toxic Torts*, 7 Envtl. Law. 183 (September, 2000).

Mr. Pizzirusso graduated *summa cum laude* from the University of Tennessee-Knoxville with a B.A. in Environmental Policy. While in college, he was a Whittle Scholar, a member of Phi Beta Kappa and earned the Torchbearer award (the highest student honor conferred by the University) . In 2001, Mr. Pizzirusso obtained his law degree from George Washington University Law School (with honors) where he was a note writer for the *Environmental Lawyer Journal* and the Student Director of the law school clinical program. He was also Vice President of the Trial Court Board and Captain of a team that placed first in the region in ATLA's 2000-2001 Student Trial Advocacy Competition.

Mr. Pizzirusso is admitted to practice in the District of Columbia, Virginia, the Fourth Circuit Court of Appeals, the Court of Federal Claims and the Eastern and Western Districts of Arkansas.

**Hilary K. Ratway**

Hilary Ratway joined the Firm in the summer of 2006 as an Associate, and she is a member of the Antitrust Practice Group.

Ms. Ratway is currently working on *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), in which a partial settlement of $85 million was reached with defendants Deutsche AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd. and *In re OSB Antitrust Litigation* (E.D. Pa.), in which a class of direct purchasers was recently certified. Ms. Ratway also works on *Boyd et al. v. AWB Limited* (S.D.N.Y.), an antitrust and RICO class action brought on behalf of American wheat farmers. The wheat farmers allege that a AWB Limited, an Australian wheat exporter, bribed the Saddam Hussein regime under the United Nations Oil for Food Program in exchange for a monopoly in the Iraqi wheat market and the exclusion of American wheat from the Iraqi market. Other antitrust cases Ms. Ratway works on include: *In*



re *Air Transportation and Surcharge Antitrust Litigation* (N.D. Cal.), *In re Publication Paper Antitrust Litigation* (D. Conn.), and *Behrend v. Comcast Corp.* (E.D. Pa.).

In addition to representing victims of anticompetitive conduct, Ms. Ratway also represents Holocaust victims in a breach of contract case alleging certain German corporations failed to pay appropriate interest due on their payments to a reparations fund.

Prior to joining the firm, Ms. Ratway worked at The Furth Firm in San Francisco, California and Finkelstein, Thompson & Loughran in Washington, D.C., where she gained substantial experience representing plaintiffs in antitrust and consumer fraud class actions. Among other cases, Ms. Ratway was involved in *Schwab v. Philip Morris USA et al.* (E.D.N.Y.), the largest class action ever certified, in which the plaintiffs allege a RICO conspiracy and fraud in connection with the marketing and sale of "light" cigarettes.

During law school, Ms. Ratway interned at the United States Supreme Court in the Office of Legal Counsel and for the Honorable Ricardo M. Urbina of the United States District Court for the District of Columbia.

Ms. Ratway received a B.A. in Environmental Studies from the University of Colorado, Boulder (1996) and a J.D. from the American University Washington College of Law (2000, *cum laude*).

Ms. Ratway is admitted to practice in California and the District of Columbia.

**Bruce F. Rinaldi**

Bruce Rinaldi joined the Firm in 2004 as Of Counsel and is a member of the Employee Benfits practice group.

After clerking for United States District Judge James A. Walsh in Tucson, Arizona, Mr. Rinaldi taught at the University of Arizona School of Law and was in private practice in Tucson before serving as a Special Counsel in the Office of the General Counsel at the Securities and Exchange Commission. In 1979 he joined the Special Litigation Division in the Office of the Solicitor of Labor as Supervisory Trial Attorney, where he ran the litigation of *Donovan v. Fitzsimmons* (N.D. Ill.), negotiating and drafting a consent decree governing the management of billions of dollars in assets of the Teamsters Central States Pension Fund, which remains in effect today. Mr. Rinaldi also conducted a four month trial of allegations of ERISA fiduciary breaches with respect to the Teamsters Central States Health and Welfare Fund in *Brock v. Robbins* (D.C. N.D. Ill.).

In 1985 Mr. Rinaldi became the Senior Trial Attorney in the Plan Benefits Security Division of the Department of Labor. Mr. Rinaldi litigated a wide range of major fiduciary breach cases brought by the Secretary of Labor under ERISA including the seminal case of *Reich v. Valley National Bank* ( S.D.N.Y.), concerning fiduciary breaches in the acquisition of employer stock by an ESOP. In 1989 Mr. Rinaldi joined the Office of Thrift Supervision ("OTS") as the Associate Chief Counsel for Litigation and directed investigations and enforcement actions under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") for fiduciary breaches arising out of failures of thrifts and savings and loan organizations. He



COHEN MILSTEIN
HAUSFELD & TOLL™

directed all of the enforcement actions taken by the OTS against officers, directors, accountants, and attorneys associated with Lincoln Savings and Loan Association, the largest thrift failure in history. *See In re American Continental Corp./Lincoln Sav. & Loan Securities Litigation* (D.C. Ariz.).

In 2000, Mr. Rinaldi left the government for private practice. As the senior litigator at the McTigue Law Firm, Mr. Rinaldi was responsible as co-lead counsel for several cases, including the approved settlement of a case against the fiduciaries of the Morrison Knudson 401(k) plan; *In re McKesson HBOC, Inc. ERISA Litigation* (N.D. Cal.); and *In re CMS Energy ERISA Litigation* (E.D.Mich.).

Mr. Rinaldi earned a B.A. in Political Science from the University of California at Berkeley in 1969, after spending three years as a Peace Corps volunteer in Venezuela, and then received his law degree from the University of California at Davis (King Hall) in 1972.

Mr. Rinaldi is admitted to practice in the District of Columbia and is an inactive member of the Arizona and California Bars.

**Sharon K. Robertson**

Sharon K. Robertson, an Associate, joined Cohen Milstein in 2007 and is a member of the Antitrust practice group.

In the antitrust field, Ms. Robertson currently represents Registered Nurses employed by hospitals in Albany and Memphis in lawsuits alleging that their employers unlawfully fixed their wages in violation of federal antitrust laws. Ms. Robertson is also working on *In re: Hydrogen Peroxide Antitrust Litigation* (E.D.Pa.), a lawsuit alleging price-fixing on behalf of purchasers. In the international human rights field, Ms. Robertson currently represents Indonesian villagers in a lawsuit against Exxon Mobil over torture and extrajudicial killings allegedly committed by the defendant's security forces (a unit of the Indonesian military).

Before attending law school, Ms. Robertson worked on the campaign committee of Councilman John Liu, the first Asian-American to be elected to City Council.

During law school, Ms. Robertson served as an Alexander Fellow. In that capacity, she spent a semester interning full-time within the Chambers of the Honorable Shira A. Scheindlin, United States District Court for the Southern District of New York. She was also an intern in the Litigation Bureau of the Office of the New York State Attorney General and the United States Court of Appeals for the Second Circuit.

Ms. Robertson graduated from the State University of New York at Binghamton, where she received a B.A. in Philosophy, Politics and Law (*magna cum laude*, 2003) and was a member of Phi Eta Sigma National Honor Society and the Golden Key International Honor Society. She received her law degree from the Benjamin N. Cardozo School of Law (J.D., 2006). She served as Notes Editor of the Cardozo Public Law, Policy and Ethics Journal.



COHEN MILSTEIN
HAUSFELD & TOLL™

Ms. Robertson is admitted to practice in New York and New Jersey.

**Bernard S. Sharfman**

Bernard Sharfman joined the Firm in 2006 as Of Counsel and is a member of the Securities Fraud/Investor Protection group.

Mr. Sharfman's legal work experience has included being a legal analyst for Bloomberg Law Reports, a member of the editorial staff of the Takeover Stock Report and an associate counsel for MERSCORP, Inc. in Vienna, Virginia. Mr. Sharfman began his legal career as an associate with the corporate and securities law firm of Muldoon Murphy & Aguggia LLP in Washington, DC. Prior to entering law school, Mr. Sharfman worked for nine years at Fannie Mae and for four years at the Office of Finance, Federal Home Loan Banks.

Mr. Sharfman is the author of two recent articles on the business judgment rule: *Being Informed Does Matter: Fine Tuning Gross Negligence Twenty Plus Years after Van Gorkom*, The Business Lawyer, Vol. 62, No. 1 (November 2006) and *Understanding Maryland's Business Judgment Rule*, Duquesne Business Law Journal, Vol. 8 (Spring 2006). Mr. Sharfman is also the author of *Modifying Model Rule 5.4 to Allow for Minority Ownership of Law Firms by NonLawyers*, Georgetown Journal of Legal Ethics, Vol. 13, No. 3 (Spring 2000).

Mr. Sharfman is a graduate of the Georgetown University Law Center (J.D., 2000) where he was an Executive Editor of the Georgetown Journal of Legal Ethics and the recipient of the journal's Saint Thomas More Award, American University (M.S. in Accounting, 1995), the University of Michigan (M.A. in Economics, 1983), The University of Toledo (M.B.A. (Finance), 1980) and The Ohio State University (B.S. Bus. Adm. *cum laude* (Economics), 1979).

Mr. Sharfman is a member of the Maryland and District of Columbia bars.

**Daniel Tenny**

Daniel Tenny, an Associate at Cohen Milstein, joined the Firm in September 2007. He is a member of the Civil Rights & Employment practice group.

Mr. Tenny is currently involved in *Keepseagle v. Schafer*, in which Native American farmers and ranchers allege discrimination in the United States Department of Agriculture's provision of agricultural loans, and *Amos v. GEICO*, in which African-American consumers allege that GEICO discriminates against them by considering level of education and occupation when it sets automobile insurance rates.

Prior to joining the Firm, Mr. Tenny served as a law clerk for the Honorable David H. Souter of the Supreme Court of the United States. Before his clerkship with Justice Souter, he was a law clerk for the Honorable David S. Tatel of the United States Court of Appeals for the District of Columbia Circuit.



Mr. Tenny graduated from Harvard University (A.B. in Mathematics, *cum laude*, 1999) and the University of Michigan Law School (J.D., *summa cum laude*, 2005). While at Michigan, he served as Executive Note Editor of the Michigan Law Review and published his own Note, *There Is Always a Need: The "Necessity Doctrine" and Class Certification Against Government Agencies*, 103 Mich. L. Rev. 1018 (2005). Mr. Tenny spent his summers during law school in the Housing Unit at South Brooklyn Legal Services and in the Office of General Counsel at the Equal Employment Opportunity Commission.

Mr. Tenny is admitted to practice in New York and the District of Columbia.

**Patrick A. Tillou**

Patrick Tillou, an Associate at the Firm, joined Cohen Milstein in 2006 and is a member of the Antitrust practice group.

Mr. Tillou is currently working on *In re New Motor Vehicles Canadian Export Antitrust Litigation* and *In re OSB Antitrust Litigation*, among other cases. Before joining Cohen Milstein, Mr. Tillou previously worked for Winston & Strawn and Cleary, Gottlieb, Steen & Hamilton, where he focused on antitrust, including counseling, mergers and litigation, as well as other complex civil and commercial litigation. He has also done appellate work and collateralized securities offerings.

Mr. Tillou graduated from Duke University with a bachelor's degree in Psychology (1997, *magna cum laude*) and attended law school at the University of Michigan (1999, *cum laude*). During law school, he also studied European Union and international law at the Katholieke Universiteit in Leuven, Belgium.

Mr. Tillou is admitted to practice in the U.S. Virgin Islands and the District of Columbia, and is a member of the bar of the United States Supreme Court.

**Catherine A. Torell**

Catherine A. Torell is Of Counsel at Cohen Milstein. She joined the Firm in 2002 and is a member of the Securities Fraud/Investor Protection practice group.

Currently, Ms. Torell is involved in the *In re Parmalat Securities Litigation* (S.D.N.Y.) in which Cohen Milstein serves as co-lead Counsel. She also conducts investigations of securities fraud cases for the practice group, working with all of its litigators.

Prior to joining Cohen Milstein, Ms. Torell was associated with the firm of Entwistle & Cappucci LLP, where she served as one of co-lead counsel in *In re Providian Financial Securities Litigation* ($38 million settlement). In approving the settlement, the Court remarked on the "extremely high quality" and "skill and efficiency" of plaintiffs' counsel's work throughout the litigation. Ms. Torell also was previously associated with Goodkind Labaton Rudoff & Sucharow LLP, where she served as counsel to the New York City Pension Funds in *In re Orbital Sciences Corp. Securities Litigation* ($22.5 million settlement), and was a key member of the litigation team that successfully resisted defendants' efforts to dismiss the case. Ms Torell



also served as counsel to the Florida State Board of Administration in *LaPerriere v. Vesta Insurance Group, et al.*, and as counsel to Amalgamated Bank of New York in *In re Bristol-Myers-Squibb Securities Litigation* ($61 million settlement).

Ms. Torell received a B.A. in Political Science from Stony Brook University (1984) and her law degree from St. John's University School of Law (1990) where she was the recipient of the Federal Jurisprudence Award.

Ms. Torell is admitted to practice in New York.

**Michelle C. Yau**

Michelle Yau joined the firm as an associate in August 2007 and is a member of the Employee Benefits practice group.

Prior to joining the firm Ms. Yau was an attorney in the Solicitor's Office of the U.S. Department of Labor, where she was responsible for the enforcement and administration of a variety of labor statutes. She started with the Department of Labor in the Honors Program where she was involved in several litigation matters, including the Department of Labor's Enron litigation alleging violations of ERISA. During law school Ms. Yau worked in the Employee Benefits and Executive Compensation Group of Shearman & Sterling, at the labor law firm of Segal Roitman & Coleman, and in the New York office of Tibetan Government in exile. Before law school, Ms. Yau worked as a financial analyst at Goldman, Sachs & Co. in the Financial Institutions Group of the Investment Banking Division.

Ms. Yau received her law degree from Harvard Law School in 2003, where was awarded several public interest fellowships, including the Heyman Fellowship for academic excellence and a demonstrated commitment to federal public service. Ms. Yau received a B.A. in Mathematics (with distinction, 1997) from the University of Virginia, where she was a member of Phi Beta Kappa and Phi Mu Epsilon (mathematics honors fraternity). Ms. Yau was also selected as an Echols Scholar and awarded the Student Council Scholarship for leadership, academic achievement and community service.

Ms. Yau is admitted to practice in the District of Columbia, the United States Court of Appeals for the Fourth Circuit and Massachusetts.

IMANAGE 221910.3
9/07/07

# EXHIBIT 2
# (To M. Hausfeld Declaration)

<u>Declaration of Magistrate Judge Edward A. Infante (Ret.)</u>

I, Edward A. Infante, declare:

1.      I am a retired Magistrate Judge for the United States District Court for the

Northern District of California.  I am currently a member of JAMS (formerly known as

Judicial Arbitration & Mediation Services), where my practice focuses on large complex

commercial disputes.  In forming the opinions contained in this declaration, I have relied

on investigation and analysis performed by my partner, Lester J. Levy, Esq., also a

member of JAMS.   I make this declaration voluntarily and, if called as a witness, I could

and would testify competently to the matters set forth herein.


<u>Terms of Engagement</u>

2.      In or about December 2006, I was contacted by Bruce Simon, formerly a partner

in Cochett, Pitre, Simon & McCarthy, and Michael Hausfeld, a name partner in Cohen,

Milstein, Hausfeld & Toll, in <u>In re Air Cargo Shipping Services Antitrust Litigation</u>, Case

No. 06-MD-1775 (CBA) (VVP), (MDL No. 1775) (E.D.N.Y.) (the "Air Cargo" case).

Counsel asked whether I would be willing to render a written opinion, in the form of a

declaration, in connection with a Settlement Agreement reached between Plaintiffs and

Lufthansa Airlines.  Counsel specifically asked whether I would opine on the fairness,

reasonableness and adequacy of the settlement -- to the settling class members.[1]

---

[1] I have also been asked by counsel to render a separate opinion with respect to motions for the preliminary approval of settlements reached between Plaintiffs and Defendants United Airlines and American Airlines in <u>In re International Air Transportation Surcharge Antitrust Litigation</u>, Case No. 06-CV-3905 (MDL No. 1793) (the "Air Passenger" case).

3.      I agreed to the proposed engagement on two conditions:  First, due to my

schedule and the amount of time that this engagement would require, I asked that counsel

agree that Mr. Levy could assist me.  I have worked with Mr. Levy on other significant

matters and have the highest confidence in his ability and judgment.  Second, I required

that our investigation would be performed independently, that Mr. Levy and I would have

access to any and all documents and witnesses necessary to carry out our charge and that

there would be no guarantee, in advance, as to the outcome of my opinion after our

investigation was completed.   Counsel agreed to each of these conditions.

### Summary of Allegations in the Amended Consolidated Complaint

4.      Plaintiffs allege that, beginning no later than January 1, 2000 and continuing to

the present ("the Class Period"), Defendants engaged in a global conspiracy to fix, raise,

maintain, or stabilize prices of airfreight shipping services through a number of

mechanisms, including, *inter alia*, concertedly levying inflated surcharges, jointly

agreeing to eliminate or prevent discounting of airfreight shipping services prices, and

agreeing on yields and allocating customers.  Plaintiffs allege that, through these

mechanisms, Defendants artificially inflated the prices of airfreight shipping services

during the Class Period, thereby causing injury to Plaintiffs who, absent Defendants'

allegedly anticompetitive conduct, would have been able to purchase airfreight shipping

services at lower prices.  Plaintiffs further contend that Defendants' unlawful conduct

took place within and had a direct, substantial and reasonably foreseeable effect upon

interstate and international commerce.  Plaintiffs assert that the adverse effects of

Defendants' allegedly anticompetitive conduct on commerce in the United States were

2

interdependent with the adverse effects on commerce worldwide and proximately caused injury to both plaintiffs in the United States and plaintiffs elsewhere. In addition, according to Plaintiffs, by agreeing to and engaging in concerted anticompetitive practices, which appreciably and foreseeably affected trade between European Union Member States, Defendants prejudiced the realization of a market between Member States and prevented, restricted, or distorted competition within the common market in the European Union. Accordingly, Plaintiffs assert that Defendants' conduct was in violation of Section 1 of the Sherman Act, various applicable state antitrust, consumer protection, and unfair competition laws, the common law, Article 81 of the E.C. Treaty, and the EEA Agreement.

## Documents Reviewed and Witnesses Interviewed

5.      We reviewed the original Complaint, the First Amended Consolidated Complaint, filed on February 8, 2007, as well as the Settlement Agreement between Air Cargo Plaintiffs and Defendants Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd., which, we understand, has been signed by all Class Counsel. In addition, we were provided, and reviewed, a copy of Magistrate Judge Victor V. Pohrelsky's Decision and Order, dated November 16, 2006, regarding the appointment of class counsel.

6.      Thereafter, Mr. Levy interviewed the following lawyers by telephone: David Ogden, a partner in Wilmer Cutler Pickering Hale and Dorr LLP, as well as Messrs. Hausfeld and Simon.

<u>Key Settlement Terms</u>

7.      The Settlement Agreement was executed on September 11, 2006.  It resolves the

liability of Lufthansa and related entities for alleged violations of Section 1 of the

Sherman Act, 15 USC Sec. 1, to a putative Settlement Class composed of U.S. and non-

U.S. domiciled purchasers of airfreight cargo shipping services for shipments within, to,

or from the United States during the period from January 1, 2000 to the execution date of

the Settlement Agreement.   The key terms of the settlement agreement are:

8.      The immediate payment of $85,000,000 into a Settlement Fund, established as an

escrow account, to be invested in guaranteed United States and foreign investment

vehicles, with interest earned to become part of the Settlement Fund, pending ultimate

distribution to the Settlement Class in a manner to be determined by court order after

final approval of the Settlement Agreement.

9.      Lufthansa is responsible for all costs of providing notice to the Settlement Class

and for all costs of administering, investing and distributing the Settlement Fund, with

any disputes over such expenditures to be submitted to binding arbitration at Lufthansa's

expense (subject to potential cost-shifting by the arbitrator to the class).

10.      The Agreement obligates Lufthansa, upon execution, to "begin to undertake to

support Plaintiff's prosecution of the Actions [against the remaining defendants] and

begin to provide Cooperation Materials as appropriate."  Cooperation Materials include:

        a.      Making available to class counsel, at Lufthansa's expense, (1) current and

                former directors, officers and employees that have been interviewed by the

                U.S. Department of Justice as part of its investigation of the air cargo

                industry, and (2) five additional current and former directors, officers, and

4

employees reasonably believed to have knowledge regarding Plaintiffs' claims, (i) for conferences, (ii) for interviews, (iii) to authenticate necessary documents, (iv) to prepare declarations and/or affidavits, and (v) to provide testimony at deposition and/or trial;

b.  Production of the following categories of documents, within five days of the Court's potential grant of preliminary approval:

i.      Worldwide transaction data in electronic format for all of Lufthansa's sales of airfreight cargo shipping services for shipments within, to or from the United States ("Airfreight Shipping Services") for the period January 1, 1993 through September 11, 2006;

(ii)     All price announcements for Airfreight Shipping Services, and/or surcharges related thereto, for shipments within, to, or from the United States for the period January 1, 1993 through September 11, 2006;

(iii)    All documents relating to or reflecting actual or potential communications between two or more air cargo carriers regarding the prices at which, or the customers to whom, Airfreight Shipping Services, and/or surcharges related thereto, would be or had been sold for shipments within, to, or from the United States for the period January 1, 1993 through September 11, 2006;

(iv)     Copies of all documents produced to the U.S. Department of Justice, the European Commission, or any other national competition authority investigating the air cargo industry, provided that such

5

documents concern air cargo commerce within, to, or from the United States; and

    (v)    Other documents relevant to Plaintiffs' claims as alleged in the Class Actions.

11.    The Settlement Agreement further required Lufthansa's counsel to provide, within ten days of its execution, "a general description of the times, places, and corporate participants relating to the conduct at issue . . . ." If preliminary approval is obtained, the Agreement requires Lufthansa's counsel to "meet as often as is reasonable and necessary with Settlement Class Counsel . . . to support Plaintiff's prosecution of the Actions" and to provide "a detailed proffer of the facts then known regarding the anti-competitive conduct alleged in the Actions."

12.    The agreement further requires Lufthansa to "produce any relevant documents or information obtained through its own internal investigation of the air cargo industry, including factual attorney work product so obtained."

13.    Additionally, the cooperation obligations set forth in the Agreement are subject to binding arbitration at Lufthansa's expense (subject to potential cost-shifting by the arbitrator to the class).

14.    The Agreement acknowledges that "Lufthansa's damages exposure is potentially limited by the terms of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. 108-237, 118 Stat. 665 (June 22, 2004) ("ACPERA"), and also acknowledges that "Lufthansa has thus far cooperated with Settlement Class Counsel in accordance with the provisions of ACPERA."

15.    The Agreement states that "Lufthansa has entered into the U.S. Department of Justice Antitrust Division's leniency program, which has 'a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions'" and contains an express representation that "on or before December 31, 2005, [Lufthansa] approached the U.S. Department of Justice to make an application under the Antitrust Division's Corporate Leniency Policy . . . to report possible price-fixing activity or other conduct potentially violative of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the air cargo industry in the United States and elsewhere. Lufthansa has, since that time, provided full and continuing cooperation in connection with the activity being reported; has been granted conditional leniency pursuant to the Antitrust Division's Corporate Leniency Policy; and has instituted compliance programs intended to halt and prevent anticompetitive activity, if any."

16.    The Agreement contains an express provision for modification by court order if the conditional grant of leniency is revoked. Thus, the Agreement provides that: "In the event the U.S. Department of Justice indicts Lufthansa and in connection with such indictment the leniency granted Lufthansa by the U.S. Department of Justice is by final order of a court of competent jurisdiction withdrawn, revoked or modified, and if Lufthansa has exhausted its appeals of such court order, then upon Plaintiffs' motion the Court may void this agreement, or modify the scope of the release set forth [herein], if and to an extent proportionate to the reasons for such withdrawal, revocation, or modification." The Agreement also provides for rescission in the event the Settlement Agreement is not finally approved by the court.

<u>Investigative Findings</u>

17.    The Settlement Agreement is the product of lengthy arms-length negotiations, which occurred over a five-month period. We are informed that the parties met in person no fewer than fifteen times and met many more times by telephone. Neither the conduct of the negotiations, nor the terms of the resulting agreement, exhibit any indicia of collusion.   Counsel alternatively described the negotiations as "long and arduous," "extremely contentious" and "highly adversarial."  The history of offers and counter-offers, relayed to us by opposing counsel, supports that view.  Moreover, the length and complexity of the Agreement itself, including the carefully crafted provisions that preserve the benefits of the settlement for class members, show no signs of collusive negotiation.

18.    Further, our investigation did not uncover any signs that early settlement negotiation damaged the class members' interests or resulted in a less favorable settlement.  To the contrary, class counsel arguably had better and potentially more reliable information with which to negotiate a settlement than might otherwise have been made available through discovery.  The settlement negotiations with Lufthansa occurred within the broad disclosure of key transactional data and analyses by Lufthansa. Substantial transactional data was produced by Lufthansa and were reviewed Class Counsel and its experts.  Class Counsel also received numerous proffers setting forth the detailed workings of the price-fixing cartel that is at issue.

19.    During our investigation, we did not observe anything to suggest that the settlement with Lufthansa was related to, or conditioned on, the settlements reached with

defendants United or American in the Air Passenger case. Negotiations with these defendants proceeded independently.[2]

20.     Class members have already received some of the benefit of the information provided by Lufthansa. This is clearly reflected in the recently filed First Amended Consolidated Complaint, which substantially expands on the inner workings of the antitrust law violations at issue. As a further result of the information disclosed by Lufthansa, new parties were added and unnecessary defendants were removed.

21.     The $85,000,000 settlement amount was reached through fair and informed bargaining. We are informed that during settlement negotiations the parties and their experts constructed and reviewed competing economic models of the relevant market, as affected by the allegedly anti-competitive activity. This complex modeling included air cargo traffic both inbound to, and outbound from, the United States. With these data, the parties negotiated over Lufthansa's alleged share of the affected surcharges, taking into account Lufthansa's more limited civil liability under the terms of ACPERA.

22.     Moreover, since September 11, 2006, the $85 million Settlement Fund has been in a currency-hedging fund at Suntrust Bank accruing interest for the benefit of the Settlement Class. This is intended to protect the class against currency devaluation during the pendency of the settlement approval process. Suntrust Bank agreed to waive all transaction fees and currency exchange fees, which would otherwise apply to settlement amounts to be paid in foreign currencies to non-U.S. Settlement Class members. As of December 29, 2006, the Settlement Fund had accrued an additional $1.5 million from the hedging program, plus interest for the benefit of the Settlement Class.

---

[2] We have provided an independent analysis of the American and United Settlement Agreements for Judge Breyer's consideration in the Air Passenger case.

23.     The Settlement Agreement provides that " . . . because of joint and several liability, this settlement with Lufthansa does not impair Plaintiffs' ability to collect the full amount of damages to which they may be entitled in the Actions." This provision correctly recognizes that to the extent that Plaintiffs' settlement with Lufthansa may ultimately be adjudicated to be less than the full amount of damages attributable to Lufthansa's actions, Plaintiffs may pursue the remainder of their damages from the non-settling defendants.

24.     The settlement with Lufthansa also resolves a number of statutory ambiguities, which might otherwise be the subject of costly litigation. Specifically, ACPERA provides little guidance on the cooperation necessary to limit an amnesty applicant's liability under the statute. We are informed that other amnesty applicants have taken the position that cooperation need not be given immediately, but rather should proceed in conjunction with discovery of the non-settling defendants. Thus, this Agreement defines the scope of the parties' cooperation obligations with a level of definition that is absent from the ACPERA statute itself. The cooperation obligations take effect prior to the approval of the settlement and include pre-discovery, whereas the statute may leave the determination of cooperation until the end of the case. Co-counsel for the class and counsel for Lufthansa both agree that the Settlement Agreement creates certainty for the class by defining the scope of cooperation that is otherwise poorly defined under the statute.

25.     Based on all of the foregoing, it is my considered opinion that the Settlement Agreement is consistent with the policies underlying ACPERA and that the terms are fair, reasonable and adequate to the settling class members. Notably, the Agreement requires

10

the immediate payment of the $85 million Settlement Fund within a single business day of its execution, rather than requiring payment only upon final court approval.  In addition to obtaining the substantial monetary recovery and costs of notice, plus costs of administering, investing and distributing the Settlement Fund, the settling parties will have avoided substantial costs in discovery and motion practice, and the class will have received important information (including work product) that may permit it to proceed more knowledgeably and efficiently in trial against the remaining defendants.

26.    More specific benefits to the class include:

a.    Receipt by the class of detailed information that explains and supports plaintiffs' prosecution of their case;

b.    The class will receive Lufthansa's communications with other carriers; will have access to Lufthansa personnel; will have received the results of the Lufthansa's internal investigations (including relevant work product); will receive affidavits to verify the documents produced; and will have the benefit of complex transactional data and explanations from knowledgeable industry personnel; and

c.    This information has and will continue to be provided early in the litigation, without the need for formal and sometimes limiting discovery procedures, and will be provided in a form most useful to the class.

(Additionally, substantial cooperation and production of key data occurred prior to the execution of the Settlement Agreement.)

d.        Further, the Settlement Agreement defines Lufthansa's cooperation obligations, and establishes an arbitration procedure for the evaluation and enforcement of the settling parties' cooperation obligations.

27.    The provision permitting Plaintiffs to move the Court to have the Settlement voided if Lufthansa is subsequently indicted by the U.S. Department of Justice provides significant protection to the Settlement Class in the event that Lufthansa fails to comply with its obligations as a leniency applicant.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this /3 day of July 2007, at San Francisco, California.

Edward A. Infante

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE<br><br>AIR CARGO SHIPPING SERVICES<br>ANTITRUST LITIGATION<br><br>MDL No. 1775 | Master File 06-MD-1775 (CBA) (VVP)<br><br>THIS DOCUMENT RELATES TO:<br>All Actions |

### [PROPOSED] ORDER CERTIFYING SETTLEMENT CLASS, PRELIMINARILY APPROVING PROPOSED SETTLEMENT, SCHEDULING HEARING FOR FINAL APPROVAL THEREOF, AND APPROVING THE PROPOSED NOTICE TO THE CLASS

**THIS CAUSE** came before the Court on Plaintiffs' Motion for Preliminary Approval of Settlement, filed July 13, 2007. (Dkt. No. 492) and Plaintiffs' Letter of February 25, 2008 submitting a revised Notice and Claim Form. Plaintiffs have entered into a settlement agreement ("Settlement Agreement") with Defendants Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd. (collectively, "Lufthansa"). On July 13, 2007, Plaintiffs submitted a Motion for Preliminary Approval of Settlement and a Proposed Order: (1) seeking entry of an order preliminarily approving the settlement; (2) certifying the proposed Settlement Class; (3) approving the proposed Notice Plan; and (4) authorizing dissemination of notice. On October 16, 2007, Magistrate Judge Pohorelsky issued a Report and Recommendation recommending that this Court conditionally certify the proposed Settlement Class and that "the proposed settlement be preliminarily approved after a conference with all parties, including non-settling defendants, to resolve issues concerning class notice." Report and Recommendation at 20 (Dkt. No. 625). Magistrate Judge Pohorelsky further ordered that such a

conference on class notice be held on October 30, 2007. *Id.* The October 30, 2007 conference

was held, at which time outstanding issues regarding notice, including issues raised by the non-

settling Defendants in their objection filed on October 30, 2007 (Dkt. No. 642), were addressed.

On January 10, 2008, this Court adopted Magistrate Judge Pohorelsky's Report and

Recommendation and ordered that the following language be included in the order granting

preliminary approval of the settlement:

> The Court's certification of the Settlement Class as provided
> herein is without prejudice to, or waiver of, (i) the rights of any
> defendant to contest certification of any other class proposed in
> these consolidated actions; or (ii) the rights and/or arguments
> asserted by any defendant in a motion to dismiss. The Court's
> findings in this Order shall have no effect on the Court's ruling on
> any motion to certify any class in these actions or on the Court's
> rulings concerning any defendant's motion to dismiss; and no party
> may cite or refer to the Court's approval of the Settlement Class as
> persuasive or binding authority with respect to any motion to
> certify any such class or any defendant's motion to dismiss.

(Dkt. No 681). On February 25, 2008, Plaintiffs submitted a revised Notice and Claim Form

incorporating both Magistrate Judge Pohorelsky's comments made at the October 30, 2007

hearing and a Plan of Allocation of the Lufthansa Settlement that was recommended to the Court

by a Special Master in two phases on December 21, 2007 and February 19, 2008.

The Court, having reviewed (1) Plaintiffs' initial motion for preliminary approval and its

accompanying memorandum and the exhibits thereto; (2) Plaintiffs' Letter of February 25, 2008

and the revised Notice and Claim Form attached thereto; (3) the Settlement Master's Report and

Recommendation Regarding the Allocation of the Lufthansa Settlement Fund filed December 21,

2007 (Dkt. No. 668); (4) the Settlement Master's Report and Recommendation Regarding the

Allocation of the Lufthansa Settlement Fund Among Foreign Purchasers filed February 19, 2008

(Dkt. No. 703); (5) the Magistrate Judge's Report and Recommendation of October 16, 2007; (6)

the Magistrate Judge's Report and Recommendation of [...]; (7) Amendment to Settlement

2

Master's Report and Recommendation Regarding Allocation of the Lufthansa Settlement Fund (to be filed February 25, 2008); (8) the Settlement Agreement; and (9) the file, hereby:

**ORDERS AND ADJUDGES:**

<u>Preliminary Approval of Settlement Agreement</u>

1.      The terms of the Settlement Agreement are hereby preliminarily approved.  There has been a showing that the Settlement Agreement was entered into at arm's-length by highly experienced counsel and is sufficiently within the range of reasonableness that notice of the Settlement Agreement should be given as provided in this Order.

<u>Class Certification</u>

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure and in light of the proposed Settlements, the Court hereby finds that the prerequisites for a class action have been met and certifies the following class for settlement purposes (the "Settlement Class"):

> All persons and entities that purchased airfreight cargo shipping services for shipments within, to, or from the United States (hereinafter "Airfreight Shipping Services"), including those persons and entities that purchased Airfreight Shipping Services through freight forwarders, from any air cargo carrier (including, without limitation, those defendants named in the Actions, and specifically including Lufthansa) and/or any named or unnamed co-conspirators (collectively, "Defendants") during the period from January 1, 2000 to the Execution Date of this Settlement Agreement [September 11, 2006].

Excluded from the Settlement Class are Defendants, their respective parents, employees, subsidiaries, and affiliates and all government entities.

3.      The Court finds that the certification of the Settlement Class is warranted in light of the Settlement Agreement because (a) the Settlement Class is so numerous that joinder is impracticable; (b) Plaintiffs' claims present common issues and are typical of the Settlement

Class; (c) Plaintiffs and Settlement Class Counsel (defined below) will fairly and adequately represent the Settlement Class; and (d) common issues predominate over any individual issues affecting the members of the Settlement Class. The Court further finds that Plaintiffs' interests are aligned with the interests of all other members of the Settlement Class. The Court also finds settlement of this action on a class basis superior to other means of resolving this matter.

4.    The Court hereby appoints Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Cotchett Pitre & McCarthy; the Furth Firm LLP; Kaplan, Fox & Kilsheimer, LLP; Labaton Sucharow LLP; Levin, Fishbein, Sedran & Berman; Lockridge Grindal Nauen LLP; and Lovell Stewart & Halebian LLP as Settlement Class Counsel, having determined that the requirements of Rule 23(g) of the Federal Rules of Civil Procedure are fully satisfied by this appointment.

5.    Plaintiffs Benchmark Export Services; Fleurchem, Inc.; FTS International Express, Inc.; JSNP, Inc.; Ralph Olarte d/b/a Olarte Transport Services; R.I.M. Logistics, Ltd.; S.A.T. Sea & Air Transport, Inc.; Sul-American Export, Inc.; TNT Freight Management USA, Inc.; Sangean American, Inc., JCK Industries, Inc.; Leis by Ron, Inc.; Alluvion, Inc.; Maria's Collections, Inc.; Printing Technologies, Inc., Plaintiff Paradiso, Inc.; TNT Freight Management (Singapore) Pte Ltd.; TNT Freight Management (Australia) Pty Ltd.; TNT Freight Management (Hong Kong) Limited; TNT Freight Management (Denmark) A/S; Deutscher Speditions und Logistikverband e.V.; TNT Freight Management (Sweden) AB; and Association des Utilisateurs du Transport de Fret will serve as Class Representatives on behalf of the Settlement Class.

<u>Notice to Potential Class Members</u>

6.    Within 60 days after the date of the entry of this Order, Settlement Class Counsel shall cause copies of the Notice of Proposed Class Action Settlement, substantially in the form of Exhibit A to Plaintiffs' Letter to the Court of February 25, 2008, to begin to be mailed by first

class mail, postage prepaid, to each potential class member whose address has been obtained from any Defendant or from IATA.

7.    For the purpose of distributing Notice, Lufthansa has also identified from its records the names and addresses of tens of thousands of potential indirect customers, who will also receive mailed notice.  Such Notice shall also be mailed to any purchaser of airfreight shipping services who requests a copy of the Notice.

8.    As soon as practicable after mailing of the Notice commences, Settlement Class Counsel shall cause to be published a Publication Notice, which shall be substantially in the form of Attachment B to the Settling Parties' November 20, 2007 Submission to the Court . Publication Notice will commence no later than 30 days after commencement of the mailing of the Notice and be completed in all events at least 30 days prior to the Fairness Hearing.

9.    Settlement Class Counsel shall also cause the Notice to be published on a website established for purpose of this settlement, www.aircargosettlement.com (the "Settlement website"), within 60 days after the entry of this Order.  Both the Notice and the Publication Notice will direct Settlement Class Members to the Settlement website, where they can access complete information on the settlement process and download or request mailed copies of all relevant forms.  The Notice and Publication Notice will also provide telephone numbers that Settlement Class Members may call to request information or order mailed copies of relevant forms.

10.    Settlement Class Members will be advised in both the Notice and in the Publication Notice of their right to exclude themselves from the Settlement Class and instructed in the Notice, in summary form in the Publication Notice, and on the Settlement website as to the

procedure for submitting a request for exclusion.  All requests for exclusion from the Settlement Class must be postmarked no later than 30 days prior to the Fairness Hearing.

11.     Settlement Class Members will also be advised in both the Notice and in the Publication Notice of the time, date, and location of the Fairness Hearing.  Detailed information regarding their right to appear at the Fairness Hearing in person or by counsel, either in support of or in opposition to the fairness, reasonableness, and adequacy of the Settlement Agreement will be provided in the Notice.

12.     Every mailed Notice will be accompanied by a Claim Form, and Settlement Class Members will be instructed in the Claim Form as to the procedure for submitting claims.  Settlement Class Members may also request a Claim Form on the Settlement website or by calling the Air Cargo Settlement Administrator at telephone numbers that will be provided to the Settlement Class.  The Claim Form will be substantially in the same form as Exhibit B to Plaintiffs' Letter to the Court of February 25, 2008.

13.     Prior to the Fairness Hearing, Settlement Class Counsel shall serve and file a sworn statement attesting to compliance with the provisions of paragraphs 6 through 13 of this Order.

14.     The foregoing notice provisions are hereby found to be the best means of providing notice under the circumstances and, when completed, shall constitute due and sufficient notice of the proposed Settlement Agreement and the Fairness Hearing to all persons affected by and/or entitled to participate in the Settlement Agreement, in full compliance with the notice requirements of Rule 23 of the Federal Rules of Civil Procedure and due process of law.

<u>Claims Administration</u>

15.    To effectuate the Settlement Agreement and the Notice provisions, the Court hereby approves The Garden City Group as the Claims Administrator ("Administrator") to be responsible for: (a) establishing a P.O. Box, information telephone line and website (to be included in the Notice of Settlement of Class Action) for the purpose of communicating with Settlement Class Members; (b) disseminating Notice to the Settlement Class; (c) accepting and maintaining documents sent from the Settlement Class Members including exclusion requests, Claim Forms, and other documents relating to claims administration; and (d) administering claims for allocation of funds among Settlement Class Members.

16.    The Court Approves Settlement Class Counsel's designation of SunTrust Banks, Inc. as Escrow Agent pursuant to the Escrow Agreement attached as Exhibit 8 to Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Preliminary Approval of Settlement.

17.    As described in the Notice of Proposed Class Action Settlement, any Settlement Class Member may opt out of the Settlement Class by notifying the Administrator at the address provided.  Information concerning exclusion is available on the Settlement website.  A Settlement Class Member wishing to request exclusion shall mail a request in written form by first-class mail, postmarked no later than November 14, 2008 to the address of the Administrator designated in the Notice.  The exclusion request must clearly state (a) the Settlement Class Member's name, address, and phone number; (b) all trade names or business names and addresses that the Settlement Class Member has used, as well as any parents, subsidiaries or affiliates that have purchased Airfreight Shipping Services at any time during the dates January 1, 2000 to September 11, 2006 who are also requesting exclusion; (c) the name of the Action ("In re Air Cargo Shipping Services Antitrust Litigation"); and (d) a signed statement that "I/we

7

hereby request that I/we be excluded from the Lufthansa Settlement Class in the *Air Cargo Shipping Services Antitrust Litigation, MDL 1775*". Settlement Class Members will be requested, but not required, to identify all air carriers from whom the Settlement Class Member purchased Airfreight Shipping Services and an estimate of the total amount paid for Airfreight Shipping Services from January 1, 2000 to September 11, 2006. Settlement Class Members will also be requested, but not required, to submit exclusions by certified mail. The request for exclusion shall not be effective unless it provides the required information and is made within the time stated above or the exclusion is otherwise accepted by the Court. Persons or entities that request exclusion from the Settlement Class shall not be entitled to share the benefits of the Settlement Agreement, nor be bound by any judgment, whether favorable or adverse.

18. Any potential member of the Settlement Class that does not properly and timely provide notification of its intent to opt out of the Settlement Class as set forth in paragraph 17 hereto shall be included in the Settlement Class and shall be bound by all the terms and provisions of the Settlement Agreement, whether or not such potential member of the Settlement Class has objected to the Settlement Agreement and whether or not such potential member of the Settlement Class makes a claim upon or participates in the Settlement Agreement.

<u>The Fairness Hearing</u>

19. A Fairness Hearing is hereby scheduled to be held on December 12, 2008 at 11:30 AM before the undersigned at 225 Cadman Plaza East, Brooklyn, New York, Ceremonial Courtroom, to consider the fairness, reasonableness, and adequacy of the Settlement Agreement.

20. Any member of the Settlement Class that has not provided notification of its intent to opt out of the Settlement Class in the manner set forth above may appear at the Fairness Hearing in person or by counsel and may be heard, to the extent allowed by the Court, either in

8

support of or in opposition to the fairness, reasonableness, and adequacy of the Settlement Agreement, provided, however, that no person shall be heard in opposition to the Settlement Agreement, and no papers or briefs submitted by or on behalf of any such person shall be accepted or considered by the Court, unless, thirty (30) days or more before the Fairness Hearing, such person: (a) files with the Clerk of the Court a notice of such person's intention to appear as well as a statement that indicates the basis for such person's opposition to the Settlement Agreement, and any documentation in support of such opposition; and (b) serves copies of such notice, statement, and documentation, as well as any other papers or briefs that such person files with the Court, either in person or by mail, upon Settlement Class Counsel and Counsel for Lufthansa.

21.    The date of the Fairness Hearing shall be set forth in the Notice and Publication Notice, but shall be subject to adjournment by the Court without further notice to the members of the Settlement Class other than that which may be posted at the Court and on the Court's website.

<u>Other Provisions</u>

22.    Terms used in this Order that are defined in the Settlement Agreement are, unless otherwise defined herein, used in this Order as defined in the Settlement Agreement.

23.    As of the date of entry of this Order, Plaintiffs and all members of the Settlement Class shall be preliminarily enjoined from commencing or prosecuting any action against Lufthansa based upon or relating to the claims released in Paragraph 35 of the Settlement Agreement pending final approval of the Settlement Agreement or until such time as this Court lifts such injunction by subsequent Order.

9

24.    In the event that the Settlement Agreement is terminated in accordance with its provisions, the Settlement Agreement and all proceedings had in connection therewith shall be null and void, except insofar as expressly provided to the contrary in the Settlement Agreement, and without prejudice to the *status quo ante* rights of Plaintiffs, Lufthansa, and the members of the Settlement Class.

25.    If the Settlement Agreement is terminated or is ultimately not approved, the Court will modify any existing scheduling order to ensure that the Plaintiffs and Lufthansa will have sufficient time to prepare for the resumption of litigation, including but not limited to the completion of discovery, preparation of expert reports, the filing of any summary judgment motion or motions, and preparation for trial.

26.    The Court's certification of the Settlement Class as provided herein is without prejudice to, or waiver of, (i) the rights of any defendant to contest certification of any other class proposed in these consolidated actions; or (ii) the rights and/or arguments asserted by any defendant in a motion to dismiss. The Court's findings in this Order shall have no effect on the Court's ruling on any motion to certify any class in these actions or on the Court's rulings concerning any defendant's motion to dismiss; and no party may cite or refer to the Court's approval of the Settlement Class as persuasive or binding authority with respect to any motion to certify any such class or any defendant's motion to dismiss.

**IT IS SO ORDERED.**

DATED: April 4, 2008

John Gleeson, U.S.D.J.

Conformed copies furnished to:
Counsel of Record

10

# EXHIBIT 3
# (To M. Hausfeld Declaration)

Plaintiff City of Oakland, California (hereafter "Oakland" or "Plaintiff"), individually and on behalf of a class of all those similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants, demands a trial by jury, and alleges the following on information and belief except as to the contents of paragraphs 1 and 16 which are based on personal knowledge:

## NATURE OF THE CASE

1.    The City of Oakland, California has issued hundreds of millions of dollars of tax-free bonds since 1992 and has purchased Guaranteed Investment Contracts ("GICs") to allow Oakland to have funds available while earning a higher rate of return than they would if Oakland simply invested the proceeds in a savings account.  For example, Oakland issued tax-free municipal bonds to, *inter alia*; rebuild the Oakland Coliseum, modernize its sewer system, and provide for general obligations.

2.    Oakland alleges a nationwide conspiracy among Defendants to rig bids, to allocate customers and markets, and to fix, raise, maintain, or stabilize the returns received by Oakland and the members of the Class for Municipal Derivatives (as defined below), including but not limited to GICs, sold in the United States.

3.    Oakland brings this action on behalf of itself and all entities that contracted for Municipal Derivatives in the United States and its territories directly from Municipal Derivatives Seller Defendants and Municipal Derivatives Broker Defendants, as defined in this Complaint during the period from January 1, 1992 through December 31, 2007.  As a result of Defendants' unlawful conduct, Oakland and the Class, as defined in this Complaint, have paid higher supracompetitive prices for these products, and therefore suffered injury to their business and property.

## JURISDICTION AND VENUE

4.    Oakland brings this action pursuant to Section 4 of the Clayton Act, 5 U.S.C. §§ 15, for treble damages, as well as reasonable attorneys' fees and costs of suit, for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Cartwright Act, California Business and Professions Code § 16720, et seq., and the California Unfair Competition Law, Business and Professions Code § 17200, et seq.

5.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337, and 1367 and by Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

6.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this district, and because a substantial part of the events giving rise to Oakland's claims occurred, and a substantial portion of the affected interstate trade and commerce described below was carried out in this district.

## INTRA-DISTRICT ASSIGNMENT

~~21.     BearStearns , Inc. ("Bear Stearns") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, Bear Stearns issued and sold Municipal Derivatives to members of the Class.~~

~~Co.. (") is a corporation its principal place of business in , .  During the Class Period, issued and sold Municipal Derivatives to members of the Class.~~

~~Piper Jaffray & Co. "Piper Jaffray") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to members of the Class.~~

~~UBS AG ("UBS") is a Swiss corporation with its in , Switzerland.  During the Class Period, UBS issued and sold Municipal Derivatives to members of the Class.~~

~~Wachovia Bank N.A. ("Wachovia") is a with its principal place of business in Charlotte, North Carolina.  During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the Class.~~

~~Funding ("Funding") is a Delaware its principal place of business in , .  During the Class Period, Funding issued and sold Municipal Derivatives to members of the Class.~~

~~XL Life Insurance & Annuity("XL Life Insurance") is a subsidiary of its principal place of business in Schaumburg, Illinois.  During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to members of the Class.~~

~     Morgan Stanley ("Morgan Stanley") is a Delaware corporation its principal place of business in New York, New York.  During the Class Period, Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

~     National Westminster Bank plc ("NatWest") is a public limited its principal place of business in London, England.   During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class.  NatWest is a subsidiary of Royal Bank of Scotland.

~     Investment Management Advisory Group, Inc. ("IMAGE") is a Pennsylvania corporation its principal place of business Pottstown, Pennsylvania.  During the Class Period, IMAGE acted as a broker for members of the Class in purchasing Municipal Derivatives from one or more of the .

~     CDR Financial Products ("CDR") is a corporation its principal place of business Beverly Hills, California.  During the Class Period, CDR acted as a broker for members of the Class in purchasing Municipal Derivatives from one or more of the .

~     Feld Winters Financial LLC ("Feld Winters") is a California limited liability with its principal place of business in Sherman Oaks, California.  During the Class Period, Feld Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from one or more of the .

~     Winters & Co. Advisors, LLC ("Winters") is a California limited liability company its principal place of business in Los Angeles, California.  During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives from one or more of the .

@Ä

- First Southwest Company ("First Southwest") is a corporation with its principal place of business in Dallas, Texas. During the Class Period, First Southwest members of the Class in the .

- George K. Baum & ("Baum") is a Missouri corporation with its principal place of business in Kansas City, Missouri. During the Class Period, Baum acted as a broker for members of the Class in purchasing Municipal Derivatives from one or more of the .

- Kinsell Newcomb & Inc. ("") is a California corporation with its principal place of business in , California. During the Class Period, members of the Class in the .

- PackerKiss Securities, Inc. ("PackerKiss") is a Florida corporationits principal place of business in Delray Beach, Florida. During the Class Period, PackerKiss acted as a broker for members of the Class in purchasing Municipal Derivatives from one or more of the .

- Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet Inc., is a corporation its principal place of business in Aurora, Colorado. During the Class Period, Shockley acted as a broker for members of the Class in purchasing Municipal Derivatives from one or more of the .

- Sound Capital ManagementInc. ("Sound Capital") is a Minnesota corporation its principal place of business Eden Prairie, Minnesota. During the Class Period, Sound Capital acted as a broker for members of the Class in purchasing Municipal Derivatives from one or more of the .

- Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of Regions Financial Corp., is a Tennessee corporation its principal place of business in Memphis,

@Ä

~~Tennessee. During the Class Period, Morgan Keegan acted as a broker for members of the Class~~

~~in purchasing Municipal Derivatives from one or more of the~~

~~-.    Whenever in this Complaint reference is made to any act, deed or transaction of~~

~~any corporation , the allegation means that the corporation engaged in the act, deed or transaction~~

~~by or through its officers, directors, agents, employees or representatives while they were~~

~~actively engaged in the management, direction, control or transaction of the business or affairs.~~

7.    Pursuant to Local Rules 3-5(b) and 3-2(c), this action should be assigned to the San Francisco/Oakland Division based on Oakland's location in the County of Alameda.

## DEFINITION

8.    Bid:  As used herein, the term "Bid" means the Rate of Return offered by prospective Municipal Derivatives Sellers during the Competitive Bidding Process for GICs or the competitive processes by which other Municipal Derivatives are purchased by Government Entities.

9.    Competitive Bidding Process:  As used herein, the term "Competitive Bidding Process" means the process mandated by Treasury Regulation §148.5, *et seq.*, and detailed below in Paragraphs 74 through 92, by which at least three Municipal Derivatives Sellers submit Bids to the Municipal Derivatives Broker retained by the Government Entity seeking to purchase a Guaranteed Investment Contract, as that term is defined herein.

10.    Government Entity:  As used herein, the term "Government Entity" means any state, local or municipal body or any subdivision thereof.  Excluded from the definition of Government Entity is any federal government body.

11.    Municipal Derivative: As used herein, the term "Municipal Derivative" means a variety of financial instruments that Government Entities use to invest the proceeds of bond offerings while waiting to use bond proceeds for their purposes or to hedge and shift the interest-rate risk associated with the issuance of tax-exempt debt. As used herein, the term Municipal Derivative encompasses all of the following types of transactions:

(a)    Guaranteed Investment Contract ("GIC"): "Guaranteed Investment Contract" or "GIC" is a security in which a Government Entity contracts with a Municipal Derivative Counterparty, typically an investment bank or bond insurer with an AAA or AA credit rating, to invest the proceeds of a municipal bond offering for a fixed amount of time in exchange for a series of payments at a guaranteed Rate of Return over the life of the contract. A GIC is a Municipal Derivative, and are sometimes characterized as "forward purchase," "forward delivery" or "repurchase" agreements (typically used for debt service funds), or as "unsecured" GICs (typically used for capital projects and subject to provisions allowing investment principal to be drawn down pursuant to a sot schedule). A GIC is similar to a bond, in that "principal" – the proceeds of a municipal bond issue – is invested in exchange for payment of a certain fixed Rate of Return determined by the terms of the contract.

(b)    Advance Refunding Escrow: An "advance refunding escrow" is an arrangement by which the proceeds of a refunding issue (a bond issued to refund an outstanding bond) are deposited into an escrow account for investment in an amount sufficient to pay the principal of, and interest on, the underlying issue to be refunded on the original interest payment and maturity dates.

(c)    Swap: A "swap" is a type of agreement frequently used to minimize the interest rate risk Government Entities face when issuing large amounts of tax-exempt debt

@Ä

obligations.  A swap involves two Counterparties – the Government Entity and a Municipal

Derivatives Setter – and is essentially the sale of an instrument and the simultaneous purchase of

another instrument for purposes of enhancing the Counterparties' respective holdings.

Government Entities use swaps to achieve desired tax results, or to alter or protect various

features of an existing municipal bond portfolio.  There are several types of swaps: (a) floating-

for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-

rate) swap, where the two are based on different indices (typically the LIBOR or BMA indices).

Government Entities, even those with sophisticated and experienced municipal finance

departments, retain a Municipal Derivatives Broker (including many of those named as

Defendants herein) as "swap advisors" to aid in the swap transaction.

      (d)    Option:  An "option" is one of two types of agreements used to shift a

Government Entity's tax-exempt securities holdings typically acquired its association with

issuance of municipal bonds.

          i.    A Put Option is a provision in a bond contract where the

investor has the right, on specified dates after required notification, to surrender the securities to

the issuer or the issuer's agent at the predetermined price (usually par value).

          ii.    . A Put Option is a provision in a bond contract where the

investor has the right, on specified dates after required notification, to surrender the securities to

the issuer or the issuer's agent at the predetermined price (usually par value). A Call Option is a

transaction where the issuer repays to the holder of an outstanding security the principal amount

thereof (plus, in certain cases, an additional amount representing a redemption premium) as a

result of the issuer exercising a right under the bond contract to repay the security prior to its

scheduled maturity date (often referred to as the "call").

      (e)    Swaption:  A "Swaption" is the combination of a Swap and an Option.

@Ä

(f)     Interest Rate Floors and Collars:  Interest rate "floors" and "collers" are agreements in which a Government Entity agrees with a Municipal Derivatives Seller (the Counterparty) to pay fixed rates of interest on an investment of variable-rate debt, either agreeing to pay the Counterparty an interest rate at or above a specified rate (a "floor") or no more or less than a particular interest rate within range of interest rates (a "collar").

12.     Municipal Derivatives Broker:  As used herein, the term "Derivatives Broker" means an entity retained by a Government Entity to oversee the processes, including the Competitive Bidding Process, pursuant to which Municipal Derivatives are purchased. Derivatives Brokers act as fiduciaries of a Government Entity seeking to purchase Municipal Derivatives, often acting as swap advisors in addition to overseeing the competitive bidding undertaken by the Government Entity for those Municipal Derivatives sold through ostensibly competitive means.  Derivatives Brokers enjoy mutually symbiotic and incestuous relationships with large investment banks and insurance companies, and act as "finders" of municipal securities business for the securities dealers or investment banks that often pay kickbacks to the Municipal Derivatives Brokers in the form of finders' fees and monthly retainers.

13.     Municipal Derivatives Counterparty:  As used herein, the term "Municipal Derivatives Counterparty" or "Counterparty" means a Municipal Derivatives Seller with whom a Government Entity contracts for a transaction involving the purchase of one or more of the Municipal Derivatives described herein.

14.     Municipal Derivatives Seller:  As used herein, the term "Derivatives Seller" means an entity offering to enter into a Municipal Derivative transaction with a Government Entity pursuant to the Competitive Bidding Process or other competitive process.

15.   Rate of Return: As used herein, the term "Rate of Return" means the fixed amount, typically expressed as a percentage of the underlying bond proceeds amount or as a specific interest rate, offered by a potential Municipal Derivatives Seller and ultimately received by a Government Entity after it enters into the GIC or similar Municipal Derivative transaction with a Municipal Derivatives Counterparty. The Rate of Return is an element of the Competitive Bidding Process where competition is intended to occur for the benefit of bond issues. It was a focus of Defendants' illegal bid-rigging and customer allocation scheme alleged herein.

## PARTIES

### Plaintiff

16.   Plaintiff, the City of Oakland, California, is a municipal corporation and a Government Entity. Oakland purchased Municipal Derivatives, including from one or more Derivatives Seller Defendants pursuant to a Competitive Bidding Process overseen by one or more of the Derivative Broker Defendants during the Class Period. Oakland purchased millions of dollars' worth of Municipal Derivatives from one or more of the Derivatives Seller Defendants and retained one or more of the Derivatives Broker Defendants to oversee, supervise and manage the processes, including the Competitive Bidding Process, undertaken to purchase the Municipal Derivatives. As a result of the unlawful conspiracy alleged herein, Oakland was injured in its business or property. Oakland has contracted for its GICs with a variety of brokers and underwriters, including Bank of America, FSA Management (a subsidiary of Financial Security Assurance Holdings, Ltd.) and 1XIS Corporate & Investment Banking, on which the

Department of Justice has served subpoenas as part of its investigation into Municipal Derivative bid-rigging.

## Municipal Derivatives Seller Defendants

17.    Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware corporation maintaining its principal place of business in Wilton, Connecticut.  It is a wholly owned subsidiary of AIG International Inc.  During the Class Period, AIG Financial issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

        (a)    AIG Financial is part of the Capital Markets arm of its parent company AIG, and raises funds for AIG in part through investment in Municipal Derivatives.

        (b)    In November, 2006, AIG Financial received a subpoena from the Antitrust Division of the United States Department of Justice in connection with its grand jury investigation into anticompetitive conduct in the Municipal Derivatives business.

18.    Defendant AIG SunAmerica Life Assurance Co., ("AIG SunAmerica") is an Arizona corporation maintaining its principal place of business in Los Angeles, California. During the Class Period, AIG SunAmerica issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

        (a)    In November, 2006, AIG SunAmerica received a subpoena from the Securities and Exchange Commission in connection with the SEC's investigation into anticompetitive practices in the Municipal Derivatives industry.

19.    Defendant Bank of America Corporation. ("BOA"} is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  During the time period covered by this complaint, Bank, of America was headquartered in San Francisco, California and conducted

@Ä

substantial business operations in this judicial district. During the Class Period, BOA issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States, either directly or through its wholly-owned subsidiary Defendant Bank of America, N.A. ("BANA").

20. Defendant Bank of America, N.A. ("BANA"), a wholly-owned subsidiary of Defendant BOA, is a Delaware corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, BANA issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

(a) In November, 2006, BOA received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

(b) In February, 2007, BOA entered into a Corporate Conditional Leniency agreement with the DOJ in connection with the antitrust investigation into anticompetitive conduct in the Municipal Derivatives business, indicating that BOA had engaged in potentially criminal anti-competitive conduct in relation to the Municipal Derivatives Industry. Such leniency agreements, which insulate the corporate applicant from criminal antitrust prosecution as long as it cooperates, are only entered into after the cooperating company has proactively offered the DOJ evidence of *per se* violations of the antitrust laws. Such leniency agreements only cover criminal antitrust violations, and do not insulate companies from criminal, civil or administrative actions in other areas.

(c) On February 4, 2008, Defendant BOA's subsidiary BANA received a so-called Wells notice from the SEC, advising the company that the SEC staff has recommended

@Ä

that the SEC bring a civil or administrative action against BANA in connection with its investigation of anticompetitive practices in the Municipal Derivatives industry.

(d)    BOA and BANA are also targets of investigation by the Internal Revenue Service ("IRS") in connection with anticompetitive practices in the Municipal Derivatives industry.  In February, 2007, concurrently with its entrance into the DOJ's Corporate Leniency agreement covering criminal antitrust violations, BOA entered into an agreement with the IRS related to BOA's role in providing GICs and other agreements in connection with certain "blind pool" municipal bond transactions.

(e)    BOA has also been implicated in a bid-rigging and kickback scheme involving a large GIC that BOA sold to the City of Atlanta in 2002 that also involved Derivative Broker Defendants CDR and Feld Winters as well as Derivative Seller Defendants UBS and Piper Jaffray.

21.    Defendant Bear Stearns Companies, Inc. ("Bear Stearns") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, Bear Stearns issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

(a)    The SEC has previously investigated Bear Stearns' municipal bond department and its municipal bond underwriting practices.

(b)    Stephen Salvador;, currently the Senior Managing Director and Manager of Municipal Capital Markets Derivatives and Investments at Bear Stearns, has disclosed that he is a target of the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the kind

received by Salvadore are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal.

(c)    In addition, at least one former Bear Stearns employee is a target of both the SEC and the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business.

(d)    Patrick Marsh, who worked at Bear Stearns from 2000 to 2005 and whose last position at the company was Managing Director and Chief of Municipal Structuring, has disclosed that he was the recipient of a Wells notice from the SEC recommending civil or administrative action against him in connection with securities violations related to bidding procedures in the Municipal Derivatives industry during his tenure at Bear Stearns.  Marsh also disclosed that he is a target of the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the kind received by Marsh are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal.  Marsh was also subpoenaed by the SEC in connection with its investigation into wrongdoing associated with municipal bond derivatives transactions in Jefferson County, Alabama.

22.    Defendant Financial Guaranty Insurance Co. ("FGIC") is a Delaware corporation maintaining its principal place of business in New York, New York.  During the Class Period,

@Ä

FGIC, a former affiliate of General Electric, issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

(a)    FGIC has received a subpoena from the Securities and Exchange Commission in connection with the SEC's investigation into anticompetitive practices in the Municipal Derivatives industry.

23.    Defendant Financial Security Assurance Holdings, Ltd. ("FSA Holdings") is a New York corporation maintaining its principal place of business in New York, New York. During the Class Period, FSA Holdings issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States, either directly or through its wholly-owned subsidiary FSA Capital Management Services, LLC, ("FSA. Capital"), a Delaware limited liability company headquartered in New York City.

(a)    In November, 2006, FSA Holdings received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

(b)    On February 4, 2008, FSA Holdings received a so-called Wells notice from the Philadelphia regional office of the SEC, informing the company that the SEC staff had recommended civil or administrative action against FSA Holdings in connection with its investigation into anticompetitive practices in the Municipal Derivatives industry. The Wells notice issued to FSA Holdings related to alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

24.    Defendant First Southwest Company ("First Southwest") is a Delaware corporation with its principal place of business in Dallas, Texas. During the Class Period, First

@Ä

Southwest issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

      (a)    First Southwest has received a subpoena from the Securities and Exchange Commission in connection with the SEC's investigation into anticompetitive practices in the Municipal Derivatives industry.

    25.    Defendant Genworth Financial, Inc. ("Genworth") is a New York corporation maintaining its principal place of business at Fairfield, Connecticut.  Genworth issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

      (a)    Genworth has received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

    26.    Defendant GE Funding Capital Market Services, Inc. ("GE Funding") is a Delaware corporation maintaining its principal place of business in New York, New York.  GE Funding is a member of the GE Funding Capital Market Services Group (GE Funding CMS). During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the Class.

    27.    Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware corporation maintaining its principal place of business in New York, New York.  During the Class period, JPMorgan issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

      (a)    In November, 2006, JPMorgan received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange

@Ä

Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

(b)     At least three former JPMorgan employees are targets of the Justice Department's grand jury investigation into anticompetitive practices in the Municipal Derivatives industry.

(c)     Samuel Gruer, who worked at JPMorgan from 1994 through 2006 and whose last position was Vice-President in the Derivatives Marketing unit of the company's Tax-Exempt Capital Markets Group, has recently disclosed that he is a target of the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the kind received by Gruer are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal.

(d)     Shlomi Raz, who worked at JPMorgan from 1992 to 2003, has also recently disclosed that he is a target of the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the kind received by Raz are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal.

(e)     James Hertz, who worked at JPMorgan from 1994 until he was fired from the firm in January, 2008, has also recently disclosed that JPMorgan informed him that he was under investigation by the DOJ for what Hertz described as "conduct on the municipal

@Ä

derivatives marketing desk," an indication that the investigation involves JPMorgan's entire Municipal derivatives business, which necessarily includes Municipal Derivatives. Target letters of the kind received by Hertz are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal.

28.    Defendant JPMorgan Chase Bank, N.A. ("JPMorgan N.A.") is a national banking association with headquarters in Ohio, and is a subsidiary of JP Morgan Chase. During the Class Period, JPMorgan N.A. issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

29.    Defendant Kinsell Newcomb & DeDios Inc. ("KND") is a California corporation with its principal place of business in Solano Beach, California. During the Class Period, KND issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

(a)    KND has received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

30.    Defendant Lehman Brothers Inc. ("Lehman Brothers") is a Delaware corporation maintaining its principal place of business in New York, New York. During the Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class. Lehman is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

@Ä

31.    Defendant Merrill Lynch & Co. Inc. (Merrill Lynch") is a Delaware corporation maintaining its principal place of business in New York, New York.  During the Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

32.    Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation maintaining its principal place of business in New York, New York.  During the Class Period, Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

33.    Defendant National Westminster Bank plc ("NatWest") is a public limited corporation maintaining its principal place of business in London, England.  During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class.  NatWest is a subsidiary of Royal Bank of Scotland.

34.    Defendant Natixis, S.A. ("Natixis"), formerly known as IXIS Corporate & Investment Bank and CDC Funding Corp., is a foreign corporation maintaining its principal place of business in Paris, France.  During the Class Period; Natixis issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

(a)    In November, 2006, Natixis' predecessor IXIS Corporate & Investment Bank received a subpoena from the Antitrust Division of the United States Department of Justice in connection with its grand jury Investigation into anticompetitive conduct in the Municipal Derivatives business.

35.    Defendant Piper Jaffray & Co. {"Piper Jaffray") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Piper Jaffray issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

@Ä

(a)     Piper Jaffray has received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

(b)     James Towne, employed as Managing Director of Piper Jaffray's municipal derivatives group until January, 2008, recently disclosed that Piper Jaffray informed him that he is under investigation by the Antitrust Division of the Department of Justice for potential antitrust and other violations relating to the Municipal Derivatives industry.

36.     Defendant Security Capital Assurance, Inc. ("Security Capital") is a foreign corporation maintaining its principal place of business in Hamilton, Bermuda.  During the Class Period, Security Capital, either directly or through its affiliates Defendants XL Capital, Ltd. and XL Asset Funding Company 1 LLC, issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

37.     Defendant Société Générale ("SocGen") is a French corporation headquartered in Paris.  During the Class Period, SocGen issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States, either directly or through its wholly-owned subsidiaries Société Générale Americas, Inc., a Delaware corporation headquartered in New York, New York and/or SG Americas Securities, LLC, a Delaware limited liability corporation also headquartered in New York, New York.

(a)     SocGen has received a subpoena from the Securities and Exchange Commission in connection with the SEC's investigation into anticompetitive practices in the Municipal Derivatives industry.

@Ä

(b)    SocGen's Municipal Derivatives business is being scrutinized by the IRS, which is investigating improper kickbacks to Defendant CDR related to a GIC brokered by CDR.

38.    Defendant Trinity Funding Company, LLC ("GE Trinity") is a New York limited liability corporation maintaining its principal place of business in New York, New York.  GE Trinity is a member of the GE Funding Capital Market Services Group (GE Funding CMS).  During the Class Period, GE Trinity issued and sold Municipal Derivatives to members of the Class.

39.    Defendant UBS AG ("UBS") is a Swiss corporation with its headquarters in Basel, Switzerland.  During the Class Period, UBS issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States, either directly or through its wholly-owned subsidiary, Defendant UBS Securities, LLC ("UBS Securities").

(a)    In November, 2006, UBS received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

(b)    On February 4, 2008, UBS received a so-called Wells notice from the Philadelphia regional office of the SEC advising the company that the SEC staff had recommended that the SEC bring a civil action against UBS in connection with the anticompetitive practices associated with municipal bond derivatives.

~    ~""  Mark Scott, director of the taxexempt bond office, stated "a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided."

(c)     Peter Ghavami, until December 2007 the Managing Director and Co-Manager of Municipal Derivatives at UBS Securities in New York and London, recently disclosed that he is a target of the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the kind received by Ghavami are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal.

40.     Defendant UBS Securities LLC, formerly known as UBS Warburg LLC, is a Delaware corporation with its principal place of business in New York, New York.  It is a subsidiary of UBS AG.  During the Class Period, UBS Securities issued and sold Municipal Derivatives to members of the Class.

41.     Defendant UBS Financial Services Inc. ("UBS Financial"), formerly known as PaineWebber Inc., is a Delaware corporation with its principal place of business in New York, New York.  It is a subsidiary of UBS AG.  In 2000, UBS Financial was purchased by Defendant UBS AG.  During the Class Period, UBS Financial issued and sold Municipal Derivatives to members of the Class.

42.     Defendant Wachovia Bank, N.A. ("Wachovia N.A.") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina.  During the Class Period, Wachovia N.A. issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

43.     Defendant Wachovia Corporation ("Wachovia") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina.  During the Class Period, Wachovia issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States either directly or through its wholly-owned subsidiary Defendant Wachovia Bank, N.A. ("Wachovia N.A.").

@Ä

(a)    In November, 2006, Wachovia received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

(b)    Both the DOJ and the SEC have advised Wachovia that they believe Wachovia N.A. employees engaged in improper conduct in relation to competitively-bid municipal derivatives transactions.

(c)    Two Wachovia N.A. employees working in the company's Derivatives Marketing Department, Martin MoConnell (the Managing Director of Marketing) and Paul Jay Saunders (the Director of Marketing), recently disclosed that they are targets of the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the kind received by McConnell and Saunders are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal. Wachovia recently placed both Saunders – who worked for Defendant Bank of America from 1998 through 2003 – and McConnell on administrative leave following their disclosure that they were targets of the government's grand jury investigation.

44.    Defendant XL Asset Funding 1, LLC ("XLAF") is a Delaware limited liability corporation maintaining its principal place of business in Schaumberg, Illinois. During the Class Period, XLAF issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

(a)    XLAF received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

45.    Defendant XL Life Insurance & Annuity Company ("XL Life Insurance") is a subsidiary of XLAF maintaining its principal place of business in Schaumburg, Illinois. During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to Oakland and/or members of the Class.

46.    Defendant XL Capital, Ltd. ("XL Capital") is a foreign corporation maintaining its principal place of business in Hamilton, Bermuda. During the Class Period, XL Capital, either directly or through its affiliates Defendants Security Capital and XL Asset Funding 1, LLC issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

~~Bank of America the amnesty grant was result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation.~~

**Derivatives Broker Defendants**

47.    Defendant Cain Brothers & Company, LLC ("Cain") is a Delaware limited liability corporation with its principal place of business in New York, New York. During the Class Period, Cain acted as a broker for Oakland and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

(a)    Cain was subpoenaed by the SEC in connection with its investigation of anticompetitive practices in the Municipal Derivatives industry.

48.    Defendant CDR Financial Products, Ina. ("CDR") is a Delaware corporation maintaining its principal place of business at Beverly Hills, California.  During the Class Period, CDR acted as a broker for Oakland and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

(a)    CDR's California offices were raided by the FBI in November, 2006, at the start of the government's investigation into anticompetitive conduct in the Municipal Derivatives market.

(b)    CDR has been the subject of a series of long-standing federal governmental investigations involving its dealings with other participants in the municipal derivatives market, including Defendant Bank of America.

49.    Defendant Feld Winters Financial, LLC ("Feld Winters"), is a California limited liability corporation with its principal place of business in Sherman Oaks, California.  During the Class Period, Feld Winters acted as a broker for Oakland and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

(a)    Feld Winters was subpoenaed by the Justice Department in connection with its investigation of anticompetitive conduct in the Municipal Derivatives business.

50.    Defendant George K. Baum & Company ("Baum') is a Missouri corporation with its principal place of business in Kansas City, Missouri.  During the Class Period, Baum acted as a broker for Oakland and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

@Ä

(a)     Baum was subpoenaed by the SEC in connection with its investigation of anticompetitive practices in the Municipal Derivatives industry.

(b)     Baum has been the target of previous governmental investigations related to its Municipal Derivatives business.

(c)     On November 10, 2006, Baum settled allegations with the IRS that it diverted profits from municipal bond deals.  In one instance the IRS alleged that bidding was rigged in the selection of a GIC provider for a $150 million loan pool underwritten by Baum in 1999 and issued by the Illinois Development Finance Authority.

51.     Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a Pennsylvania corporation maintaining its principal place of business at Pottstown, Pennsylvania. During the Class Period, IMAGE acted as a broker for Oakland and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

(a)     IMAGE's Pennsylvania offices were raided by the FBI in November, 2006, at the start of the government's investigation into anticompetitive conduct in the Municipal Derivatives market.

52.     Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of Regions Financial Corp., is a Tennessee corporation maintaining its principal place of business in Memphis, Tennessee.  During the Class Period, Morgan Keegan acted as a broker for Plaintiff and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants:

(a)    Morgan Keegan has received a subpoena from the Securities and Exchange Commission in connection with the SEC's investigation into anticompetitive practices in the Municipal Derivatives industry.

53.    Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida corporation maintaining its principal place of business in Delray Beach, Florida. During the Class Period, PackerKiss acted as a broker for Plaintiff and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

54.    Defendant Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet Inc., is a corporation maintaining its principal place of business in Aurora, Colorado. During the Class Period, Shockley acted as a broker for Plaintiff and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

55.    Defendant Sound Capital Management Inc. ("Sound Capital") is a Minnesota corporation maintaining its principal place of business at Eden Prairie, Minnesota. During the Class, Period, Sound Capital acted as a broker for Oakland and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

(a)    Sound Capital's Minnesota offices were raided by the FBI in November, 2006, at the start of the government's investigation into anticompetitive conduct in the Municipal Derivatives market.

56.    Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company maintaining its principal place of business in Los Angeles, California. During the Class Period, Winters acted as a broker for Plaintiff and/or members of the Class in

purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

Defendants.

## CO-CONSPIRATORS

57.    Various other persons, firms and corporations, not named as Defendants herein,

have participated as co-conspirators with Defendants and have performed acts and made

statements in furtherance of the conspiracy.

58.    Whenever in this Complaint reference is made to any act, deed or transaction of

any corporation, the allegation means that the corporation engaged in the act, deed or transaction

by or through its officers, directors, agents, employees or representatives while they were

actively engaged in the management, direction, control or transaction of the corporation's

business or affairs.

## CLASS ACTION ALLEGATIONS

59.    Oakland brings this action on behalf of itself and as a class action under the

provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of

all members of the following Class:

> All state, local or municipal Government Entities and private entities in
> the United States and its territories that purchased Municipal
> derivatives directly from one or more of the Municipal Derivatives
> Seller Defendants and/or through one or more of the Derivatives
> Broker Defendants at any time from January 1, 1992 through December
> 31, 2007.  Excluded from the Class are all federal governmental entities
> and instrumentalities of the federal government.

60.    Oakland does not know the exact number of Class members because such

information is in the exclusive control of Defendants.  But due to the nature of the trade and

commerce involved, Oakland believes that there are hundreds or thousands of Class members as described above, the exact number and their identities being known by Defendants.

61. The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

62. There are questions of law and fact common to the Class, including:

(a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the effective prices of Municipal Derivatives sold in the United States;

(b) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to rig bids for Municipal Derivatives sold in the United States;

(c) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers and the markets for Municipal Derivatives sold in the United States;

(d) The identity of the participants of the alleged conspiracy;

(e) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(f) Whether the alleged conspiracy violated Section I of the Sherman Act, 15 U.S.C. § 1;

(g) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, violated the California Cartwright Act, Cal. Bus. & Prof. Code § 16720, et seq.;

(h) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, violated the California Unfair Competition Law, Cal. Bus. & Prof Code § 17200, et seq.;

(i)    Whether the conduct of <u>Defendants</u> and <u>their</u> co-conspirators, as alleged in this Complaint, caused injury to the business or property of the <u>Oakland</u> and the other members of the Class;

(j)    The effect of the alleged conspiracy on the <u>effective</u> prices of Municipal Derivatives sold in the United States during the Class Period;

(k)    Whether <u>the Defendants</u> and <u>their</u> co-conspirators fraudulently concealed the conspiracy's existence from the <u>Oakland</u> and the other members of the Class; and

(l)    The appropriate class-wide measure of damages.

63.    <u>Oakland is a member</u> of the Class, <u>Oakland's</u> claims are typical of the claims of the Class members, and <u>Oakland</u> will fairly and adequately protect the interests of the Class. <u>Oakland is a direct purchaser</u> of Municipal Derivatives, and <u>its</u> interests are coincident with, and not antagonistic to, those of the other members of the Class.

64.    <u>Oakland is</u> represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

65.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for <u>Defendants</u>.

66.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

67.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should <u>exist. Prosecution as</u> a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of

@Ä

effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

68.    The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

69.    During the Class Period, Defendants and their co-conspirators issued and sold substantial quantities of Municipal Derivatives, in a continuous and uninterrupted flow of interstate commerce, to Government Entities located in states other than the states in which the Municipal Derivatives Seller Defendants issued and/or brokered these products.

70.    The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## FACTS

### The Market for Municipal Derivatives

71.    Municipalities and state and local government agencies issue over $2 trillion worth of municipal bonds annually.

72.    While the tax-free bonds are sold in contemplation of construction, public housing or other public-works projects, municipalities have in the last decade opted to invest the proceeds of the bond sales before these projects are even started, or to hedge the interest-rate risk associated with the issuance of large amounts of tax-exempt debt.

73.    Municipal Derivatives have became an attractive investment vehicle for municipalities looking to park bond proceeds until the money raised from the sale is actually needed for capital projects, or to protect themselves from interest-rate risk associated with issuing their tax-exempt bonds.  There are roughly $40 - $60 billion in Municipal Derivatives created in the United States annually.

@Ä

74.    The market for Municipal Derivatives has become more concentrated since the late 1990's, with an increasingly smaller number of investment banks and bond insurers occupying the market.

75.    The Municipal Derivatives industry has been variously described by market participants as opaque, intertwined and interconnected, all characteristics which facilitate the type of illegal collusion alleged herein.  The Municipal Derivatives market lacks transparency, and regulatory and private efforts to impose transparency have not been successful.  On July 26, 2007, the Chairman of the Securities and Exchange Commission delivered a white paper to Congress calling for improved oversight of the municipal securities market.

### The Competitive Bidding Process

76.    A wide variety of Municipal Derivatives are sold through competitive bidding undertaken by Government Entities and overseen by the Municipal Derivatives Brokers acting as their fiduciaries.

77.    The Competitive Bidding Process involving GICS is illustrative of the way many Government Entities purchase Municipal Derivatives, and indicative of the methods by which the Defendants have succeeded in manipulating these financial instruments pursuant to their bid-rigging and customer allocation conspiracy.

78.    Flush with proceeds from a muni bond sale, a Government Entity looks to invest in a GIC.  The Government Entity will retain a GIC Broker to facilitate the acquisition of the contract.  The Government Entities typically pay a fee to the GIC Broker for shopping for GIC Bids.

79.    In the wake of the so-called "yield-burning" scandal of the 1980's and 1990's – in which municipal bond issuers were sold overpriced investment vehicles or charged fees that

@Ä

acted to artificially reduce the yields on their underlying bond issues – the IRS promulgated regulations meant to ensure that Government Entities were purchasing Municipal Derivatives at a fair market value price.

80.    IRS tax-exempt bond regulations (here, "Treasury Regulations") stipulate that if Government Entities invest the proceeds of bond sales, the yield of the investment cannot exceed the yield of the municipal bond itself.  Any interest exceeding the bond rate of the tax-exempt bond investments is required to be rebated to the IRS, absent an exception.

81.    To satisfy these so-called arbitrage rules, any given GIC is structured to limit the rate of interest that a municipality can earn on the GIC to less than the yield of the bond whose issuance financed the investment in the GIC in the first place.  The Rate of Return any particular Municipal Derivatives Seller can offer a Government Entity is therefore effectively capped.

82.    Treasury Regulations related to Municipal Derivatives are aimed at ensuring that Government Entities get competitive bids on the interest rate a Municipal Derivatives Seller pays the municipalities under the terms of the GIC.  According to Treasury Regulations, a GIC is sold at "fair market value" if the bidding process satisfies certain procedures.  Essentially, there should be at least three reasonably competitive bids solicited from Municipal Derivatives Sellers, and all of these bidders must have an equal opportunity to bid – that is, no bidder can have a "last look" to review other bids before bidding on the contract.  Treasury Regulations state that a "reasonably competitive" Municipal Derivatives Seller is an entity with "an established industry reputation" as a competitive Municipal Derivatives Seller.  The IRS may levy penalties under Section 6700 of the tax code when it determines bid-rigging has occurred.

83.    The Municipal Derivatives Broker, acting as the fiduciary to the Government Entity, oversees the solicitation and placement of the bids from Municipal Derivatives Sellers.

84.    After hiring a Municipal Derivatives Broker to oversee the solicitation of GIC Bids, Government Entities buy a GIC from a Municipal Derivatives Seller pursuant to the Competitive Bidding Process.

85.    The parties to a GIC are the Municipal Derivatives Seller, acting as the Counterparty and the Government Entity.  The Municipal Derivatives Seller now acting as the Counterparty supplies the most salient term, namely the Rate of Return on the investment.

86.    The GIC entitles the Government Entity to receive the return of the Government Entity's initial principal plus guaranteed interest at a specified Rate of Return, and to withdraw principal from the GIC as permitted.

87.    Generally, a Government Entity will acquire a GIC in order to invest funds on deposit in a debt service reserve fund or construction fund until it needs to use such funds to service debt or fund the payment of project expenses in accordance with the underlying bond documents.

88.    In exchange for the payment of a guaranteed Rate of Return to the Government Entity, and the full repayment of all principal on a date certain, the Municipal Derivatives Counterparty is allowed to invest the principal furnished by the Government Entity.  The Municipal Derivatives Counterparty's profits are made on the spread between the Rate of Return the Municipal Derivatives Counterparty offers to the Government Entity and the returns the GIC's invested principal makes for the Municipal Derivatives Counterparty pursuant to whatever investment the Municipal Derivatives Counterparty chooses.

89.    The Competitive Bidding Process outlined in the Treasury Regulations mandates that any Government Entity seeking to buy a GIC receive at least three bona fide Bids from Municipal Derivatives Sellers.  Each bidder typically faxes its Bid into the Municipal Derivatives

@Ä

Broker, which collects the ostensibly competitive Bids and informs the Government Entity of the range of Bids, the identity of the Municipal Derivatives Sellers submitting them, and the time each Bid was received.

90.    Each GIC Bid includes a statement that the Bid was determined without regard to any other formal or informal agreement with another Municipal Derivatives Seller, and that the Bid was not submitted solely as a so-called "courtesy" Bid.

91.    The Municipal Derivatives Seller that offers the highest-yielding Rate of Return is selected as the Counterparty, often within hours of the close of the Competitive Bidding Process.

92.    The vast majority of GICS purchased in the United States are purchased pursuant to the competitive bidding process established by Treasury Regulation §1.148-5 et seq., which has been in effect since approximately 1993, and which are only some of the Treasury Regulations governing the reinvestment of municipal bond proceeds.

93.    The entire GIC bidding and purchasing process, as well as those processes relating to the purchase of other types of Municipal Derivatives, is susceptible to abuse even when dealings involve sophisticated and experienced Government Entities.

94.    Even sophisticated Government Entities (who rely in large part on the Municipal Derivatives Broker Defendants acting as their fiduciaries) may not know that they are the target of the bid-rigging and customer allocation conspiracy alleged herein.

**The Bid-Bidding Conspiracy**

95.    The potential for bid-rigging in any given GIC transaction exists in the exploitation of the Rate of Return that a particular OTC Seller is willing to offer to a Government Entity looking to invest its bond proceeds. The Municipal Derivatives Seller Defendants, aided by the Municipal Derivatives Broker Defendants, have turned the Treasury

Regulations into a travesty by exploiting Government Entities' need for reinvestment of bond proceeds.

96.     The Municipal Derivatives Seller Defendants, in concert with the Municipal Derivative Brokers, similarly exploited the elements of other types of Municipal Derivatives bought by Government Entities as part of their bid-rigging and customer allocation conspiracy.

97.     Bid-rigging of GIC transactions, which are illustrative of anticompetitive conduct in the overall market for Municipal Derivatives, typically occurs when only one firm submits a reasonable, financially viable Bid, and the other two or more bidders submit Bids offering unjustifiably low Rates of Return, or simply refuse (or "pass") on the opportunity to bid.

98.     Other times, bids- are late or incomplete, leaving only one viable bid for the Government Entity to choose from.

99.     Although at least one market participant has recently attempted to add transparency to the market by developing a web-based bid auction service, GIC Bids are traditionally done over the phone or sent to Municipal Derivatives Brokers via fax, facilitating collusion of the type alleged herein.

100.    At least one investment bank has provided the government with transcripts of telephone conversations that indicated that the investment bank and other market participants were involved in anticompetitive conduct on Municipal Derivatives sold to Government Entities.

101.    While the winning bid may be financially viable in light of the Treasury Regulations' restrictions on bond issue reinvestment, it is not necessarily at fair market value, and does not necessarily provide the Government Entity with the best possible Rate of Return on the investment it is seeking by buying the GIC.

102.    The unrealistically low bids – dubbed "courtesy bids" because they are provided solely as a courtesy so that another Municipal Derivatives Seller can win on a bid that is below fair market value – are often more than 100 basis points below the winning bid.  As Mark Scott, director of the IRS tax exempt bond office, stated in *The Bond Buyer* on January 6, 2005, "When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided."

103.    Often the winning bid is the only one high enough to make the GIC work and be a worthwhile reinvestment vehicle for the Government Entity.

104.    According to a speaker at a recent teleconference organized by the National Association of Bond Lawyers and reported in *The Bond Buyer* on February 8, 2007, the use of courtesy bids in GICs transactions is quite prevalent.  IRS officials have stated that bid-rigging is a wide and pervasive practice in GIC transactions and have uncovered numerous transactions involving rigged bids and customer allocation.  A number of these transactions involve both the Municipal Derivatives Seller Defendants and the Municipal Derivatives Broker Defendants.

105.    Municipal Derivatives Brokers also routinely offer favored Municipal Derivatives Sellers with an illegal "last look" at their competitors' submitted bids, or even exclude potential bidders without the Government Entity's knowledge.

106.    Evidence seized by the federal government as part of its wide-ranging investigation, including taped telephone conversations, revealed instances in which the winning bidder was given a "last look" at other bids, or bidders were asked to bid low in exchange for preferential treatment in later deals.

107.    As part of its ongoing investigation into these practices, the IRS also uncovered several bidding schemes that allowed the Municipal Derivatives Seller to underpay for the GIC –

that is, provide a less than fair market value interest rate – and then overpay the Municipal

Derivatives Broker for other investment agreements or remarketing fees associated with the GIC,

a form of kickback that may jeopardize the tax-exempt status of the underlying bond or result in

excess "arbitrage" paid to the federal government.

### Governmental Investigations of Defendants' Conspiracies

~~The combination and conspiracy alleged herein has had the following effects, among others:~~

a ~~Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated in the United States;~~

~~by and the members of the Class Municipal Derivatives were fixed, stabilized and maintained at non-competitive levels the United States;~~

d ~~and the other members of the Class received Municipal Derivatives than they would have in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities;~~

e ~~the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and~~

108. On Wednesday, November 15, 2006, the FBI began a series of nationwide raids

on numerous Municipal Derivatives Brokers, including the Municipal Derivatives Broker

Defendants.  The FBI raids coincided with the service of nearly two dozen subpoenas on other participants in the Municipal Derivatives business, including the Municipal Derivatives Sellers named as Defendants herein.

109.    The DOJ's Antitrust Division served subpoenas from a grand jury sitting in the Southern District of New York, and a number of the targeted companies revealed that they had also received subpoenas from the Securities and Exchange Commission in connection with a parallel civil probe.

110.    The Antitrust Division is conducting a criminal probe into anticompetitive conduct, including bid-rigging and customer allocation, and the DOJ is contemplating charging market participants with continuing acts of conspiracy, and (as detailed above) have targeted a number of individuals for indictment.

111.    The SEC probe, entitled *In the Matter of Certain GIC Brokers*, is focused on securities fraud in municipal bond deals undertaken since 2000.  Upon information and belief, the SEC is investigating Municipal Derivatives Sellers' non-disclosure of an extensive scheme involving kickbacks to Municipal Derivatives Brokers, a scheme that acted as a necessary corollary to the conspiracy alleged herein.  Such a non-disclosure of kickbacks to Municipal Derivatives Brokers jeopardizes the tax-exempt status of Government Entities' bonds, or may subject them to potentially excessive arbitrage payments to the federal government.

112.    The DOJ and SEC investigations follow a lengthy and continuing probe by the IRS' Criminal Investigation Division and its Tax-Exempt Bond office.

113.    The Justice Department subpoenas asked for documents, e-mails, tapes or notes of phone conversations and other information regarding "contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy loads [as

well as] related transactions involving the management or transferal of the interest rate risk associated with those bonds, including but not limited to [GICs], forward supply, purchase or delivery agreements; repurchase agreements; swaps; options; and swaptions."

114.    The subpoenas also demanded organizational charts, phone directories, and lists of all employees involved with Municipal Derivatives, in addition to all documents associated with what the subpoenas apparently described as "relevant municipal contracts awarded or intended to be awarded pursuant to competitive bidding," which would include invitations to bid; solicitations, notices or RFPs issued to any provider by municipal clients; actual or proposed responses to those RFPs; and amounts and prices bid for the various investment vehicles.

115.    On February 9, 2007, Defendant Bank of America announced that it entered into a leniency agreement with the Justice Department in connection with what it described as "the Department's investigation into anticompetitive practices in the municipal derivatives industry."

116.    Defendant Bank of America noted that the amnesty grant "was the result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation."

117.    Entry into the DOJ's amnesty program follows presentation of evidence of a *per se* antitrust violation on behalf of the applicant, in this instance Defendant Bank of America. Evidence of Defendant Bank of America's dealings, including recorded telephone conversations of traders giving courtesy bids, was one of the key derivatives of the criminal investigation. Key derivatives officials at the bank were placed on "administrative leave," including Dean Pinard, the head of BOA's derivatives department.

118.    Defendant Bank of America also disclosed that it had reached a $14.7 million settlement with the IRS relating to the company's role in providing GICs and other agreements to municipal bond issuers.

119.    As detailed in Paragraphs 16 to 53 above, a number of individuals have been targeted for indictment by the Department of Justice, and a number of Municipal Derivatives Seller Defendants are facing civil and administrative actions from the SBC in relation to that agency's investigation into anticompetitive practices in the Municipal Derivatives market.

**FRAUDULENT CONCEALMENT**

120.    Oakland and members of the Class had no knowledge of the agreement, contract, combination, and conspiracy alleged in this Complaint, or of any facts that might have led to the discovery thereof, until shortly before the filing of this action.  Oakland could not have discovered the agreement, contract, combination, and conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and methods of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their agreement, contract, combination, and conspiracy.  These methods of secrecy included, but were not limited to, secret meetings, misrepresentations concerning the reasons for price increases, encouraging witnesses to give false testimony to the grand jury and government officials, and destroying or concealing evidence of their illegal conduct.

121.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

122.    By their very nature, Defendants' bid-rigging and customer-allocation conspiracy was inherently self-concealing.  The Municipal Derivatives industry is not exempt from antitrust

regulation, and thus Oakland reasonably considered it to be a well-regulated competitive industry.

123.    In the context of the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' bidding and pricing were conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' proffered Municipal Derivatives prices.

124.    Oakland and members of the Class could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.  Such practices are especially prevalent in bid-rigging and customer allocation conspiracies such as the one alleged herein.

125.    Because the alleged conspiracy was both self concealing and affirmatively concealed by Defendants and their co-conspirators, Oakland and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

126.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Oakland and members of the Class have alleged in this Complaint.

127.    Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

128.    Oakland and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until before this litigation was commenced because Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal their violations.  Nor could Oakland or the Class members have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

129.    Defendants and their co-conspirators engaged in a successful anticompetitive conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

(a)    By meeting secretly to discuss effective prices, bids, and customers and markets of Municipal Derivatives in the U.S.;

(b)    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

(c)    By intentionally creating the false appearance of competition by staging sham auctions in which the results were pre-determined; and

(d)    By furnishing each other participant in all given bidding sessions with illegal "last looks" at their ostensible competitors' bids.

@Ä

130. Oakland and Class members did not know, and could not have discovered through reasonable diligence, that the auctions arranged by the Derivatives Broker Defendants were sham, and that rather than being competitive, the results of the auctions were rigged.

131. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Oakland's and the Class' claims have been tolled.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
**(Violation of Section 1 of the Sherman Act)**

132. From as early as January 1, 1992 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Municipal Derivatives in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133. The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially

supracompetitive prices for Municipal Derivatives and to rig bids and to allocate customers and markets for Municipal Derivatives in the United States.

134.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)    participating in meetings and conversations among themselves during which they agreed to price Municipal Derivatives at certain levels, and otherwise to fix, increase, maintain or stabilize effective prices paid by Oakland and members of the Class with respect to Municipal Derivatives sold in the United States and to rig bids and allocate customers and markets of Municipal Derivatives;

(b)    arranging sham auctions among the Municipal Derivatives Seller Defendants that were designed to create the appearance of competition for the sale of Municipal Derivatives, but in which the result had been agreed upon among the Defendants and co-conspirators;

(c)    allocating customers and markets for Municipal Derivatives in the United States in furtherance of their agreements;

(d)    rigging bids for Municipal Derivatives sold in the United States; and

(e)    participating in meetings and conversations among themselves to implement, adhere and police the agreements they reached.

135.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease or stabilize prices and to allocate customers and markets with respect to Municipal Derivatives.

136.    The Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

(a)   Effective prices paid by Oakland and the members of the Class with respect to Municipal Derivatives were fixed, stabilized and maintained at artificially low and non-competitive levels in the United States;

(b)   Bids for Municipal Derivatives sold in the United States were rigged;

(c)   Customers and markets for Municipal Derivatives were allocated among Defendants and their co-conspirators;

(d)   Oakland and the other members of the Class paid more or received lower Rates of Return for the Municipal Derivatives they purchased than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

(e)   Price competition with respect to the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and

(f)   As a direct and proximate result of the illegal combination, contract or conspiracy, Oakland and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined, by being deprived of the highest-allowable interest rate on its Municipal Derivatives investment.  The courtesy (sometimes also called complimentary) bids submitted by the Municipal Derivatives Sellers defrauded the Government Entities by creating the appearance of competition to conceal the secretly deflated interest rate offers.

## SECOND CLAIM FOR RELIEF
### (Violation of the California Cartwright Act, Cal. Bus. & Prof. Code Section 16720, et seq.)

137.    Oakland, on behalf of itself and all others similarly situated, realleges and incorporates, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants as follows.

138.    The unlawful conduct of Defendants, including the Defendants headquartered or based in California, was centered in and carried out within California, and Defendants' conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

139.    Beginning at least as early as January 1, 1992 through the present, the exact dates being unknown to Oakland, Defendants and various co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code. Defendants, and each of them; have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, allocate markets and rig bids for, Municipal Derivatives.

140.    For the purpose of forming and implementing the alleged combinations, trusts, agreements, understandings and concert of action, Defendants and their co-conspirators did those things they conspired to do, including but not limited to the acts alleged above, including actions:

(a)    To fix, raise, maintain and stabilize the price of Municipal Derivatives;

(b)    To allocate markets for Municipal Derivatives amongst themselves; and

(c)    To submit rigged bids for Municipal Derivatives.

141.    In formulating and carrying out the alleged combinations, trusts, agreements, understandings and concert of action, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were (a) to artificially raise, fix,

maintain, or stabilize the prices of Municipal Derivatives; (b) to allocate among themselves

Municipal Derivatives markets and customers; and (c) to facilitate, effectuate, and implement the

contract, combination, and conspiracy.

142.    The combination and conspiracy alleged herein has had the following effects,

among others:

(a)    Price competition in the sale of Municipal Derivatives has been restrained,

suppressed and/or eliminated in the State of California and throughout the United States;

(b)    Prices for Municipal Derivatives sold by Defendants and their co-

conspirators have been fixed, raised, maintained and stabilized at artificially high, non-

competitive levels in the State of California and throughout the United States; and

(c)    Those who purchased Municipal Derivatives from Defendants and their

co-conspirators have been deprived of the benefit of free and open competition.

143.    As a direct and proximate result of the illegal combination, trust, agreement,

understanding and concert of action, Oakland and the members of the Class have been injured in

their business and property in that they paid more for Municipal Derivatives than they otherwise

would have paid in the absence of Defendants' unlawful conduct.

144.    As a result of Defendants' violation of Section 16720 of the California Business

and Professions Code, Oakland seeks treble damages and the costs of suit, including

reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and

Professions Code.

### THIRD CLAIM FOR RELIEF
**(Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code
Section 16720, *et seq.*)**

145.    Oakland, on behalf of itself and all others similarly situated, realleges and incorporates, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants as follows.

146.    Defendants' unlawful conduct was centered in, carried out and perfected mainly within the State of California, and Defendants' conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

147.    Beginning at least as early as January 1, 1992 and continuing to the present; the exact dates being unknown to Oakland, Defendants committed acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, commonly known as the Unfair Competition Law, by engaging in the acts and practices specified above.

148.    Oakland and the members of the Class bring this claim pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution and/or disgorgement from these Defendants for acts, as alleged herein, that violate the Unfair Competition Law.

149.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures, as alleged herein, constitute a common course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, in that, for example:

(a)     the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(b)     the acts described above violate the Sherman Act, 15 U.S.C. § 1;

@Ä

(c)    Defendants' acts, omissions, representations Practices and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(d)    Defendants' act and practices are unfair to consumers of Municipal Derivatives in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and

(e)    Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

150.    Oakland and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business acts or practices.

151.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused Oakland and the members of the Class to pay supracompetitive and artificially-inflated prices for Municipal Derivatives. Oakland and the members of the class suffered injury in fact and lost money or property as a result of such unfair competition.

152.    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

153.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Oakland and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits

which may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

## PRAYER FOR RELIEF

WHEREFORE, the, Plaintiff prays for relief as follows:

1.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Oakland be certified as a class representative and Oakland's counsel be appointed as counsel for the Class;

2.    That the unlawful contract, combination or conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and Section 16720, *et seq.*, of the California Business & Professions Code (the Cartwright Act);

3.    That the unlawful contract combination or conspiracy alleged be adjudged and decreed to be unfair, fraudulent, and illegal in violation of Section 17200, *et seq.*, of the California Business & Professions Code (the Unfair Competition Law);

4.    That Oakland and the Class recover damages and restitution, as provided by law, determined to have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust laws, and that judgment be entered against defendants on behalf of Oakland and of the Class;

5.    That Oakland and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

6.    For such other and further relief as is just under the circumstances.

## DEMAND FOR JURY TRIAL

@Ä

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

@Ä

@Ä

| Report | **Litera Change-Pro ML WIX 6.0.0.130 Document Comparison done on 5/23/2008 12:33:17 PM** |
|---|---|
| Style Name: | May 23 |
| Original Filename | C:\Documents and Settings\rrodems\Desktop\Comparison Docs\Modified Docs\BOA Complaint - DDC Modified.doc |
| Original DMS: | |
| Modified Filename | C:\Documents and Settings\rrodems\Desktop\Comparison Docs\Modified Docs\Oakland Complaint draft 5-22-08.doc |
| Modified DMS: | |
| Add: | 612 |
| Delete: | 567 |
| ~~Move From:~~ | 177 |
| Move To: | 177 |
| Table Insert | 0 |
| ~~Table Delete~~ | 1 |
| Total Changes: | 1534 |

# EXHIBIT 4
# (To M. Hausfeld Declaration)

Plaintiff Haywood County, Tennessee, individually and on behalf of itself and all others similarly situated, brings this action against the Defendants named in this Complaint for treble damages and injunctive relief under the antitrust laws of the United States. Plaintiff alleges the following upon information and belief based upon the investigation of counsel, except as to those paragraphs applicable to the named Plaintiff which are alleged upon knowledge, as follows;

## NATURE OF THE CASE

1.      This antitrust class action is brought to recover treble damages and injunctive relief for violations of Section I of the Sherman Act. 1 S U.S.C. §I. This action is brought on behalf of Plaintiff and a class of all slate, local and municipal government entities, independent government agencies and private entities that purchased by competitive bidding or auction Municipal Derivatives directly from a Defendant. or through a broker, at any time from January t. 1992 through the present in the United States and its territories or for delivery in the United States and its territories.

2.      The United States Department of Justice's ( °DOJ") Antitrust Division, the Internal Revenue Service ("IRS"), and the; ;Securities and Exchange Commission ("SEC") have been investigating collusive practices in municipal bond industry and a grand jury investigation currently is being conducted by the DOJ, Antitrust Division in the United States District Court for the Southern District-of Now York Defendant Bank of America has received conditional amnesty and has agreed to provide the Government with information regarding the conspiracy

alleged herein. As part of its agreement with the Government, Bank of America will provide full

and complete cooperation in accordance with the terms of the DOJ amnesty program.

3.     Plaintiff alleges that Defendants entered into a contract, combination or

conspiracy to not compete and to rig bids for Municipal Derivatives sold to issuers of Municipal

Bonds. Defendants have engaged in communications to restrain competition by rigging bids,

secretly compensating losing bidders, making courtesy bids, deliberately losing bids, and

entering into agreements not to make competitive bids.


4.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

the Class have sustained injury to their business and property by: ( i)  receiving lower interest

rates on  contracts than they would have in a competitive market ; and  (ii) paying ancillary fees

and other costs and expenses .

### JURISDICTION AND VENUE

5.     This action is instituted under Sections 4 and 16 of the Clayton Act . 15 U.S.C. §§

and 26, to recover treble damages  and the costs of this suit, including reasonable attorneys' fees,

against  Defendants for the injuries sustained by  Plaintiff and the members of the Class by

reason of the violations  alleged  herein.

6.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16

of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.     Venue is proper in this District pursuant to Sections §§ 4, 12, and 16 of the

Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 (b), (c) and (d), because during

the Class Period the  Defendants resided, transacted business,  were found, or had agents in  this

District. Moreover,  a substantial portion of the affected interstate  bade and commerce described

2

herein is and has been carried out in this District, and overt acts in furtherance of the alleged conspiracy were undertaken in this District.

## PLAINTIFF

8.    Plaintiff Haywood County, Tennessee purchased one or more Municipal Derivatives from at least one Defendant during the Class Period.

## DEFENDANTS

9.    Defendant Bank of America, N.A., is a Delaware corporation with its principal place of business located at 100 N. Tryon Street, Charlotte, NC 28255,. During the Class Period, Bank of America issued and sold Municipal Derivatives to members of the Class.

10.    Defendant JP Morgan Chase & Co. (" .1P Morgan فـوڤ□□ڈر) is a Delaware

corporation with its principal place of business  located at 270 Park Avenue, New York, NY,

10017. During the Class Period, JP Morgan issued and sold Municipal Derivatives to members

of the Class.

~    Piper Jaffray & Co ("Piper Jaffray") is a Delaware corporation with its principal

place of business  Minneapolis, Minnesota.  During the Class Period, Piper  issued and sold

Municipal Derivatives to members of the Class.


~    UBS AG ") is a Swiss corporation with its principal place of business  Zurich,

Switzerland.  the Class Period, UBS issued and sold Municipal Derivatives to members of the

Class.

~    Wachovia  ("Wachovia ) is a  with its principal place of business  Charlotte,  .

During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the

Class

4

~~CDR Financial Products ("CDR") is a California corporation with its principal place of business Beverly Hills, . During the Class Period, CDR acted as a broker for members the Class in purchasing Municipal Derivatives~~

~~Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business Los Angeles, During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives~~

11. Defendant Morgan Keegan & Co.,. ("Morgan Keegan"% a subsidiary of Regions Financial Corp., is a Tennessee corporation with its principal place of business located at 50 N. Front Street, Memphis, TN 38101 During the Class Period, Morgan Keegan acted as a broker for members of the Class in purchasing Municipal Derivatives .

12, Defendant CDR Financial Products ("CDR") is a California corporation with its principal place of business located at 9777 Wilshire Boulevard, Suite 800, Beverly Hills, CA

5

357062.1 1

90212. During the Class Period, CDR acted as a broker for members or the Class in purchasing Municipal Derivatives,

    13.    Defendant UBS AG CUBS") is a Swiss corporation with its principal place of business located at Bahnhofstmsse 45, CH-8090 Zurich, Switzerland. Daring the Class Period, UBS issued and sold Municipal Derivatives to members of the Class.

    14.    Defendant Piper Jaffray & Co, ("Piper Jaffray") is a Delaware corporation with its principal place of business located at 800 Nicoliet Mall, Suite 800, Minneapolis, Minnesota 554027020. During the Class Period, Piper JaMay issued and sold Municipal Derivatives to members of the Class.

    15.    Defendant Feld Winters Financial LLC (" Feld Winters") is a California limited liability company with its principal place of business located at 15260 Ventura Boulevard, Suite 2220, Sherman Oaks, CA 91403.    During the Class Period, Feld Winters acted as a broker for members of the Class in purchasing Municipal Derivatives .

    16.    Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company with its principal place of business located at 11845 W. Olympic Boulevard, Suite 540, Los Angeles. CA 90064: During the Class Period, Winters acted as a broker for members of the Class in purchasing Municipal Derivatives,

    17.    Defendant Wachovia ("Wachovia') is a North Carolina corporation with its principal place of business located at 301 S. College Street, Suite 4000, One Wachovia Center; Charlotte, NC. 28288-0013, During the Class Period, Wachovia issued and sold Municipal Derivatives to members of the Class,

## UNNAMED CO-CONSPIRATORS

357062.1 1

18.   Various other persons, firms , corporations and John Does 1-100, not named

herein as a Defendant  or  named conspirator, have participated as co-conspirators with  the

Defendants and have performed acts and made statements in furtherance of the conspiracy.

19.   Whenever in this Complaint reference is made to any act, deed or transaction of

any corporation or entity, the allegation means that the corporation or entity engaged in the act,

deed or transaction by  at through its officers, directors : agents, employees or representatives

while they were actively engaged in the management, direction, control or transaction of the

corporation or entity's business or affairs.

## A.   Municipal Bonds

20.   Municipal bonds are issued by states, cities, and counties, or their agencies, as

well as by private entities , also known as issuers, to raise funds for various  typos of large public

projects, including, for example, the construction and repair of roads, buildings, mass transit,

water treatment plants, and power plants.  Municipal bonds  bear interest  at either a fixed or

variable rate  of interest. The issuer of a municipal bond  receives a cash payment at the time of

issuance in exchange for a promise to repay the investors who provide the cash payment (the

bond holder) over time. Repayment periods typically span several years.

~~receives a cash payment at the time of issuance in exchange for a promise to repay the~~
~~investors who provide the cash payment (the bond holder) over time.  Repayment periods~~
~~typically span  several years~~

21.   In light of the tax-exempt status of municipal bonds', investors typically accept

lower interest payments.  Bonds are an effective source of financing to many government and

private entities because the borrowing rate available in the tax free municipal bond market is

frequently lower than what is available through other channels, In order for municipal bonds to maintain their tax exempt status, IRS regulations governing the bonds generally require all money raised by a bond sale to be spent on one-time capital projects within three to five years of issuance.

22.     Municipal bond proceeds are typically placed into three types of funds : (i) a project fund or construction fund which is used to pay for the construction or public works project at hand ; (ii) a "sinking fund" which contains the money used to make principal and interest payments on the bond ; or (iii) a debt service reserve fund which ensures that if unforeseen contingencies occur, debt obligations can still be paid.

23.     The municipal bond industry is extremely large. In 2006, approximately $385 billion worth of municipal bonds were issued . The total United States municipal bond market itself presently is valued at approximately $2.6 trillion.

### B.     Municipal Derivatives

24.     A "Municipal Derivative" is one of a variety of tax-exempt vehicles that government entities use to invest the proceeds of bond offerings in their possession.

25.     Municipal Derivatives, typically sold to government entities, are provided by highly rated insurance companies and large commercial and investment banks . Municipal derivatives are a particularly favored form of investment in the municipal bond industry because they are considered safe and reliable investment vehicles.

26.     When purchasing a municipal derivative government entities typically engage a broker to obtain the best possible price for such derivatives by arranging an auction among multiple providers of Municipal Derivatives,

8

27.    Municipal Derivatives are grouped generally into two categories, pertaining either to: ( i) the investment of bond proceeds, or ( ii) the bond's underlying interest rate obligations. The former category of Municipal Derivatives includes instruments such as Guaranteed Investment Contracts  ("GICs") (forward purchase, supply, or delivery agreements and repurchase agreements) and escrow agreements. The latter category of Municipal Derivatives includes instruments such as Swaps, Options, "Swaptions," Collars, and Floors, which are risk-shifting vehicles.

28.    A GIC is an agreement secured by a contract with a financial institution  which guarantees a fixed  rata of return and a fixed date of maturity. GICs also can-mean-any unallocated group contract, investment contract, funding agreement, guaranteed interest contract or other similar instrument in which a  provider agrees to guarantee a fixed or variable rate of interest or a future payment that is based on an index or similar criteria . It is payable at a predetermined date on monies that are deposited with the company. [1]The types of investment agreements that the IRS generally references as GICs are: ( i) Forward  purchase or Forward Delivery Agreements; ( ii) Repurchase Agreements or Collateralized GICs; and ( iii) Unsecured or Uncollateralized GICs.

29.    A Forward Purchase or Forward Delivery Agreement is often used in connection with debt service funds. Issuers  request bids based on rate of return or on upfront payments . In other words, the buyer and seller agree to settle their respective obligations at some, specified future date based upon the current market price at the time the contract is executed.  These contracts are generally entered into in the over-the-counter markets.

---

9

30.    A Repurchase Agreement or "Collateralized GIC" is an agreement consisting of two simultaneous transactions. The issuer purchases securities' from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces au agreed-upon rate of return.

31.    An Unsecured or Uncollateralized GIC does not involve associated securities. Instead, they function like a savings account . They are frequently for construction or project funds . In the bidding process, the issuer sets forth a proposed draw-down schedule in situations where it wants to spend all of the bond proceeds, for example, within a three-year period.

~    A Repurchase Agreement or "Collateralized GIC" is an agreement consisting of two simultaneous transactions  issuer purchases securities from a provider, and the provider agrees to repurchase the securities on a certain future date at a price that produces  agreed-upon rate of return.

32.    An Advance Refunding Escrow  pertains to an arrangement  by which the proceeds of the refunding issue  are deposited into an escrow account for investment in an amount sufficient to pay the principal of and interest on the issue being refunded on the original interest payment and maturity dates.

33.    A Swap is a type of agreement frequently used with respect to interest rate obligations. It is the sale of an instrument and the simultaneous purchase of another instrument for purposes of enhancing the investor's holdings.   There are  at least three types of swaps: ( i) floating-for-fixed interest swap; ( it) fixed-for-floating interest swap; and ( iii) floating-for-floating (basis-rate) swap, where the two are based on different indices  such as LIBOR or BMA.

34.    An Option is  much like an option on a securities transaction as it involves one of two types: (i) a Put Option; or (ii) a Call Option. A Put Option is a provision in a bond contract

10

where the investor has the right, on specified dates after required notification, to surrender the securities to the issuer or the issuer's agent at the predetermined price . A Call Option is a transaction where the issuer repays to tire holder of an outstanding security the principal amount thereof   as a result of the issuer exercising a right under the bond contract to repay the security prior to its scheduled maturity date .

35.    A "Swaption" is the combination of a Swap and an Option.

36.    A Floor is an agreement by the issuer to pay a stated rate of interest even if the actual rate on the variable rate debt is lower. The interest rate floor agreement is entered into with a third party who typically pays the issuer an upfront fee in exchange for the right to collect the difference between the interest rate floor' and the actual lower rate on the debt.        In other words, a Floor agreement establishes, for an issuer of variable rate bonds, a minimum or "floor" rate of interest that the issuer will effectively pay, though the bonds themselves may state a different minim um rate.

37.    A Collar is an agreement by the issuer or obligor of variable rate debt combining an interest rate cap and an interest rate floor. The Collar establishes the effective minimum rate of interest that the issuer will pay. The cap component "caps" or establishes a maximum rate of interest the issuer will effectively pay, which again may vary from the maximum stated rate of interest on the variable rate debt

38.    The Municipal Derivatives industry is very large and a substantial portion of the approximately $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives

approximately $400 billion annually spent on municipal bonds is invested annually in Municipal Derivatives. The Municipal Derivatives industry is comprised of approximately 20

11

357062.1 1

major providers of Municipal Derivatives in the United States. With respect to GICs , there are 10 to 12 major dealers in the United States. Issuers, on the other hand, number in the tens of thousands.

## C.    IRS Rules And Regulations

39.    IRS rules and their corresponding regulations subject issuers to potential taxation from arbitrage off of their tax-exempt bond proceeds, subject to certain exceptions. See Internal Revenue Code § 148(a); Internal Revenue Code §§ 148(c), (d) an (e) (enumerating exceptions to this principle). If the yield from the municipal derivative exceeds the bond's yield by a certain amount, it will be deemed arbitrage and be subject to taxation.

40.    The purpose of the rules and regulations governing arbitrage is lu limit issuers' ability to take advantage of tax exempt rates on municipal bonds by investing the bond proceeds at higher, non-tax exempt rates , no rules and regulations, therefore, require all interest that exceeds the bond rate made on tax exempt bond investments to be rebated to the IRS, absent an exception.

41.    IRS regulations also ensure a competitive marketplace for GICs by creating a fair bidding process, See Treasury Reg. § 1.148-5(d)(6). The central regulations include the following:

a    The bid specifications must be in writing;

b    The bid specifications must be timely forwarded to potential providers;

c    The bid specifications must contain all material terms (i.e., the term directly or indirectly affects yield);

d    The bid specifications must state that by submitting a bid, the potential provider is representing that it has not consulted with other potential

12

providers, that its bid was not submitted solely as a courtesy bid, and that the bid was determined without regard to an agreement with another issuer or other person;

e        The bid specifications must be commercially reasonable;

f        There must be a legitimate business purpose for all terms in the bid specifications other than solely to increase the price or reduce the yield;

g        The bid specifications must contain a reasonably expected draw down schedule;

h        All potential providers must have an equal opportunity to bid, and no potential provider can have a last look to review other bids before bidding; and

i        The issuer must receive at least three bids from solicited providers.

42.      These rules were designed to provide a fair, competitive, and transparent process for issuers to obtain the best possible price for tax-exempt municipal derivatives.

### D.    Defendants' Anticompetitive Conduct

43.      During the Class Period , Defendants entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in the United States  in Violation of Section  I of the Sherman Act . 15 U.S.C. § i.

44.      Defendants have combined and conspired to allocate customers and fix or stabilize the prices of Municipal Derivatives , including the  Interest rates paid to issuers on such derivatives, sold in the United States through agreements not to compete and acts of bid rigging,

45.      Defendants knowingly and intentionally engaged in these rigged auctions . In furtherance of  their contract combination or conspiracy, Defendants directly discussed with each other the terms  prior to submitting their bids.

13

46.    Defendants also communicated indirectly through one or more means by suggesting the terms of their respective bids.

47.    Defendants engaged in complementary trades to compensate other Defendants who either did not submit bids or who engaged in sham bids. On occasion, a winning bidder would compensate one or more bidders for agreeing not to submit a competitive bid.

48.    Defendants have knowingly participated in an unlawful contract, combination or conspiracy not to compete and to rig bids in order to win the favor of other Defendants and share in the profits of the conspiracy. This conduct was in breach of their fiduciary and other duties as agents for Plaintiff and members of the class during the bidding process.

49.    The interconnected nature of the Municipal Derivatives industry facilitated and reinforced the conspiratorial conduct alleged herein, leading to the massive, multi-agency government investigation. As The Bond Buyer reported on November 21, 2006:

> "The industry tends to be quite intertwined and interconnected, said Willis Rtitter, a partner at Ungaretti & Harris here. " Virtually all the major houses are involved in selling [GICs ), so if you think you've found something about one, you suspect you're going to find it about all of them."

50.    Tic existence of the unlawful contract, combination or conspiracy occurred through communications among marketing personnel employed in the municipal bond/derivative market. These individuals have participated in direct communications with competitors with respect to the following, *inter alia* .

a    the rigging of bids, including the collusive suppression of interest rates paid to issuers on Municipal Derivatives;

b    conduct that would be used to limit competition;

c    sharing of profits from a winning bid with a losing bidder and other secret compensation of losing bidders;

14

357062.1 1

    d        bids that would be won by specific  Defendants; and

    e        an exchange of a deliberately losing bid for a future winning bid.

    51.    The existence of the unlawful contract, combination or conspiracy occurred through communications among marketing personnel employed in the municipal bond/derivative certain individuals. These individuals have participated in direct communications with competitors with respect to limit competition, rig bids and create the false impression of a competitive environment by:

    a        submitting courtesy bids to create the appearance of competition where there was none;

    b        submitting bids known to be unrealistically low and deliberately losing bids;

    c        submitting bids where only one bid was sufficiently high to make the deal work;

    d        agreeing to share profits from a winning bid with a losing bidder tough transactions between one another;

    e        engaging conduct in violation of IRS regulations relating to the bidding process; secret last look agreements; and

    f        entering into agreements not to bid.

    52.    Defendants shared their wrongful profits from the illegal agreement, understanding  arid conspiracy, by paying kickbacks to  broker. For example, CDR had a secret agreement with the provider of a GIC for bonds issued in 1999 by an authority in Gulf Breeze, Florida The deal allowed CDR to increase its fees if none of $220 million in bond proceeds was used for its intended purpose -affordable housing.

c ~~where only one bid was sufficiently high to make the deal work;~~

d ~~to share profits from a winning bid with a losing bidder~~ transactions between ;

53. Brokers knowingly participated in the unlawful contract, combination or conspiracy by agreeing: (i) not to compete ; (i) to rig bids in order to limit competition ; and (iii) to create the appearance of competition where there was none. Brokers participated in and facilitated the unlawful contract, combination or conspiracy by arranging the allocation of winning bids among the Defendants. Brokers engaged in conspiratorial communications concerning:

a winning bids that would be allocated to Defendants;

b confirming understandings that bids would be won by Defendants;

c confirming understandings that bids would be lost by Defendants;

d the fact that bids were being rigged; and

e bid levels that would be necessary by Defendants to win or lose a bid.

54. Individuals who have engaged in the unlawful contract, combination or conspiracy include, *Inter alia*:

a Douglas Campbell, a former co-conspirator Bank of America sales team manager who also formerly worked at Piper Jaffiay;

b Dean Pinard, former manager of co-conspirator Bank of America's derivatives department;

16

  <u>c</u>  James Hertz, former vice-president in JP <u>Morgan is </u>tax-exempt capital markets group;

  <u>d</u>  Stephen Salvadore, Managing Director of municipal capital markets and derivatives at Bear <u>Steams;</u>

  <u>e</u>  Jay Saunders,who worked in the derivatives marketing department at Wachovia;

  <u>f</u>  Martin McConnell, who worked in the derivatives marketing department at Wachovia;

  <u>g</u>  Peter <u>Ghaval</u>, former Managing Director and co-manager in <u>1JBS's</u> municipal derivatives group;

  <u>h</u>  Patrick Marsh, Managing Director of Deutsche Bank's municipal restructuring unit, who had worked at Bear Stearns;

  <u>i</u>  <u>Sblomi Rez</u>, a banker who formerly worked at JP Morgan, and

  <u>j</u>  Samuel Gruer, <u>Former </u>vice-president in JP Morgan's tax-exempt capital markets group.

  <u>k</u>  James Towne, former Managing Director of <u>Defendant </u>Piper Jaffray's municipal derivatives group;

  <u>l</u>  David Lail, who worked in Baum's derivatives department; and

  <u>m</u>  Mary Packer, president of <u>Packer Klss</u>.

<u>55.</u>  <u>The conspiracy has been facilitated through intercompetitor contacts at trade</u>

--  ~~The conspiracy has been facilitated through intercompetitor contacts at trade~~

associations such <u>as </u>the International Swaps & Derivatives Association ("ISDA") <u>whose</u>

members include Bank of America, JP Morgan, Bear Stearns, <u>Societe Generalc</u>, UBS, and

Wachovia. Another <u>such organization </u>is the American Bankers Association, which <u>includes</u>

Bank of America, Morgan Keegan, JP Morgan, <u>(IBS</u>, and Wachovia.

56.    One of the numerous instances of bid-rigging and kickbacks is the $453 million

GIC that Bank of America provided to the City of Atlanta id 2002, in which CDR acted as the

broker and handled the bidding. In a June 28, 2002 e-mail, Douglas Campbell told Phil Murphy

that $182,393 was paid to CDR, Piper Jaffray, PaineWebber, and Winters , The payments were

described as a bid to build Bank of America's relationship with these companies.

57.    Other examples of bid-rigging and kickbacks exist. The IRS is examining over 20

lease-to-own deals between CDR and Societe Generale, as well as CDR's involvement is

California school advance refunding escrows and put option cases from several issuers around

the nation. 'there is evidence of quarterly payments Societe Generale made to CDR for

"unspecified services" relating to these lease-to-own deals. The IRS's audits of 21 deals done

between 1996 and 2005 now center on bid-rigging and price-fixing issues.

58:    The IRS has scrutinized a $27 million bond sold by Pima County, Arizona's

Industry Development Authority to help individuals buy homes. The IRS said it was concerned

about quarterly payments made by Societe Generale to CDR, which structured the transaction

and evaluated bids for the investment agreement , Records suggest that Defendant PSA was one

of the four that bid for that contract.

60.    In November of 2006, as part of a settlement with the IRS, it was disclosed that

Baum, illegally diverted profits on municipal bond deals. That settlement covered more than $2

billion worth of blind pool deals entered into between 1997 and 2001. The agency found

evidence of big rigging in these deals. Baum had rigged the deals to allow CDR, who was the

winner an many of the deals, to underpay for the GIC and simultaneously overpay far other

investment agreement and remarketing fees, diverting arbitrage profits back to Baum. In one

ease, CDR paid a large fee directly to David Lail of Baum.

18

60.    Bank of America also provided the GIC, on at, least one of flie-Baum transactions --targeted by the IRS, a $100 million issue from the Illinois Development Finance Authority sold in 2000 by Rural Enterprises of Oklahoma, Inc .    Rural Enterprises disclosed in July 2003 that the provider of the GIC made a significant hidden payment to Baum

61.    The objective of the unlawful contract, combination or conspiracy was to artificially suppress interest rates paid on, tower the value of, and reduce and stabilize the market prices of Municipal Derivatives sold by Defendants.

### E.    The Internal Revenue Service Investigation

62.    The IRS was the first agency to launch an investigation of collusive practices in the Municipal Derivatives industry.. Its inquiry initially focused on-dozens of municipal bond deals where the providers failed to pay $100 million in taxes by engaging in abusive arbitrage devices.

63.    In 2005, Charles Anderson, field operations manager for the IRS's tax-exempt bond office, publicly stated that "[ it looks like bid rigging is wider and more pervasive than we thought" Mark Scott, director of the IRS's tax-exempt bond office, publicly stated that "[ when a bid is TOO to 150 basis points below the market and there is no justification for that being so low, one of the assumptions you can draw is that there are courtesy bids being provided." These types of bids are "provided solely as a courtesy so that another banking organization can win on a bid that is below fairmarket value," according to Scott. "We have seen transactions where the winning bid is the only bid high enough to make the deal work." As Scott went onto note, "[t] bat's basically what we've been doing ....is following those, what I like to refer to as `tentacles of abuse. ""

64.    As the agency's investigation progressed in 2006, Anderson stated that the regulators "think we have evidence of bid rigging." The IRS probe showed that investment

19

contracts were sold at below market rates, according to Anderson. That means lower returns for municipalities and less tax revenue for the IRS. He added, "[p]eople were ~~winthere were~~ obviously deliberate - losing bidders, thereby allowing the winner to ~~win- a-~~ sweetheart deal." GICs at below fair market values and

65.    The IRS investigation led an investment banking firm to uncover transcripts of telephone conversations: involving an employee that indicated the employee and other market participants were involved in bid-rigging on GICs in the municipal market.

66.    On February 7, 2007,  Bank of America announced that it would pay $14.7 million to the IRS for its role in providing GICs in blind pool deals to some state and local government  entitles.

67.    In addition to the IRS regulations concerning arbitrage, as well as the federal antitrust laws, the IRS regulations governing GIC bidding also have been  broken. Besides discovering illegal arbitrage, the IRS has stated that it has come across instances of price-fixing, bid-rigging and kickbacks.

**F.    The Antitrust Division Investigation**

~~Antitrust  Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other Municipal Derivatives.~~

68.    The Antitrust Division has been examining whether there was collusion among financial institutions in the bidding process for GICs and other Municipal Derivatives. On November 15, 2006, the Federal Bureau of Investigation ("FBI") raided the offices of and seized documents from three Broker Defendants: CDR, IMAGE, and Sound Capital.

69.    Following the FBI raids, the industry players were served with subpoenas which sought detailed information from the companies dating back to 1992. According to news reports and company filings, the following entities have received governmental subpoenas: GE Funding; GB Trinity; CDR; FSA; FGIC ; Security Capital; XL Capital; IMAGE; Sound Capital; FSA; First Southwest; JXIS (and through it, CDC); Kinsell; XL Capital Assurance, Inc.; Societe Generale; Baum; Feld Winters; JP Morgan; American International Group Inc.; Bear Steams; UBS; Piper Jaffray; Wachovia ; Cain Brothers; Morgan Keegan; Shockley; Genworth Financial; and SunAmerica.

70    On December 11, 2006 ;-prosecutors based out of the DOJ Antitrust Division's New York field office  were tasked with investigating the alleged bid-rigging and brought their case to a federal grand jury sitting in the Southern District of New York.

### G.    The DOJ Grants Conditional Amnesty to Bank Of America

71.    On February 9, 2007,  Bank of America, the second largest bank in the United States, announced that it was cooperating with the  DOD's investigation into bidding practices in the municipal  bond business in exchange for leniency as part of the  DOD's amnesty program.

72.    On February 9, 2007,  Bank of America issued a press release and stated the following:

> Bank of America Corporation has entered a leniency agreement with the United States Department of Justice in Connection with the Department's investigation into bidding practices in the municipal derivatives industry. This amnesty grant was as a result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation.

21

The amnesty agreement provides that, in return for the company's continuing cooperation with the Justice Department's investigation, the Justice Department will not bring any criminal antitrust prosecution against the company in connection with matters that the company reported to the Justice Department.

In addition, in a ˏmatter involving the Internal  Revenge Service (IRS), Bank of America has agreed to a $ 14,7 million settlement with the IRS  relating to the company's role in providing guaranteed investment contracts and other agreements in connection with certain "blind pool" bond transactions.

73.    It was reported that key derivatives officials at the bank were on "administrative leave," including Dean  Picard.

74    On February 28,  2008,13ank of America, in its SEC Form 10- if stated the following:

Municipal Derivatives Matters

The Antitrust Division of the U ˏS. Department of Justice ( DO)), the SEC, and the IRS are investigating possible anticompetitive bidding practices in  municipal derivatives industry -including various  parities, including  BANA [ co-conspirator Bank of America , from the early  19906, to date.  The activities at issue in these industry- ˏride government investigations concern the bidding` process for municipal derivatives that are offered to states, municipalities and other issuers of tax-exempt bonds. The Corporation has cooperated, and continues to cooperate, with the DOJ, the SEC and the  Ills. On February 4, 2008,  DANA received a Wells notice advising that the SEC staff is considering recommending that theˏ SEC bring a civil injunctive action and/or an administrative proceeding "in connection with the bidding of various financial instruments associated with municipal securities."  DANA intends to respond to the notice. An SEC action or proceeding could seek a permanent injunction, disgorgement plus prejudgment interest, civil penalties and other remedial relief ˏ

On January 11, 2007, the Corporation entered into a Corporate Conditional Leniency Letter (the Letter) with  DOT. Under the Letter and subject to the Corporations continuing cooperation, DOJ will not bring any criminal antitrust prosecution against the Corporation in connection with the matters that the Corporation reported to DOJ. Civil actions may be filed ˏ Subject to satisfying DOJ and the court presiding  aver any civil litigation of the Corporation's cooperation, the Corporation is eligible for (i) a limit on liability to single, rather than treble, damages in certain types of related civil antitrust actions, and ( H) relief from joint and several antitrust liability with other civil defendants.

22

75.    Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All state, local and municipal government entities, independent government agencies and private entities that purchased by competitive bidding or auction Municipal Derivatives directly from a Defendant, or through a broker, at any time from January 1, 1992 through the present in the United States and its territories or for delivery in the United States and its territories.

76.    Plaintiff does not know the exact number of class members because such information is in the exclusive control of the Defendants and the unnamed co-conspirators. Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands of Class members , the exact number and their identities being known by the Defendants and unnamed co-conspirators

77.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

78.    There are questions of law and fact common to the Class, including:

a    Whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain or stabilize prices, and to rig bids or allocate customers and markets of Municipal Derivatives;

b    The identity of the participants of the alleged conspiracy;

c    The duration o€ the alleged conspiracy, and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d    Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

23

e        Whether the conduct of <u>Defendants</u> and <u>their</u> co-conspirators, as alleged in this Complaint, caused injury to the business or property of the <u>Plaintiff</u> and the other members of the Class;

f        The effect of the alleged conspiracy on the prices of Municipal Derivatives sold in the United States during the Class Period;

g        Whether <u>Defendants</u> and <u>their</u> co-conspirators fraudulently concealed the conspiracy's existence from <u>Plaintiff</u> and the other members of the Class; and

h        The appropriate class-wide measure of damages.

<u>79.</u>    <u>Plaintiff is a member</u> of the Class . Plaintiffs claims are typical of the claims of the Class members, and <u>Plaintiff</u> will fairly and adequately protect the interests of the Class. <u>Plaintiff is a purchaser</u> of Municipal Derivatives, and <u>its</u> interests are coincident with, and not antagonistic to, those of the other members of the Class.

<u>80.</u>    <u>Plaintiff is</u> represented by counsel who <u>is</u> competent and experienced in the prosecution of antitrust and class action litigation.

<u>81.</u>    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for <u>Defendants</u>.

<u>82.</u>    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

<u>83.</u>    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of

24

357062.1 1

effort and expense that numerous individual actions would engender. This class action presents

no difficulties in management that would preclude maintenance as a class action.

### INTERSTATE TRADE AND COMMERCE

84.    The activities of Defendants and their co-conspirators, as described in this

Complaint, were within the flow of and substantially affected interstate commerce.

85.    During the Class Period, Defendants and their co-conspirators issued and/or sold

Municipal Derivatives in a continuous and uninterrupted flow of interstate commerce to class

members located in states all across the nation .

~    The combination  conspiracy alleged herein has had the following effects, among

others:

    a    Price competition in the sale of Municipal Derivatives has been restrained,

        suppressed and/or eliminated in the United States;

    b     charged by  and  co-conspirators to Plaintiffs and the members of the

        Class for Municipal Derivatives were  , stabilized and maintained at non-

        competitive levels throughout the United States;

    e    Customers and markets of Municipal Derivatives  allocated among  and

        co-conspirators;

d        ~~Plaintiffs and the other members of the Class received~~ interest rates on ~~Municipal Derivatives than they would have received in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities;~~

~~and the members of the Class have been injured and financially damaged in their and property in amounts to be determined.~~

## FRAUDULENT CONCEALMENT

96.    <u>At all times relevant during</u> the Class Period, <u>Defendants</u> and <u>their</u> co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

87.    <u>Plaintiff</u> and the Class members did not discover, nor could have discovered through reasonable diligence, that <u>Defendants</u> and <u>their</u> co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because <u>Defendants</u> and <u>their</u> co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Neither <u>Defendants</u> nor <u>their</u> co-conspirators told <u>Plaintiff</u> or other class members that they were rigging bids. To the contrary, <u>Plaintiff and members of the Class</u> were falsely assured that  bids for Municipal Derivatives  were fair and competitively priced <u>in compliance</u> with specific IRS rules and regulations that required  <u>brokers</u> to obtain at least three commercially reasonable bids. Thus,  <u>Plaintiff</u> and Class members could not have discovered the violations alleged herein earlier until shortly before the filing of this Complaint  because

26

Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of

their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities

brought various other means and methods designed to avoid detection.

88.    Defendants and their co-conspirators engaged in a successful price-fixing

conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the

following respects:

a    By meeting secretly to discuss prices, customers and markets of Municipal
     Derivatives sold in the United States and elsewhere;

b    By agreeing among themselves at meetings and in communications not to
     discuss publicly, or otherwise reveal, the nature and substance of the acts
     and communications in furtherance of their illegal scheme;

c    By intentionally creating the false appearance of competition by engaging
     in sham auctions in which the results were predetermined;

d    Through covert sharing of profits or other secret compensation paid to
     losing bidders;

e    By secretly communicating about bids that would be won or lost by the
     Defendants;

f    By paying kickbacks to brokers; .

g    By submit or courtesy Mils, or unrealistically low or other artificial bids,
     and/or deliberately losing bids, to create the appearance of competition
     where there was none; and By covert agreements not to bid;

h    By giving false and pretextual reasons for the pricing of Municipal
     Derivatives sold during the Class Period, including by falsely describing
     such pricing as being the result of competitive factors rather than
     collusion,

i    Through other schemes and devices which will be learned during
     discovery.

89.    As a result of Defendants and their co-conspirators' fraudulent concealment, ail

applicable statutes of limitations affecting the Plaintiff's and the Class's claims have been tolled.

(violation o€ Sherman Act 15 U,S,C. §I)

27

357062.1 1

90.    Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1-89 herein.

91,    Beginning at least as early as January 1, 1992, sad continuing until the present, the exact dates being unknown to the plaintiff, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy in restraint of trade to artificially fix, raise, maintain, or stabilize prices for Municipal Derivatives in violation of, Section 1 of the Sherman - Act, 15 U.S.C. § 1.

92.    During the Class Period, Plaintiff and members of the Class purchased Municipal Derivatives directly from a Defendant or through an agent.

93.    The contract, combination or conspiracy alleged herein has had the following effects, among others:

    a    Price competition in the sale of Municipal Derivatives has been restrained, suppressed and/or eliminated in the United States;

    b    Bids charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Municipal Derivatives were faxed, stabilized and maintained at non-competitive levels throughout the United States;

    c    Customers and markets of Municipal Derivatives ware allocated among Defendants and their co-conspirators;

    d    Plaintiffs and the other members of the Class received lower interest rates on Municipal Derivatives than they would have received in a competitive marketplace, unfettered by Defendants and their co-conspirators' collusive and unlawful activities; and Competition in the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States.

94.    As a direct and proximate result of the unlawful contract, combination or conspiracy,

    Plaintiff and the members of the Class have been injured and financially damaged in their business and property in amounts to be determined.

28

95.    Plaintiff and members of the class seek injunctive relief, and treble damages and such other relief that the court deems necessary by reason of the violations alleged herein.

## COUNT II
### (Restitution/Disgorgement/Unjust Enrichment)

96.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint

97.    Defendants benefited from their unlawful acts through the receipt of overpayments by Plaintiff and other Class members. It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiff and members of the Class and retained by Defendants.

98.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of the benefits to Defendants of, or as the result of such overpayments from which Plaintiff and other Class members may make claims on a pro-rata basis for restitution.

## PRAYER FOR RELIEF
**WHEREFORE,** Plaintiff prays as follows:

A    That the Court determine that this action may be maintained as a class action under Ruic 23 of the Federal Rules of Civl Procedure..

B    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a per se violation of Section I of the Sherman Act, 15 U.S.C. § 1;

C.    That judgment be entered for Plaintiff and members of the Class against Defendants for treble damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys, fees and expenses;

D.    That Plaintiff and the Class be awarded pre judgment and post judg}neat interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

357062.1 1

E.    That  Plaintiff and members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

32

| Report | **Litera Change-Pro ML WIX 6.0.0.130 Document Comparison done on 5/23/2008 12:03:58 PM** |
|---|---|
| Style Name: | May 23 |
| Original Filename | C:\Documents and Settings\rrodems\Desktop\Comparison Docs\Modified Docs\BOA Complaint - DDC Modified.doc |
| Original DMS: | |
| Modified Filename | C:\Documents and Settings\rrodems\Desktop\Comparison Docs\Modified Docs\Tennessee GIC Complaint Modified.doc |
| Modified DMS: | |
| Add: | 584 |
| Delete: | 719 |
| ~~Move From:~~ | 73 |
| Move To: | 73 |
| Table Insert | 0 |
| ~~Table Delete~~ | 1 |
| Total Changes: | 1450 |

1